UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CREATIVE COPIER SERVICES,        :
    Plaintiff,                  :
                                 :  CIVIL ACTION NO.
v.                               :  3:01cv155 (SRU)
                                 :
XEROX CORPORATION,               :
    Defendant.                  :

RULING ON PLAINTIFF'S MOTION TO REINSTATE
COUNT II OF THE COMPLAINT

In April 1994, Creative Copier Services ("CCS"), along with twenty other independent service organizations ("ISOs"), filed suit in the Northern District of California against Xerox Corporation ("Xerox"). The ISOs alleged that Xerox had violated federal antitrust laws and state tortious interference law by refusing to sell parts, service manuals, and licensed diagnostic software to ISOs that competed with Xerox in the market for service and repair of high-volume photocopiers. Xerox counterclaimed alleging patent and copyright infringement. On October 5, 1994, the Judicial Panel on Multidistrict Litigation ("MDL panel") transferred that action to the District of Kansas for consolidated pretrial proceedings with a similar case brought by two other ISOs. On April 19, 1999, Xerox filed a motion for summary judgment on various claims, including CCS's antitrust claims, before Judge Kathryn H. Vratil of the District of Kansas. On February 16, 2000, Judge Vratil issued a ruling granting summary judgment on CCS's antitrust claims. In re Independent Service Organizations Antitrust Litigation, 114 F. Supp. 2d 1070,

1115 (D. Kan. 2000).

Because CCS is based in Connecticut and Xerox is headquartered in Connecticut, the parties stipulated that the case should be transferred to this District for further proceedings. The MDL panel remanded the case to the Northern District of California, which then transferred the case to the District of Connecticut.

Soon thereafter, CCS requested and was granted leave to file a motion to reinstate Count II of the complaint[1] (a Section Two Sherman Act claim alleging monopolization of the service market) on which Judge Vratil had granted summary judgment in the February 16, 2000 ruling. CCS contends that Judge Vratil erred by entering summary judgment for Xerox, and that the ruling will likely be reversed on appeal. Such an outcome, CCS argues, would result in a waste of judicial resources, and thus, reconsideration of the issue is warranted. Xerox challenges the motion on the grounds that the motion is procedurally barred and foreclosed by case law.

Although I agree with much of Judge Vratil's analysis in her ruling on the motion for summary judgment, for the reasons that follow, I conclude that summary judgment should not have entered as a result of the deficiencies in the plaintiff's case. Accordingly, CCS's motion to reinstate its claim of monopolization of the service market is granted.

---

[1] Although the motion purports to seek reinstatement of Count II of the complaint, it appears that CCS intended to move to reinstate Count I of the complaint. Count I of the First Amended Complaint, filed in the District of Kansas, raises a claim of monopolization of the service market. Count II raises a claim of monopolization of the parts market. The numbering of counts has been maintained in the Second and Supplemental Complaint filed in this Court. (doc. # 37.) Because both parties have briefed the question whether to reinstate the service market monopolization claim, I will treat the motion as one to reinstate Count I of the complaint.

I.  **Background**

The pertinent facts and the positions of the parties have been set out in detail in Judge Vratil's decision and will not be repeated here.  CCS seeks to have reinstated its claim that Xerox monopolized or attempted to monopolize the market for service of high-volume photocopiers.

CCS's service market monopolization claim alleged that Xerox violated Section Two of the Sherman Act by leveraging its power in the replacement parts market to the service market by, among other things, restricting the parts available to competing ISOs.  Judge Vratil correctly held that Xerox did not commit an antitrust violation by unilaterally refusing to sell *patented* parts to CCS.  Id. at 1090.  Thus, the only viable basis for CCS's service market monopolization claim would be Xerox's restrictions on the sale of *unpatented* parts.

In its motion for summary judgment, Xerox argued that it was entitled to summary judgment on CCS's service market monopolization claim because CCS failed to disaggregate the damages attributable to a lawful refusal to sell patented parts from damages caused by restrictions on the sale of unpatented parts.

In reviewing the motion for summary judgment, Judge Vratil first explained that CCS had the burden of showing that its injury was due to unlawful anticompetitive conduct and that this burden included a duty to disaggregate damages caused by lawful conduct – specifically, the refusal to sell patented parts.  Id. at 1090-91.  She then examined the evidence and concluded that CCS had not raised a genuine issue whether its injury was caused by Xerox's alleged antitrust violation.  Id. at 1091.  Judge Vratil based this conclusion in large part on her determination that CCS had not disaggregated its damages, i.e., it had offered insufficient evidence to show what portion of damages was attributable to Xerox's lawful refusal to sell patented parts.  Id. at 1092.

Conceding that it had not disaggregated damages, CCS argued that "the remedy [was] not to grant summary judgment for Xerox but to give CCS experts a chance to revise their damage calculations." Id. at 1094. Judge Vratil declined to follow this course and, instead, granted summary judgment, observing that "CCS ha[d] been on notice that the case involved a critical distinction between damages attributable to the refusal to sell patented, as opposed to unpatented parts." Id. at 1095.

Thereafter, CCS supplemented the record and moved for reconsideration of the grant of summary judgment in favor of Xerox. Judge Vratil denied that motion. CCS then moved for certification of an interlocutory appeal, which also was denied.

II.   **Discussion**

   A.   Procedural Arguments

Xerox argues that the motion to reinstate is procedurally barred because it was made long after the 10-day period for filing motions for reconsideration under Local Rule 7(c)(1) (formerly Local Rule 9(e)(1)) of the District of Connecticut. I disagree.

First, the motion to reinstate is not a motion for reconsideration, although it may have the same effect. CCS is not asking me to reconsider any ruling I have made in this case. Rather, CCS is asking me, as the judge who must try this case (and re-try it if the grant of summary judgment is left standing and later found to have been error), to decide if I agree that the service market monopolization claim should not be presented to the jury. Because that decision was made by another judge, prior to this case being transferred to this District, it hardly makes sense to expect CCS to comply with the 10-day time limit set forth in this District's Local Rules.

Second, CCS made the motion to reinstate only after requesting and being granted leave

4

to do so. Even if the motion is construed as a motion to reconsider and one governed by this District's Local Rules, a district court retains the "inherent power to decide when a departure from its Local Rules should be excused or overlooked." Somlyo v. J. Lu-Rob Enter., 932 F.2d 1043, 1048 (2d Cir. 1991). This case presents circumstances warranting a departure from the 10-day deadline of Local Rule 7(c)(1).

Finally, to the extent that the motion would be deemed untimely under the Local Rules or under Rules 54(b) or 59(e) of the Federal Rules of Civil Procedure, it can be treated as a motion for relief from judgment under Rule 60(b)(6) of the Federal Rules of Civil Procedure. Such motions may be made "within a reasonable time" after the judgment or order was entered. See 11 Charles Alan Wright et al., Federal Practice and Procedure § 2817, at 184 & n.16 (2d ed. 1995 & Supp. 2003). CCS sought leave to file the motion to reinstate promptly after transfer to this District. Thus, under all the circumstances, the motion was made within a reasonable time after the judgment or order was entered.

    B. Disaggregation of Damages

        1. *Legal Standard*

In ruling on Xerox's motion for summary judgment, Judge Vratil correctly held that Xerox's refusal to sell patented parts did not violate the antitrust laws. In re Indep. Serv. Orgs. Antitrust Litig., 114 F. Supp. 2d at 1090. She then correctly explained that CCS had the initial burden of showing that its injury was due to unlawful anti-competitive behavior (i.e., restrictions on the sale of unpatented parts). Id. at 1090; see also United States Football League v. National Football League, 842 F.2d 1335, 1377 (2d Cir. 1988) ("[a]n antitrust plaintiff must prove that its injury was, in fact, caused by the defendant's violation of the antitrust laws"). Where I part ways

with Judge Vratil is in her conclusion that this burden requires CCS, at the summary judgment stage, to disaggregate damages due to Xerox's lawful conduct. I read the law only to require that CCS prove Xerox's unlawful activity was a material cause of CCS's injury, a burden it has sustained for the purpose of summary judgment. In short, provided that CCS has offered evidence from which reasonable jurors could find causation, CCS will survive summary judgment even if it has not disaggregated damages.

Ordinarily, to satisfy the element of causation an antitrust plaintiff need only prove (1) a violation of the antitrust law, (2) that has a tendency to injure the plaintiff's business, and (3) a subsequent decline in that business not attributable to other causes. See Amerinet v. Xerox, 972 F.2d 1483, 1495 (8th Cir. 1992). Once the defendant offers evidence of other forces causing plaintiff's harm (in this case, refusal to sell patented parts), the plaintiff then must show that the antitrust violation was a material cause of its injury. The plaintiff need not establish that the violations were the sole cause of the injury, "[i]t is enough that the illegality is shown to be a material cause." Zenith Radio Corp. v. Hazeltine Research Inc., 395 U.S. 100, 114 n.9 (1969).

The plaintiff is of course free to demonstrate this by "disaggregating" damages (i.e., by showing that the lawful actions did not constitute the only material cause of damage), but I see no indication that this is a requirement. In certain cases, it is true, the nature of the evidence is such that there is no practical alternative to disaggregation, and so, the plaintiff who fails to disaggregate will have failed to demonstrate causation. See, e.g., National Ass'n of Review Appraisers and Mortgage Underwriters, Inc. v. Appraisal Found., 64 F.3d 1130, 1136 (8th Cir. 1995) ("We do not require a negation of all possible explanations for the decreased membership, but in the face of this record the allegations of conspiratorial harm are too speculative to raise a

triable issue of fact."). Put another way, the failure to disaggregate damages, *along with* a failure to offer affirmative evidence of harm resulting from unlawful activity, requires granting judgment for the defendant. See Amerinet, 972 F.2d at 1496 ("Amerinet has not distinguished its alleged antitrust injury from other evidenced injury it sustained in 1986-87, *or* shown the causal connection between the defendant's alleged anticompetitive violation and Amerinet's injury") (emphasis added). However, a plaintiff that does not disaggregate damages, but does raise a genuine issue with respect to whether the defendant's unlawful conduct was a material cause of the plaintiff's damages, is entitled to try his case to a jury.

Disaggregation at the *damages* stage of trial is an entirely different matter. There a plaintiff will ordinarily need to dissaggregate damages that are the result of unlawful activity in order to make any sort of recovery.[2] This, however, has nothing to do with whether the plaintiff has provided evidence from which reasonable jurors could find that he satisfied his burden of proof of the elements of an antitrust violation – all that is required to survive summary judgment.[3] Disaggregation at the damages stage goes to the *amount*, not the *existence,* of

---

[2] Even this is not always necessary. If a plaintiff shows that disaggregation is impracticable or impossible, the burden shifts to the defendant to demonstrate the contrary. Spray-Rite Serv. Corp. v. Monsanto Co., 684 F.2d 1226, 1243 (7th Cir. 1982). There is some evidence that this may be the case here. (See Declaration of Jonathan A. Cunitz ¶¶ 6, 9 (April 3, 200) (Plaintiff's Appendix, Ex. C) ("not aware of any acceptable methodology" by which to disaggregate; "it is neither logical nor possible to disaggregate"); Deposition of Jeffrey K. Mackie-Mason at 196-97 (April 6, 1999) (Plaintiff's Appendix, Ex. J) ("very difficult" but "not impossible").) In any event, it is not necessary – or appropriate – to resolve this question on a motion for summary judgment.

[3] In fairness to Judge Vratil and Xerox, I should note that some courts have entered summary judgment for an antitrust defendant as the result of a failure to disaggregate damages, Vernon v. Southern California Edison Co., 955 F.2d 1361, 1372-73 (9th Cir. 1992) (affirming grant of summary judgment), although most courts entering judgment on this ground have done so only after plaintiff has presented its evidence at trial. E.g., In re IBM Peripheral EDP Devices

damages. See Zenith Radio, 395 U.S. at 114 n.9 ("inquiry beyond this minimum point [of causation] goes only to the amount and not the fact of damage"); MCI Communication Corp. v. A.T.&T., 708 F.3d 1081, 1161 (7th Cir. 1982) ("The courts have always distinguished between proof of *causation* of damages and proof of the *amount* of damages.") (emphasis in original). Moreover, even a plaintiff who fails to disaggregate damages at trial is not precluded from judgment, because nominal damages are available in an antitrust case. See United States Football League, 842 F.2d at 1377 ("We also reject the ... claim that the award of nominal damages in antitrust cases is somehow 'suspect.' Other courts routinely approve the award of such damages, and the [defendant] cites no authority holding that nominal damages are impermissible in an antitrust case.").

Consequently, at the summary judgment stage of this case, the only question is whether CCS has raised a genuine question whether Xerox's unlawful conduct was a material cause of CCS's harm.

2. *Analysis*

Though I disagree with Judge Vratil's conclusion that CCS is required to disaggregate damages in order to survive summary judgment, there is still a very serious question – as she made clear – whether CCS has demonstrated the existence of *any* harm attributable to Xerox's allegedly unlawful conduct. Ultimately, however, I conclude that CCS has made enough of a

---

Antitrust Litigation, 481 F. Supp. 965, 1013 (N.D. Cal. 1979), aff'd, 698 F.2d 1377 (9th Cir. 1983); ILC Peripherals Leasing Corp. v. IBM Corp., 458 F. Supp. 423, 434-36 (N.D. Cal. 1978), aff'd, 636 F.2d 1188 (9th Cir. 1980). To the extent that these courts concluded that disaggregation was an *element* of an antitrust cause of action, I respectfully disagree for the reasons stated in this opinion. Obviously, to the extent these courts merely held that, in those particular cases, disaggregation was the only practical method of proving causation, there is no inconsistency with my holding.

showing to raise a genuine issue regarding this material fact.

In the District of Kansas, CCS argued that, because unpatented parts represented 99-percent of the parts in ten-series copiers, unpatented parts necessarily were a substantial cause of CCS's injury. This assumption, Judge Vratil observed, was undermined by the fact that CCS's witnesses had acknowledged that patented parts were "critical" to the servicing of Xerox copiers and that such parts were "among the three or four most frequently replaced parts." Indeed, Dr. Mackie-Mason, CCS's causation expert, conceded that, even in the face of other factors, Xerox's restrictions on patented parts limited CCS's ability to compete and grow. In re Indep. Serv. Orgs. Antitrust Litig., 114 F. Supp. 2d at 1092 (citing Mackie-Mason, Dep. Tr. at 201).

CCS also argued that William Dixon's declaration, that CCS could have remained in business in the absence of only patented parts, provided sufficient evidence to create a triable issue of fact. Judge Vratil considered Dixon's testimony that CCS could have accommodated restrictions on patented parts by "cajoling 'most' of its customers to stockpile spare parts and/or use third party suppliers" to be speculative, and determined that Dixon did not have personal knowledge or the technical competency to distinguish the impact of Xerox's restrictions on patented and unpatented parts. Id. CCS now contends that Dixon, as CCS's owner, had personal knowledge and was competent to testify whether CCS could have worked around Xerox's restrictions on patented parts, and that Dixon's testimony raised a genuine issue of material fact that should have been submitted to a jury.

I agree with Judge Vratil that much of Dixon's declaration is speculative and conclusory. Although Dixon was CCS's owner and had personal knowledge of CCS's operations, Dixon can do no more than speculate whether CCS's customers could have been convinced to stockpile

patented parts in order to circumvent Xerox's end-user verification policy, or whether third-party suppliers could have developed substitutes for the patented parts. Moreover, CCS presented no evidence to suggest that its customers had agreed to take such steps to assist CCS in securing patented parts.[4] Indeed, Dixon acknowledged in a March 1996 deposition that "[i]t would have got to be kind of inconvenient ... to be asking our customer during the day to be ordering parts for us." (See Dixon Dep. Tr. at 245 (March 4, 1996).)

Nevertheless, other aspects of Dixon's testimony are more valuable. Dixon swore that "non-patented parts break without warning, and the consequences [of Xerox's parts verification requirements] were that the machines were down until the parts could be replaced." (Dixon Decl. ¶ 11; see also id. ¶ 14.) On the other hand, most of the patented parts, he declared, had a "fairly predictable wear life," making it easier to anticipate and prepare for problems. (Dixon Decl. ¶ 62.) In addition, he stated that two of the patented parts – heat rollers and dicorotrons – could be repaired, and so CCS did not need to rely on Xerox for them. Id. Unlike the speculation discussed above, this is exactly the sort of information about which Dixon had personal knowledge and is competent to testify.

Moreover, an analysis of CCS purchase orders, (see Plaintiff's Appendix, Ex. E), shows that many parts orders did not include patented parts. Reasonable jurors could conclude from this that Xerox's restrictions on unpatented parts delayed repair of copiers by CCS, thereby harming CCS's goodwill with its customers and causing damage to CCS.

Thus, though I agree with Judge Vratil that CCS does not have a strong case, on the basis

---

[4] Cigna had done so for a period of time but eventually declined to continue doing so. (See Declaration of William Dixon ¶ 45 (March 8, 2000) (Plaintiff's Appendix, Ex. G).)

of the current record reasonable jurors could nevertheless find that an antitrust injury – even if not of the magnitude alleged by CCS's damages expert – was caused by Xerox's restrictions on unpatented parts.  Consequently, I conclude that, although CCS has not yet disaggregated its damages (and may be unable to do so at trial), CCS is nevertheless entitled to present its service market monopolization claim to a jury.

III.    **Conclusion**

For the foregoing reasons, CCS's Motion to Reinstate the service market monopolization claim (doc. # 48) is GRANTED.

It is so ordered.

Dated at Bridgeport, Connecticut this 30th day of March 2004.


      /s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge