UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 APR 29  A 9: 54

U.S. DISTRICT COURT
BRIDGEPORT, CONN

CREATIVE COPIER SERVICES        :        CIVIL ACTION NO.
                                :        3:01 CV 155 (SRU)
        v.                      :
                                :
XEROX CORP.                     :

## THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

### PARTIES

1.    CCS is an Independent Service Organization ("ISO") providing service of high speed copiers manufactured by Xerox.  CCS is the trade name of a sole proprietorship owned by William Dixon and has its principal place of business in Middletown, Connecticut.  CCS has also done business in Connecticut, in South Carolina and in Philadelphia, Pennsylvania.

2.    Xerox is a New York corporation with its principal executive offices in Stamford, Connecticut.  It engages in the business of selling and leasing new and remanufactured high volume copiers, and selling maintenance service and replacement parts for such equipment.

3.    CCS competes with Xerox for the servicing of high volume copiers, and for the sale of reconditioned Xerox machines.

### JURISDICTION AND VENUE

4.    This action is brought under the Federal Antitrust Laws, 15 U.S.C. § 15 and 26, and seeks damages and injunctive relief for violations of Section 2

1

of the Sherman Act, 15 U.S.C. § 2. This Court has jurisdiction pursuant to 15

U.S.C. §§ 15 and 28 U.S.C. §§ 1331 and 1337(a), and under 15 U.S.C. §1125(a)

for violation of the Lanham Act. This Court has jurisdiction over the state law

claims pursuant to its supplemental jurisdiction.

5.      Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28

U.S.C. § 1391. Xerox maintains its corporate headquarters, regularly transacts

business, has agents, and is found within this District.

## STATEMENT OF FACTS

6.      In 1973, the United States Federal Trade Commission ("FTC")

alleged that Xerox had engaged in anti-competitive licensing, patent, and

marketing practices in office copier markets. Xerox sought to exclude

competition for the servicing of Xerox office copiers; falsely disparaged its

competitors; and tied the sale of copier supplies to the lease of office copiers.

In July 1975, without admitting liability, Xerox signed a consent decree settling

this litigation. *In the Matter of Xerox Corp.*, 86 F.T.C. 364 (1975).

7.      In the decade after the FTC consent decree, Xerox freely sold parts

to ISO's. Xerox profited from the sale of its used copiers and parts to ISO's.

These arrangements also allowed Xerox to concentrate on sales of newer

copiers.

8.      Mr. Dixon, the proprietor of CCS, received electronics training in

the Air Force, and then studied at the Connecticut School of Electronics. From

1969 to 1974, he worked for Xerox as a service technician, servicing Xerox machines in the Southern Connecticut area.  He then worked for Dyna Lease, servicing Xerox photocopiers.  His responsibilities included ordering parts from Xerox.

9.  He founded Creative Copier Service in 1981.  Yale University was his first client, where he serviced five or six Xerox copiers.

10.  Before founding CCS, he wrote to Xerox, stating he was planning to start an independent service company to service Xerox machines, and requesting confirmation that Xerox would sell him parts on an on-going basis.  Xerox responded that it would.  Xerox assigned to CCS a customer number for ordering parts, and he obtained the Xerox parts catalogue from which to order.

11.   Based on that assurance, CCS began to contact large customers, including Aetna, Cigna, Travelers and the State of Connecticut.

12.   These companies had photocopying needs for high volume copiers. CCS was able to obtain this business because customers being serviced by Xerox were dissatisfied with Xerox' response time, i.e. the time it took the technician to respond to fix a broken machine.  CCS guaranteed a four (4) hour response time to customers like Aetna and Cigna.  For some customers, CCS even agreed to have a technician on-site full time.  Xerox' response time was considerably slower than this.

13.   CCS' guarantee of quick response time, along with reliable service,

3

were keys to its obtaining and retaining business. Customers also had high "uptime" requirements. "Uptime" means a guaranteed time the machine will be performing correctly. CCS customers insisted on an "uptime" of 90% or more, and frequently in the 95% range.

14.    Xerox was well aware of the response time and "uptime" requirements, because Xerox competed to service these same machines at the same clients.

15.    CCS sent its technicians to be trained in Xerox schools. CCS paid Xerox $1,700 to train its technician on the 1055 machine. Xerox provided manuals as part of the training package. CCS then entered into a contract with Fairfield University to service their 1055 machines.

16.    Several of CCS' existing customers had 1075 machines, and sought to have CCS to service those. Xerox told CCS that CCS was now required to own a 1075 machine to attend school and be trained. This was a large investment for a sole proprietorship.

17.    CCS spoke to Xerox, and obtained assurance that if CCS purchased a new machine, Xerox would continue to supply CCS with parts to service CCS' customers. Xerox arranged for a $13,000 parts credit, and CCS enrolled its technician in the 1075 school. CCS ordered the machine in November, 1985, at a cost of about $60,000, and took delivery in January, 1986.

4

18.    In September, 1986, CCS was awarded the contract with the State of Connecticut. This included between 10 to 20 machines of the 10 series, including 1040's, 1050's, 1090's, and 1075's. This contract was announced on September 20, 1986. The next month, Xerox cancelled its class for CCS technician Jim Blake on the 1075/1090 machines. He was in the middle of the program, and CCS had already paid his tuition, when Xerox cancelled. Xerox subsequently backed down and completed the training, and provided service manuals. However, this incident demonstrated that Xerox was coming to regard CCS as a serious competitor.

19.    In the late 1980's, Xerox decided to put the ISO's including CCS out of business.

20.    In August, 1988, a Xerox employee noted in a memorandum that "service accounts for more than half of Xerox' revenue", and stated that "third party service of Xerox equipment is emerging as a multimillion dollar business. The result is a reduction in Xerox service revenue...P. Allaire [President of Xerox has] expressed concern about third party service and [has] requested that a strategy be developed to stop the revenue loss."

21.    In October, 1988, Xerox developed its action plan against ISO's nationwide. The plan targeted six major ISO's in five districts nationwide, including CCS in the Hartford district.

22.    During the six years 1989 through 1994, Xerox implemented its

5

scheme to put CCS and other ISO's out of business by refusing to sell the ISO's parts needed to repair their customers' machines.   By doing this, Xerox' sought intentionally to frustrate the existing and prospective service contracts between ISO's and their service customers. Xerox sought to eliminate the competition ISO's provided to Xerox through their lower pricing of service to customers and higher reliability of service. Xerox sought to increase its share of the service market to 100%. By 1993, it had increased its market share to 98%. In 1994, Xerox confirmed that the goal of its ISO strategy was to capture 100 percent of the market for service of Xerox high speed copiers.

23. In implementing the above strategies, one Xerox executive said that he wanted "to shut the bastards down." Another Xerox representative stated that "the entire district is in agreement that the only way really to stop the problem is to simply cut off the parts availability" to the ISO's.  An internal Xerox memorandum used the acronym "PTFOOB", meaning "Put Those 'Fellas' Out of Business." Another spoke of "delivering a knock-out punch" to ISO competition.

24.    Xerox rated ISO's with the colors of stop lights: red, yellow, and green. Red meant those ISO's that "have a significant share of the service business, and they are growing or maintaining this share." Mr. Dixon was one of ten ISO's in the United States that Xerox placed in "red" status in January, 1989. Xerox kept him in that status for two years, and then in January, 1991,

6

after denying him parts needed to service customers' accounts, stated:

"Creative's level of service has deteriorated."

25.    Xerox anti-ISO policy was to stop selling parts to ISO's who needed the parts for service contracts with customers, and to sell parts only to "end users." Before selling a particular part to an "end user" customer, Xerox' policy called for it to "verify" that the customer really needed that part for a particular machine.

26.    CCS, in an effort to stay in business despite Xerox efforts to put it out of business, purchased additional Xerox machines to comply with Xerox' "end user" parts restriction policy. In December, 1990, for example, Mr. Dixon had contracts to service and repair about one hundred fifty (150) 10-series machines at numerous customers' locations. He was forced to purchase Xerox machines and open a copy shop to qualify those machines as "end user" machines with Xerox. He then had to juggle ordering parts for those machines to attempt to honor his service contracts for parts needed on his customer's machines.

27.    Xerox recorded the serial numbers of those machines, and often visited his premises when he placed a part order, to see if the part was actually needed for one of those machines. If Xerox decided his particular machine did not "need" the part (because he had ordered the same part too frequently in the past), Xerox would refuse to sell it. Xerox arbitrarily deleted parts that CCS

7

ordered, and arbitrarily reduced quantities of parts.

28.    CCS ordered parts on an emergency, overnight basis, because of its customers "uptime" requirements.  (Xerox surcharged $35 for these orders). Each time CCS ordered a needed part from Xerox' parts headquarters in Rochester, NY, the Xerox parts office contacted the Xerox district office in Connecticut.  The district office had the right to inspect Mr. Dixon's machine to "verify" that the part was actually needed for CCS' own "end user" machines. Even when the full order was finally released,  this "on-site verification" process typically took 2-3 days before Xerox would release the order.  When CCS placed an order for multiple parts needed on an emergency basis, the whole order was often delayed while Xerox challenged the "verification" of just one of the parts. Mr. Dixon could not meet his customer's "up time" requirements of 95%, or their response time requirements.  Customer complaints escalated.  He lost service contracts.  They went to Xerox.

29.    Xerox' district manager in Connecticut who was in charge of this "end user verification" procedure could offer no business justification for it. Its purpose and effect was to drive CCS out of business.

30.    Xerox' actions crippled CCS' ability to service machines in a timely manner.  Because of Xerox' scheme, CCS experienced loss of service business under service contracts it had with Aetna, Cheshire Board of Education, Choate Rosemary Hall, Cigna, Colt Industries, Deloite Touche, Fairfield

University, G. Fox & Company, Innovative Business Systems, Kamen
Aerospace, N.E.O.N., State of Connecticut, Veeder-Root, Wallingford,
Wethersfield Board of Education, Windsor Board of Education.

31.    In an internal memo dated February 7, 1991, Xerox expressed
satisfaction that it had caused a competitive injury to CCS.  In noting the
success of Xerox' increased monopolization of the service market, the memo
stated the following as to ISO's nationwide: "Four others, . . . [including]
Creative Copier Services in Hartford, . . . have lost business to Xerox and are
no longer considered to be threats by the districts."

32.    Xerox' anti-competitive actions also forced CCS not to bid on
contracts, because it could not commit to have parts needed to service the
machines.  In 1989, the State of Connecticut let a bid to service 10 series
copiers the State owned or leased.  The bid specifications required bidders to
demonstrate proof of ability to obtain Xerox parts.  Xerox and CCS were the
only two bidders.  CCS was forced to withdraw its bid because of Xerox'
policies, and the bid went to Xerox.  Xerox' conduct also caused CCS to
suspend and/or curtail its existing expansion plans in Connecticut,
Philadelphia and South Carolina.

33.    At Aetna, Xerox disparaged CCS by stating to Aetna that CCS'
technicians were untrained.

34.    Xerox ended its "third party end user parts verification policy" in

1994, when it settled an antitrust class action lawsuit. But Xerox has continued since then a pattern of anti-competitive actions which have injured CCS.

35.    Xerox has priced its parts in a discriminatory manner, whereby CCS can only obtain the parts by paying approximately 10 times the amount that Xerox charges to its wholly-owned service company for the same part. To illustrate, a clutch assembly which can only be obtained from Xerox costs CCS nearly $1,000. Xerox sells the same part to its wholly-owned service company for $70. This places CCS at a cost disadvantage in competing against Xerox for service business. When Xerox enters into a "Full Service Maintenance Agreement" (FSMA) with a customer, Xerox agrees to supply the labor, the parts, and the supplies for the copier at a set price per copy. The Xerox branch which performs this service contract is able to obtain the parts to honor its Full Service Maintenance Agreement at prices which are approximately one tenth of CCS' costs for the same parts. The effect is to eliminate service competition.

36.    Xerox also misused its leasing practices to injure CCS in the service market. Xerox leases (as well as sells) Xerox machines to customers. The lease typically contains a purchase option price, or "residual buy out" price, at which the customer can purchase the equipment at the end of the lease period, and own it. The buy out price is supposed to represent the fair

market price of the used equipment, or a residual value.

37.    At Aetna Insurance Company, in Hartford, Connecticut, Aetna had Xerox model 1090 photocopier machines on term lease from Xerox. CCS had service contracts with Aetna for some of these machines, and Xerox had service contracts with Aetna for the remainder.  The Xerox leases for those machines contained buy out prices, as set by Xerox, that were between approximately $5,300 and $6,200 for each machine.  These were prices set by Xerox at which Aetna could buy out and own the machines at the end of the lease period.

38.    CCS desired to obtain the service contracts for all of the machines, and to reduce Aetna's costs in the process.  CCS proposed to Aetna that CCS buy out the machines at the end of the lease, at Xerox' stated prices of $5,300 to $6,200 per machine. CCS had lined up a finance company to finance the project. CCS presented a proposal to Aetna whereby CCS would service these machines for Aetna after CCS purchased them, at a cost less than Xerox' current service contracts cost.

39.    In response, Xerox told Aetna that CCS would not be permitted to buy out the leases, and that only Aetna could do so.

40.    When Aetna indicated its interest in buying the machines at the residual rates, so that CCS could service them, Xerox, in October, 1997, changed the buy-out rate on these machines, increasing the residual or buy out price to $15,000 per machine.  Xerox did this in order to prevent CCS from

11

servicing the machines.

41.    Xerox has to pay Hartford ad valorem taxes on Xerox' property. Upon information and belief, Xerox took the position with the City of Hartford that the same machines are valued at substantially less than $15,000.

42.    CCS has desired to sell to the State of Connecticut Xerox machines which CCS has refurbished.  CCS has the ability to refurbish high speed Xerox machines, especially model 1090's, and to guarantee its work.  CCS would then contract to service these machines.

43.    Prior to June, 1999, the State accepted bids for machines that were new or refurbished.  However, in June, 1999, the State changed its contract to provide that it would purchase only new machines, not refurbished ones.  This provision prevented CCS from bidding for the work, because CCS could not buy and resell new Xerox machines at a price that was competitive with Xerox' price for selling new machines.

44.    Xerox bid for and was awarded this contract, worth about $4 million.  However, Xerox did not sell the State new machines.  Xerox supplied the State with model 5892 and other machines, many of which were simply older-model Xerox machines with new nameplates.  Many had parts that were 5-7 years old.  For example, the model 5892, one of the models Xerox used in this contract,  is simply the model 1090 machine with a new finisher, stapler and collator.  The "guts" of the machine is a refurbished model 1090, which

Xerox stopped manufacturing a number of years ago.

45.    In filling this bid, Xerox misrepresented to the State that it was selling new machines.

46.    As a result of this tactic, Xerox prevented CCS from bidding on the State's business for refurbished machines for a two year period.

47.    In late 1996, CCS offered to sell to Aetna a used Xerox which CCS had reconditioned.  In contrast, Xerox claimed it would sell Aetna a "newly manufactured" 5388.  CCS lost the sale when Aetna decided to buy Xerox' machine because it was supposedly "new."  CCS has not been able to compete with selling reconditioned machines versus the supposedly "new" model 5388 sold by Xerox.

48.    The 5388's are supposedly recent machines that Xerox introduced in the 1990's.

49.    However, when CCS examined a model 5388, CCS discovered that it had parts from 1987 and 1988,  and that it was just a model 1090  that Xerox had repainted.  Xerox stopped making the 1090 sometime in the 1980's.  A matrix on a machine is an emblem that defines the machine's engineering changes.  The matrix on Xerox' machine even had the 1090 nameplate.  This supposedly "newly manufactured" piece of equipment was actually rebuilt from a 1090 and/or old 1090 parts.

50.    Xerox has engaged in below-cost pricing at a selected customer,

13

Aetna, in an effort to harm CCS.

51.    Xerox' anticompetitive pricing is illustrated in the following chart. The first column is Xerox' GSA price on a service contract. It is supposedly Xerox' lowest price, which it charges the Federal Government, and the State of Connecticut. It includes labor, parts and supplies, but does not include leasing of the machine by the customer. In the second column is the cost of obtaining a typical Xerox high speed copier, prorated over 36 months (a standard three year lease period). The third column shows Xerox' cost per copy program to Aetna. It includes all of the following: Xerox provides the new machine, plus the parts, labor, and supplies, and pays the taxes on the machine as well.

52.    Xerox' price to Aetna should be approximately the sum of columns 1 (parts and labor) and 2 (the machine). However, Xerox' price to Aetna (column 3) is very substantially less:

| MODEL | STATE CONN. CCP PLAN[2] | COST OF MACHINE | AETNA CCP PLAN[1] |
|-------|--------------------------|-----------------|--------------------|
| 5680  | $.0159 for 75,000 copies, $1,192.50/mo | $44,095, or $1,225/mo over 36 months | .012 for 75,000, or $900/mo at this rate |

_____

[1] Aetna's CCP, or cost per copy plan, from Xerox, includes labor, parts, supplies, plus the machine and taxes on the machine.

[2]  The State of Connecticut's cost per copy plan from Xerox provides parts, labor, and supplies, but no machine.

14

| 5390 | $.0129 for 400,000 copies, $5,160/mo | $157,000, or $4,361/mo over 36 months | .012 for 400,000, or $4,800/mo at this rate |
|---|---|---|---|

53. Xerox did not charge any software license fees to customers on its model 1090 machine, which it put into service in 1985. Servicing this machine has been a large portion of CCS' service business. All software used to diagnose or troubleshoot malfunctions on the 1090 is built into the machine as the customer purchases it. The repair person simply uses this diagnostic machinery by pushing buttons on the machine's control panel, in much the same manner as a customer pushes buttons to select how many copies should be made.

54. Xerox recently introduced license fees of about $800-$900 per year on its models 5388 and 5680 Xerox high speed copier machines.

55. The 5388 and the 5680 are basically the same machine as the 1090. A machine which Xerox sold as a "new" 5388, was a repainted 1090, and even had the 1090 nameplate and matrix, meaning it was rebuilt from a 1090 and/or old 1090 parts. The models 5388 and 5680 appear to have exactly the same circuitry as the 1090. Diagnostic software on these models is essentially the same as the 1090.

56. Xerox' actions have been undertaken for anti-competitive purposes. Xerox does not itself pay such licensing fees on machines it

15

services, nor does it require customers who contract for service with Xerox to pay such fees. However, customers who contract with non-Xerox service providers are burdened with such spurious fees.

57.    In 1994, when Xerox agreed to sell parts to ISO's, as part of its settlement of the R & D litigation, Xerox agreed that it would not raise the prices of parts, during any 12 month period, more than the following, whichever one was less:

> (1) 5%, or
>
> (2) "the smallest increase in the base price of any Full Service Maintenance Agreement being offered by Xerox for the Relevant Equipment, as identified by the SPL Code, in which the part is used".

58.    Xerox has sought to evade this agreement, by assigning new parts numbers and then raising their prices substantially.

59.    For example, on May 7, 1998, CCS ordered from Xerox part number 30S26733. This is a magnetic strip which holds paper on the transport belt for the Xerox model 1090 copier. The price was $26.80. However, Xerox changed the part number to 30K47340, and raised the price to $49.05.

60.    On July 31, 1998, CCS ordered from Xerox part number 20P3396. This is a pulley for the Xerox 1090. Xerox changed the part number to

16

20E29140, and raised the price from $7.15 to $11.15.

61.    On July 6, 1998, CCS ordered from Xerox part number 600K64270, a thermal fuse for the Xerox copier 5052. Xerox assigned it a new number, and raised its price from $49.75 to $142.

62.    In 1998, CCS ordered from Xerox part number 22K630. This is a foam roll for the Xerox 5052. Xerox gave this a new part number, and raised the price from $33.40 to $63.90.

63.    CCS has contracts to service certain Xerox low end copiers with the State of Connecticut.

64.    Xerox has re-designated what have traditionally been "parts" into supposed "supply items", and refused to sell them to CCS.  Xerox has taken what were traditionally "parts", renamed them as new "supply items" which it calls a "copy cartridge" instead of a "part", and has then refused to sell these to CCS unless CCS can prove it is needed for a specific end-user's machine.  In other words, Xerox has re-implemented its same 1989 restrictive parts policy ("On Site End-User Verification Policy") on these parts that it purported to abolish in 1995.

65.    CCS was not able to obtain parts (copy cartridges) needed to service low-end machines under a contract with the State of Connecticut, because Xerox had designated these parts as "supply items", and refused to sell them to CCS on the stated rationale that CCS did not itself own those

models of machines.

## COUNT I

## MONOPOLIZATION OF RELEVANT SERVICE MARKET

66.    The foregoing paragraphs are incorporated by reference.

67.    There are three product markets in the United States relevant to this count:

(A) the high volume equipment market in the United States. "High volume copiers" mean durable photocopying machines with measured throughput greater than 50 copies per minute, rated maximum monthly maximum monthly copy volume in excess of 150,000 copies, and exceeding 1,000 pounds. In the 1980's Xerox introduced the "10 Series" of machines, including the models 1065, 1070, and 1090, which are examples of high volume copiers. Subsequently Xerox introduced functionally related high speed copiers in the 50 series. At times relevant herein, Xerox has had a monopoly market share of this high volume copier market, with Kodak (which had a much less share) its only competitor;

(B) the market for servicing Xerox high volume copiers in the United States. CCS and Xerox are horizontal competitors in this service market. By 1993, Xerox had increased its monopoly market share to 98% of this market, through anti-competitive practices set forth in the statement of facts;

18

(C)  The market for selling replacement parts to use in servicing high volume Xerox copiers.  Xerox has held a monopoly market share of this market.  To illustrate, the 10 series' high volume machines each contain between 2,000 and 2,600 parts.  The parts are unique to the particular machine.  Kodak parts will not work in a Xerox machine.  Other model Xerox parts will not work in a 10 series machine.  Xerox was the only source for purchasing all but about 50 to 100 of the parts needed for the 10 series machines.  Its parts catalogues listed all of the parts needed to repair the 10 series machines. In contrast, a few after market supply houses offered between 50 and 100 of the more popular parts.  Xerox controlled over 90% of the parts market  for repairing high-volume Xerox photocopying machines.

68.    Xerox has misused the monopoly market power it held in the parts market to foreclose competition from ISO's, including CCS, in the service market, in order to extend Xerox' dominance of the service market.  This is a prohibited practice often referred to "monopoly leveraging," i.e. leveraging monopoly power obtained in one market (parts) to illegally increase market power in another market (service).

69.    Xerox has also engaged in a pattern of other illegal and anti-competitive actions to suppress competition and to further its monopoly market share of the service market, as set forth in the statement of facts above.

70.    Xerox' conduct violates Section 2 of the Sherman Act, 15 U.S.C.

19

§2.

71.    CCS has suffered harm and injury as a direct and proximate result
of Xerox' conduct.

## COUNT II

### INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE

72.    The foregoing paragraphs are incorporated by reference.

73.    Xerox knew that CCS was a competitor with Xerox for repairing
customers' Xerox machines.  Xerox also knew that CCS was dependent upon
Xerox to obtain many of the parts needed to repair those machines.  Xerox
affirmatively represented to CCS on numerous occasions that CCS would be
able to obtain parts from Xerox, including when CCS purchased machines from
Xerox and paid to train technicians.  Based on those assurances CCS entered
into contracts with customers.

74.    Xerox subsequently intentionally refused to supply  parts to CCS
in a timely manner and in the quantities ordered, in order to frustrate CCS'
service contracts with its customers, and in order to have those customers
cancel their contracts with CCS and to instead contract with Xerox.  The
averments set forth at ¶¶ 19-32 above constitute tortious interference with
contract and prospective contractual advantage during the time period through

20

1994.

75.    Subsequently, Xerox continued to engage in a pattern of actions designed to frustrate CCS' existing and prospective contracts with its customers, set forth in ¶¶34-65 above.   Xerox' conduct has been intentional, malicious, and without justification.

76.    Xerox' conduct violated Restatement (Second) Torts §§766 and 767.

77.  CCS has been harmed and injured by Xerox' conduct.

**COUNT III**

**DEFAMATION AND TRADE DISPARAGEMENT**

78.    Xerox has defamed CCS and committed trade disparagement, as set forth in ¶33 above.

79.    CCS has been harmed and injured by Xerox' conduct.

**COUNT IV**

**CONNECTICUT GENERAL STATUTE §42-110g(a)**

80.    The foregoing paragraphs are incorporated by reference.

81.    Xerox conduct has constituted an unfair method of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Connecticut General Statute §42-110g(a).

82.    CCS has been harmed and injured by Xerox' conduct.

## COUNT V

### SECTION 43(A) OF THE LANHAM ACT, 15 U.S.C. §1125(A)

83.  Xerox has violated Section 43(a) of the Lanham Act as set forth in ¶¶ 42-49 above.

84.  CCS has been harmed and injured by Xerox' conduct.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

1)  Judgment in its favor and against Xerox on each Count of this Complaint;

2)  Compensatory damages;

3)  Trebling of damages as to Count I;

4)  Punitive damages as to Counts II, III, and IV;

5)  Injunctive relief;

6)  Reasonable attorneys' fees and costs of the suit;

7)  Such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff demands trial by jury on all claims and issues so triable.

Dated: April 29, 2004

_Robert LaRocca_

Robert J. LaRocca   CT 22901
**Kohn, Swift & Graf, P.C.**
1 South Broad St.
Philadelphia, PA 19106
(215) 238-1700
(215) 238-1968 (fax)
Attorney for CCS

Of Counsel:
Elias A. Alexiades CT03543
P.O. Box 3859
New Haven, CT 06525
(203) 641-3744

## CERTIFICATE OF SERVICE

On April 29, 2004, the foregoing third amended and supplemental complaint was served by e-mail and by first class mail upon:

> Jonathan Gleklen
> Arnold & Porter
> 555 12th Street, N.W.
> Washington, DC 20004-1202

Robert LaRocca