**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CREATIVE COPIER SERVICES, ) | |
| ) | |
| Plaintiff, ) | Civil Action |
| ) | No.  3:01-CV-155 (SRU) |
| v. ) | |
| ) | |
| XEROX CORPORATION, ) | |
| ) | |
| Defendant. ) | June 1, 2004 |

## <u>XEROX'S MOTION TO DISMISS CCS'S THIRD AMENDED COMPLAINT</u>

Xerox Corporation, by and through its undersigned counsel, respectfully moves

pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss in its entirety all counts of the Third

Amended Complaint filed by Creative Copier Services ("CCS").  The grounds for

Xerox's motion are set forth in the accompanying Memorandum.


Respectfully submitted,


/s/ Robert Dolian
Robert Dolian, CT04278
CUMMINGS & LOCKWOOD
Four Stamford Plaza
107 Elm Street
Stamford, Connecticut  06902
(203) 351-4307
fax: (203) 708-3948
email: rdolian@cl-law.com

Peter K. Bleakley
Jonathan I. Gleklen
Christopher F. Winters
Jon J. Nathan
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000
fax: (202)-942-5454
email: jonathan_gleklen@aporter.com

Peter W. Marshall
XEROX CORPORATION
800 Long Ridge Road
Stamford, Connecticut  06904
(203) 968-4590
fax: (203) 968-3446
email: peter.marshall@usa.xerox.com
***Counsel for Xerox Corporation***

Dated:  June 1, 2004

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| CREATIVE COPIER SERVICES, ) | |
| ) | |
| Plaintiff, ) | Civil Action |
| ) | |
| v. ) | No. 3:01-CV-155 (SRU) |
| ) | |
| XEROX CORPORATION, ) | |
| ) | |
| Defendant. ) | June 1, 2004 |

**MEMORANDUM IN SUPPORT OF XEROX'S MOTION TO DISMISS
CCS'S THIRD AMENDED COMPLAINT**

Peter K. Bleakley
Jonathan I. Gleklen
Christopher F. Winters
Jon J. Nathan
ARNOLD & PORTER
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000
fax: (202)-942-5999
email: jonathan_gleklen@aporter.com

Robert Dolian, CT04278
CUMMINGS & LOCKWOOD
Four Stamford Plaza
107 Elm Street
Stamford, Connecticut 06902
(203) 351-4307
fax: (203) 708-3948
email: rdolian@cl-law.com

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ..........................................................................................1

I.   CCS FAILS TO STATE A CLAIM UPON WHICH RELIEF
     CAN BE GRANTED UNDER SECTION 2 OF THE
     SHERMAN ACT ....................................................................................................3

     A.   CCS's Antitrust Claims Must Be Dismissed Because
          CCS Has Not Alleged A Proper Relevant Market....................................4

          1.   CCS Lacks A "Theoretically Rational
               Explanation" For Its Proposed Market From
               The Perspective of Demand Substitutability.................................7

          2.   CCS Lacks A "Theoretically Rational
               Explanation" For Its Proposed Market From
               The Perspective Of Supply Substitutability.................................8

     B.   CCS Does Not Allege Actionable Anticompetitive
          Conduct ......................................................................................10

          1.   Xerox's Refusal to Assist CCS Was Not
               Anticompetitive Because It Did Not Require
               Xerox To Sacrifice Short-Term Profits.....................................10

          2.   Xerox's Delays In Shipping Parts Were Not
               Anticompetitive Because CCS Had No Right
               To Free Ride On Xerox's Investment In Parts
               Inventory ..............................................................................12

     C.   Xerox's Alleged Misrepresentation of Used Copiers
          As New Does Not Violate the Antitrust Laws.......................................15

     D.   Xerox's Alleged Below-Cost Pricing To Aetna Does
          Not Violate The Antitrust Laws............................................................15

     E.   It Is Not Unlawful For Xerox To Charge For
          Diagnostic Software............................................................................17

     F.   CCS's Other Allegations Of Wrongdoing Do Not
          Involve "Antitrust Injury"....................................................................18

          1.   Xerox's Alleged "Manipulation" Of The Buy-
               Out Amounts Of Leases Cannot Cause An
               Antitrust Injury .....................................................................19

2. Xerox's Alleged Breach Of The Price Caps Set
In The *R&D* Settlement Cannot Cause An
Antitrust Injury ...................................................................................20

II. CCS FAILS TO ALLEGE SUFFICIENT FACTS TO
SUPPORT A DEFAMATION CLAIM UNDER
CONNECTICUT LAW ....................................................................................21

III. CCS'S TORTIOUS INTERFERENCE CLAIM SHOULD BE
DISMISSED BECAUSE CCS HAS FAILED TO ALLEGE
ANY CONDUCT THAT MAY BE CONSIDERED
TORTIOUS....................................................................................................22

A. CCS Has Not Alleged That Xerox Had An Improper
Motive.....................................................................................................23

B. Xerox's Refusal To Sell Parts In A Timely Manner
Cannot Be An "Improper Means" As A Matter Of Law .......................24

IV. CCS'S CUTPA CLAIM FAILS BECAUSE XEROX'S
ALLEGED CONDUCT DOES NOT VIOLATE THE
ANTITRUST LAWS .......................................................................................25

V. CCS'S LANHAM ACT CLAIM SHOULD BE DISMISSED.........................................26

## INTRODUCTION AND SUMMARY

Despite ten years of litigation between the parties, Creative Copier Service ("CCS") – having already stated, changed, and restated its allegations – has not yet been able to formulate cognizable claims against Xerox Corporation ("Xerox"). Pursuant to the Court's Order of March 30, 2004, CCS filed a reformulated "Third Amended Complaint," dramatically paring down the dozen claims it made in its "Second Amended and Supplemental Complaint." However, despite the long history of litigation between the parties and extensive discovery on nearly every issue, this most recent version of the Complaint contains antitrust, defamation, tortious interference, Connecticut Unfair Trade Pratices Act ("CUTPA"), and Lanham Act counts that fail to state a claim upon which relief can be granted. As discussed below, each of these claims contains unique but fatal defects that requires dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

Antitrust Claims: CCS's antitrust claims are defective on many levels. *First*, CCS's definitions of the relevant service and parts market are patently defective. Simply put, CCS's gerrymandered market allegations have no basis in economics or logic. As courts in this district and the Second Circuit have held, an antitrust claim based on patently defective market definitions should be dismissed. *Second*, CCS fails to allege the cognizable anticompetitive conduct required to support any antitrust claim. Under the Supreme Court's recent *Trinko* decision, CCS's complaints about Xerox's refusal to sell it parts cannot form the basis of an antitrust claim absent an allegation that Xerox's parts policy was economically irrational in the short term and pursued only because of its potential for supracompetitive profits after competitors were foreclosed. CCS does not, and cannot, make such an allegation. Similarly, while CCS complains that Xerox did not provide it with parts on a "timely" basis, such a claim fails as a matter of law because CCS has no right to free ride on Xerox's investment in

maintaining a parts inventory by demanding overnight delivery.  The Sherman Act creates no right to FedEx.  *Third*, CCS's other allegations of anticompetitive conduct simply are not cognizable under the antitrust laws as they are pled.

Defamation:  CCS's defamation claim fails to include necessary allegations concerning which Xerox employee made the alleged defamatory remarks, who heard the remarks, and when the remarks were made.  Under precedent in the Connecticut state courts as well as this Court, the failure to make such allegations necessitates dismissal of CCS's defamation claim.

Tortious Interference:  CCS's tortious interference claim fails because CCS has not pled any Xerox conduct that is tortious.  CCS's allegation that Xerox refused to provide it with parts in a "timely manner" does not constitute a violation of the antitrust laws, and therefore cannot support a claim of tortious interference.

CUTPA:  CCS's claim under CUTPA fails because, as Connecticut courts have recognized, conduct that does not violate the antitrust laws cannot form the basis of CUTPA claims.

Lanham Act:  CCS's Lanham Act claim, premised upon Xerox's allegedly false statements to the State of Connecticut, fails to state a claim upon which relief can be granted.  In the case of one of CCS's alleged lost customers, CCS's own allegations negate the possibility that it suffered injury as a result of the alleged statements, and therefore CCS has no standing to bring a Lanham Act claim based on those statements.  In the case of the other, CCS fails to allege that Xerox actually made any false statement.

## LEGAL STANDARD

A court will dismiss claims under Rule 12(b)(6) where "it appears beyond any doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Kittay v. Kornstein*, 230 F.3d 531, 537-38 (2d Cir. 2000).  Thus, "a court may dismiss a claim for either '(1) the lack of a cognizable legal theory; or (2) the absence of factual assertions to support a claim.'"  *In re: Vasu*, 129 F. Supp. 2d 113, 116 (D. Conn. 2001) (quoting *Titan Sports, Inc. v. Hellwig*, No. CIV.A.98-467, 1999 WL 301695 at *5 (D. Conn. April 26, 1999)).  However, "[w]hen deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must construe any well pleaded factual allegations in the plaintiff's favor."  *Vasu*, 129 F. Supp. 2d at 116 (citation omitted).  Moreover, the court must "limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint."  *Id*. (quoting *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)).  The court strictly limits itself to those materials; "a complaint cannot be cured by a memorandum of law in opposition to a motion to dismiss."  *Ludtke v. United States*, 84 F. Supp. 2d 294, 302 n.3 (D. Conn. 1999).

## ARGUMENT

## I.    CCS FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED UNDER SECTION 2 OF THE SHERMAN ACT

Count 1 of CCS's complaint must be dismissed because CCS's well-pled allegations would not establish that Xerox has unlawfully monopolized any market in violation of Section 2 of the Sherman Act.  15 U.S.C. § 2.  To prevail on its monopolization claim under § 2, CCS must show: (1) that Xerox possessed monopoly power in the relevant market; (2) that Xerox willfully

maintained that power through anticompetitive means as distinguished from growth or

development as a consequence of a superior product, business acumen, or historic accident; and

(3) that as a result of such anticompetitive means, CCS suffered an antitrust injury. *See*

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Eastman Kodak Co. v. Image*

*Tech Servs., Inc.*, 504 U.S. 451, 480 (1992); *AD/SAT v. Associated Press*, 181 F.3d 216, 226 (2d

Cir. 1999).  CCS's monopolization claim fails because it has not alleged a proper relevant market

or that Xerox engaged in anticompetitive conduct.

### A.    CCS's Antitrust Claims Must Be Dismissed Because CCS Has Not Alleged A Proper Relevant Market

A plaintiff claiming a violation of § 2 of the Sherman Act must allege a relevant product

market. *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Walker Process*

*Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)("Without a definition of

[the] market there is no way to measure a defendant's ability to lessen or destroy competition.");

*Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 85 (2d Cir. 2000)("[W]hen we speak of

monopolization or attempted monopolization, we necessarily are talking about monopoly power

within a relevant market."); *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832, 840

(2d Cir. 1980)("Proof of the relevant product market is a necessary element of a cause of action

for monopolization or attempted monopolization.").  Accordingly, "[i]n order to make out their

antitrust claim, the plaintiffs must allege a relevant product market in which the anticompetitive

effects of the challenged activity can be assessed." *Subsolutions, Inc. v. Doctor's Assocs., Inc.*,

62 F. Supp. 2d 616, 624 (D. Conn. 1999)(citation and quotation omitted); *see also Hack v.*

*President & Fellows of Yale Coll.*, 16 F. Supp. 2d 183, 196 (D. Conn. 1998), *aff'd*, 237 F.3d 81,

86 (2d Cir. 2000).

Specifically, to survive a motion to dismiss, CCS must do more than assert the existence

of a relevant market; the defined market must be supported in the complaint by a "theoretically

rational explanation" for why the boundaries of the market are defined as they are. *International

Audiotext Network, Inc. v. American Tel. & Tel. Co.*, 893 F. Supp. 1207, 1213 (S.D.N.Y. 1994),

*aff'd*, 62 F.3d 69 (2d Cir. 1995).

> Where the plaintiff fails to define its proposed relevant market with reference to
> the rule of reasonable interchangeability and cross-elasticity of demand, or alleges
> a proposed relevant market that clearly does not encompass all interchangeable
> substitute products even when all factual inferences are granted in plaintiff's
> favor, the relevant market is legally insufficient and a motion to dismiss may be
> granted.

*North American Energy Sys., LLC v. New England Energy Mgmt., Inc.*, 269 F. Supp. 2d 12, 16

(D. Conn. 2002) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37

(3d Cir. 1997)); *Subsolutions*, 62 F. Supp. 2d at 624 (same).

Courts have not hesitated to dismiss antitrust complaints that fail to meet this standard.

*See, e.g.*, *Mathias v. Daily News*, 152 F. Supp. 2d 465, 481-83 (S.D.N.Y. 2001)(dismissing

complaint because plaintiff failed even to reference the rule of reasonable interchangeability);

*Commercial Data Servers, Inc. v. IBM Corp.*, 166 F. Supp. 2d 891, 897 (S.D.N.Y.

2001)(dismissing plaintiff's complaint because its market definition limited to "mainframes

compatible with IBM's licensed" operating system failed to allege any facts explaining why the

market excluded other operating systems); *Subsolutions, Inc.*, 62 F. Supp. 2d at 625 (dismissing

plaintiff's complaint because the market definition failed to raise any allegations regarding

substitute products or cross-elasticity of demand); *B.V. Optische Industrie De Oude Delft v.

Hologic, Inc.*, 909 F. Supp. 162, 171 (S.D.N.Y. 1995)(dismissing § 2 claims because the

plaintiff's pleadings did not refer to interchangeable alternatives nor explain why they defined the market for chest equalization radiography in such narrow terms).

A proper antitrust market is defined with regard to substitution and reasonable interchangeability on both the supply side and the demand side.[1]  "[M]arkets are to be defined in terms of the close substitutability of either product (demand) or production facilities (supply), since it is ultimately the degree of substitutability that limits the exercise of market power, and it is only by delimiting the area of effective competition that . . . competitive effects can be ascertained."  *U.S. v. Aluminum Co. of America*, 377 U.S. 271, 283 (1964).  *Accord Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1410 (7th Cir. 1995) ("the definition of a market depends on substitutability on the supply side as well as on the demand side"); *AD/SAT v. Associated Press*, 920 F. Supp. 1287, 1297 (S.D.N.Y. 1996) ("determination of whether a product or service is reasonably interchangeable requires consideration of the cross-elasticity of both demand and supply.").

CCS alleges that the relevant product market monopolized by Xerox is one for the service of Xerox high volume copiers "with measured throughput greater than 50 copies per minute, rated maximum monthly copy volume in excess of 150,000 copies, and exceeding 1,000 pounds."  Third Am. Compl. ¶ 67.  The Amended Complaint does not support this gerrymandered market definition with any justification at all, let alone the required "theoretically rational explanation" based on reasonable interchangeability and cross-elasticity of demand and

---

[1] "'Demand substitution' exists if a consumer can turn to a different product or service to satisfy its need-- i.e., if the customer has a choice of products.  'Supply substitution' exists if suppliers of other products or services could easily modify their activities to provide the product or service at issue – *i.e.*, if the customer has a choice of suppliers."  *Intellective, Inc. v. Massachusetts Mut. Life Ins. Co.*, 190 F. Supp. 2d 600, 612 (S.D.N.Y. 2002).

of supply.  *International Audiotext Network,* 893 F. Supp. at 1213.  CCS's Amended Complaint

must therefore be dismissed.

>    **1.    CCS Lacks A "Theoretically Rational Explanation" For
>           Its Proposed Market From The Perspective of Demand
>           Substitutability**

When defining a relevant market from the perspective of demand substitution, the

relevant question is whether products "have reasonable interchangeability for the purposes for

which they are produced – price, use and qualities considered."  *United States v. E.I. du Pont de*

*Nemours & Co.*, 351 U.S. 377, 404 (1956); *see also PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d

101, 105 (2d Cir. 2002).  The "reasonable interchangeability" question is answered by looking at

how customers respond to price changes.  "If customers would respond to a small price change

in a product by changing to another product, then there is a high cross-elasticity of demand

between the products.  In such a case, the products are reasonably interchangeable, and therefore

compete in the same market."  *AD/SAT*, 920 F. Supp. at 1297.

CCS offers no explanation whatsoever for why the service of Xerox high volume copiers

is a proper antitrust market from the perspective of demand substitution.  Specifically, CCS does

not allege any reason why the market can be limited to an "aftermarket" consisting only of the

service of Xerox copiers and offers no explanation for why competition among competing

equipment makers does not constrain the pricing for copier service.[2]  In other words, CCS's

Amended Complaint offers no explanation for why customers faced with supracompetitive

prices for service of Xerox copiers would not simply buy a competing copier instead, just as

---

[2] Similarly, CCS offers no reason why the relevant foremarket competition would be limited to
competition among firms that sell copiers "with measured throughput greater than 50 copies per minute,
rated maximum monthly copy volume in excess of 150,000 copies, and exceeding 1,000 pounds."

many automobile consumers refused to buy Yugos because the costs of servicing them were so high.  CCS's Amended Complaint thus ignores the key issue in any aftermarket case.  *See SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 17 (1st Cir. 1999) ("Unless the evidence shows that the manufacturer can exert raw power in the aftermarket without regard for commercial consequences in the foremarket, the aftermarket is not the relevant market."); *Subsolutions, Inc. v. Doctor's Assocs., Inc.*, No. CIV.A.98-470, 2001 WL 1860382 (D. Conn. April 6, 2001) ("The primary market and the aftermarket for any brand product do not exist in vacuums and are symbiotically related.  As a result, a powerful party may not exercise all of the power available to it in the aftermarket out of concern for the effects the conduct may have in the primary market.").

Aftermarket allegations have been dismissed under Rule 12 even where a plaintiff alleged that "unspecified 'information' and 'switching' costs" meant that the aftermarket operated independently of the primary market where the court found those allegations implausible.  *Lee v. Life Ins. Co. of North America*, 23 F.3d 14, 18 (1st Cir. 1994).  CCS has not even alleged such information or switching costs.  As such, it has not offered a "theoretically rational" explanation for its proposed relevant market from the perspective of demand substitution, and its monopolization claim must be dismissed.

### 2.    CCS Lacks A "Theoretically Rational Explanation" For Its Proposed Market From The Perspective Of Supply Substitutability

Even if CCS had properly alleged a service aftermarket from the perspective of demand substitution – and it certainly has not – CCS's Amended Complaint would nevertheless be subject to dismissal because its relevant market is implausible from the perspective of supply substitution.  Under the principles of supply substitution, "[i]f producers of product X can readily

shift their production facilities to produce product Y, then the sales of both should be included in the relevant market." *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) (citing IV Phillip Areeda & Donald Turner, *Antitrust Law* ¶ 521a, at 354 (1978)). *Accord Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 71 (2d Cir. 1984) (definition of the relevant product market requires taking into account the "groups of producers which, because of the similarity of their products, have the ability – actual or potential—to take significant amounts of business away from each other" (citation omitted)); *see also Blue Cross & Blue Shield United of Wisconsin*, 65 F.3d at 1410-11.

CCS's Amended Complaint does not and cannot explain why a relevant market defined with reference to supply substitutability is limited to the service of *Xerox* copiers. CCS does not allege (nor could it allege) that Xerox is the only manufacturer of copiers or that a firm that services one brand of copier is incapable of servicing other copier brands. Indeed, we would note that CCS's First Amended Complaint defined a "relevant high volume copier service market" that "encompasses, in part, service and maintenance of Xerox' Model 9500, 9900, 1065, 1075, 1090, 5065, 5090, and 5100 copiers, as well as Kodak's 150/AF, 220F/FS/S, 235/F/S/AF, and 300F/AF/AFB models, IBM's Models 70 and 85, and OCE of America's Model 2500." *See* First Amended Complaint, ¶¶ 16-17 (attached hereto as Exhibit 1). Nor does CCS explain why firms that service copiers that operate at 50 copies/minute or less cannot service faster copiers, or why firms that service copiers that weigh less than 1,000 pounds cannot service heavier copiers.

Absent a rational explanation from the perspective of supply substitution for its gerrymandered market definition, CCS's amended complaint fails to state a claim and must be dismissed. *See New York v. Kraft Gen. Foods*, 926 F. Supp. 321, 332 (S.D.N.Y. 1995)(rejecting on summary judgment a market definition limited to "adult" cereals because competing firms in

the broader cereal industry could easily enter the "adult" market as processing methods are similar); *Frank Saltz & Sons, Inc. v. Hart Schaffner & Marx*, No. CIV.A.82-2931, 1985 WL 2510 (S.D.N.Y. Sept. 5, 1985)(holding that a market defined as "men's better quality suits and sport coats" was legally insufficient because plaintiff failed to consider that some plants are capable of entering the better quality suit and sport coat market).

### B.     CCS Does Not Allege Actionable Anticompetitive Conduct

CCS's monopolization claim also fails because CCS does allege that Xerox has engaged in actionable anticompetitive conduct.  To establish a monopolization claim under § 2 of the Sherman Act, CCS must allege and prove that Xerox willfully acquired or maintained monopoly power through anticompetitive means "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Grinell Corp.*, 384 U.S. 563, 570-71 (1966).  *See also Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko*, -- U.S. --, 124 S. Ct. 872, 879 (2004); *Invamed v. Barr Labs*, 22 F. Supp. 2d 210, 218 (S.D.N.Y. 1998)("It is not the possession, but the abuse of monopoly power that violates § 2").  Even when actions threaten to maintain a monopoly, only "exclusionary" or "predatory conduct" is proscribed by Section 2.  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985).

### 1.     Xerox's Refusal to Assist CCS Was Not Anticompetitive Because It Did Not Require Xerox To Sacrifice Short-Term Profits

CCS's monopolization claims are based primarily on Xerox's refusal to assist CCS in competing with it, whether by selling parts or by offering expedited delivery of such parts.  The Supreme Court's decision earlier this year in *Trinko*, however, eviscerates claims based on refusals to deal by an alleged monopolist.  The Supreme Court recognized that:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers.  Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities.  Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing--a role for which they are ill-suited.  Moreover, compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion.  Thus, as a general matter, the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.,* 250 U.S. 300, 307 (1919).

*Trinko*, 124 S. Ct. at 879.

Given the risks created by forcing firms to assist their competitors, the Supreme Court held that a monopolist's refusal to deal is unlawful only if it reflects "a willingness to forsake short-term profits to achieve an anticompetitive end."  *Id*. at 880.  *Accord Aspen Skiing*, 472 U.S. at 601 (conduct is anticompetitive where it "sacrifice[s] short-run benefits," because it "reduc[es] competition . . . over the long run");  *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 523 (5th Cir. 1999)("A finding of exclusionary conduct requires some sign that the monopolist engaged in behavior that – examined without reference to its effects on competitors – is economically irrational."); *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 803 (8th Cir. 1987) (conduct is anticompetitive if "its 'anticipated benefits were dependent upon its tendency to discipline or eliminate competition and thereby enhance the firm's long term ability to reap the benefits of monopoly power.'")(citation omitted).

After *Trinko*, it is not unlawful for a firm to refuse to deal with its rivals where that refusal to deal is more profitable in the *short run* than assisting its rivals.  It is thus perfectly lawful for Xerox to refuse to sell parts to its service competitors simply because it is less profitable in the short run to sell parts to ISOs than it is for Xerox to sell service to copier

owners.  It is similarly lawful for Xerox to refuse to provide parts to CCS on an expedited basis

if it were not profitable for Xerox to do so in the short run.  As the leading treatise on antitrust

law notes:

> [S]hort-term profitability must be a complete defense, lest monopolists be obliged
> to join every proposed joint venture.  As a general matter a firm is under no
> obligation to sacrifice its own profits in order to make the overall market larger.

3A P. Areeda & H. Hovenkamp, *Antitrust Law* ¶¶ 651a, 658f, at 72, 131-132, 135 (2d ed. 2002).

Xerox's refusal to assist CCS could be unlawful under *Trinko* only if that refusal was

unprofitable for Xerox in the short run (*i.e.* it was more profitable for Xerox to sell parts than to

sell service), and profitable in the long run only because of its potential to foreclose competition,

allowing Xerox to charge higher prices after its competitors exited the market.  *Cf. AD/SAT*, 920

F. Supp. at 1301 (conduct is predatory when it involves "'the deliberate sacrifice of present

revenues for the purpose of driving rivals out of the market and then recouping the losses

through higher profits earned in the absence of competition.'") (quoting *Northeastern Tel. Co. v.

American Tel. & Tel. Co.,* 651 F.2d 76, 86 (2d Cir. 1981)).  Because CCS does not and cannot

allege that Xerox's refusal to assist its rivals was inconsistent with its *short term* gain, CCS's

Amended Complaint fails to state a claim for which relief can be granted.

> **2.    Xerox's Delays In Shipping Parts Were Not Anticompetitive Because
> CCS Had No Right To Free Ride On Xerox's Investment In Parts
> Inventory**

Because Xerox had no obligation to supply parts to CCS *at all*, delays in parts shipments

cannot violate the antitrust laws.  Regardless, it is equally clear that the antitrust laws impose no

obligation upon Xerox to ship parts in a "timely" manner in order to relieve CCS of the expense

of carrying a parts inventory.  The antitrust laws do not require firms to let their competitors

"free ride" on their investments, and thus do not require Xerox to allow CCS to free ride on

Xerox's substantial investment in parts inventory. "'Section 2 of the Sherman Act does not give purchasers the exclusive right to dictate the terms on which they will deal,' nor does it require a monopolist to accede to every demand of its customers or competitors." *Trace X Chem. Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 267 (8th Cir. 1984) (quoting *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 715 F.2d 30, 34 (2d Cir. 1983) (internal citation omitted)). CCS has no right to dictate to Xerox the delivery terms upon which Xerox should sell replacement parts; as the court in *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 290 n.101 (5th Cir. 1978) wrote, "[i]f three parts delays, unilateral pricing policies and three-week credit holds were the stuff of which antitrust violations were made, federal courts would undoubtedly have little time left for more pressing problems."

CCS claims that it "ordered parts on an emergency, overnight basis, because of its customers 'uptime' requirements" and that when Xerox allegedly did not deliver such parts on a "timely basis . . . Mr. Dixon could not meet his customer's "up time" requirements of 95%, or their response time requirements. Customer complaints escalated. He lost service contracts. They went to Xerox." Third Am. Compl. ¶ 28.

Taken as true, CCS's allegation is insufficient as a matter of law to establish that Xerox violated the antitrust laws. There is no obligation under the antitrust laws to provide parts in an expedited or timely manner; no right to FedEx overnight delivery is written into the Sherman Act or the precedent interpreting it. By demanding that Xerox provide expedited delivery of parts, CCS is claiming that the antitrust laws require Xerox to relieve CCS of the expense of maintaining its own parts inventory. But it is not a violation of the antitrust laws for a company to refuse to allow a competitor to free ride on its inventory by demanding expedited delivery of parts.

A claim indistinguishable from that asserted by CCS was addressed and rejected by the Fourth Circuit in *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 926 (4th Cir. 1990). In that case, the antitrust plaintiff complained that the defendant had required the plaintiff to submit orders for parts in writing rather than over the phone, which slowed down the order and delivery process and consequently "inhibit[ed] [plaintiff]'s ability to handle emergencies." *Id.* at 929. The plaintiff argued that this delayed parts shipment policy was "instituted as part of an overall plan to destroy [the plaintiff]." *Id.* However, the Fourth Circuit concluded that, as a matter of law, such a parts shipment policy could not constitute an unlawful anticompetitive activity. *See id.* at 930. In arriving at that conclusion, the Fourth Circuit noted that an antitrust plaintiff has no right to "free ride" on the efforts of an alleged monopolist, and thus that it had no right to rely upon the alleged monopolist's inventory of parts to demand expedited shipment to "handle emergencies." *See id.* at 929-30; *cf. also Servicetrends, Inc. v. Siemens Med. Sys., Inc.*, 870 F. Supp. 1042, 1055-56 (N.D. Ga. 1994) ("[A]s a competitor, [plaintiff] is not by right entitled to enjoy the 'free ride' that [defendant] provides in the form of inventory financing for its own customers.").

*Abcor* cannot be distinguished from this case. CCS, like the *Abcor* plaintiff, alleges that Xerox's failed to provide CCS with parts on an expedited basis with the intent to put it out of business. Like the *Abcor* plaintiff, CCS thus seeks a free ride on Xerox's parts inventory in order to service its clients on an emergency basis. Accordingly, Xerox's alleged refusal to provide CCS with parts on an expedited basis cannot violate the antitrust laws as a matter of law.

**C.     Xerox's Alleged Misrepresentation of Used Copiers As New Does Not Violate the Antitrust Laws**

CCS alleges that Xerox violated the antitrust laws by misrepresenting older copiers as new in order to sell copiers to the State of Connecticut and Aetna.  Third Am. Compl. ¶¶ 42-49.  At the most basic level, this allegation fails to support a claim that Xerox monopolized a market for service of Xerox copiers because there is no allegation that Xerox foreclosed CCS from the *service* of copiers, rather than the sale of copier equipment.  Even if the State of Connecticut or Aetna purchased copier equipment from Xerox as a result of these alleged misrepresentations, CCS fails to allege anything about the alleged misrepresentation preventing CCS (or anyone else) from servicing the copiers.  Absent an allegation that service competitors were foreclosed *at all* as a result of Xerox's alleged conduct, the misrepresentation allegation cannot support a claim for monopolization of a service market.

**D.     Xerox's Alleged Below-Cost Pricing To Aetna Does Not Violate The Antitrust Laws**

CCS alleges that "Xerox has engaged in below-cost pricing at a selected customer, Aetna, in an effort to harm CCS."  Third Am. Compl. ¶ 50.  CCS's well-pled allegations relating to Xerox's pricing do not state a claim for violation of § 2.

Low prices are anticompetitive only when they are "predatory."  As set forth in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), there are two elements of a predatory pricing claim.  First, "a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs."  *Id.* at 222.  Second, the plaintiff must "demonstrat[e] that the [defendant] had a reasonable prospect, or, under § 2 of the Sherman Act, a dangerous

probability, of recouping its investment in below-cost prices." *Id*. at 224.[3]  Both elements are

"essential components of real market injury[, for] predatory pricing schemes are rarely tried, and

even more rarely successful."  *Id*. at 226 (citation omitted).  *See also Virgin Atlantic Airways Ltd.*

*v. British Airways PLC*, 257 F.3d 256, 266 (2d Cir. 2001) (stating same elements).  A complaint

that does not allege both below-cost pricing and that the defendant has a reasonable likelihood of

recoupment fails to state a claim and must be dismissed.  *Mathias*, 152 F. Supp. 2d at 473 (citing

*Cardinal Indus., Inc. v. Pressman Toy Corp.,* No. CIV.A.96-4590, 1996 WL 724730, at *6

(S.D.N.Y. Dec. 17, 1996)).

CCS has alleged *neither* element.  First, CCS does not allege, as required, that Xerox's

prices are below an *appropriate* measure of its costs.  In the Second Circuit, the appropriate

measure is Xerox's "reasonably anticipated marginal cost, and its surrogate, reasonably

anticipated variable cost."  *Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vermont, Inc.*, 845

F.2d 404, 407 (2d Cir. 1988) (citing *Northeastern Tel. Co.*, 651 F.2d at 88).  CCS's Amended

Complaint fails to state a claim because it contains no allegations comparing Xerox's *costs* to

manufacture copiers or provide service with its *pricing* for such copiers and service.[4]  Nor does

CCS allege that Xerox can recoup its "investment in below-cost prices."  Indeed, CCS does not

even allege that Xerox won the bid in question.[5]  To properly allege a predatory pricing claim,

---

[3] This is a wholly separate element: "Evidence of below-cost pricing is not alone sufficient to permit an inference of probable recoupment and injury to competition." *Brooke Group*, 509 U.S. at 226.

[4] "[T]he cost of obtaining a typical Xerox high speed copier" that CCS compares to the combined price charged by Xerox for copier equipment and copier service under certain plans, Third Am. Compl. ¶ 52, is not the relevant "cost" for a predatory pricing analysis.  Cost in the predatory pricing context is the cost to Xerox to manufacture such a copier and provide service.  The "cost" to which CCS refers is actually the *price* at which CCS is alleging Xerox has sold its copiers.

[5] We note that in its Second Amended Complaint, CCS alleges that it – not Xerox – won the bid in question.  Second Am. Compl. ¶ 149 (attached hereto as Exhibit 2).  Xerox plainly cannot recoup its

Footnote continued on next page

16

CCS would have to claim that Xerox's two low bids were likely to drive it from the market. *Stearns Airport Equip.*, 170 F.3d at 529. Absent such a claim, CCS has failed to allege a likelihood of recoupment, mandating dismissal of its claim. *See Mathias*, 152 F. Supp. 2d at 473.

### E.    It Is Not Unlawful For Xerox To Charge For Diagnostic Software

CCS also challenges as violative of the Sherman Act Xerox's introduction of diagnostic software license fees on equipment for which Xerox did not previously charge a license fee. *See* Third Am. Compl. ¶¶ 53-56. But nothing in the antitrust laws requires Xerox to give away its diagnostic software for free. Indeed, because Xerox need not license its copyrighted diagnostic software *at all*, nothing in the antitrust laws prohibits Xerox from charging a price as high as it sees fit. The Supreme Court has held that it is not unlawful for a copyright holder to "make demands – like respondent's demand for 50% of petitioners' gross proceeds in excess of advertising expenses – which are so exorbitant that a negotiated economic accommodation will be impossible." (internal quotation omitted). *Stewart v. Abend*, 495 U.S. 207, 228 (1990). *Accord In re Indep. Serv. Orgs. Antitrust Litig.*, 964 F. Supp. 1479, 1490 (D. Kan. 1997) ("Thus, if Xerox could lawfully refuse to sell its patented parts, it could certainly price its parts at a price as high as it sees fit.") (citing *Brulotte v. Thys Co.*, 379 U.S. 29, 33 (1964)).

As discussed above, under *Trinko* a firm – even a monopolist – has no general duty to help its competitors. Xerox's imposition of license fees is anticompetitive only if it is irrational in the short term, less profitable that charging no license fee at all. *Trinko*, 124 S. Ct. at 880.

---

Footnote continued from previous page
alleged investment in below cost prices if the conduct in question did not prevent CCS from winning the bid.

Because CCS does not, and cannot, allege that it was unprofitable for Xerox to charge a diagnostic software license fee, Xerox's decision to do so cannot violate the antitrust laws.

### F.    CCS's Other Allegations Of Wrongdoing Do Not Involve "Antitrust Injury"

A private plaintiff has standing to sue under the antitrust laws only if it has suffered "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flow from that which makes defendants' act unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). *Accord Consol. Gold Fields, PLC v. Minorco, S.A.*, 871 F.2d 252, 257 (2d Cir. 1989); *Remington Prods., Inc. v. North American Philips Corp.*, 755 F. Supp. 52, 55 (D. Conn. 1991). To survive a motion to dismiss, "[a] private plaintiff seeking to state a claim for violations of sections 1 or 2 of the Sherman Act must allege that it has suffered [such] antitrust injury." *George Haug Co. v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 139 (2d Cir. 1998).

CCS alleges only that *it* – and not competition – has been harmed by Xerox's conduct. *See* Third Am. Compl. ¶¶ 68, 71. This is not antitrust injury, and it is not sufficient to survive a motion to dismiss. "It is now well settled that in order to have standing to prosecute private antitrust claims, plaintiffs must show more than that the defendants' conduct caused them injury." *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994). "Mere allegations of loss of individual competitive ability are not sufficient. There must be some allegation of public injury to competition; a harmful effect on a more generalized market and not merely on a single supplier or purchaser." *Blaine v. Meineke Disc. Muffler Shops, Inc.*, 670 F. Supp. 1107, 1114 (D. Conn. 1987); *see also Belfiore v. New York Times, Co.*, 654 F. Supp. 842, 847-48 (D. Conn. 1986)(dismissing complaint because "[p]laintiffs have made no showing of an impact upon competition, as opposed to an impact on themselves, sufficient to transform the [defendant's]

otherwise legitimate business activities into an antitrust violation"), *aff'd*, 826 F.2d 177 (2d Cir. 1987).

CCS's remaining allegations of anticompetitive conduct by Xerox fail because CCS does not and cannot claim any injury to competition.

### 1.    Xerox's Alleged "Manipulation" Of The Buy-Out Amounts Of Leases Cannot Cause An Antitrust Injury

CCS alleges that Xerox breached its contract with Aetna by increasing the buy-out price for several copiers that it leased to Aetna in an effort to prevent CCS from servicing those copiers.  Third Am. Compl. ¶¶ 36-41.  However, Xerox's breach of its contract with Aetna, even if true, is not a violation of the federal antitrust laws.  Rather, "it is not an antitrust purpose to regulate ordinary business contracts."  IIIA Areeda & Hovenkamp, *Antitrust Law* ¶ 782m.  "As a result courts consistently reject antitrust claims that are in fact a breach of contract or claims that one party's interpretation of or performance under its contract violates the antitrust laws."  *Id.*; *see also, e.g., Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 527 (1983) (defendant's alleged breach of contract "plainly not subject to review under the federal antitrust laws"); *Colsa Corp. v. Martin Marietta Servs., Inc.*, 133 F.3d 853, 856 (11th Cir. 1998)(holding that "[i]t is not anticompetitive for [the defendant](a party to the [government contract]) to exclude [plaintiff](a non-party to the [government contract]) from performing services under the [government contract].").

Moreover, while CCS may have indirectly lost a contract and potential profits as a result of Xerox's alleged breach of its contract with Aetna, it does not, nor can it, allege that this action had any broader effect on the market as a whole.  *See Balaklaw*, 14 F.3d at 797 ("the antitrust laws . . . were enacted for the protection of *competition*, not *competitors*")(emphasis in

19

original)(quoting *Brunswick,* 429 U.S. at 488); *Budget Rent A Car of Westchester, Inc. v. Rental Car Res., Inc.*, 842 F. Supp. 614, 617 (D. Conn. 1993)(dismissing complaint because an action by defendant "that threatens the viability of a competitor does not give rise to antitrust liability.").  CCS has not set forth facts demonstrating injury to the purported market for service of Xerox high-speed copiers, but rather has alleged its own loss of business.  Accordingly, CCS has failed to link Xerox's actions to harm to consumers that the antitrust laws were implemented to address and this claim must be dismissed.

> **2.    Xerox's Alleged Breach Of The Price Caps Set In The *R&D* Settlement Cannot Cause An Antitrust Injury**

CCS alleges that certain parts price increases are violative of a settlement agreement. Third Am. Compl. ¶¶ 57-62.  Even assuming the truth of CCS's allegations for purposes of this motion only, Xerox is at most liable for breaching its settlement agreement – an action that would not constitute antitrust injury.  *See*, *e.g.*, *Associated Gen. Contractors*, 459 U.S. at 527.

Even if Xerox's high prices for parts violate a contract, they do not violate the antitrust laws because it is not an antitrust violation to charge high prices.  *Trinko*, 124 S. Ct. at 879 ("the . . . charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system").  By complaining about higher prices as the result of a breach of contract, CCS is not complaining about "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Brunswick Corp.*, 429 U.S. at  489. CCS is not complaining about antitrust injury, and the antitrust claim fails to state a claim for which relief can be granted.

## II.    CCS FAILS TO ALLEGE SUFFICIENT FACTS TO SUPPORT A DEFAMATION CLAIM UNDER CONNECTICUT LAW

CCS's conclusory allegations of defamation are insufficient as a matter of law to state a claim for relief and thus should be dismissed pursuant to Rule 12(b)(6).  It is well-established under Connecticut law and in this Court that a plaintiff making a claim for defamation must specifically allege the disparaging statements, who made them, who heard them, when they were made, and the context in which they were made.  *See Kloth v. Citibank (South Dakota), N.A.,* 33 F. Supp. 2d 115, 121 (D. Conn. 1999); *Thomas v. Saint Francis Hosp. & Med. Ctr.*, 990 F. Supp. 81, 92 (D. Conn. 1998); *Croslan v. Housing Auth.*, 974 F. Supp. 161, 169-70 (D. Conn. 1997); *see also Pro Performance Corporate Servs., Inc. v. Goldman*, No. CIV.A.01-0186618, 2003 WL 22133945, at *2 (Conn. Super. Ct. Aug. 25, 2003); *Chertkova v. Connecticut Gen. Life Ins. Co.*, No. CIV.A.98-04863465, 2002 WL 1902988, at *4-*5 (Conn. Super. Ct. July 12, 2002).  As stated just two months ago by a Connecticut court:

> A claim of libel must be pled with specificity, as the precise meaning and choice of words employed is a crucial factor in any evaluation of falsity. The allegations should set forth facts ... sufficient to apprise the defendant of the claim made against him ... [A] complaint for defamation must, on its face, specifically identify what allegedly defamatory statements were made, by whom, and to whom.

*Rice v. Meridian Housing Auth.*, No. CIV.03-0479556, 2004 WL 870816, at *7 (Conn. Super. Ct. Mar. 31, 2004) (internal quotations and citations omitted).

As the court held in *Kloth*:

> Although the Second Circuit does not require *in haec verba* pleading, i.e., of the exact alleged defamatory words, Fed.R.Civ.P. 8 requires that the complaint "afford defendant sufficient notice of the communications complained of to enable him to defend himself"

33 F. Supp. 2d at 121.  Accordingly, in the absence of specific allegations of: (1) what Xerox's

alleged defamatory statements were; (2) which Xerox employee uttered them; (3) when they

uttered them; and (4) who heard them, CCS's defamation claim must be dismissed. *See id*.;

*Thomas.*, 990 F. Supp. at 92; *Croslan,* 974 F. Supp. at 169-70.

CCS's defamation claim fails to meet at least three of those pleading requirements.  The

sum total of CCS's defamation claim consists of two paragraphs:

> 33.     At Aetna, Xerox disparaged CCS by stating to Aetna that CCS' [sic.]
> technicians were untrained.
>
> ***
>
> 78.     Xerox has defamed CCS and committed trade disparagement, as set forth
> in ¶ 33 above.

By these allegations, CCS fails to identify which of Xerox's thousands of employees defamed

CCS, who heard the defamatory statements, or when the defamation occurred.  Without such

allegations, Xerox does not have "sufficient notice of the communications complained of to

enable [it] to defend [it]self."  *Kloth,* 33 F. Supp. 2d at 121.  Accordingly, CCS's claim for

"Defamation and Trade Disparagement" should be dismissed pursuant to Rule 12(b)(6) for

failure to state a claim upon which relief can be granted.

## III.    CCS'S TORTIOUS INTERFERENCE CLAIM SHOULD BE DISMISSED BECAUSE CCS HAS FAILED TO ALLEGE ANY CONDUCT THAT MAY <u>BE</u> CONSIDERED TORTIOUS

CCS's claim of tortious interference based upon Xerox's refusal to sell parts in a timely

manner (Count II of the Third Amended Complaint) should be dismissed pursuant to Rule

12(b)(6) because CCS fails to allege any conduct that is tortious.  Xerox's refusal to sell parts in

a timely manner cannot, as a matter of law, be considered tortious because that conduct is not an "improper means."[6]

To state a claim for tortious interference, CCS must allege (1) the existence of a contractual or beneficial relationship, (2) [Xerox's] knowledge of that relationship, (3) [Xerox's] intent to interfere with the relationship, (4) that the interference was tortious, and (5) a loss suffered by [CCS] that was caused by [Xerox's] tortious conduct. *See Collum v. Chapin*, 671 A.2d 1329, 1332 (Conn. App. Ct. 1996); *see also Hart, Nininger & Campbell Assocs. v. Rogers*, 548 A.2d 758, 764 (Conn. App. Ct. 1988). Without admitting those allegations, Xerox concedes that CCS has alleged elements (1)-(3) and (5) of a tortious interference claim. CCS, however, has failed to allege facts sufficient to sustain a claim that Xerox's conduct was tortious.

## A.    CCS Has Not Alleged That Xerox Had An Improper Motive

Under Connecticut law, in order for conduct to be tortious, a plaintiff must show that the defendant either had an improper motive or used improper means. *See Blake v. Levy*, 464 A.2d 52, 55 (Conn. 1983). As an initial matter, Xerox's desire to compete with CCS – which CCS alleges in paragraphs 3 and 73 of the Third Amended Complaint – cannot be an "improper motive" as a matter of law. *See* Restatement (Second) of Torts § 768 (competition with the

---

[6] As Judge Vratil noted in her decision on summary judgment, Xerox did not "discuss the legality of delayed shipment of parts to ISOs. . . . and did not discuss the legality of delayed shipments of parts to ISO's." *See In re Indep. Servs. Orgs. Antitrust Litig.*, 85 F. Supp. 2d 1130, 1143 (D. Kan. 2000). Xerox did not discuss the effect of delays of parts shipments because CCS's First Amended Complaint *made no mention* of tortious interference based upon delayed parts shipments. *See* First Am. Compl. ¶¶ 97-102 (alleging that "Xerox representatives have successfully encouraged and enticed employees in the various agencies and departments of the State of Connecticut to contract for services with Xerox in breach of CCS' contract with the State of Connecticut.")(Ex. 1). Xerox notes that CCS has impermissibly expanded its "tortious interference" claim beyond its relationship with the State of Connecticut. As such, CCS's tortious interference claim is defective in light of the statute of limitations on such claims. This point is addressed in Xerox's companion Motion for Summary Judgment.

plaintiff cannot be improper means); *Int'l Mktg., Ltd. v. Archer-Daniels Midland Co.,* 192 F.3d 724, 731 (7th Cir. 1999) (dismissing claim of tortious interference where competition was evident from face of complaint); *Fred Siegel Co. v. Arter & Hadden*, 707 N.E.2d 853, 860-61 (Ohio 1999); *Mannion v. Stallings & Co.*, 561 N.E.2d 1134, 1141 (Ill. 1990); *Ramirez v. Selles*, 784 P.2d 433, 435-37 (Or. 1989) (allegations that show on their face that rival's acts are privileged do not support a claim of intentional interference with economic relationship); *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,* 406 N.E.2d 445, 448-49 (N.Y. 1980).

**B.    Xerox's Refusal To Sell Parts In A Timely Manner Cannot Be An "Improper Means" As A Matter Of Law**

CCS's complaint also does not allege conduct that could be considered "improper means."  CCS's central allegation is that Xerox "intentionally refused to supply parts to CCS in a timely manner and in the quantities ordered."  Third Am. Compl. ¶ 74.  However, accepting that allegation as true for the purposes of this motion, Xerox's refusal to sell CCS parts in a timely manner cannot be an "improper means."  As discussed above, the alleged refusal to sell parts "in a timely manner" does not violate the antitrust laws.  Because conduct that does not violate the antitrust laws cannot be "improper means" for the purpose of a tortious interference claim, CCS's tortious interference claim must be dismissed.

Courts have recognized that the conduct of a competitor that does not violate the antitrust laws cannot support a tortious interference claim.  *See Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island*, 883 F.2d 1101, 1114 (1st Cir. 1989) (antitrust law provides best barometer of whether alleged anticompetitive behavior can be found "wrongful" and hence tortious under state law); *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1430-31 (9th Cir. 1993) (defendant's conduct that did not violate the antitrust laws was

privileged competition that could not give rise to tortious interference claim); *Aviani v. Sisters of St. Mary*, No. CIV.A.82-2966, 1987 WL 18934, at *3 (N.D. Ill. 1987) (summary judgment granted in favor of defendant on tortious interference claim where tort was based on conduct found not to be an illegal restraint of trade); *Machine Maint. & Equip. v. Cooper Indus.*, 661 F.Supp. 1112, 1116 (E.D. Mo. 1987) (holding that competitive conduct that was not a violation of the antitrust laws could not form the basis of a tortious interference claim); *cf. also Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1364 (S.D. Fla. 1998) ("[W]here the tort is grounded on precisely the same 'anticompetitive' behavior alleged in the failed antitrust claim, it cannot as a matter of law constitute tortious interference with a business relationship."); *Maxim Integrated Prods., Inc. v. Analog Devices, Inc.*, No. CIV.A.92-20716, 1994 WL 514024, at *4 (N.D. Cal. 1994) (where alleged interference involves same conduct as the antitrust violations, plaintiff's inability to raise a genuine issue on its antitrust claims dooms its state law interference claim).

As we discussed above in Section I.B.2, the antitrust laws do not impose upon Xerox any duty to supply parts in a "timely" manner. Accordingly, CCS's tortious interference claim based on the same allegations must be dismissed.

## IV.    CCS'S CUTPA CLAIM FAILS BECAUSE XEROX'S ALLEGED CONDUCT DOES NOT VIOLATE THE ANTITRUST LAWS

CCS's claim under CUTPA (Count IV) also fails to state a claim. Courts enforcing CUTPA look to federal antitrust law to determine what constitutes an unfair trade practice under CUTPA, and "[c]laims of unfair trade practices [under CUTPA] fail if no underlying antitrust violation is found." *CDC Techs., Inc. v. Idexx Labs., Inc.*, 7 F. Supp. 2d 119, 132 (D. Conn. 1998), *aff'd*, 186 F.3d 74 (2d Cir. 1999); *accord Suburban Restoration Co. v. ACMAT Corp.*,

700 F.2d 98, 101-02 (2d Cir. 1983). If conduct does not violate the antitrust laws, to establish a

CUTPA violation, a plaintiff must prove that the defendant's action violates another established

cause of action. *Soriso v. Lenox, Inc.*, 701 F. Supp. 950, 963 (D. Conn. 1988), *aff'd*, 863 F.2d

195 (2d Cir. 1988). Because the antitrust and tortious interference claims CCS makes in

conjunction with its CUTPA claims are both defective, CCS has no additional theory to make its

CUTPA claim independently viable.

## V.    CCS'S LANHAM ACT CLAIM SHOULD BE DISMISSED

To prevail upon its claim under Section 43(a) of the Lanham Act, CCS must show that

"the contested statement or representation must be either false on its face or, although literally

true, likely to mislead and to confuse consumers given the merchandising context." *Mylan*

*Labs., Inc. v. Matkari*, 7 F.3d 1130, 1138 (4th Cir. 1992); *see also L & F. Prods. v. Procter &*

*Gamble Co.*, 45 F.3d 709, 712 (2d Cir. 1995). To recover damages on such a claim, CCS must

show that is has suffered an injury that was caused by actual consumer reliance on the

misleading act. *See Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.,* 926

F.2d 134, 139-40 (2d Cir. 1991); *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 206 (7th Cir.

1982) (collecting cases). Indeed, to have *standing* to bring a Section 43(a) claim, CCS is

required to allege that it at least had the *potential* for a commercial injury. *See Omega Eng'g,*

*Inc. v. Eastman Kodak Co.*, 30 F. Supp. 2d 226, 255 (D. Conn. 1998) (citing *Berni v.*

*International Gourmet Rests. of Am., Inc.*, 838 F.2d 642, 648 (2d Cir. 1988).

CCS's Lanham Act claim related to Xerox's alleged false statements to the State of

Connecticut should be dismissed pursuant to Rule 12(b)(6) because CCS's own allegations show

that it suffered no injury as a result of those statements. CCS alleges that the State of

Connecticut instituted a policy of purchasing only "new" copiers and that Xerox falsely claimed

the copiers it sold were "new."  CCS's own allegations, however, betray the fact that it did not

suffer an injury as a result of Xerox's alleged false statements to the State of Connecticut.  CCS

alleges that:

> Prior to June 1999, the State accepted bids for machines that were new or refurbished.  However, in June 1999, the State [of Connecticut] changed its contract to provide that it would purchase only new machines, not refurbished ones.  This provision *prevented CCS from bidding for the work*, because CCS could not buy and resell new Xerox machines at a price that was competitive with Xerox's price for selling such machines.

Third Am. Compl. ¶ 43 (emphasis added).  Thus, by CCS's own admission, it did not bid for the

contract with the State of Connecticut.  Accordingly, CCS could not have been harmed by

Xerox's alleged misrepresentation that it was selling new machines to the State; had Xerox told

the truth, CCS still would have not won the contract.[7]  By failing to bid on the contract, CCS

excluded itself from claiming any injuries based upon the misrepresentations of those in the

bidding process.  *Cf. M.C. Mfg. Co. v. Texas Foundries, Inc.*, 517 F. 2d 1059, 1064 (5th Cir.

1975) (holding that there was no injury to the plaintiff based upon defendant's illegal bid

because even had that bid been removed from process, plaintiff would not have received

contract).

CCS also claims that Xerox violated the Lanham Act when it sold to Aetna Model 5388

copiers that Xerox claimed were "new."  Third Am. Compl. ¶¶ 47-49.  But CCS does not

actually allege that Xerox misrepresented the nature of the copiers it sold to Aetna.  CCS claims

that when it examined "a model 5388" it determined that the copier it examined contained old

parts.  *Id.* ¶ 49.  But CCS does *not* claim either that it examined any Model 5388 copier sold to

---

[7] Indeed, it appears as though CCS's misrepresentation claim is merely an attempt by it to assert a breach of contract claim on behalf of the State of Connecticut.  CCS does not have standing to do so.

Aetna or that any copier Xerox actually sold to Aetna was not in fact "new."  (The fact that other 5388 copiers are alleged not to have been "new" is irrelevant.)  Because CCS does not allege a misrepresentation that caused it injury, its Lanham Act claim challenging alleged misstatements to Aetna fails.

<u>**CONCLUSION**</u>

For the aforementioned reasons, CCS's antitrust, defamation, tortious interference, and Lanham Act claims should be dismissed pursuant to Rule 12(b)(6).

Respectfully submitted,

/s/ Robert Dolian

| | |
|---|---|
| Peter K. Bleakley | Robert Dolian |
| Jonathan I. Gleklen | CUMMINGS & LOCKWOOD |
| Christopher F. Winters | Four Stamford Plaza |
| Jon J. Nathan | 107 Elm Street |
| ARNOLD & PORTER | Stamford, Connecticut  06902 |
| 555 Twelfth Street, N.W. | (203) 351-4307 |
| Washington, D.C. 20004-1206 | fax: (203) 708-3948 |
| (202) 942-5000 | email: rdolian@cl-law.com |
| fax: (202)-942-5999 | |
| email: jonathan_gleklen@aporter.com | |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ———————————————— ) | |
| CREATIVE COPIER SERVICES, ) | |
| ) | |
| Plaintiff, ) | Civil Action |
| ) | |
| v. ) | No. 3:01-CV-155 (SRU) |
| ) | |
| XEROX CORPORATION, ) | |
| ) | |
| Defendant. ) | |
| ———————————————— ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2004, I served a copy of the foregoing Motion to Dismiss and Memorandum in Support of Xerox's Motion to Dismiss by first class mail upon the following counsel for Plaintiff Creative Copier Services:

> Robert LaRocca
> Kohn, Swift & Graf, P.C.
> One South Broad Street – Suite 2100
> Philadelphia, PA 19107-3389

and

> J. Daniel Sagarin
> Elias A. Alexiades
> Hurwitz & Sagarin
> 147 North Broad Street
> Milford, CT 06460

> /s/ Robert Dolian
> Robert Dolian
> CUMMINGS & LOCKWOOD
> Four Stamford Plaza, 107 Elm Street
> Stamford, Connecticut 06902
> (203) 351-4307
> fax: (203) 708-3948
> email: rdolian@cl-law.com

***Counsel for Xerox Corporation***

.StmLib1:1061734.1 06/02/04

1