### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **CREATIVE COPIER SERVICES** | : | **CIVIL ACTION NO.** |
| | : | **3:01 CV 155 (SDU)** |
| **v.** | : | |
| | : | |
| **XEROX CORP.** | : | |

## SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

## INTRODUCTION

Plaintiff, Creative Copier Services ("CCS"), alleges as follows for its second amended and supplemental complaint. The averments in the first amended complaint, filed in December, 1995, are incorporated by reference pursuant to F.R.Civ.P. 10(c). That complaint is attached as Ex. A for convenience. On February 16, 2000, the MDL transferee court granted and denied summary judgment to Xerox as to various claims in that complaint. In re Independent Service Organization Antitrust Litigation, 114 F.Supp.2d 1070 (D. Kan. 2000). Those claims or partial claims as to which judgment was granted to Xerox are reflected herein and preserved. The original numbering of the counts I through IV of that complaint are used to prevent confusion.

### COUNT I (FIRST AMENDED COMPLAINT)
#### Monopolization of Relevant Service Market

Summary judgment was granted to Xerox on this claim.  114 F.Supp.2d 1070, 1091-

1095.

### COUNT II (FIRST AMENDED COMPLAINT)
#### Monopolization of Relevant Parts Market

Summary judgment was granted to Xerox on this claim. 114 F.Supp.2d 1070, 1087.

### COUNT III (FIRST AMENDED COMPLAINT)
#### Defamation and Trade Disparagement

Summary judgment was denied as to Xerox' actions at Aetna Insurance, but granted as to

the other locations pled.  114 F.Supp.2d 1070, 1078-1080.

### COUNT IV (FIRST AMENDED COMPLAINT)
#### Interference with Contract and Prospective Economic Advantage

Summary judgment was denied to Xerox as to this claim as to the State of Connecticut,

the only customer pled.  114 F.Supp. 1070, 1081.  Plaintiff hereby amends that Count to allege as

follows.

103.    The foregoing averments are incorporated by reference.

104.    During the period 1987-1995, Xerox knew that CCS was a competitor with Xerox

for repairing customers' Xerox machines.  Xerox also knew that CCS was

dependent upon Xerox to obtain many of the parts needed to repair those

2

machines.

105.   Xerox knew that by refusing to sell parts to CCS in a timely manner and in the quantities ordered, Xerox would frustrate CCS' ability to perform CCS' contracts with its customers.

106.   Xerox deliberately and intentionally refused to sell parts to CCS in a timely manner and in the quantities ordered.

107.   Xerox acted intentionally and maliciously to frustrate CCS' contracts with CCS' customers, in order to have those customers cancel their contracts with CCS and in order for Xerox to obtain the customers' repair business.

108.   CCS was harmed and injured by Xerox' conduct, and CCS lost customers' business as a direct and proximate result of Xerox' conduct.

109.   Xerox' conduct violated Restatement (Second) Torts §§766 and 767, and constituted an unfair method of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Connecticut General Statute §42-110g(a).

110.   Xerox is liable for actual damages and punitive damages for the harm and injury it caused to CCS.

### COUNT V

#### Manipulation of Buy Out Amounts on Leases

111.   The foregoing averments are incorporated by reference.

112.   Xerox leases Xerox machines to customers.  The lease typically contains a purchase option price, or "residual buy out" price, at which the customer can purchase the

3

equipment at the end of the lease period, and own it. The buy out price is supposed to represent the fair market price of the used equipment, or a residual value.

113.  CCS has sought to compete with Xerox for business servicing Xerox copiers at Aetna Insurance Company, in Hartford, Connecticut. Aetna had Xerox model 1090 photocopier machines on term lease from Xerox. CCS had service contracts with Aetna for some of these machines, and Xerox had service contracts with Aetna for the remainder. The Xerox leases for those machines contained buy out prices, as set by Xerox, that were between approximately $5,300 and $6,200 for each machine. These were prices set by Xerox at which Aetna could buy out and own the machines at the end of the lease period.

114.  CCS desired to obtain the service contracts for all of the machines, and to reduce Aetna's costs in the process. CCS proposed to Aetna that CCS buy out the machines at the end of the lease, at Xerox' stated prices of $5,300 to $6,200 per machine. CCS had lined up a finance company (Tetra) to finance the project. CCS presented a proposal to Aetna whereby CCS would service these machines for Aetna after CCS purchased them, at a cost less than Xerox' current service contracts cost.

115.  In response, Xerox told Aetna that CCS would not be permitted to buy out the leases, and that only Aetna could do so.

116.  When Aetna indicated its interest in buying the machines at the residual rates, so that CCS could service them, Xerox, in October, 1997, changed the buy-out rate on these machines, increasing the residual or buy out price to $15,000 per machine. Xerox did this in order to prevent CCS from servicing the machines.

117.  Xerox has to pay Hartford ad valorem taxes on Xerox' property. Upon information and

4

belief, Xerox took the position with the City of Hartford that the same machines are valued at substantially less than $15,000.

118. Xerox' actions were taken with the purpose of harming CCS, and have harmed and injured CCS.

119. Xerox conduct is in violation of the federal antitrust laws, Restatement (Second) Torts §§ 766 and 767, and constitute an unfair method of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Connecticut General Statute §42-110g(a).

120. Xerox is liable for actual damages, trebling of damages, and punitive damages for the harm and injury it caused to CCS.


## COUNT VI

### The Price Squeeze on Xerox Parts

121. The foregoing averments are incorporated by reference.

122. Most parts needed to repair a Xerox machine can be obtained only from Xerox. And some customers require use of only Xerox parts (as opposed to parts furnished by aftermarket supply houses). For example, the State of Connecticut inserted a new term into its contracts, during 1996-1998, that CCS can use only parts obtained from Xerox when it services State equipment.

123. Xerox charges its own service company (which is in competition with CCS for repair of Xerox machines) prices for Xerox parts which are a very small fraction of the prices Xerox charges to CCS.

5

124.    Xerox charges CCS prices for parts which are substantially higher than the prices Xerox charges to sell the same part to its own company.  A chart illustrating historical prices on parts which are frequently needed to repair Xerox copiers shows the following:

| Name | Part Number | Xerox Price to Its Branch | Xerox Price to CCS |
|---|---|---|---|
| Wire Feed Repair Kit | 600S92546 | | $21.25 |
| Front Link | 12PO1577 | | $5.20 |
| Duplex Drive Assembly | 2S53975 | | $176.60 |
| Feed Head Latch | 003S05591 | | $12.40 |
| RDH Inverter Shaft | 006S23282 | | $68.90 |
| Dev Drive Assembly | 007S21232 | | $596 |
| SADH Gas Spring | 009PO4877 | | $58.95 |
| Reg Finger Crank Lever | 011P01520 | | $7.00 |
| Prefuser Jam Switch | 110P21012 | | $29.80 |
| RDH Tar Clutch Assembly | 121S01974 | | $446.00 |
| HVAC Output Module | 140S12507 | | $978 |
| Billing Board | 140S24892 | | $77.80 |
| Thermostat | 130P00761 | | $40.30 |
| XER PWB | 140S27212 | | $1,789.00 |
| Waste Toner Kit | 600S08139 | | $37.10 |
| DCR PWB | 140S27483 | | $1152.00 |

*Redacted*

6

125.   This pricing disparity puts CCS at an unfair commercial disadvantage in competing with Xerox' service company. It constitutes misuse of Xerox' monopoly in the parts market to control and extend the service market.

126.   The reality of this pricing disparity means that when Xerox enters into a "Full Service Maintenance Agreement" (FSMA) with a customer, Xerox agrees to supply the labor, the parts, and the supplies for the copier at a set price per copy. The Xerox branch which performs this service contract is able to obtain the parts to honor its Full Service Maintenance Agreement at prices which are approximately one tenth of CCS' costs for the same parts. CCS as a competitor of Xerox for service business is placed in a price squeeze by Xerox.

127.   CCS has been harmed and injured by Xerox' conduct.

128.   Xerox conduct is in violation of the federal antitrust laws, Restatement (Second) Torts §§ 766 and 767, and constitute an unfair method of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Connecticut General Statute §42-110g(a).

129.   Xerox is liable for actual damages, trebling of damages, and punitive damages for the harm and injury it caused to CCS.

## COUNT VII

### State of Connecticut and "Newly Manufactured" Machines

130.   The foregoing averments are incorporated by reference.

131.   CCS has desired to sell to the State of Connecticut Xerox machines which CCS

7

has refurbished.  CCS has the ability to refurbish high speed Xerox machines, especially model 1090's, and to guarantee its work.

132.    Prior to June, 1999, the State accepted bids for machines that were new or refurbished.  However, in June, 1999, the State changed its contract to provide that it would purchase only new machines, not refurbished ones.  This provision prevented CCS from bidding for the work, because CCS could not buy and resell new Xerox machines at a price that was competitive with Xerox' price for selling such machines.

133.    Xerox bid for and was awarded this contract, worth about $4 million.  However, Xerox did not sell the State new machines.  Xerox supplied the State with model 5892 and other machines, many of which were simply older-model Xerox machines with new nameplates.  Many had parts that were 5-7 years old.  For example, the model 5892, one of the models Xerox used in this contract,  is simply the model 1090 machine with a new finisher, stapler and collator.  The "guts" of the machine is a refurbished model 1090, which Xerox stopped manufacturing a number of years ago.

134.    In filling this bid, Xerox misrepresented to the State that it was selling new machines.

135.    As a result of this tactic, Xerox prevented CCS from bidding on the State's business for refurbished machines for a two year period.

136.    CCS has been harmed and injured by Xerox' conduct.

137.    Xerox conduct is in violation of the federal antitrust laws; Section 43(a) of the Lanham

Act, 15 U.S.C. §1125(a); Restatement (Second) Torts §§ 766 and 767, and constitute an

unfair method of competition and unfair or deceptive acts or practices in the conduct of

trade or commerce, in violation of Connecticut General Statute §42-110g(a).

## COUNT VIII

### Misrepresenting "Old" Machines as "New"

138. The foregoing averments are incorporated by reference.

139. In late 1996, CCS offered to sell to Aetna a used Xerox which CCS had reconditioned. In
contrast, Xerox claimed it would sell Aetna a "newly manufactured" 5388. CCS lost the
sale when Aetna decided to buy Xerox' machine because it was supposedly "new." CCS
has not been able to compete with selling reconditioned machines versus the supposedly
"new" model 5388 sold by Xerox.

140. The 5388's are supposedly recent machines that Xerox introduced in the 1990's.

141. However, when CCS examined a model 5388, CCS discovered that it had parts from
1987 and 1988, and that it was just a model 1090 that Xerox had repainted. Xerox
stopped making the 1090 sometime in the 1980's. A matrix on a machine is an emblem
that defines the machine's engineering changes. The matrix on Xerox' machine even had
the 1090 nameplate. This supposedly "newly manufactured" piece of equipment was
actually rebuilt from a 1090 and/or old 1090 parts.

142. Xerox has engaged in misrepresentation of the nature, characteristics, qualities or its
"new" 5388 machines.

9

143.    Xerox' conduct has harmed and injured CCS.

144.    Xerox actions violate of Section 43(a)of the Lanham Act, 15 U.S.C. §1125(a); the federal

        antitrust laws; Restatement (Second) Torts §§ 766 and 767; and constitute an unfair

        method of competition and unfair or deceptive acts or practices in the conduct of trade or

        commerce, in violation of Connecticut General Statute §42-110g(a).

145.    Xerox is liable for actual damages, trebling of damages, and punitive damages for the

        harm and injury it caused to CCS.


### COUNT IX

### Below Cost Pricing

146.    The foregoing averments are incorporated by reference.

147.    Xerox has engaged in below-cost pricing, in an effort to drive CCS out of business.

148.    Xerox' anticompetitive pricing is illustrated in the following chart. The first column is

        Xerox' GSA price on a service contract. It is supposedly Xerox' lowest price, which it

        charges the Federal Government, and the State of Connecticut. It includes labor, parts

        and supplies, but does not include leasing of the machine by the customer. (In other

        words, it assumes that the customer already owns the machine and is just contracting for

        labor, parts and supplies). In the second column is the cost of obtaining a typical Xerox

        high speed copier, prorated over 36 months (a standard three year lease period). The third

        column shows Xerox' cost per copy program to Aetna. It includes all of the following:

        Xerox provides the new machine, plus the parts, labor, and supplies, and pays the taxes

on the machine as well.

149.   Xerox' price to Aetna should be approximately the sum of columns 1 (parts and labor)

and 2 (the machine).  However, Xerox' price to Aetna (column 3) is substantially less:

| MODEL | STATE CONN. CCP PLAN[2] | COST OF MACHINE | AETNA CCP PLAN[1] |
|---|---|---|---|
| 5614 | $.0299 for 3,000 copies ($89.70/month) | $2,835, or $78.75/ month over 36 months | .012 for 3,000 ($36.00/month at this rate) |
| 5680 | $.0159 for 75,000 copies, $1,192.50/mo | $44,095, or $1,225/mo over 36 months | .012 for 75,000, or $900/mo at this rate |
| 5390 | $.0129 for 400,000 copies,  $5,160/mo | $157,000,or $4,361/mo over 36 months | .012 for 400,000, or $4,800/mo at this rate |

150.   Xerox' actions have harmed and injured CCS.  CCS was forced to accept two

contracts with Aetna in which CCS lost money directly as a result of Xerox'

conduct.

151.   Xerox conduct is in violation of the federal antitrust laws, Restatement (Second)

Torts §§ 766 and 767, and constitute an unfair method of competition and unfair

or deceptive acts or practices in the conduct of trade or commerce, in violation of

Connecticut General Statute §42-110g(a).

---

[1] Aetna's CCP, or cost per copy plan, from Xerox, includes labor, parts, supplies, plus the machine and taxes on the machine.

[2]  The State of Connecticut's cost per copy plan from Xerox provides parts, labor, and supplies, but no machine.

152.    Xerox is liable for actual damages, trebling of damages, and punitive damages for

the harm and injury it caused to CCS.


## COUNT X

### Software License Fees on Previously Unlicenced Machines

153.    The foregoing averments are incorporated by reference.

154.    Xerox did not charged any software license fees to customers on its model 1090 machine,

which it put into service in 1985. Servicing this machine has been the bulk of CCS'

service business.  All software used to diagnose or troubleshoot malfunctions on the 1090

is built into the machine as the customer purchases it.  The repair person simply uses this

diagnostic machinery by pushing buttons on the machine's control panel, in much the

same manner as a customer pushes buttons to select how many copies should be made.

155.    Xerox recently introduced license fees of about $800-$900 per year on its models 5388

and 5680 Xerox high speed copier machines.

156.    The 5388 and the 5680 are basically the same machine as the 1090.  A machine which

Xerox sold as a "new" 5388, was a repainted 1090, and even had the 1090 nameplate and

matrix, meaning it was rebuilt from a 1090 and/or old 1090 parts. The models 5388 and

5680 appear to have exactly the same circuitry as the 1090.  Diagnostic software on these

models is essentially the same as the 1090.

157.    Xerox' actions have been undertaken for anti-competitive purposes.  Xerox does not itself

pay such licensing fees on machines it services, nor does it require customers who

12

contract for service with Xerox to pay such fees. However, customers who contract with

non-Xerox service providers (such as CCS) are burdened with such spurious fees.

158.   Xerox conduct is in violation of the federal antitrust laws, for abusing its monopoly of

machines in order to extend its control of the service market; Restatement (Second) Torts

§§ 766 and 767, and constitute an unfair method of competition and unfair or deceptive

acts or practices in the conduct of trade or commerce, in violation of Connecticut General

Statute §42-110g(a).

159.   Xerox is liable for actual damages, trebling of damages, and punitive damages for the

harm and injury it caused to CCS.


## COUNT XI

### Changing Part Numbers to Increase Prices

160.   The foregoing averments are incorporated by reference.

161.   In 1994, Xerox agreed to sell parts to ISO's, as part of its settlement of the R & D

litigation. As part of that agreement, Xerox agreed that it would not raise the prices of

parts, during any 12 month period, more than the following, whichever one was less:

> (1) 5%, or
>
> (2) "the smallest increase in the base price of any Full Service
>
> Maintenance Agreement being offered by Xerox for the Relevant
>
> Equipment, as identified by the SPL Code, in which the part is
>
> used".

162. Xerox has sought to evade this agreement, by assigning new parts numbers and then raising their prices substantially.

163. For example, on May 7, 1998, CCS ordered from Xerox part number 30S26733. This is a magnetic strip which holds paper on the transport belt for the Xerox model 1090 copier. The price was $26.80. However, Xerox changed the part number to 30K47340, and raised the price to $49.05.

164. On July 31, 1998, CCS ordered from Xerox part number 20P3396. This is a pulley for the Xerox 1090. Xerox changed the part number to 20E29140, and raised the price from $7.15 to $11.15.

165. On July 6, 1998, CCS ordered from Xerox part number 600K64270, a thermal fuse for the Xerox copier 5052. Xerox assigned it a new number, and raised its price from $49.75 to $142.

166. In 1998, CCS ordered from Xerox part number 22K630. This is a foam roll for the Xerox 5052. Xerox gave this a new part number, and raised the price from $33.40 to $63.90.

167. These are illustrations of a general pattern of conduct by Xerox in selling parts to CCS.

168. Xerox conduct is in violation of the federal antitrust laws, Restatement (Second) Torts §§ 766 and 767, and constitute an unfair method of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Connecticut General Statute §42-110g(a).

169. Xerox is liable for actual damages, trebling of damages, and punitive damages for the harm and injury it caused to CCS.

14

## COUNT XII

### Changing Parts To "Supply Items" And Refusing to Sell them

170.    The foregoing averments are incorporated by reference.

171.    CCS has contracts to service certain Xerox low end copiers with the State of
Connecticut.

172.    Xerox has re-designated what have traditionally been "parts" into supposed "supply
items", and refused to sell them to CCS. For example, a corotron is a part used in a
Xerox machine to place and remove an electric charge on the photoelectric belt. This has
always been considered a "part", and sold as such. Similarly, a photoreceptor belt was a
"part." And a cleaning assembly was a "part". Xerox has re-designated these parts as
supposedly a new "supply item" which it calls a "copy cartridge" instead of a "part", and
has then refused to sell these to CCS unless CCS can prove it is needed for a specific end-
user's specific machine. In other words, Xerox has re-implemented its same 1987 and
1989 restrictive parts policy ("On Site End-User Verification Policy") on these parts that
it purported to abolish in 1995.

173.    Recently, CCS was not able to obtain parts (copy cartridges) needed to service
low-end machines under a contract with the State of Connecticut, because Xerox
had designated these parts as "supply items", and refused to sell them to CCS on
the stated rationale that CCS did not itself own those models of machines.

174.    Xerox' actions have been taken with the intent and effect of harming CCS.

175.    Xerox conduct is in violation of the federal antitrust laws, Restatement (Second) Torts §§
766 and 767, and constitute an unfair method of competition and unfair or deceptive acts

or practices in the conduct of trade or commerce, in violation of Connecticut General Statute §42-110g(a).

176.   Xerox is liable for actual damages, trebling of damages, and punitive damages for the harm and injury it caused to CCS.


## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

1)     Judgment in its favor and against Xerox on each Count of this Complaint;

2)     Compensatory damages;

3)     Trebling of damages;

4)     Punitive damages;

5)     Injunctive relief;

6)     Reasonable attorneys' fees and costs of the suit;

7)     Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

CCS demands a jury trial on all issues triable by jury.

16

Dated: November 5, 2001

Respectfully submitted,

Robert J. LaRocca   CT 22901
**Kohn, Swift & Graf, P.C.**
1 South Broad St.
Philadelphia, PA 19106
(215) 238-1700
(215) 238-1968 (fax)
Attorney for CCS

Of Counsel:
J. Daniel Sagarin CT04289
Elias A. Alexiades CT03543
**Hurwitz & Sagarin, LLC**
147 N. Broad Street
Milford, CT 06460
(203) 877-8000

17