**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

FILED

2004 JUN 17 A II: 01

U.S. DISTRICT COURT
BRIDGEPORT, CONN

| | | |
|---|---|---|
| CREATIVE COPIER SERVICES, | : | |
| | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | Civ. No. 3:01cv155 (SDU) |
| v. | : | |
| | : | |
| XEROX CORPORATION, | : | June 16, 2004 |
| | : | |
| Defendant | : | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS THE THIRD AMENDED AND SUPPLEMENTAL COMPLAINT**

Robert LaRocca CT 22901
Kohn, Swift & Graf, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
(215) 238-1700
(215) 238-1968 (fax)

Of counsel:
Elias A. Alexiades CT03543
P.O. Box 3859
Amity Station
New Haven, CT 06525

**TABLE OF CONTENTS**

**Page**

Background and Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-6

Count I States a Claim For Abuse of Monopoly Power in Service Market . . 6-20

    A.  Denying ISO's Parts In the "End User Verification" Scheme . . . . 6-14

    B.  Misrepresenting Copiers . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

    C.  Below Cost Pricing At Aetna . . . . . . . . . . . . . . . . . . . . . . . . 15-18

    D.  Spurious "Diagnostic" Fees . . . . . . . . . . . . . . . . . . . . . . . . . 18-19

    E.  Manipulation of Lease Buy-Out Amounts . . . . . . . . . . . . . . . 19-20

    F.  Price Caps in R & D Settlement . . . . . . . . . . . . . . . . . . . . . . . 20

Count III States a Claim For Defamation . . . . . . . . . . . . . . . . . . . . . . . 20-22

Count II States a Claim For Tortious Interference . . . . . . . . . . . . . . . . . 22-28

Count IV States a Claim For CUTPA Violations . . . . . . . . . . . . . . . . . . 29-31

Count V States a Claim For Lanham Act Violations . . . . . . . . . . . . . . . . 32-36

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

i

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Creative Copier Services ("CCS") is a sole proprietorship owned and operated by William Dixon, a resident of Wallingford, CT.   CCS repairs high-speed, high-volume Xerox photocopying machines.  CCS, termed an Independent Service Company, or ISO, competes with Xerox' own wholly-owned service company for service contracts at companies such as Aetna and Cigna.

This lawsuit originated because of anti-competitive practices Xerox adopted in the late 1980's.  In brief outline, in 1989 Xerox implemented a plan to put independent repair companies throughout the U.S., including CCS, out of business by denying them access to the parts they needed to repair Xerox machines.

Xerox and Kodak by the mid-1980's were the two major manufacturers of high speed photocopiers (copiers producing in the range of 65 to 90 copies per minute).  Kodak had about 30% of the total market for sales of new machines; Xerox had over 60%. The copiers are used by large companies, such as Aetna and Cigna, which have very high photocopying demands.  Xerox and Kodak each controlled the supply of parts needed to repair their respective machines (each machine is composed of about 2,000 parts, which are not interchangeable between brands).  Both had their own service companies to repair the respective machines.

During the 1980's, both encountered competition from ISO's, independent companies trained to service these machines at customers'

locations.  Both Xerox and Kodak decided, at about the same time, to put the respective ISO's out of business, so as to secure 100% of the revenue for servicing their machines for their own service companies.   Cutting off the ISO's ability to buy parts, while providing parts to their own service companies, was the method employed.

The MDL Court, reviewing this on the evidence of a summary judgment record, stated that Xerox had specifically targeted Creative Copier Services in its efforts to eliminate competition from ISO's nationwide:

> Xerox recognized that ISO's [independent service companies, such as CCS] were a competitive threat in the copier service market...
>
> ...On October 21, 1988, senior partners of Xerox developed an action plan against ISO's . **The plan targeted six major ISO's in five districts, including CCS in the Hartford district**.  The plan proposed to strengthen Xerox policy on the sale of parts by concentrating on these six ISO's, by requiring end user verification, use of on/site physical tracing, and outright refusal to sell replacement parts to ISO's.

*In re Independent Service Organizations Antitrust Litigation*, 114 F.Supp.2d 1070, 1083 (D. Kan. 2000) (emphasis supplied).  The Court found that Xerox had offered no justification for this policy, and there was a triable issue that Xerox had acted with malice.  *Id.* at 1081.

Both Kodak and Xerox were sued by the ISO's, as well as by customers who were being deprived of the benefit of price and quality competition provided by the respective ISO's.

After the Ninth Circuit reversed summary judgment to Kodak, the U.S. Supreme Court granted certiorari, affirmed the denial of summary judgment to Kodak, and established the basic principles which control the present case. *Eastman Kodak v. Image Technical Service*, 504 U.S. 451 (1992) . In particular, the Supreme Court held that there was sufficient evidence to present at trial as to three relevant markets: the market for buying the Kodak high speed photocopying machines; the market for servicing these Kodak machines; and the market for supplying parts for the Kodak machines. The Court held that evidence was sufficient to show that Kodak had monopoly power in all three markets. The Court held that there was a genuine issue of material fact requiring trial as to whether Kodak had illegally increased its market share in the service market, by seeking to put the ISO's out of business by restricting and denying them parts. 504 U.S. at 482-485.

On remand for trial, the jury returned a verdict for 11 plaintiff Kodak ISO's in the amount of $78 million, which the Ninth Circuit affirmed in substantial part, and as to which the Supreme Court denied certiorari. 125 F.3d 1195 (9th Cir. 1997) *cert. den* 118 S.Ct. 1560 (1998).

3

Xerox was also sued by ISO's who repaired Xerox machines for the same conduct, and settled a large class-action lawsuit in federal court in Texas in 1994, brought by ISO's and "end users."  Twenty-one ISO's opted out of the settlement, including CCS, and filed a lawsuit in federal court in the Northern District of California.  This suit was transferred by the MDL panel to Kansas City, Kansas, to be consolidated with one other lawsuit in that venue, brought by an ISO named Copier Services Unlimited, or "CSU".

Xerox settled with 20 of the 21 transferred ISO's in 1996, but not with Creative Copier Services, which was represented by separate counsel.  CCS' case remained dormant in the MDL from 1996 through 1999, while Xerox litigated against the other plaintiff, CSU.  In 1999, Mr. Dixon came to be represented by undersigned counsel, his case was re-activated, and he and Xerox litigated cross motions for summary judgment.

Because plaintiff contended that Xerox continued its pattern of anti-competitive conduct during the time period that his case was dormant, Mr. Dixon and Xerox entered into a stipulation that those new claims could be pled (and the statute of limitations would be tolled) once this case was ultimately transferred to this District.

In 1999, Xerox obtained summary judgment against the other remaining litigant, CSU, which was affirmed by the Federal Circuit. *In re Independent Service Organizations (CSU v. Xerox)*, 203 F.3d 1322 (Fed. Cir. 2000).

4

Xerox litigated summary judgment motions and cross-motions against Creative Copier Service. Expert reports were exchanged, and depositions taken. By Opinion and Order in February, 2000, the MDL transferee court adjudicated these summary judgment motions. The court granted summary judgment in favor of Xerox on the two federal antitrust counts, for abuse of power in the parts market, and abuse of power in the service market. *In re Independent Service Organizations Antitrust Litigation,* 114 F.Supp.2d 1070 (D. Kan. 2000). The Court granted in part and denied in part Xerox' motion as to plaintiff's defamation count under Connecticut law. *Id.* at 1078-1080. The Court denied Xerox' motion as to the claim for tortious interference with contract under Connecticut law. *Id.* at 1081.

Upon transfer, plaintiff moved this Court to re-instate the federal antitrust claim for abuse of monopoly power in the service market (114 F.Supp.2d at 1088-1096). This Court ordered this claim to be reinstated on March 30, 2004, at the same time directing that a third amended complaint be filed, holding that other rulings of the MDL Court would be treated as law of the case.

In brief outline, the third amended complaint now before this Court is temporally divided: at ¶¶6-33 it relates to the 1989-1994 time period, and alleges conduct at issue before the MDL Court. At ¶¶ 35-65 it alleges conduct

5

subsequent to 1995 that was not before the MDL Court, and which Xerox stipulated in 1999 could be pled.

The Third Amended Complaint contains five counts. Count I alleges abuse of monopoly power in the service market. Count II alleges tortious interference with contract. Count III alleges defamation and trade disparagement. Count IV is pled under the Connecticut statute for unfair trade practices. Count V asserts a violation of the Lanham Act. These counts, unless specifically noted (i.e. Counts III and V) refer to all conduct alleged at ¶¶6-65.

Plaintiff responds to Xerox' brief in the order of argument set forth by Xerox.

## COUNT I STATES A CLAIM
## FOR ABUSE OF MONOPOLY POWER IN THE SERVICE MARKET

### A. Denying ISO's Parts In the "End User Verification" Scheme

The claim that Xerox abused its monopoly power in the service market to drive ISO's out of business (Count I of the present complaint) was before the MDL Count as to conduct during the 1989-1994 time period. The MDL Judge granted summary judgment to Xerox on the failure of plaintiff to "disaggregate" damages. 114 F.Supp.2d at 1088-1095. The Court ordered this Count reinstated by Order of March 30, 2004. It has now been re-pled as part of Count I. This Count is based on upon *Kodak, supra.* Xerox present brief, at pp. 1-12, is one prolonged effort to avoid *Kodak.*

6

In *Kodak,* the Court held that "a single brand of a product or service" could constitute a relevant market. 504 U.S. at 482. The Court further held that because Kodak possessed "nearly 100% of the parts market [for Kodak highspeed copiers] and 80% to 95% of the service market [for servicing these copiers], with no readily available substitutes", that summary judgment was foreclosed to Kodak as to whether it had monopoly market power. *Id.* at 481. The Court further held that a triable issued existed as to whether Kodak's exclusionary action against ISO's constituted an abuse of its monopoly market power. *Id* at 483-486. More specifically, the Court held that there was evidence that "Kodak used its control over parts to strengthen its monopoly share of the Kodak service market." *Id.* at 483:

> the second element of a §2 claim is the use of monopoly power to foreclose competition, to gain a competitive advantage...If Kodak adopts its parts and service policies as part of a scheme of willful acquisition or maintenance of monopoly power, it will have violated §2...As recounted at length above, respondents have presented evidence that Kodak ...used its control over parts to strength its monopoly share of the Kodak service market.

*Id.* at 483.

The Court addressed the anti-competitive consequences of Kodak's practices:

> Respondents also allege that Kodak's control over the parts market has excluded service competition, boosted service prices, and forced unwilling

> consumption of Kodak service. Respondents offer
> evidence that consumers have switched to Kodak
> service even though they preferred ISO service, that
> Kodak service was of higher price and lower quality
> than the preferred ISO service, and that ISO's were
> driven out of business by Kodak's policies. Under our
> prior precedents, this evidence would be sufficient to
> entitle respondents to a trial on their claim of market
> power.

*Id.* at 465.

The third amended complaint tracks *Kodak* in alleging that there were

separate markets: (1) for purchasing the Xerox high speed photocopiers; (2) for

parts for those photocopiers; and (3) for servicing those photocopiers, and that

Xerox had monopoly power in each market. Third amended complaint, ¶67.

Plaintiff follows *Kodak* in alleging that Xerox misused its monopoly power over

parts to seek to eliminate the competition from ISO's in the service market.

Third amended complaint, ¶¶67-71. Plaintiff has alleged that Xerox did so

intentionally to eliminate the price competition and quality competition

provided by the ISO's. *Id.*, ¶22. *Kodak* is on "all fours" with this case, and it

is difficult to understand how Xerox can seriously argue that plaintiff has failed

to state a claim under *Kodak*.[1]

---

[1] Courts sometimes refer to this as "monopoly leveraging", i.e.
"leveraging" power from one market (here parts) to improperly increase control
in another market (here, service). *See Kodak* on remand and after trial, 125
F.3d 1195, 1208 (9th Cir. 1997) ("The ISO's proceeded under a 'monopoly
leveraging theory' alleging that Kodak used its monopoly over Kodak parts to
gain or attempt to gain a monopoly over the service of Kodak equipment. The
(continued...)

Xerox first argues at pp. 4-10 that this Count, having just been re-

instated, should now be dismissed because plaintiff did not adequately "plead"

market definitions.  Xerox claims plaintiff was required to allege in detail

"demand substitutability" (pp. 7-8) and "supply substitutability" (pp. 8-10).

However, the Second Circuit has rejected the argument that "antitrust claims,

because of their complexity, must be pleaded with greater specificity than other

claims", holding:

> It has been clear in this circuit since *Nagler v. Admiral
> Corp.*, 248 F.2d 319 (2d Cir. 1957) (Clark, C. J.),
> however, that a short plain statement of a claim for
> relief which gives notice to the opposing party is all
> that is necessary in antitrust cases, as in other cases
> under the Federal Rules.

*George C. Frey Readi-Mix Concrete Co. v. Pine Hill Concrete Mix Corp*, 554 F.2d

551, 553-554 (2d Cir. 1977).  Furthermore, this Court's Order of March 30,

---

[1](...continued)
Supreme Court endorsed this theory in *Kodak*...").
    In *Berkey Photo Inc. v. Eastman Kodak*, 603 F.2d 263, 275 (2d Cir. 1979)
the court stated it was sufficient if monopoly power were used in one market to
gain a "competitive advantage" in a second market.  This concept has
subsequently come under criticism in this Circuit, on the basis that
"competitive advantage" in the second market is too weak a showing, and that
an increase in monopoly market power must be shown in the second market as
well.  *See Virgin Atlantic Airways v. British Airways PLC*, 257 F.3d 256, 272 (2d
Cir. 2001).  The third amended complaint passes muster under both *Kodak*
and *Virgin Atlantic* because it alleges that Xerox had monopoly market power in
both the parts and service market, and illegally sought to increase its power in
the service market.  Third amended complaint, ¶¶67-71.

9

2004 stated that "the forthcoming third amended complaint should set forth a short and plain statement of each claim..."

Xerox' argument is especially perplexing because plaintiff furnished Xerox with an expert economic report, and Xerox deposed its author, prior to the summary judgment briefing in the MDL Court. It explains in detail the issues that Xerox' current motion to dismiss addresses. The logic of Xerox' argument is that, to withstand a Rule 12(b)(6) motion, plaintiff was required to plead every fact and opinion in this economic report, increasing the length of the third amended complaint from 22 pages to 122 pages. This argument defies common sense.   These issues will be the subject of a proverbial "battle of the experts" at trial.  As *Kodak* held, they are not appropriate for summary judgment rulings.  Obviously they are not appropriate for Rule 12(b)(6) adjudications.

Xerox next argues that ¶¶6-33 of the third amended complaint do not "allege actionable anti-competitive conduct." (Xerox brief, pp. 10-14).  The Supreme Court held that the same conduct by Kodak in denying Kodak parts to its ISO's could violate Section Two of the Sherman Act, requiring a trial.  504 U.S. at 482-486. The Ninth Circuit subsequently affirmed the jury verdict that Kodak's conduct *had* violated the antitrust laws. 125 F.3d 1195 (9th Cir. 1997) *cert. den* 118 S.Ct. 1560 (1998).   It is difficult to see how Xerox can

seriously advance an argument that plaintiff has not alleged actionable conduct.

Xerox relies heavily at p. 14 upon a pre-*Kodak* case from the 4th Circuit, *Abcor Corp v. AM Int'l Inc.*, 916 F.2d 926 (4th Cir. 1990), which did not relate to depriving ISO's of parts. In contrast, Xerox ignores *Kodak,* authored two years later by the Supreme Court, which did address denying parts to ISO's.

Xerox relies even more heavily upon *Verizon Communications Inc. v. Law Offices of Curtis v. Trinko,* – U.S. -, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004). (Xerox at pp. 10-12). *Trinko* did not mention *Kodak,* and certainly did not overrule it. In *Trinko*, the plaintiff law firm claimed that defendant Verizon had violated a telecommunications act, 47 U.S.C. §251(c), which required Verizon to provide access of its network to other telecommunications companies on an "unbundled basis." This violation of a telecommunications act, plaintiff argued, was the basis for concluding that Verizon had violated the antitrust laws, by refusing to provide these unbundled services to its rivals. More specifically, the plaintiff law firm claimed that Verizon had complied with this telecommunications act in a discriminatory manner that favored defendant and disadvantaged defendant's competitors. The Court held that a violation of 47 U.S.C. §251(c) did not "create new claims that go beyond existing antitrust standards." 124 S.Ct. at 878.

11

The Court then elaborated upon those traditional existing standards of when a "refusal to deal" by a monopolist is and is not lawful. *Trinko* contrasted prior cases where the monopolist had "engaged in a course of dealing with its rivals", and then stopped, for anti-competitive reasons, which violated the Sherman Act. *Id.* at 880. In contrast, in *Trinko*:

> The services allegedly withheld are not otherwise available to the public…The unbundled elements offered pursuant to §251(c)(3) exist only deep within the bowels of Verizon.

*Id.* The Court explained that under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), the monopolist violated the law because "what the defendant refused to provide to its competitor was a product that it already sold at retail—to oversimplify slightly, lift tickets representing a bundle of services to skiers." *Id.* at 880. Similarly, in *Otter Tail Power v. United States*, 410 U.S. 366 (1973), the monopolist "was already in the business of providing a service to certain customers (power transmission over its network) and refused to provide the same service to certain other customers." *Id.* at 880.

The case at bar fits squarely within this traditional, existing law as explained in *Trinko*. Here, Xerox had historically made its parts available for repairing its photocopying machines. Third amended complaint, ¶7. Xerox assured Creative Copier Service that Xerox would continue to sell parts to CCS, and did so for a period. *Id.* ¶¶ 10, 11, 17. And when Xerox then abruptly changed its policy, in order to try to put CCS and the other ISO's out of

12

business, ¶¶19-24, Xerox continued to make available parts to "end user" customers, while refusing to sell them to ISO's. *Id*, ¶25. This is the discriminatory conduct which *Trinko*, explaining *Aspen Skiing* and *Otter Tail*, held to be violations of Section Two of the Sherman Act.

At pp. 12-14, Xerox argues that Creative Copier Service could not "free ride" on Xerox' parts inventory. This is a type of affirmative defense, which is improper to raise on a motion to dismiss. *See* Wright & Miller, *Federal Practice & Procedure*, §1357 pp. 350-351 (West, 1990). *Deckard v. General Motors*, 307 F.3d 556, 560 (7th Cir. 2002) ("a motion to dismiss was improper since...the existence of a defense does not undercut the adequacy of the claim").

Even more importantly, the Supreme Court in *Kodak* addressed the very same "business justification" defenses now proffered by Xerox, and held they were not grounds for summary judgment:

> There is also a triable issue of fact on Kodak's second justification—controlling inventory costs...Kodak's actions appear inconsistent with any need to control inventory costs. Presumably, the inventory of parts needed to repair Kodak machines turns only on the breakdown rates, and those rates should be the same whether Kodak or ISO's perform the repair.

504 U.S. at 484-85. Clearly, these will be the subject of trial, not summary judgment, let alone a motion to dismiss.

Xerox also tries to ridicule CCS' claims by arguing that "no right to FedEx overnight delivery is written into the Sherman Act." (Xerox p. 13). Xerox

seeks to deflect the Court's attention from the actual averments. After Xerox implemented its anti-ISO policy, CCS tried, as best it could, to comply, in order to mitigate its damages and prevent total loss of customers. Third amended complaint ¶26. Xerox sought to, and did, intentionally frustrate CCS in that effort. *Id.* ¶¶27-29. This was part of the overall anti-competitive conduct.

### B. Misrepresenting Copiers

The third amended complaint, at ¶¶35-65, alleges how Xerox has continued to misuse its power in a series of actions since 1995 in an effort to cripple CCS. Xerox challenges certain of these allegations at pp. 15-20 of its brief.[2]

Xerox argues that the averments at ¶¶42-49, namely that Xerox misrepresented "used" copiers as "new" copiers cannot be part Count I because it relates to the sale of copiers, not servicing of copiers. (Xerox, p. 15).

---

[2] Xerox does not appear to address all of plaintiff's allegations. For example, at ¶35 plaintiff alleged that Xerox priced its parts in a discriminatory manner to injure CCS in the service market. Xerox' motion does not take issue with this averment. The MDL Court found that high prices of parts, standing alone, could not sustain a claim of abuse of monopoly power in the **parts** market. 114 F.Supp.2d at 1087. (To show misuse of monopoly power in the parts market, plaintiff would have to show that Xerox illegally increased its share of that market, such as by improperly driving other wholesalers of parts out of business). The MDL Judge did not address, consider, or rule that Xerox' anti-competitive pricing of parts to ISO's (i.e. charging ISO's 10 times or more the prices it charged its own service company) could not be one facet of Xerox' pattern of abuse of the **service** market, in its effort to eliminate ISO's. Just as denying parts entirely to ISO's is anti=competitive conduct, so is pricing them at 10 times their normal price.

However, CCS alleged that it intended to enter into service contracts for these machines, and was foreclosed from doing so. Complaint, ¶¶42. Since Creative Copier Services is primarily a service company (¶10), it is a fair inference that these collateral activities of selling refurbished copiers has been taken by CCS with the objective of generating additional service contracts, and that Xerox' anti-competitive response has been taken with the intention of frustrating the same.

### C.  Below Cost Pricing At Aetna

At pp. 15-16, Xerox argues that the allegations at ¶¶50-53 cannot be part of Count I because CCS did not allege below cost pricing at Aetna with enough specificity. That argument fails under the *Frey* decision, quoted on p. 9 above.

The cases upon which Xerox relies, such as *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) involve trial of below cost pricing claims, upon a full discovery and evidentiary record, or at least proof after full discovery in a summary judgment posture. They do not involve "pleading" deficiencies. Here, plaintiff has alleged at ¶¶51-52 pricing by Xerox at Aetna which, on its face, seems so far below Xerox "lowest" represented price to raise a strong inference that it is below Xerox' appropriate cost, and was intended to make it unable for CCS to compete at Aetna (where both companies have competed for a long time, ¶30).

These paragraphs detail Xerox' "GSA price"—supposedly the lowest price charged by Xerox to any customer, for labor, parts and supplies. It did not include Xerox supplying the machine, but rather was predicated on the customer already owning the machine, and hence not paying any additional cost for the machine itself. CCS then set forth the lowest cost of obtaining a Xerox machine. Added together, these should approximate the very lowest price Xerox could charge and still make a profit for a contract where Xerox supplied the labor, parts, supplies, and the machine. The price to Aetna was so much lower than these components as to raise a strong inference that Xerox had priced below its cost at Aetna, in order to prevent CCS from obtaining service contracts.

Xerox finds fault because CCS alleged Xerox' conduct was "below cost" Xerox claims CCS should have alleged that Xerox' conduct was "below an *appropriate* measure of its costs." [Xerox, p. 16] However, Xerox' citation, *Kelco Disposal v. Browning Ferris*, 845 F.2d 404, 407 (2d Cir. 1988) does not support Xerox' pleading argument. *Kelco* was adjudicating a full *trial* record. It was not a Rule 12(b)(6) adjudication. It did not hold that a claim had to be dismissed if the magic word "appropriate" was not inserted in the complaint between the words "below" and "cost." Xerox similarly argues that plaintiff has not sufficiently alleged a probability that Xerox would recoup its investment. (Xerox p. 16). To the contrary, the allegations that suffuse the third amended

16

complaint support an inference that once Xerox eliminated CCS' competition at

Aetna, it would have the business for itself.  In sum, CCS has alleged below

cost pricing more specifically than plaintiffs are usually able to do at a pleading

stage.

The issue of what "below cost" pricing means is not as fixed as Xerox

claims:

> The judicial response has been a blend of these
> positions.  While a strict Areeda-Turner formula [of
> marginal cost] has been generally rejected, several
> courts that have addressed the issue have adopted a
> variation in which prices below average variable cost
> (AVC) are presumed illegal, prices above average total
> cost (ATC) are deemed legal, and prices above AVC but
> below ATC are presumed legal but may be shown to be
> predatory in special market situations.

Holmes, *Antitrust Law Handbook* (West, 2003), p. 589.  An illustration of

localized predatory pricing to disadvantage a small competitor is *Sunshine

Books Ltd. v. Temple University*, 697 F.2d 90 (3d Cir. 1982).  In *LePage's Inc. v.

3M*, 324 F.3d 141 (3d Cir. 2003) *petition for cert. filed*, the Third Circuit *en banc*

upheld a jury verdict that the defendant monopolized the market by bundling

discounts for tape, health care and other products together in a way that the

plaintiff and other competitors could not realistically match, due to their more

limited product lines.

17

### D.  Spurious "Diagnostic" Fees

At p. 17, Xerox attacks the allegations of the complaint at ¶¶53-56.  As

set forth in those paragraphs, Xerox has added supposed "diagnostic fees"

solely to disadvantage ISO's and their customers, for what are in reality built-in

diagnostic operations that traditionally had no such fees.  Xerox argues that it

has unlimited and unfettered discretion to impose such fees because of

copyrights.   However, as the Supreme Court held in *Kodak*, Xerox' right is not

unfettered:

> The Court has held many times that power gained
> through some natural and legal advantage such as a
> patent, copyright or business acumen can give rise to
> liability if a seller exploits his dominant position in one
> market to expand his empire into the next.  *Times
> Picayune Publishing Co v. United States*, 345 U.S. 592
> (1953); *Northern Pacific R. Co v. United States*, 356 U.S.
> 1 (1958); *United States v. Paramount Pictures*, 334 U.S.
> 131 (1948); *Leitch Mfg. Co v. Barber Co.*, 302 U.S. 458
> (1938).

504 U.S. at 479 note 29.   The present allegation fits comfortably under *Trinko*,

and the *Aspen Skiing* and *Otter Tail* decisions summarized in *Trinko*, namely

that Xerox did not historically impose these "diagnostic" fees, that they are

sham fees because they do not relate to any new software, and they have been

imposed selectively for the purpose of disadvantaging ISO's and customers who

choose to do business with ISO's.

18

### E. Manipulation of Lease Buy-Out Amounts

At pp. 18-20, Xerox attacks the averments of ¶¶36-41, relating to Xerox'

manipulation of Aetna's buy-out lease amounts. Xerox claims it is "not an

antitrust purpose to regulate ordinary business contracts." (P. 19). That

argument puts the rabbit in the hat. By that logic, every "refusal to deal" by a

monopolist could be characterized as "regulating ordinary business contracts",

and would be *per se* legal. *Aspen Skiing* and *Otter Tail Power* hold otherwise,

because each involve "contracts." *Kodak* itself could be characterized as

"regulating business contracts" (i.e. refusal to sell parts to ISO's). Here, as

elsewhere, Xerox' argument proves too much.

As alleged at ¶¶36-41, Xerox undertook anti-competitive conduct solely

to prevent Aetna from leasing the machines which CCS would service. Xerox

argues CCS has no "antitrust standing" to pursue this claim, even though the

complaint alleges that Xerox sought to "injure CCS in the service market" (¶36),

because CCS did not "allege that this had any broader effect on the market as a

whole." (P. 19). However, these averments must be read, not in isolation, but

in conjunction with the other averments of the complaint, which establish that

Xerox has engaged in a pattern of anti-competitive actions against ISO's, which

provide price and quality competition to Xerox, in order to increase its over-all

monopoly share of the service market. The Court must view this conduct not

in isolation, but as part of a pattern of anti-competitive conduct against ISO's

generally and CCS in particular. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

### F. Price Caps in R & D Settlement

Finally, Xerox argues that the averments of ¶¶57-62 cannot pass muster under Count I, because the "mere" breach of a court-ordered agreement cannot constitute "antitrust injury."   Again, Xerox merely repeats its well-worn argument that it has unfettered discretion to charge any prices it likes.  It ignores the averment that it committed, in a court-approved document, not to do so.

For the foregoing reasons, Xerox' motion to dismiss Count I should be denied.

### COUNT III STATES A CLAIM FOR DEFAMATION

At pp. 21-22, Xerox argues that Count III (defamation) should be dismissed.  Count III is limited to paragraph 33 of the third amended complaint.  That is the incident at Aetna.  The MDL Court, applying Connecticut law of defamation on a summary judgment record, denied summary judgment to Xerox on this:

> A jury could find, however, that Xerox defamed CCS
> when it discussed training with Aetna
> representatives...Viewed in the light most favorable to
> CCS, the record shows that Xerox asserted that CCS
> technicians were untrained and therefore incompetent.

114 F.Supp.2d at 1079. This Court's Order of March 30, 2004 stated that "I consider Judge Vratil's ruling on summary judgment the law of the case..."

The same Order directed a "plain and simple" statement of the claim. Paragraph 33 of the third amended complaint complies.

Xerox' argues that it does not have sufficient "notice" of what was pled in ¶33, absent elaborate re-pleading of the background circumstances, who said what to whom, when it was said, and so forth. The parties fully briefed this matter on summary judgment. Xerox has the deposition transcripts at issue. Xerox knows all of the surrounding circumstances, because they are matters of the briefing record. Xerox' argument is in favor of prolixity and against common sense.[3]

A libel or slander is actionable per se under Connecticut law if it suggests or implies that a person has a "lack of skill or integrity in one's profession or business" and the statement "is of such a nature that it is calculated to cause injury to one in his profession or business":

> It is well-settled that a libel is actionable per se if it charges improper conduct or lack of skill or integrity in one's profession or business and is of such a nature

---

[3] As Xerox well knows from the discovery and summary judgment briefing, DeRon Franklin, the Aetna purchasing representative, testified at deposition that Xerox finance people attended key meetings with Aetna at which Xerox made these disparaging comments about Creative Copier Services. Mr. Franklin testified that they clearly referred to CCS, and that they were designed to, and did, affect Aetna's decisions about using CCS.

> that it is calculated to cause injury to one in his
> profession or business.
>
> ....Spoken words are actionable per se only if they
> charge a general incompetence...

*Proto v. Bridgeport Herald Corporation*, 72 A.2d 820, 826 (Supreme Court of Errors of Connecticut, 1950). *Accord, Battista v. United Illuminating Company*, 523 A.2d 1356, 1360 (Appellate Court of Connecticut, 1987) (libel per se are "libels which injure a man in his profession and calling"); *Gaudio v. Griffin Health Services*, 1997 WL 242873 *2 (Superior Court Conn. 1997); *Carrie Santangelo Realty Association LLC v. City of Derby*, 1998 WL 47790 (Conn. Super. 1998) ("Slander becomes actionable per se upon [if they are] statements in derogation of one's existing business, [or] charging a professional person with general incompetence. *See* Douglass B. Wright et al, **Conn. Law of Torts** (3d ed.), §147, pp. 410-12)").

### COUNT II STATES A CLAIM FOR TORTIOUS INTERFERENCE

At pp. 22-25, Xerox argues for dismissal of Count II, which alleges tortious interference with contract and prospective contract. As with the defamation Count, Xerox does not advise the Court that the MDL Court denied summary judgment to Xerox on the legal underpinnings of this claim, which is law of this case.

As originally pled in the first amended complaint by CCS' predecessor counsel, it referred to interference with only one of CCS' customer, the State of

Connecticut. Ex. 1 to Xerox' motion, p. 26. Xerox sought summary judgment on this claim. The summary judgment record showed that Mr. Jones, in charge of purchasing for the State of Connecticut, testified that the State was very pleased with CCS' service. "CCS has been a very good, a real success story for an independent contractor with the State of Connecticut. We, most agencies are very, very happy with their work." CCS had been awarded the State's contract continuously from 1981 onwards.

However, in 1989, after it had been awarded a large contract to repair machines, CCS was forced to withdraw its bid, because it could not ensure that it could obtain sufficient parts from Xerox to repair the machines. This was because Xerox had implemented its policy of refusing to sell parts to ISO's. That left Xerox as the only bidder, which was awarded the contract. Xerox, through its conduct of refusing to supply parts to ISO's, deliberately frustrated CCS' ongoing contractual relations.

Judge Vratil, the MDL Judge, had before her a summary judgment record in which Xerox' Connecticut District Manager testified that he could offer no legitimate justification for Xerox' "end user verification" policy, which he was required by Xerox to implement against CCS. Nugent deposition, p. 31.

Judge Vratil denied Xerox' motion for summary judgment, holding that a triable issue of fact existed under the tortious interference standard of Connecticut law:

> ...Xerox did not discuss the legality of delayed
> shipment of parts to ISO's.  CCS has presented
> evidence that it lost the State of Connecticut contract
> because Xerox delayed such shipments.  Xerox has not
> attempted to justify such delays and a jury could
> reasonably infer that they resulted from malice.

114 F.Supp.2d at 1081.

The parties had briefed the claim under Connecticut law of tortious

interference with contract.  This "requires the plaintiff to plead and prove at

least some improper motive or improper means."  *Blake v. Levy*, 464 A.2d 52

(Supreme Ct. Conn. 1983).  Connecticut has adopted the *Restatement, Second,*

*Torts,* §§766-768.  *See, e.g. Dowling v. First Federal Bank*, 1995 WL 405827

(Conn. Superior 1995) and *Dombroski v. Pellegrino*, 1990 WL 271107 (Conn.

Super. 1990). [4]  "While the plaintiff must plead and prove at least some

---

[4] The relevant provisions are:

Restatement 766A:  One who intentionally and improperly interferes with
the performance of a contract (except a contract to marry) between another and
a third person, by preventing the other from performing the contract or causing
his performance to be more expensive or burdensome, is subject to liability to
the other for the pecuniary loss resulting to him;

Restatement 766B:One who intentionally and improperly interferes with
another's prospective contractual relation (except a contract to marry) is
subject to liability to the other for the pecuniary harm resulting from loss of the
benefits of the relation, whether the interference consists of

> (a) inducing or otherwise causing a third person not to
> enter into or continue the prospective relation or
>
> (B) preventing the other from acquiring or continuing

(continued...)

24

improper motive or improper means, there is authority for the proposition that this burden is met by pleading the defendant acted intentionally and without justification." *Precision Computer Services Inc. v. McIlmurray*, 2002 WL 318256 (Conn. Super. 2002). See also *Dreamcatcher Software Dev. v. Pop Warner Little Scholars, Inc.*, 298 F.Supp.2d 276, 286-87 (D. Conn. 2004).

Hence, Judge Vratil determined that Xerox' refusal to supply parts to CCS on a timely basis not only stated a claim of tortious interference, but withstood summary judgment on that claim.[5]

Present counsel for CCS, in briefing this issue in the MDL Court, realized that the same Xerox policy of intentionally denying and delaying parts so as to frustrate CCS' ability to service its contracts impacted CCS' relations with its other customers, not just the State of Connecticut, and therefore argued that this claim should encompass other customers in addition to the State of Connecticut. However, Judge Vratil decided that because there had been no

---

[4](...continued)
  the prospective relation

[5] Xerox argues at p. 23 note 6 that it did not address the illegality of delayed shipment of parts as tortious interference because that was not pled in the first amended complaint. This argument is a make-weight. Xerox was briefing a summary judgment motion, in which this conduct by Xerox was expressly the focus of plaintiff's response to that motion. If Xerox "did not address" its conduct, it was because its own District Manager, at deposition, testified he knew of no business justification for the conduct.

formal averment in the extant complaint as to other customers besides the State of Connecticut, she would not consider this evidence. 114 F.Supp.2d at 1081, note 5.

CCS set forth, in the Joint Pretrial Order entered in the MDL Proceedings, its intention to amend this Count, after transfer to this District, to include CCS' other customers where CCS had suffered injury as a result of Xerox' conduct. See page 16 ¶ 7 thereof. Plaintiff moved, for leave to amend to include these additional customers, in this Court in October, 2001, and Xerox stipulated on October 26, 2001 that such amendment could be filed. The averment encompassing all of CCS's customers was made in the second amended complaint, and now in the third amended complaint. "Amplification of previously alleged claims is one of the clearest cases for leave to amend." *Price v. International Union, United Auto. Aerospace & Agric. Workers*, 621 F. Supp. 1243, 1245 (D. Conn. 1984).[6]

---

[6] Xerox argues at p. 23, note 6, that CCS has "impermissibly" expanded this claim to include customers in addition to the State of Connecticut, and that this is barred by the statute of limitations. This statement is without basis. Xerox stipulated that such amendment could be filed in October, 2001. The second amended complaint of November 5, 2001 at ¶¶104-110 alleged tortious interference for all CCS customers during the 1987-1995 time period. (Ex. 2 to Xerox' current brief). Xerox moved to dismiss that complaint, but raised no statute of limitations contention. This amendment clearly "relates back," involving the same conduct by Xerox which caused injury at the same CCS customers that was at issue in the MDL. An amendment "relates back" to the date of filing the original complaint when it "arises out of the same core of operative facts as the other causes of action in the complaint." *Shane v. State*

(continued...)

The third amended complaint alleges tortious interference for all conduct alleged in ¶¶19-65.  This includes both the 1989-1994 time period, and the subsequent time period.  Xerox' arguments for dismissal are addressed below.

Xerox argues at pp. 23-24 that CCS has not alleged "improper motive." Given that the MDL judge held that this claim passed muster under Connecticut law in a summary judgment context, and that the record contains evidence of Xerox "malice," 114 F.Supp.2d at 1081, Xerox' argument for such a pleading deficiency is difficult to fathom.  The third amended complaint at ¶75 alleges malice.

In explaining what "legal malice" meant in this context, the court in *Dowling, supra*, stated:

> There are frequent expressions in judicial opinions that malice is requisite for liability in the cases cited in this section.  But the context and the course of the decisions make it clear that what is meant is not malice in the sense of ill-will but merely intentional interference without justification.

1995 WL 405827 *1.  Judge Vratil cited *Dowling* in denying summary judgment to Xerox, holding "if actor motivated in whole or in part by desire to interfere

_____

[6](...continued)
*of Connecticut,* 821 F.Supp. 829, 834 (D. Conn. 1993).  The effect of Xerox' restriction of parts upon CCS and its customers was the "core of operative facts" in the MDL.

with other's contractual relations, the interference is almost certain to be held improper." 114 F.Supp.2d at 1081.

Further, Restatement Section 767 sets forth factors to be considered. It states in pertinent part:

> **Economic Pressure**. Economic pressure of various types is a common means of inducing persons not to deal with another, as when A refuses to deal with B if B enters into or continues a relation with C, or when A increases his prices to B or induces D not to deal with B on the same condition...The question whether the pressure is proper is answered in the light of the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective.

*Restatement, Torts, Second*, Vol. 4 §767 comment on clause (a), "Economic pressure", p. 31 (ALI 1979). The third amended complaint alleges that Xerox exerted such economic pressure, by refusing to sell parts as ordered and needed, so that CCS' customers would become dissatisfied with CCS' service, would cancel their contracts with CCS, and would return to Xerox. Indeed, as alleged in the complaint at ¶24, Xerox internally placed CCS in a "red light" status for two years, and then gloated that CCS "level of service has deteriorated."

At pp. 24-25, Xerox argues that an allegation that "Xerox intentionally refused to supply parts to CCS in a timely manner and in the quantities ordered" cannot state a claim. However, the MDL Judge held to the contrary, denying summary judgment on this ground. See above.

Xerox' brief does not separately address the supplemental claims alleged at ¶¶35 and following. They clearly state claims for tortious interference. For example, the incident at ¶¶36-41 where Xerox deliberately frustrated a proposed contract between Aetna and CCS, and at ¶¶42-49 where Xerox frustrated actual or prospective contracts by misrepresenting its machines, are quintessential incidents of tortious interference.

### COUNT IV STATES A CLAIM FOR CUTPA VIOLATIONS

CCS also alleged that Xerox violated CUTPA, Conn. Gen. Stat. §42-110g(a) in Count IV. This Act prohibits Xerox from engaging in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Id, §42-110b. Xerox' addresses CUTPA at pp. 25-26, but its analysis is perfunctory and off-point. Xerox argues that CUTPA cannot be violated "if no antitrust violation is found." (Xerox, p. 25). Its cited authority, the *CDC* decision, turns out to rely upon a Massachusetts case which contains simply an *ipse dixit* statement that does not analyze Connecticut law, *Ben Elfman & Sons Inc v. Criterion Mills Inc*, 774 F.Supp. 683,

687 (D. Mass. 1991), *cited by CDC Techs Inc. v. Idexx Labs*, 7 F.Supp.2d 119, 132 (D. Conn. 1998).[7]

CUTPA is, by the Connecticut Legislature's design, a broadly remedial statute. The Connecticut Supreme Court has observed that the Connecticut "General Assembly, in adopting the sweeping language of §5(a)(1) of the [Federal Trade Commission Act] deliberately chose not to define the scope of unfair or deceptive acts proscribed by CUTPA so that courts might develop a body of law responsive to the marketplace practices that actually generate such complaints." *Associated Inv. Co. Ltd. P'ship v. Williams Associates IV*, 230 Conn. 148, 157, 645 A.2d 505, 510 (1994). "Predictably therefore CUTPA has come to embrace a much broader range of business conduct than does the common law tort." *Id.* at 157-158, 645 A.2d at 510. CUTPA is construed "liberally in an effort to effective its public policy goals." *Id.* Accordingly, the

---

[7] Xerox also cites *Suburban Restoration Co. Inc. v. Acmat Corp*, 700 F.2d 98 (2d Cir. 1983). That decision holds that filing a single, isolated frivolous lawsuit in state court is not the basis for a CUPTA violation. It is not authority for the proposition cited, and is not applicable to this case.

Xerox also cites *Sorisio v. Lenox Inc.*, 701 F.Supp. 950 (D. Conn. 1988) *aff'd* 863 F.2d 195 (2d Cir. 1988) for the proposition that "a plaintiff must prove that the defendant's actions violates another established cause of action." The argument is ironic, because in *Soriosio* the "defendant acknowledges that its conduct may be actionably unfair under CUTPA even if not actually violative of the antitrust laws." 701 F.Supp. at 963. This is the opposite proposition than Xerox argues in its memorandum, i.e. that a CUTPA violation must violate the federal antitrust laws. Further, *Soriosio* simply acknowledged that the claim there "did not violate the FTC Act, or any other statute, common law, or established concept of fairness...and did not constitute unfair competition," *Id.*, a different proposition than that for which Xerox cites it.

Connecticut Supreme Court has held that "there is no ...unfair method of competition or unfair [or] deceptive act or practice that cannot be reached [under CUTPA]", and there is a "unique breadth and flexibility of the cause of action created by CUTPA." *Id.* "In enacting CUTPA, the legislature intended to create an expansive act which would provide relief to persons suffering 'any ascertainable loss' as a result of an unfair or deceptive trade practice." *Web Press Servs. Corp v. New London Motors*, 203 Conn. 342, 525 A.2d 57, 63 (1987).

Contrary to Xerox' argument, there is obviously no requirement of proving a federal antitrust violation as a predicate to a CUTPA violation. *See, e.g. Murphy v. McNamara*, 416 A.2d 170, 174-75 (Superior Ct. 1979) ("the act eradicates unfairness and deception employed by unscrupulous competitors.") The Second Circuit cited *Murphy* with approval in *Bailey Employment System Inc. v. Hahn*, 655 F.2d 473, 476 (2d Cir. 1981).

The Second Circuit has set forth the following factors for a CUTPA violation:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness;
>
> (2) whether it is immoral, unethical, oppressive, or unscrupulous;

31

(3) whether it causes substantial injury to consumers [competitors or other businessmen] ....

All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three ....

*Sport's Farm LLC v. Sportsman's Market Inc.*, 202 F.3d 489, 501 (2d Cir. 2000), citing *Saturn Const. Co. v. Premier Roofing Co.*, 238 Conn. 293, 310-11, 680 A.2d 1274, 1283 (1996). The Third Amended Complaint meets this standard.

## COUNT V STATES A CLAIM FOR LANHAM ACT VIOLATIONS

Xerox' final argument is that Count V should be dismissed. This Count avers that Xerox violated the Lanham Act by misrepresenting the nature of its allegedly "new" machines, which were in reality "used" machines, both to the State of Connecticut (¶¶42-46) and at Aetna (¶¶47-49).

The Lanham Act provides as follows:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, **false or misleading description of fact**, or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, **misrepresents the nature, characteristics,**

32

**qualities**, or geographic origin of **his or her or
another person's goods**, services, or commercial
activities,

shall be liable in a civil action by any person who believes that he
or she is or is likely to be damaged by such act.

The Lanham Act "makes actionable false or misleading descriptions or
false or misleading representations of fact made about one's own or another's
goods or services." *Boule v. Hutton*, 328 F.3d 84, 90 (2d Cir. 2003). The
complaint so alleges.

As to Aetna (¶¶47-49), CCS alleges that Xerox misrepresented that its
Model 5388 was a new machine, whereas CCS' investigation showed that the
model 5388 was merely being palmed off as a new machine. Xerox merely
argues that CCS did not allege that it analyzed the exact same 5388 machine
Xerox sold to Aetna, but rather that CCS examined another Xerox series 5388
machine that CCS located. This argument could at best be termed an
argument to be made to the jury.

As to the State of Connecticut, Xerox' argument for dismissal is that ¶43
alleges that the State had changed its policy in 1999 to require new machines,
not refurbished ones. Xerox argues that because plaintiff could not supply new
machines, plaintiff cannot state a claim under the Lanham Act because "if
Xerox told the truth, CCS still would have not won the contract."

But this Circuit has rejected that type of argument. In *Irvin Industries
Inc v. Goodyear Aerospace Corp.*, 974 F.2d 241 (2d Cir. 1992), a monopolist

33

was charged with "below cost" predatory pricing. Defendant Goodyear had bid $322, and had won the contract. This number was below cost, and therefore illegal. The "at cost" number was determined to be $367. Goodyear's rival, the plaintiff, had bid $376, and lost the bid to Goodyear. Goodyear argued, as a defense to plaintiff's Section Two abuse of monopoly claim, that it might hypothetically have acted legally, by submitting a bid between $368 and $375, and still won the contract. Thus, argued Goodyear, as does Xerox here, that plaintiff suffered no "injury" from its conduct, because even if Goodyear had acted legally plaintiff still would have suffered the same injury. Here, Xerox argues: "If Xerox had told the truth, CCS still would have not won the contract."

The Second Circuit rejected this argument:

> Goodyear's $322 bid prevailed over Irvin's bid of $376...Goodyear argues, however, that it would have won the contract anyway with a lawful bid between $367.16 and $376. But Goodyear did not submit such a bid. The possibility that it might have submitted a lawful bid, and, if so, the same damage might have resulted, cannot in and of itself negate causation as a matter of law.

974 F.2d at 245.

Further, here plaintiff has alleged that the State of Connecticut temporarily changed its policy in 1999. Prior to that time, it accepted bids for refurbished machines, and subsequently it accepted bids for refurbished

34

machines. (¶¶ 43 and 46). Xerox misrepresented to the State that it was furnishing new machines in June, 1999, in order to win the contract. (Whether Xerox played any role in having the State temporarily change its requirements will have to abide discovery). The inference is permissible that if Xerox had been straightforward with the State in the time period leading up to this bid in 1999, and had stated that it either could not or would not furnish new machines, that the State might have altered its newly-imposed bid requirement, in which case CCS could have competed on an equal footing with Xerox and won the bid. CCS was in a competitive relationship with Xerox as to refurbished machines throughout this time period, which is what is required to assert standing as a competitor under the Lanham Act. *Dreamcatcher Software Development v. Pop Warner Little Scholars*, 298 F.Supp.2d 276, 285 (D. Conn. 2004).

A Rule 12(b)(6) adjudication requires finding that under "no" set of facts could CCS prevail on this Count. A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). Clearly, there are some sets of facts under which CCS could prevail.

Further, while Xerox argues that this Count should be dismissed because of the allegation in ¶43, Xerox did not apprise the Court that when it

35

answered the second amended complaint, it <u>denied</u> that those allegations were true. Xerox answered as follows:

> 132. Prior to June, 1999, the State accepted bids for machines that were new or refurbished. However, in June, 1999, the State changed its contract to provide that it would purchase only new machines, not refurbished ones. This provision prevented CCS from bidding for the work, because CCS could not buy and resell new Xerox machines at a price that was competitive with Xerox' price for selling such machines.
> **Answer: Xerox denies the allegations of the first two sentences of Paragraph 132. Xerox lacks information sufficient to permit or deny the remaining allegations of the paragraph, and they are accordingly denied.**

Hence, Xerox is the position of asking this Court to dismiss Count V as to the State of Connecticut on the basis of an allegation which Xerox claims is untrue and inaccurate. It stands the purposes of Rule 12(b)(6) on its head to permit a litigant to move to dismiss a Count in this circumstance. Clearly, resolution of this should await factual discovery as to what actually occurred in the June, 1999 bidding process.[8]

---

[8] Although not briefed by Xerox, what constitutes "commercial... promotion" under the Lanham Act has been subject to adjudication in this Circuit. In *Mobius Management System v. Fourth Dimension Software*, 880 F.Supp. 1005, 1020-21 (S.D.N.Y. 1994), the District Court held that a single letter to a single customer of plaintiff and defendant constituted a "promotion" because "in this case, the true relevant purchasing public consisted solely of M & I."

In *Fashion Boutique of Short Hills v. Fendi USA*, 314 F.3d 48, 57 (2d Cir. 2002), the Second Circuit cited, and did not overrule *Mobius*, but held that in

(continued...)

## CONCLUSION

For the foregoing reasons, Xerox motion to dismiss should be denied.

Respectfully,

Dated: June 16, 2004

Robert LaRocca CT 22901
Kohn, Swift & Graf, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
(215) 238-1700
(215) 238-1968 (fax)

Of Counsel:
Elias A. Alexiades CT03543
P.O. Box 3859
Amity Station
New Haven, CT 06525

---

[8](...continued)
the context of retail department stores "the touchstone of whether a
defendant's actions maybe considered commercial advertising or promotion
under the Lanham Act is that the contested representations are part of an
organized campaign to penetrate the relevant market," and held that
"businesses harmed by isolated disparaging statements do not have redress
under the Lanham Act; they must seek redress under state-law causes of
action." *Id.* The Court in *Fendi* held that 27 oral statements in a marketplace
of "thousands" of retail customers were insufficient.

*Mobius* and *Fendi* can be harmonized. *Mobius* was (as here) dealing with
a situation where the "customers" of the plaintiff and defendant were a small
number of sophisticated commercial entities, whereas in *Fendi* at issue were
thousands of retail consumers. The isolated comments in *Fendi* were made by
lower-level sales people, whereas here they were made by those at Xerox
responsible for selling the machines. An inference of a "policy" by Xerox of
promoting and selling "used" machines as "new" machines is warranted.

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served, by first class mail, on June     , 2004 upon:

Jonathan Gleklen
Arnold & Porter
555 12th Street, N.W.
Washington, DC 20004-1202

Robert Dolian CT04278
Cummings & Lockwood
Four Stamford Plaza
107 Elm Street
Stamford, CN 06902

Peter W. Marshall
Xerox Corporation
800 Long Ridge Road
Stamford, CN 06904

_____
Robert LaRocca