**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

—————————————————————
CREATIVE COPIER SERVICES,     )
                                             )
        Plaintiff,                  )     Civil Action
                                             )
        v.                       )     No. 01-CV-155
                                             )
XEROX CORPORATION,              )
                                             )
        Defendant.               )
—————————————————————

**XEROX CORPORATION'S MOTION FOR
SUMMARY JUDGMENT ON CCS'S ANTITRUST CLAIM**

Defendant Xerox Corporation ("Xerox") respectfully moves, pursuant to Fed. R. Civ. P. 56, for summary judgment on the antitrust claims asserted by Plaintiff Creative Copier Services ("CCS"). As set forth in detail in the attached Memorandum in Support, CCS's antitrust claim fails as a matter of law for three reasons. First, it is barred by the statute of limitations because the undisputed facts establish that, even accounting for tolling of the limitations period, CCS did not assert its claims until more than five years after they accrued. Because the statute of limitations for claims under the antitrust laws is four years, CCS's claims are untimely and must be dismissed. Second, the undisputed facts show that the "market" Xerox allegedly monopolized is not a proper antitrust market because Xerox did not change its policy during the relevant time period. Finally, the uncontroverted evidence demonstrates that CCS failed to mitigate its damages by ordering parts through its end-user customers. Accordingly, summary judgment against CCS on its antitrust claim is warranted.

Respectfully submitted,

Robert Dolian
CUMMINGS & LOCKWOOD
Four Stamford Plaza
Stamford, Connecticut  06904
(203) 351-4307
fax: (203) 708-3948
email: rdolian@cl-law.com

Peter K. Bleakley
Jonathan I. Gleklen
Christopher Winters
Jon J. Nathan
ARNOLD & PORTER LLP
555 12th Street, NW
Washington, DC 20004
(202)942-5000
jonathan_gleklen@aporter.com

Peter W. Marshall
Senior Counsel
XEROX CORPORATION
800 Long Ridge Road
Stamford, CT  06904
(203) 968-4590
*Attorneys For Defendant Xerox Corporation*

Dated: June 25, 2004

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| _____ ) | |
| CREATIVE COPIER SERVICES, ) | |
| ) | |
| Plaintiff, ) | Civil Action |
| ) | |
| v. ) | No. 01-CV-155 |
| ) | |
| XEROX CORPORATION, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**MEMORANDUM IN SUPPORT OF XEROX CORPORATION'S MOTION FOR
SUMMARY JUDGMENT ON CCS'S ANTITRUST CLAIM**

**<u>INTRODUCTION</u>**

The antitrust claim brought by Creative Copier Services ("CCS") fails as a matter of law

for three separate reasons presented herein: (1) it is barred by the statute of limitations; (2) the

undisputed facts show that the "market" that Xerox Corporation ("Xerox") allegedly

monopolized is not a proper antitrust market; and (3) CCS has failed to mitigate its damages.

The facts are undisputed as to each of these three grounds, and any of these three grounds would

alone warrant entry of summary judgment against CCS on its antitrust claims as a matter of law.

**A.      Statute of Limitations**

This case presents an archetypical example of a party that has slept on its rights.  CCS

filed suit in 1994 challenging a policy that Xerox adopted in 1984 – *ten years earlier* – of

refusing to sell parts to independent service organizations for their use in providing third party

service.  CCS was fully aware that it was impacted as of 1985 (and no later than 1987) as a result

of Xerox's refusal to sell it parts, yet it sat on its hands and did nothing for nearly a decade.

Even assuming that the antitrust laws' four year statute of limitations was tolled by a related

class action litigation filed in 1992, CCS's claims were still filed at least five years after its cause

of action accrued.  CCS's antitrust claims are thus a year or more too late and barred by the

antitrust statute of limitations, 15 U.S.C. § 15b.[1]

Under precedent established in this circuit and in the majority of the other circuits, an

antitrust claim based on a refusal to deal – such as CCS's claim against Xerox – accrues for the

purposes of the antitrust statute of limitations when the defendant's refusal to deal became "final

and unequivocal."  As the leading treatise on antitrust law states:

> An illegal unilateral refusal to deal, following a termination of prior dealings or
> otherwise, creates a cause of action when it occurs or when it becomes final.
> Plaintiffs are not generally allowed to restart the limitation period perpetually
> merely by repeated requests that the defendant refuses.  Thus the limitation period
> continues running notwithstanding a terminated dealer's new request for supplies.
> Most courts see no continuing violation when the initial refusal to deal is
> "irrevocable, immutable, permanent and final." These courts emphasize that the
> plaintiff's injury resulted from the initial refusal.

II Philip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320c3 (2002).

The undisputed facts establish that CCS was aware of Xerox's policy of refusing to sell

CCS parts for use in providing third party service (*i.e.*, except to service machines CCS owned)

as early as 1985, and that in 1986 Xerox made clear that it absolutely would not supply CCS

with parts (either patented or unpatented parts) for use in third party service.  As William Dixon,

CCS's sole proprietor made clear:

> [Access to parts] was completely foreclosed.  We could not buy it.  If we did not
> own a 5090, we could not buy it.  Was it completely foreclosed without

---

[1] Xerox previously filed a similar motion for summary judgment before Judge Vratil of the
District of Kansas.  Having dismissed CCS's antitrust claims on their merits, Judge Vratil did not
reach Xerox's motion on statute of limitations grounds.  *See In re Indep. Serv. Orgs. Antitrust
Litig.*, 114 F. Supp. 2d 1070, 1096 n.18 ("Given that the Court sustains the Xerox motion for
summary judgment on plaintiff's antitrust claims on the above grounds . . . it need not reach the
issues of . . .  the timeliness of plaintiff's antitrust claims.").

> stipulation?  It was completely foreclosed.  We could not buy the parts unless we
> owned the 5090.

SOF ¶ 17.

It is unclear why CCS waited eight more years before filing suit against Xerox.  But the

reasons for CCS's lack of diligence are irrelevant.  The law is clear that CCS's claim accrued

when Xerox provided CCS with an unequivocal and final refusal to deal in 1987 or earlier; the

claim was not renewed with each subsequent refusal to deal.  Accordingly, CCS's antitrust claim

diligently are barred by limitations.

### B.    Lack Of A Change In Policy To Support A Single-Brand Aftermarket

Plaintiff Creative Copier Services ("CCS") alleges that Xerox Corporation ("Xerox") has

violated the antitrust laws by monopolizing an "aftermarket" that is limited to the service of

high-speed Xerox-brand photocopiers.  The undisputed facts establish, however, that an

aftermarket limited to the service of Xerox copiers is not a proper antitrust market.  Because

Xerox cannot, as a matter of law, monopolize something that is not a proper antitrust market,

Xerox is entitled to judgment on CCS's antitrust claim as a matter of law.

Courts have held that a single-brand aftermarket may exist only when a manufacturer

changes its policies affecting service to disadvantage customers after they have already

purchased equipment.  To be actionable, the policy change must occur within the limitations

period.  However, the undisputed facts present here establish that Xerox changed its parts policy

in 1984, and certainly no later than 1986, outside the limitations period that begins in March of

1988.  Because Xerox did not change its parts policy to disadvantage consumers within the

relevant time period, CCS's alleged aftermarket fails as a matter of law and its antitrust claim

must be dismissed.

**C.     CCS's Failure to Mitigate**

CCS's antitrust claim also fails because CCS admits that it failed to engage in efforts to mitigate its damages. At all times, CCS has recognized that Xerox's parts policies allowed customers to order parts directly from Xerox.  And, indeed, CCS has claimed that it could have asked its customers to order parts from Xerox in order to try to defeat Xerox's showing that CCS failed to demonstrate a "but for" cause of its injuries.  CCS's failure to ask its customers to order parts – both patented and unpatented – constitutes a failure to mitigate that bar CCS's antitrust claim as a matter of law.

<u>ARGUMENT</u>

**THE SUMMARY JUDGMENT STANDARD**

Summary judgment may be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c).  The burden of showing that no genuine factual dispute exists rests upon the moving party.  *See Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).  Whether an issue of material fact is genuine rests on "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  *In re Independent Serv. Org. Antitrust Litig.*, 964 F. Supp. 1454, 1456 (D. Kan. 1997) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986)).

As the Supreme Court noted in *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986), "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action" (citation and internal quotations omitted).  "Summary judgment is appropriate where the factual predicates of each legal question are

undisputed." *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 739 (2d Cir. 1984); *see also K & A Radiologic Tech. Servs., Inc. v. Commissioner of the Dep't Of Health*, 189 F.3d 273, 278 (2d Cir. 1999) (noting the appropriateness of summary judgment where only legal issues are disputed).

Numerous courts have granted summary judgment on the grounds raised by Xerox in this motion. *See, e.g.*, *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11 (1st Cir. 1999) (granting summary judgment on aftermarket monopolization claims where defendant had not changed its policies); *PSI Repair Serv., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997) (same); *Commercial Data Servers, Inc. v. International Bus. Mach., Inc.*, 262 F. Supp. 2d 50, 70 (S.D.N.Y. 2003) (same); *Golf City, Inc. v. Wilson Sporting Goods Co., Inc.*, 555 F.2d 426, 436 (5th Cir. 1977) (granting summary judgment for failure to mitigate); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 228 (E.D.N.Y. 2003) (granting summary judgment on antitrust claims barred by limitations).

I.     **CCS'S CHALLENGE TO XEROX'S REFUSAL TO SELL PARTS IS BARRED BY THE STATUTE OF LIMITATIONS BECAUSE XEROX'S REFUSAL TO DEAL BEGAN BEFORE THE LIMITATIONS PERIOD.**

A.     **CCS Is Barred From Asserting Claims That Accrued Before March 24, 1988.**

Section 4B of the Clayton Act provides a four-year statute of limitations for claims under the antitrust laws. "Any action to enforce any cause of action . . . shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. Despite Xerox's argument that the *R&D* class action did not toll absent ISO class members' claims for damages because no such claims were asserted, the District of Kansas previously held that the *R&D* case did toll the statute of limitations. *In re Independent Serv. Orgs. Antitrust Litig.*, No 94-2102-EEO, 1997 WL 161940, at *5 (D. Kan. March 12, 1997). Xerox does not ask for

reconsideration of that decision at this point.  Because the *R&D* class action was filed on March 24, 1992, the statute of limitations thus bars any CCS antitrust claims that accrued before March 24, 1988.

> **B.      The Statute Of Limitations Begins To Run On A Refusal To Deal At The Time Of The First Refusal If That Refusal Is Final.**

The precedent from district courts in this circuit is clear that in antitrust cases based upon a refusal to deal, the limitations period begins to run at the time of the first refusal and is not renewed with each subsequent refusal.  *See In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 228 (E.D.N.Y. 2003) (citing with approval *Vitale v. Marlborough Gallery*, CIV.No. 93-6276, 1994 WL 654494, at *5 (S.D.N.Y. July 5, 1994)) for the proposition that "the statute of limitations began to run at the initial refusal to deal and does not restart when the plaintiff makes subsequent unsuccessful efforts to deal with the defendant"); *Daniel v. American Bd. of Emergency Med.*, 988 F. Supp. 112, 121 (W.D.N.Y. 1997) (granting summary judgment because when defendant refused to deal, "this decision was by its nature permanent at initiation without further action, thus, subsequent applications and appeals of application denials do not constitute new acts which inflict continuing and accumulating harm on the Plaintiffs."); *Urban v. Manhattan Cable Television, Inc.*, No. CIV.A.86-1821, WL 14129, at *3 (S.D.N.Y. Oct. 13, 1987) (dismissing complaint because statute of limitations began to run with initial refusal to deal).

This district court precedent is in accord with the vast majority of circuit court precedent. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1052 (8th Cir. 2000) ("acts that 'simply reflect or implement a prior refusal to deal or acts that are merely unabated inertial consequences (of a single act) do not restart the statute of limitations.'"); *DXS, Inc. v. Siemens*

*Med. Sys., Inc.,* 100 F.3d 462, 467-68 (6th Cir. 1996) (same); *Kaw Valley Elec. Coop. Co. v.*

*Kansas Elec. Power Coop., Inc.*, 872 F.2d 931, 933-34 (10th Cir. 1989); *Midwestern Waffles,*

*Inc. v. Waffle House, Inc.*, 734 F.2d 705, 715 (11th Cir. 1984) ("If, however, plaintiffs'

subsequent requests [to deal] were futile and plaintiffs had reason to know they were futile, the

statute of limitations will be found to bar plaintiffs' claim."); *David Orgell, Inc. v. Geary's*

*Stores, Inc.*, 640 F.2d 936, 938 (9th Cir. 1981) ("[E]ach time Wedgwood repeated the refusal, it

was a reaffirmation of the original decision not to deal with the plaintiff.  Since the original

refusal pursuant to the alleged conspiracy occurred over a dozen years ago, this action is time-

barred by the four year statute of limitations."); *Garelick v. Goerlich's, Inc.*, 323 F.2d 854, 856

(6th Cir. 1963).

The question is thus whether Xerox refused to deal with CCS before the limitations

period and whether that refusal to deal was final.  The undisputed facts establish that: (1)

Xerox's first refusal to deal with CCS was in 1985 or 1986 – outside the limitations period; and

(2) that the refusal was final.  Summary judgment must therefore be entered against CCS.

### C.    Xerox First Refused To Deal With CCS In 1985 Or 1986.

The undisputed facts establish that Xerox established its policy of refusing to supply parts

to ISOs for their use in servicing third parties in 1984.  *See* SOF ¶ 3.  Although CCS may not

have learned of the policy immediately, CCS's owner, William Dixon, testified that he learned of

the policy and Xerox's refusal to supply CCS with replacement parts in 1985 or 1986.  *See* SOF

¶ 5.  Xerox clearly informed Mr. Dixon of its policy by letter on October 10, 1986, stating that

Xerox would not sell parts to CCS in excess of those required to service machines that CCS itself

owned:

> Please be advised th[at] your order for replacement parts dated 10/06/86 has been limited to those quantities deemed reasonable to support the machines our records indicate you personally own.
>
> As a reminder for future ordering; Xerox sells 10 Series Copier (i.e.; 1020, 1040, 1090, etc.) and Memorywriter electronic typewriter replacement parts for resale exclusively to Authorized Xerox Service Dealers. End users (owners of these products) may order such parts and relative Service Literature in quantities reasonably necessary to support their machines.

*See* SOF ¶ 6. Xerox followed this letter with another letter to CCS on October 14, 1986, stating:

> It is Xerox's policy to provide technical training, parts support, and documentation to 10 Series end-users for the purpose of internally servicing their own equipment. Xerox reserves the right to limit the training and parts support to the level necessary to provide service on the equipment which is owned.

*See* SOF ¶ 7. These letters clearly evidence that Xerox first refused to sell CCS replacement parts no later than October 1986, far outside the limitations period.

Moreover, Mr. Dixon himself admitted that Xerox refused to sell him parts before March 23, 1988, the date on which the statute of limitations began to run. When he was deposed in 1996, Mr. Dixon testified that he learned of Xerox's policy of refusing to sell parts to ISOs in "1985 or 1986" when Xerox refused to ship parts to CCS for "10 Series" copiers, specifically the Model 1075 and Model 1090. *See* SOF ¶ 5. He further testified that in 1986, CCS was "shut down on some parts that [it] had tried to order on [a Model] 1055." *Id.* Accordingly, there is no dispute that Xerox's first refusal to sell CCS replacement parts beyond those necessary to service CCS's own copiers occurred outside the limitations period, which bars claims accruing before March 1988.

### D.    Additional Evidence Shows CCS Was Impacted By Xerox's Parts Policy No Later Than 1987, Before The Statute of Limitations Began To Run.

Mr. Dixon provided similarly unequivocal testimony that he was impacted by Xerox's policy in 1987.

Q:  In 1987, did Xerox ever refuse to sell parts to Creative?

A:  Yes.

Q:  What parts did you order that Xerox refused to sell?

A:  10 Series parts.

Q:  Did Xerox refuse outright or did it just delay delivering the parts?

A:  They've refused.

Q:  In 1987, did Xerox actually refuse?

A:  Yes.

SOF ¶ 14.  Mr. Dixon also testified that CCS began stripping its own machines for parts beginning in 1987 because it was unable to obtain parts from Xerox.  *See* SOF ¶ 13.  In addition, James Withstandley, one of CCS's employees, testified that he joined CCS in January 1988, and that by the time he joined CCS it was already having problems getting Xerox parts.  *See* SOF ¶ 16.  Even if CCS was not impacted by Xerox's policy until 1987, its claims would still be barred by the statute of limitations, which bars any cause of action that accrued before March 24, 1988.

### E.  Xerox's Refusal To Deal Was Final

Courts have held that a refusal is final when it sends a clear and irrevocable message that the defendant will not deal with the plaintiff.  *See Kaw Valley*, 872 F.2d at 934-35; *In re Multidistrict Vehicle Air Pollution*, 591 F.2d at 72; *Siegel Oil Co. v. Gulf Oil Corp.*, 556 F. Supp. 302, 307 (D. Colo. 1982) (holding that a refusal was final where the defendant made it clear that its decision was non-negotiable).  Under this standard, the undisputed facts establish that Xerox's refusal to deal was final by 1986.

In 1986, Xerox informed Mr. Dixon in no uncertain terms that its policy was to refuse to supply parts for use by ISOs in their third party service activities. *See* SOF ¶¶ 6-8. By referring to the refusal to deal as a "policy," Xerox's letters made clear that the refusal to deal was final. *Cf. Kaw Valley*, 872 F.2d at 934-35 (statement adopted as a policy "indicates its finality."). These statements were unequivocal and left no room for Mr. Dixon or CCS to expect that Xerox might reevaluate its position. *Cf. In re Multidistrict Vehicle Air Pollution*, 591 F.2d at 72 ("Whatever hope a business [plaintiff] may have clutched, its source could not have been actions or words of the [defendants].").  Indeed, Mr. Dixon testified that Xerox's policy was consistently enforced. *See* SOF ¶ 17.

Moreover, CCS' actions after it learned of Xerox's parts policy indicate that CCS was aware of the finality of the policy – so aware of the policy's finality that it *relied* on the policy to devise a strategy to circumvent that policy and order replacement parts through its customers. *See* SOF ¶¶ 15, 18-22.

Further, the record is devoid of any evidence that Xerox equivocated in its enforcement of its parts policy. Indeed, CCS alleged in its First Amended Complaint that Xerox enforced its 1987 parts policy. *See* SOF ¶ 10. Until the *R & D* settlement in 1994, Xerox never wavered in its policy of selling parts only to authorized Xerox dealers and to end-users. It never made an exception for CCS and never offered to sell parts to CCS in CCS's capacity as an ISO. Indeed, Mr. Dixon testified that CCS's access was "completely foreclosed without stipulation." *See* SOF ¶ 17.

Although Xerox has the burden of proof on its affirmative statute of limitations defense, it does not have to prove a negative, *i.e.*, that it did not equivocate in its enforcement of it parts policy. *See Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) ("A

defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'").  Because Xerox consistently and unequivocally enforced its parts policy, there is no genuine issue of fact as to whether Xerox's refusal to sell CCS replacement parts in CCS's capacity as an ISO before the limitations period was a final refusal.

**F.    CCS Has Not Suffered New Injury Within The Limitations Period**

Xerox expects that CCS will argue that Xerox's 1989 verification policy was a new anticompetitive act within the limitations period.  However, the undisputed facts establish that Xerox's 1989 verification policy (pursuant to which Xerox ensured that ISOs who ordered parts were doing so only for their own use, and not for use servicing third parties) cannot serve to restart the limitations period.

A subsequent refusal to deal can only restart the limitations period if: (1) it is a new and independent act that is not merely a reaffirmation of a previous act; and (2) it inflicts a new and accumulating injury.  *See Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987); *Martinez v. Western Ohio Health Care Corp.*, 872 F. Supp. 469, 471-72 (S.D. Ohio 1994).  The uncontroverted evidence on the record, in addition to CCS's own First Amended Complaint, shows that there is no genuine issue of material fact that the 1989 verification policy was not the type of act that could restart the limitations period.

**1.    Xerox's 1989 Verification Policy Was Not A New And Independent Act That Could Restart The Limitations Period**

As CCS stated in its First Amended Complaint, the 1989 verification policy "tightened enforcement of [Xerox's] 1987 Parts Policy by implementing new parts 'verification' procedures

when end users or ISOs ordered parts directly from Xerox."  SOF ¶ 25.[2]  Accordingly, by CCS's

own admission, Xerox's verification policy was nothing more than a stricter enforcement of its

previously enacted 1987 parts policy.  Stricter enforcement of a policy is qualitatively different

from the creation of a new policy.  *Cf. Sentara-Hampton Gen. Hosp. v. Sullivan*, 980 F.2d 749,

759 (D.C. Cir. 1992) ("Stricter enforcement of the same standard must be distinguished from the

enforcement of new obligations.").  By its very nature, the enhanced enforcement of a policy is a

reaffirmation of that policy.  Such a reaffirmation cannot be a new and independent act that

restarts the limitations period.  *See Pace Indus.*, 813 F.2d at 238.

Moreover, the 1989 verification policy was not independent of the 1987 parts policy.

Without the 1987 parts policy, the 1989 verification policy would be a dead letter; visits to parts

customers' businesses would have been meaningless if Xerox sold replacement parts to anyone

who placed an order.  As a measure meant to enforce the 1987 parts policy, the 1989 verification

policy was wholly dependent upon the existence of that 1987 policy.  Therefore, Xerox's 1989

verification policy was not a new and independent act that could restart the limitations period.

### 2.    Xerox's 1989 Verification Policy Did Not Inflict a New and Accumulating Injury Upon CCS.

Even if the 1989 verification policy could be deemed new and independent, there is no

record evidence that the verification policy (as opposed to Xerox's refusal to sell parts) inflicted

---

[2] Although later amended pleadings are not, in the strictest sense, considered binding judicial admissions, they may be used like any other extrajudicial admission by a party and are competent evidence of the facts stated therein.  *See, e.g.*, *U.S. v. GAF Corp.*, 928 F.2d 1253, 1259-60 (2d Cir. 1991); *Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir. 1996).  It is notable that CCS's Third Amended Complaint now omits these material allegations from its prior versions in an attempt to plead around the statute of limitations issue that were raised by Xerox in the District of Kansas.

any injury on CCS.  Xerox never imposed the verification policy on a CCS customer.  *See* SOF ¶ 26.  Indeed, Xerox only conducted an on-site verification of CCS's facilities twice, and on each occasion the inspection lasted less than thirty minutes.  *See id.*  It is implausible that these two short inspections could have caused CCS injury, and there is no record evidence that they did.

### G. The Undisputed Evidence Shows That CCS Suffered An Ascertainable Injury Before March 1988

Xerox anticipates that CCS will contend that its claims are not barred because CCS did not suffer "ascertainable injury" until 1989, *i.e.*, within the limitations period.  Such an argument would be contrary to the undisputed evidence.

The undisputed evidence establishes that CCS was impacted by Xerox's policy outside the limitations period.  CCS's owner, William Dixon, testified that Xerox's refusal to sell parts to CCS prevented CCS from expanding to New York in 1986 or 1987:

Q:  Mr. Dixon, when did you consider providing service in New York City?

A:  1986-87, that time frame.

* * * *

Q:  What did you do in 1986 or 1987 to investigate providing service in New York City?

A:  Actually, a broker called me and asked me if I would be interested in servicing.

* * * *

Q:  Was it Xerox equipment?

A:  Part of it was, yeah.

* * * *

13

Q:  What was your response to this broker?

A:  We weren't going to get involved in it at that time.

Q:  Why didn't you want to provide service in –

A:  We would have a problem supporting it with parts and service, things of that nature.

Q:  Were parts going to be an issue for Xerox equipment?

A:  Yes.

\* \* \* \*

Q:  Did you tell that broker why you were not interested in providing service in New York?

A:  The parts, supporting the parts, from the parts standpoint.

Q:  So you actually gave him a reason, as opposed to just saying no?

A:  Yes, um-hum.

SOF ¶ 14.

CCS's alleged inability to expand in 1986 or 1987 would plainly constitute "ascertainable injury" from Xerox's parts policy outside the limitations period.  *See*, *e.g.*, *In re Independent Serv. Orgs. Antitrust Litig.*, 964 F. Supp. 1454, 1465-68 (D. Kan. 1997) (discussing an ISO's alleged inability to expand to new cities because of Xerox's parts policies).

Even if CCS believed that it could not accurately calculate its damages before 1989, this inability to precisely calculate damages does not mean that CCS's claims did not accrue earlier. *See Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1984) (holding that unless special circumstances exist which make damages excessively speculative, statute of limitations is not tolled for purposes of ascertaining their precise amount).  *Cf. Akron Preform*

14

*Mold Co. v. McNeil Corp.*, 496 F.2d 230, 234 (6th Cir. 1974) (holding that uncertainty as to legal sufficiency of cause of action does not render damages speculative so as to delay accrual of cause of action). Indeed, it is a consistent theme across federal and state law that a cause of action accrues when a plaintiff knows that he is injured, not when he knows the full extent of his damages. *See*, *e.g. United States v. Kubrick,* 444 U.S. 111, 122 (1979) (holding that the statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury that is the basis of his action under the Federal Torts Claims Act); *Higgins v. New York Stock Exch., Inc.*, 942 F.2d 829, 832 (2d Cir. 1991) ("A cause of action for violation of the antitrust laws ordinarily accrues as soon as there is an injury to competition."); *Burns v. Hartford Hosp.*, 460 A.2d 1257, 1261 (Conn. 1984) ("an injury occurs when a party suffers some form of actionable harm. The harm need not have reached its fullest manifestation before the statute [of limitations] begins to run.").

The uncontroverted evidence shows that CCS believed that Xerox's parts policy was causing injury no later than 1987. Indeed, in its response to Xerox's interrogatories, CCS concedes that "[p]rior to 1987, Xerox had already imposed limitations on the quantity of 10 series parts that would be supplied to CCS, and CCS was thereby experiencing difficulty in obtaining parts sufficient to service the copiers it had under contract." SOF ¶ 9. Moreover, soon after Xerox first refused to sell CCS replacement parts in 1986, Mr. Dixon learned that CCS could use its customers or other end users to order parts for CCS. *See* SOF ¶¶ 18-22. His reasons for doing so were clear; he needed to order parts through his customers or he would lose business. Accordingly, because CCS believed that Xerox's parts policies were causing it injury before March 24, 1988, CCS's claims are barred by the statute of limitations.

II.  **CCS'S SINGLE-BRAND AFTERMARKET CLAIM FAILS BECAUSE AN AFTERMARKET CANNOT BE A PROPER ANTITRUST MARKET UNLESS THE MANUFACTURER HAS CHANGED ITS POLICIES TO "LOCK IN" CONSUMERS WITHIN THE LIMITATIONS PERIOD.**

An antitrust plaintiff can only prevail in a monopolization claim if it proves the existence of a proper antitrust market that the defendant has monopolized. CCS's monopolization claim fails because the undisputed facts establish that the market that Xerox has allegedly monopolized, an "aftermarket" limited to the service of certain Xerox high-speed copiers, is not a proper antitrust market.

A.  **CCS Must Define A Relevant Antitrust Market**

To state a claim under § 2 of the Sherman Act, 15 U.S.C. § 2, a plaintiff must establish "1) the possession of monopoly power in the relevant market and 2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident." *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 61 (2d Cir. 1997) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). To support such a claim, a plaintiff must define "a relevant product market in which the anti-competitive effects of the challenged activity can be assessed." *Carell v. Shurbert Org., Inc.*, 104 F. Supp. 2d 236, 264 (S.D.N.Y. 2000); *see also Subsolutions, Inc. v. Doctor's Assocs., Inc.*, 62 F. Supp. 2d 616, 624 (D. Conn. 1999). "When we speak of monopolization or attempted monopolization, we necessarily are talking about monopoly power within a relevant market." *Hack v. President & Fellows of Yale College*, 237 F. 3d 81, 85 (2d Cir. 2000); *Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 68 (2d Cir. 1984); *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832, 840 (2d Cir. 1980)("Proof of the relevant product market is a necessary element of a cause of action for monopolization or attempted monopolization."). As the Supreme Court has held, "[w]ithout a definition of that market there is no way to measure [a

defendant's] ability to lessen or destroy competition." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965).

Courts routinely grant summary judgment when plaintiffs have failed to properly define an antitrust relevant market. *See, e.g., Belfiore v. New York Times Co.*, 826 F.2d 177, 180 (2d Cir. 1987) (holding that district court's grant of summary judgment on Sherman Act claim was appropriate because plaintiff's market definition was "implausible as a theoretical matter"), *cert. denied,* 484 U.S. 1067 (1988); *Commerical Data Servers*, 262 F. Supp. 2d at 72 (rejecting plaintiff's narrow market definition and granting summary judgment in favor of defendant on antitrust claims); *PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2000); *Discon, Inc. v. NYNEX Corp.*, 86 F. Supp. 2d 154, 163 (N.D.N.Y. 1999).

### B. Courts Have Limited Single-Brand Aftermarket Claims To Situations In Which There Has Been A Change In the Manufacturer's Policies

CCS's antitrust claim is based on Xerox's conduct in an alleged aftermarket for servicing Xerox-brand (and Xerox-brand alone) high volume photocopiers "with measured throughput greater than 50 copies per minute, rated maximum monthly copy volume in excess of 150,000 copies, and exceeding 1,000 pounds." Third Am. Compl. ¶ 67. As Xerox discussed in its Motion to Dismiss, an aftermarket is not a proper antitrust market if competition in the foremarket – the copier market – disciplines conduct in the aftermarket. *See SMS Sys. Maint. Servs.,* 188 F.3d at 17 ("Unless the evidence shows that the manufacturer can exert raw power in the aftermarket without regard for commercial consequences in the foremarket, the aftermarket is not the relevant market.").

Courts have found that foremarket competition is insufficient to render an aftermarket an improper antitrust market when "information costs have distorted market behavior." *Id*. at 18. In

other words, "the primary market's ability to check a firm's behavior in its own aftermarket hinges in substantial part on whether information about the latter is sufficiently reflected in the former." *Id*. at 19.

Every court of appeals to address the question of single-brand aftermarkets[3] has held that there can be no aftermarket limited to a particular brand unless the manufacturer has made a surprise change in its policies that prevented foremarket customers from assessing the competitive situation in the aftermarket at the time they made their foremarket purchase. Because the undisputed facts show that Xerox has not changed its policies within the limitations period, an aftermarket limited to the service of Xerox copiers is not a proper antitrust market, and CCS's claims fail as a matter of law.

The leading case is the Sixth Circuit's decision in *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997). In *PSI*, the Sixth Circuit rejected an antitrust claim alleging monopolization of a service aftermarket based on facts similar to those present here. In that case a competing service firm challenged Honeywell's policy of refusing to sell components for its circuit boards as monopolization of an aftermarket for the service of Honeywell boards. 104 F.3d at 813-14. The court, interpreting the Supreme Court's decision in *Eastman Kodak Co. v.*

---

[3] District courts in this circuit have generally rejected alleged market definitions limited to a single brand. *See Mathias v. Daily News*, 152 F. Supp. 2d 465, 482-83 (S.D.N.Y. 2001)(rejecting proposed market definition limited to the distribution of a particular newspaper); *K.M.B. Warehouse Distrib., Inc. v. Walker Mfg. Co.*, Civ.No.92-1167, 1994 WL 250115, at *3 (S.D.N.Y. June 1, 1994)(granting summary judgment because the market could not be limited to the exhaust equipment aftermarket for a single brand but needed to include the industry as a whole), *aff'd*, 63 F.3d 123 (2d Cir. 1995); *Re-Alco Indus., Inc. v. Nat'l Center for Health Educ., Inc.*, 812 F. Supp. 387, 391-92 (S.D.N.Y. 1993)(dismissing antitrust claims because plaintiff failed to make a showing why the relevant market should be limited to a particular brand of health education materials); *Morse v. Swank, Inc.*, 493 F. Supp. 110, 115 (S.D.N.Y. 1980)(granting summary judgment because the market definition limited to a single brand offered no evidence on which the anticompetitive effect in the industry could be judged).

*Image Technical Servs.*, 504 U.S. 451 (1992), the leading aftermarket case, held that "an antitrust

plaintiff cannot succeed on a *Kodak*-type theory when the defendant has not changed its policy

after locking-in some of its customers, and the defendant has been otherwise forthcoming about

its pricing structure and service policies."  104 F.3d at 820.[4]

The First, Third, Fifth, and Seventh Circuits have all agreed with the *PSI Repair* court

that *Kodak* is limited to situations where there was a surprise change in policy after customers

had made their purchases:

- In *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756 (7th Cir. 1996), the
  court affirmed rejection of an antitrust plaintiff's claim that the relevant market was
  "operating systems for Digital's computers."  73 F.3d at 761.  Like *PSI*, the court
  focused on the necessity that there be a change in policy, noting that "[t]he Court did
  not doubt in *Kodak* that if spare parts had been bundled with Kodak's copiers from the
  outset, or Kodak had informed customers about its policies before they bought its
  machines, purchasers could have shopped around for competitive life-cycle prices.
  The material dispute that called for a trial was whether the change in policy enabled
  Kodak to extract supra-competitive prices from customers who had already purchased
  its machines."  *Id.* at 763.

- In *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772 (5th Cir. 1999), the court
  rejected antitrust claims based on an aftermarket limited to expansion cards for a
  specific brand of telephone switches. *Id.* at 781.  This market definition was rejected
  because "DGI did not prove that a change in any of [Alcatel's] pricing, warranty, or
  other policies served to subject . . . switch owners to substantial additional

---

[4]  In *Kodak* itself, the Supreme Court upheld reversal of summary judgment for an antitrust
defendant that contended that it could not exercise market power in an "aftermarket" limited to
the service of its own copier and micrographic equipment because it lacked market power in the
"primary" equipment market.  However, the Supreme Court's holding was based on the fact that
the plaintiff had presented evidence that, although Kodak initially had a policy of selling
replacement parts for its equipment to its competitors, Kodak had changed its policy and stopped
selling parts.  504 U.S. at 457-58.  It was this change in policy – coupled with the exploitation of
surprised customers that has purchased equipment before the policy change – that permitted the
finding of an aftermarket.  *Compare* 504 U.S. at 491 (Scalia, J., dissenting)(arguing that there
could be no aftermarket "had Kodak – from the date of its market entry – consistently pursued an
announced policy of limiting parts sales in the manner alleged in this case, so that customers
bought with the knowledge that aftermarket support could be obtained only from Kodak" *with*
504 U.S. at 477 n.24 (majority opinion)(agreeing with Justice Scalia's reasoning, but finding no
evidence "that the restrictive parts policy . . . was generally known").  For this reason, CCS
cannot rely on *Kodak* to defeat summary judgment.

information or switching costs . . . . Several circuits have held that such a change in policy is a crucial factor in establishing an aftermarket monopoly claim." *Id.* at 783 (emphasis added).

- In *SMS Sys. Maintenance Servs.,* 188 F.3d at 18-19, the First Circuit affirmed the rejection on summary judgment of antitrust claims based on an alleged aftermarket for service of Digital computers.  The court found that the aftermarket was not a proper relevant market because there was no change in policy; "the transparency of DEC's allegedly monopolistic policy represents a salient departure from the Kodak scenario."  188 F.3d at 19.  *See also id.* (noting that Kodak can be explained by the "bait and switch" tactics used by the defendant in that case in implementing a "retroactive change in the rules").

- In *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997), the court rejected an aftermarket for sales of supplies to Domino's franchisees.  The court noted that Kodak had changed its policies.  "Because this change in policy was not foreseen at the time of sale, buyers had no ability to calculate these higher costs at the time of purchase and incorporate them into their purchase decision . . . Unlike the plaintiffs in Kodak, the Domino's franchisees could assess the potential costs and economic risks at the time they signed the franchise agreement."  *Id.* at 439.

The Second Circuit and the district courts in this circuit have recognized the need for a change in policy to establish a *Kodak*-type aftermarket antitrust claim in similar contexts.  In *Hack*, 237 F.3d at 87, the court concluded that the plaintiff, a Yale student challenging Yale's housing policy requiring undergraduates to live in co-ed on-campus housing, did not implicate the concerns raised in *Kodak* because "Yale's housing policies were fully disclosed long before plaintiff applied for admission."  Since the policy was fully disclosed when the plaintiffs decided to attend Yale, they could not claim that they had any "lock-in" costs.  *Id.*  Similarly, the district courts within the circuit have found that a plaintiff could only establish *Kodak*-based aftermarkets if it could show that customers were reasonably unaware of the policy at the time it entered into the agreement.  *See Commercial Data Servers*, 262 F. Supp. 2d at 70 (holding that the plaintiff failed to establish an aftermarket limited to customers of a particular type of computer system because it could not show that customers faced excessive information costs at the time of initial purchase); *Subsolutions*, 62 F. Supp. 2d at 626 (denying summary judgment

because where plaintiff showed that because defendant's policy "was not in place at the time many franchises entered into their agreements, … it is arguable that that the franchisees could not reasonably foresee that [defendant] would implement such a restriction").[5]

It is axiomatic that for a change in policy to provide the basis for establishing an aftermarket, the change must occur during the relevant limitations period. *See, e.g., Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1359 (S.D. Fla. 1998)(rejecting plaintiff's aftermarket claim because "the defendant's decision to vertically integrate was made in the early 1980's, many years outside the statute of limitations period in [the] case.").  Absent this protection, manufacturers would be unable to alter their customer policies without being subject to an antitrust suit at any point during the life span of their product alleging that parties were locked-in by the change.  Policy changes that occurred in the 1950's, the 1940's or even before would be subject to fresh antitrust claims based on a plaintiff's aftermarket assertions.  As the limitations period in this case commences on March 24, 1998, *see In re: Independent Serv. Orgs. Antitrust Litig.*, 1997 WL 161940, at *1, *5, any policy in place and generally known before that date cannot provide the basis for establishing an aftermarket.

The import of these cases is unmistakable: for CCS to prevail on its aftermarket monopolization claim against Xerox, it must prove that Xerox "changed it policy after locking-in some of its customers" during the limitations period or has not been otherwise "forthcoming

---

[5] Other district court decisions from other circuits have adopted this same rule of law.  *See, e.g., I.D. Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 642 (E.D. Pa. 2003); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 253 F, Supp. 2d 943, 966 n.3 (E.D. Ky. 2003); *Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947, 956 (D. Ariz. 2001); *Laserworks v. Pitney Bowes, Inc.*, Civ.No.96-1307, 1999 WL 33435671, at *8 (S.D. Ohio Dec. 29, 1999); *Metzler*, 19 F. Supp. 2d at 1359; *Little Caesar Enters., Inc. v. Smith*, 34 F. Supp. 2d 459, 512-13 (E.D. Mich. 1998); *Wilson v. Mobil Oil Corp.*, 940 F. Supp. 944, 953 (E.D. La. 1996).

about its pricing structure and service policies." *PSI Repair*, 104 F.3d at 820. In the absence of such evidence – or, as will be shown below, in the face of undisputed evidence that Xerox's policy remained constant at all relevant times – CCS's claim fails as a matter of law and Xerox is entitled to summary judgment.

### C. The Product Market Cannot Be Limited To Service of Xerox's High Speed Copiers Because Xerox Has Not Changed Its Policy During The Relevant Period.

#### 1. The Undisputed Record Demonstrates Xerox Began Its Parts Policy In 1984.

The undisputed facts show that Xerox's parts policy was first adopted in 1984, thus foreclosing any claim by CCS that Xerox had a "change in policy" during the limitations period that could form the basis for its aftermarket antitrust claim.

Xerox first announced its restrictive parts policy in April 1984 when it decided that it would sell replacement parts for its "10 series" copiers to end users and authorized resellers, but not to ISOs. *See* SOF ¶ 3. CCS became aware of this policy at the latest in either 1985 or 1986. *See* SOF ¶¶ 5-8. Xerox then extended this policy to cover its newer "9 series" and "50 series" copiers in January 1987. *See* SOF ¶ 10.

#### 2. The Undisputed Record Indicates That Not Only Did Xerox Not Materially Change Its Parts Policy After 1984, But Xerox's Customers Were Aware Of The Parts Policy By 1987 At The Latest.

The uncontroverted evidence also demonstrates that Xerox's customers were aware or should have been aware of the policy during that time as well. Far from perfect knowledge regarding a manufacturer's policy is required to establish sufficient awareness to defeat a lock-in claim. *See Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947, 956 (D. Ariz. 2001)("perfect information about the aftermarket is not required. In fact, very imperfect

22

knowledge suffices to defeat the assertion of a *Kodak* lock-in market.")(citations omitted).

Rather, there can be no aftermarket if "customers knew or could readily obtain information about

the defendants' parts and service policies." *Metzler*, 19 F. Supp. 2d at 1359. *Accord PSI*, 104

F.3d at 820; *Little Caesar Enter., Inc. v. Smith*, 34 F. Supp. 2d 459, 490 (E.D. Mich. 1998)("[a]

buyer knowing an announced or generally understood restrictive policy, or even the buyer who

could reasonably anticipate the risk of such a future policy can compare whether similar risks

were faced with alternate competitors in the foremarket….")(relying on 10 Phillip E. Areeda, et.

al., *Antitrust Law* ¶ 1740, at 150 (1996)).

      Here, it is undisputed that Xerox disseminated information about its parts policy widely

so that any reasonably informed copier customer should have been aware of Xerox's parts

policy. *See* SOF ¶ 23. For example, Xerox directly promulgated this policy among its copier

customers, informing them that ISOs would have difficulty receiving replacement parts from

Xerox. *See id*.[6] Moreover, there is no evidence in the record that any customer bought a Xerox

copier and was then surprised to learn that Xerox did not sell parts to ISOs. (And, as noted

above, any such surprise would have been unreasonable, and thus irrelevant.) The absence of a

policy change as well as the general availability of information regarding a manufacturer's

policy precludes the possibility of a lock-in.

      In sum, the undisputed facts demonstrate that Xerox established its restrictive parts policy

in 1984 and that information about the policy was widely disseminated by 1987. Absent any

---

[6] Indeed, CCS attempted to maintain a *defamation* claim against Xerox based on its allegations
that Xerox was telling customers that CCS would not be able to get parts. Judge Vratil rejected
CCS's defamation claim on the grounds that CCS was estopped from asserting such a claim
based on its own acknowledgement that it was having difficulty getting parts. *See* 114 F. Supp.
2d at 1079 ("With respect to its inability to timely obtain parts, CCS has admitted the truth of the
allegedly defamatory statement.").

contrary evidence, there is no issue of material fact regarding a lock-in that would permit a market restricted to the service of high-speed Xerox copiers "with measured throughput greater than 50 copies per minute, rated maximum monthly copy volume in excess of 150,000 copies, and exceeding 1,000 pounds" as alleged in the Third Amended Complaint. Accordingly, summary judgment on CCS's antitrust claim in Count I is required.

## III. CCS'S CLAIMS BASED ON XEROX'S REFUSAL TO SELL PARTS ARE PRECLUDED BY CCS'S FAILURE TO USE REASONABLE CARE TO MITIGATE ITS ALLEGED LOSSES.

Even if CCS has properly established an antitrust market, CCS's claims would still fail because CCS failed to take reasonable steps to mitigate its damages. It is undisputed that although Xerox refused to sell parts to ISOs, end users of Xerox equipment, including CCS's customers, remained free to purchase parts from Xerox. Several of CCS's customers purchased parts from Xerox for CCS's use, but CCS inexplicably failed to ask other customers to order parts. Because CCS could have obtained parts for its use in servicing copiers by requesting that its customers order the parts, and because CCS failed to do so, CCS's claims based on Xerox's refusal to sell parts are barred by CCS's failure to take reasonable steps to mitigate its damages.

### A. CCS Had a Duty to Take Reasonable Steps to Mitigate Damages

Antitrust plaintiffs have a duty to mitigate damages. *See, e.g., Litton Sys., Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785, 820 n.47 (2d Cir. 1983)("An antitrust plaintiff has a duty to mitigate damages."); *Golf City, Inc. v. Wilson Sporting Goods Co., Inc.*, 555 F.2d 426, 436 (5th Cir. 1977) (same); *In re Visa Check/Mastermoney Antitrust Litig.*, No. CIV.A.96-5238, 2003 WL 1712568, at *8 (S.D.N.Y. April 1, 2003)(same)(quoting *Litton*, 700 F.2d at 820 n.47);

*Westman Comm'n Co. v. Hobart Corp.*, 541 F. Supp. 307, 314 (D. Colo. 1982) (same).[7]  In a refusal to deal case such as this, the mitigation obligation requires that "an antitrust victim must seek to minimize the amount of his damages" by "locat[ing] suitable substitutes for the denied goods."  *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 863 (5th Cir. 1981).

This obligation to "locate suitable sources for the denied goods" requires an antitrust plaintiff to look outside its normal sources.  For example, in *Golf City*, a retailer alleged that Wilson and other manufacturers had conspired with the Professional Golfers' Association to limit the distribution of "pro line" golf equipment to pro shops.  555 F.2d at 430-31.  The court specified that the plaintiff-retailer could have mitigated its damages by purchasing "leaked" pro-line equipment resold to retailers by other pro shops.  *Id*. at 436.  In so doing, the Fifth Circuit recognized that plaintiffs have a duty to make a reasonable effort to mitigate damages even if it requires them to "cover" by purchasing goods outside their normal channels.  *Id*.  In *Westman*, the District of Colorado similarly recognized that, "[i]f feasible and cost-effective, a plaintiff may even be obligated to buy the goods that it cannot purchase directly through a bootleg market."  541 F. Supp. at 314.

## B.    CCS Unreasonably Failed to Mitigate Losses By Refusing to Request Customers to Order Xerox Parts

There is no genuine issue of material fact that it would have been "feasible and cost-effective" for CCS to obtain parts through its customers.  It is undisputed that Xerox's parts

---

[7]  *See also Fishman v. Estate of Wirtz*, 807 F.2d 520, 558 (7th Cir. 1986) (plaintiff alleging §1 and § 2 violation when he was denied National Basketball Association franchise had duty to mitigate by using money he would have spent to obtain franchise for other investments of similar risk); *Pierce v. Ramsey Winch Co*., 753 F.2d 416, 436 (5th Cir. 1985) (dealer alleging he was terminated as the result of a § 1 price-fixing conspiracy had duty to mitigate by trying to obtain similar goods from other manufacturers); *Borger v. Yamaha Int'l Corp*., 625 F.2d 390, 399 (2d Cir. 1980) (dealer whose line of merchandise was terminated had duty to mitigate by taking reasonable steps to merchandise substitute lines).

policy permitted end-users of Xerox products to purchase replacement parts, SOF ¶ 3, and that at least three CCS customers did in fact order parts for CCS's use. SOF ¶¶ 18-19. Xerox never refused to sell parts to a CCS end user. SOF ¶ 20.

CCS concedes that it could have requested other customers that are Xerox end-users to obtain parts from Xerox for CCS's use. SOF ¶ 22. There was no reason why CCS could not have done so; CCS concedes that no customer ever refused a CCS request that it order parts for CCS's use. SOF ¶ 21. Indeed, even the limited extent to which CCS asked its customers to order parts "made it easier [for CCS] to pick up more accounts." SOF ¶ 19. But despite the willingness of the three customers it asked to order parts, CCS did not even consider asking other customers to do the same. SOF ¶ 22. By refusing even to attempt to request customers other than CIGNA, Connecticut Mutual, and Fairfield University to procure parts from Xerox, CCS failed to make reasonable efforts to mitigate.

There is no record evidence that it was more burdensome or expensive for CCS to obtain parts through its customers. But even if it *were*, CCS would have no justification for refusing to *attempt* to mitigate by asking additional customers to order parts. This case cannot be distinguished from *Golf City*, where the plaintiff claimed that "the bootleg market in leaked goods was not dependable and that leaked goods cost more." 555 F.2d at 436. Dismissing plaintiff's claims for failure to mitigate, the court held that these arguments "would bear on the *amount* of mitigation Golf City could be expected to accomplish . . . [but does] not absolve Golf City of its duty to mitigate." *Id*. (emphasis added).

In sum, there is no admissible evidence that an effort to mitigate by asking customer to order parts would have been futile. Because CCS failed even to ask most of its customers to order parts, CCS failed to use reasonable efforts to mitigate its alleged damages. Xerox is

accordingly entitled to summary judgment on CCS's claims premised on Xerox's refusal to sell parts.

## CONCLUSION

For the reasons set forth above, Xerox respectfully requests that summary judgment be entered against Plaintiff on its antitrust claim raised in Count I of the Third Amended Complaint.

Respectfully submitted,

Peter K. Bleakley
Jonathan I. Gleklen
Christopher F. Winters
Jon J. Nathan
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000
fax: (202)-942-5999
email: jonathan_gleklen@aporter.com

Robert Dolian
CUMMINGS & LOCKWOOD
Four Stamford Plaza
Stamford, Connecticut 06904
(203) 351-4307
fax: (203) 708-3948
email: rdolian@cl-law.com

Peter W. Marshall
Senior Counsel
XEROX CORPORATION
800 Long Ridge Road
Stamford, CT 06904
(203) 968-4590

*Attorneys For Defendant Xerox Corporation*

Dated June 25, 2004

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CREATIVE COPIER SERVICES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action |
| v. | ) |
| | ) No. 01-CV-155 |
| XEROX CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2004, I served a copy of the foregoing Motion for Summary Judgment and Memorandum in Support of Xerox's Motion for Summary Judgment by first class mail upon the following counsel for Plaintiff Creative Copier Services:

> Robert LaRocca
> Kohn, Swift & Graf, P.C.
> One South Broad Street – Suite 2100
> Philadelphia, PA 19107-3389

and

> Elias A. Alexiades
> 215 Church Street, 2nd Floor
> New Haven CT 06510

Jonathan I. Gleklen    JJ~
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000
fax: (202) 942-5999
email: jonathan_gleklen@aporter.com

***Counsel for Xerox Corporation***