**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CREATIVE COPIER SERVICES, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action |
| v. | ) ) | No. 01-CV-155 |
| XEROX CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

## STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 56.1, Xerox hereby sets forth those material facts as to which no genuine issue exists.

### The Parties

1. Defendant Xerox Corporation ("Xerox") is a New York corporation with its principal offices in Stamford, Connecticut. Xerox is engaged in the business of inventing, manufacturing, selling, and servicing document processing equipment, including photocopiers and laser printers. *See In re Indep. Serv. Orgs. Antitrust Litig.*, 23 F. Supp. 2d 1242, 1244 (D. Kan. 1998).

2. In 1981, William D. Dixon, a former Xerox employee, founded Plaintiff Creative Copier Services ("CCS"), the fictitious trade name of a sole proprietorship that has its principal place of business in Middletown, Connecticut. *See* 3/4/96 Dixon Dep. Tr. at 8-23 (Ex. 1). CCS is an independent service organization ("ISO") that provides service and maintenance of copiers manufactured by Xerox. *See* Third Am. Compl. ¶¶ 1, 9 (Ex. 2).

**The Xerox Parts Policy**

3. In April 1984 Xerox implemented a policy of selling replacement parts for its "10 series" of photocopiers only to end users of that equipment and to authorized service resellers, and refusing to sell such parts to ISOs. *See* Peter Marshall Decl. Ex. A. *See also* CCS First Am. Compl. ¶ 24 (Ex. 3) (in 1984 "Xerox changed its parts policy to provide that '[t]he sale of parts which are unique to the '10' Series products and memorywriters will not be permitted to any third party, unless that third party is an end purchaser . . . or . . . an authorized service dealer/retailer . . .'").

4. CCS claims in this action that it was injured by Xerox's refusal to sell it parts pursuant to this policy. *See* Third Am. Compl. ¶¶ 25, 30, 32 (Ex. 2); 3/11/96 Dixon Dep. Tr. at 445, 447, 448, 450, 451, 452, 455, 460, 462, 464, 465, 470 (Ex. 4).

5. CCS was impacted by Xerox's refusal to sell parts as early as 1985, and certainly no later than 1986. Mr. Dixon, the owner of CCS, testified that he learned of Xerox's policy of refusing to sell parts to ISOs in 1985 or 1986 when Xerox refused to ship parts to CCS for "10 Series" copiers, specifically the Model 1075 and Model 1090. *See* 3/4/96 Dixon Dep. Tr. at 239 (Ex. 1). He similarly testified that in 1986 CCS was "shut down on some parts that [it] had tried to order on 1055 from Xerox." *Id.* at 241.

6. On October 10, 1986, Xerox wrote to Mr. Dixon to inform him that it was Xerox's policy to sell replacement parts for its "10 Series" copiers only to end

users and to Xerox's authorized service dealers. *See* Marshall Decl. Ex. B. This refusal was clear, unequivocal, and final. The letter stated:

> Please be advised th[at] your order for replacement parts dated 10/06/86 has been limited to those quantities deemed reasonable to support the machines our records indicate you personally own.
>
> As a reminder for future ordering; Xerox sells 10 Series Copier (i.e.; 1020, 1040, 1090, etc.) and Memorywriter electronic typewriter replacement parts for resale exclusively to Authorized Xerox Service Dealers. End users (owners of these products) may order such parts and relative Service Literature in quantities reasonably necessary to support their machines.

*Id*.

7. In a letter dated October 14, 1986, Xerox further refused to provide technical training on Xerox's 10 Series copiers to CCS's employees. Marshall Decl. Ex. C. The letter stated that:

> It is Xerox's policy to provide technical training, parts support, and documentation to 10 Series end-users for the purpose of internally servicing their own equipment. Xerox reserves the right to limit the training and parts support to the level necessary to provide service on the equipment which is owned.

*Id*.

8. Xerox reiterated its refusal to deal in another letter dated October 23, 1986. *See* Marshall Decl. Ex. D. This letter contained a similarly clear, unequivocal, and final refusal to sell parts to CCS for use in servicing copiers for third parties, agreeing to sell CCS parts only to self-service its own in-house copiers. *See id.*

> Mr. Dixon, allow me to reiterate what I know Pat Ferry has been explaining to you in regard to the sales of 10 Series and Memorywriter parts. It is a policy of Xerox Corporation to restrict the sales of the 10 Series and

3

>Memorywriter parts to the owners of the equipment for their repair of their own machines and/or Authorized Xerox Sales and Service Dealerships. We reserve the right to limit quantities to reasonable amounts in support of these products. The basis used for honoring orders for the protected product lines is decided first by proof of ownership, then number of machines owned, pieces used per machine, failure rate and standard copy volume (if known).

*Id*. at 1-2. This letter allowed Mr. Dixon to buy one each of twelve different items Mr. Dixon had previously ordered. It was enough parts for CCS to self-service only its own in-house copiers, not to provide service to third parties. *See id.* at 1.

9. By 1986, Xerox's restrictive parts policy already had begun to have an impact on CCS's ability to service the copiers it had under contract. *See* CCS's Response to Xerox's Interrogatories ¶ 2 (Ex. 5) ("[P]rior to 1987, Xerox had already imposed limitations on the quantity of 10 Series parts that would be supplied to CCS, and CCS was thereby experiencing difficulty in obtaining parts sufficient to service the copiers it had under contract.").

### Xerox Broadened its Parts Policy in 1987

10. Xerox revised its parts policy in January 1987 so that it covered a broader group of products – not only the "10 Series" copiers, but also newer "9 Series" copiers, "50 Series" copiers, and electronic printers. *See* Marshall Decl. Ex. E. *See also* First Am. Compl. ¶ 26 (Ex. 3); *In re Indep. Serv. Org. Antitrust Litig.*, 85 F. Supp. 2d at 1145. CCS has alleged that Xerox enforced this policy and that "as a result, ISOs' ability to purchase restricted parts from Xerox became the exception rather than the norm." First Am. Compl. ¶ 30 (Ex. 3).

4

11. Mr. Dixon, CCS's owner, provided unequivocal testimony that CCS felt the effects of Xerox's policy in 1987. *See* 3/11/96 Dixon Dep. Tr. at 348-52 (Ex. 4) ("Q: In 1987, did Xerox ever refuse to sell parts to Creative [Copier Services]? A: Yes. Q: What parts did you order that Xerox refused to sell? A: 10 Series parts. Q: Did Xerox refuse outright or did it just delay delivering the parts? A: They've refused. Q: In 1987, did Xerox actually refuse? A: Yes."). This new policy could not, however, inflict any new injury on CCS because CCS has alleged that the only high volume copiers it services are "10 Series" copiers subject to the original 1984 policy; CCS does not service high volume "50 Series" copiers or "9 Series" copiers or any electronic printers. *See* First Am. Compl. ¶ 16 (Ex. 3).

12. Jeffrey MacKie-Mason, CCS's expert witness on economics, stated in his expert report that Xerox's policy restricting the sale of parts "was enforced beginning in 1987." Expert Report of Jeffrey K. MacKie-Mason, at 18 (Ex. 6).

13. Mr. Dixon testified that, beginning in 1987, CCS was forced to purchase copiers to cannibalize them for replacement parts because of Xerox's refusal to sell it parts. *See* 4/12/96 Dixon Dep. Tr. at 88-89 (Ex. 7).

14. Mr. Dixon testified that Xerox's refusal to sell parts to CCS prevented CCS from expanding to New York in 1986 or 1987:

> Q: Mr. Dixon, when did you consider providing service in New York City?
>
> A: 1986-87, that time frame.
>
> * * * *
>
> Q: Was it Xerox equipment?

A: Part of it was, yeah.

* * * *

Q: What was your response to this broker?

A: We weren't going to get involved in it at that time.

Q: Why didn't you want to provide service in –

A: We would have a problem supporting it with parts and service, things of that nature.

Q: Were parts going to be an issue for Xerox equipment?

A: Yes.

* * * *

Q: Did you tell that broker why you were not interested in providing service in New York?

A: The parts, supporting the parts, from the parts standpoint.

Q: So you actually gave him a reason, as opposed to just saying no?

A: Yes, um-hum.

Q: In 1987, did Xerox ever refuse to sell parts to Creative?

A: Yes.

Q: What parts did you order that Xerox refused to sell?

A: 10 Series parts.

Q: Did Xerox refuse outright or did it just delay delivering the parts?

A: They've refused.

Q: In 1987, did Xerox actually refuse?

A: Yes.

3/11/96 Dixon Dep. Tr. at 348-352 (Ex. 4).

15. Richard Magnano began working for CCS in January of 1987. *See* 3/26/96 Magnano Dep. Tr. at 12 (Ex. 8). He testified that "when [he] first started working for [CCS]," he had to order parts from Xerox by stating that he worked for Cigna, the actual owner of the copiers CCS serviced, because Xerox would not sell parts to a third-party service provider. *Id.* at 15-16.

16. James Withstandley began working for CCS in January 1988. *See* 3/26/97 Withstandley Dep. Tr. at 10 (Ex. 9). He testified that when he started working at CCS, he experienced difficulties obtaining parts: "I wouldn't be able to get the part very quick[ly]. I would have to wait for it." *Id.* at 11.

17. Mr. Dixon testified that Xerox's enforcement of its policy was consistent. Access to parts "was completely foreclosed. We could not buy it. If we did not own a 5090, we could not buy it. Was it completely foreclosed without stipulation? It was completely foreclosed. We could not buy the parts unless we owned the 5090." 3/4/96 Dixon Dep. Tr. at 122 (Ex. 1).

### CCS's Refusal to Request Customers to Order Parts

18. Because Xerox refused to sell parts to ISOs, but would sell parts to copier end users (regardless of whether or not they obtained service from ISOs), CCS requested that CIGNA, one of its customers, begin purchasing parts for use by CCS in 1987. *See* 3/11/96 Dixon Dep. Tr. at 456 (Ex. 4) ("Q: When did you first ask Cigna to order parts? A: Cigna started ordering parts in 1987").

19. At least three CCS customers purchased parts for CCS to install, including CIGNA, Connecticut Mutual and Fairfield University. *See* Answer and Objections of Plaintiff, Creative Copier Services, to Xerox Corporation's First Set

7

of Requests for Admissions at 3-4 (Ex. 10).  Indeed, CIGNA ordered more than $125,000 of parts from Xerox for use by CCS.  *See* CCS 002476-8 (Ex. 11).  CIGNA's ordering of parts for CCS "made it easier [for CCS] to pick up more accounts."  4/11/96 Blake Dep. Tr. at 44 (Ex. 12).

20. Xerox never refused to supply parts to a CCS customer who ordered them; the single item that Xerox ever refused to supply to a CCS customer was a service manual.  *See* 3/4/96 Dixon Dep. Tr. at 246 (Ex. 1).

21. No CCS customer ever refused to order parts on behalf of CCS.  *See* 4/11/96 Blake Dep. Tr. at 77 (Ex. 12); 3/4/96 Dixon Dep. Tr. at 246 (Ex. 1).

22. CCS could have asked its other customers who were end-users of Xerox products to order parts from Xerox for CCS to use in servicing Xerox copiers.  *See* 4/11/96 Blake Dep. Tr. at 44, 53-64 (Ex. 12).  Despite the willingness of its customers to order such parts, CCS did not attempt to request other customers to do the same.  *See id.* at 48-51; 3/4/96 Dixon Dep. Tr. at 175 (Ex. 1); 3/11/96 Dixon Dep. Tr. at 435-36, 462-63 (Ex. 4); 3/26/97 Withstandley Dep. Tr. at 71 (Ex. 9).  CCS's owner testified that he never even considered asking other customers to order parts.  *See* 3/4/96 Dixon Dep. Tr. at 246 (Ex. 1).

**Xerox Regularly Informed Its Copier Customers About Its Parts Policy**

23. Xerox regularly informed its copier customers about its restrictive parts policy, telling them that ISOs would have difficulty receiving replacement parts from Xerox.  *See* First Am. Compl. ¶ 63 (Ex. 3) ("the systemic and pervasive use Xerox makes of its parts policies with potential ISO customers … undermine[d] their confidence in ISOs."); *id. at* ¶ 64 ("Xerox repeatedly represented to end

users that they should not employ the services of ISOs because the ISOs cannot obtain Xerox parts.").

### Xerox's 1989 Verification Policy

24. In 1989 Xerox announced a new "verification policy" to ensure that ISOs were complying with Xerox's policy of selling parts to ISOs only for use in servicing their own in-house copiers as self-servicers, rather than to provide third-party service to others. *See* Marshall Decl. Ex. F.

25. The 1989 verification policy amounts to little more than stringent enforcement of Xerox's previously existing parts policy. CCS has alleged that it "tightened enforcement of [Xerox's] 1987 Parts policy by implementing new parts 'verification' procedures when end users ordered parts directly from Xerox." First Am. Compl. ¶ 31 (Ex. 3).

26. There is no evidence in the record that the verification policy itself caused any injury to CCS. No CCS customer was ever subject to the 1989 verification policy. *See* 3/4/96 Dixon Dep. Tr. at 103 (Ex. 1). Indeed, CCS itself was subject to only two on-site inspections by Xerox personnel to verify that CCS owned the equipment for which it was ordering parts, and each of these visits lasted less than half an hour. *See* 3/26/96 Magnano Dep. Tr. at 15, 44 (Ex. 8). Rather, any alleged injury suffered by CCS flowed solely from Xerox's enforcement of its earlier-announced policy of refusing to sell parts to ISOs.

### The Legal Action

27. On March 24, 1992, an antitrust class action, *R&D Bus. Sys. et al. v. Xerox Corporation*, No 2-92-CV-042 (E.D. Tex.), was filed against Xerox challenging

9

Xerox's refusal to sell parts to ISOs. *See In re Independent Serv. Orgs. Antitrust Litig.*, No. 94-2102-EEO, MDL-1021, 1997 WL 161940, at *1, *5 (D. Kan. Mar. 12, 1997).

28. In 1994, pursuant to the settlement of that litigation, Xerox changed its parts policy. Since that time it has been Xerox's policy to sell all parts to ISOs. *See In re Independent Serv. Orgs. Antitrust Litig.*, 989 F. Supp. 1131, 1133 (D. Kan. 1997).

29. There is no evidence of record that Xerox ever suggested that it would reevaluate or consider changing its policies regarding the sale of parts to ISOs before the settlement of the *R&D* case in 1994 or that it wavered in its refusal to sell parts to CCS.

Respectfully submitted,

Robert Dolian
CUMMINGS & LOCKWOOD
Four Stamford Plaza
Stamford, Connecticut 06904
(203) 351-4307
fax: (203) 708-3948
email: rdolian@cl-law.com

Peter K. Bleakley
Jonathan I. Gleklen
Christopher F. Winters
Jon J. Nathan
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000
fax: (202)-942-5999
email: jonathan_gleklen@aporter.com

Dated June 25, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CREATIVE COPIER SERVICES,<br><br>  Plaintiff,<br><br>  v.<br><br>XEROX CORPORATION,<br><br>  Defendant. | Civil Action<br><br>No. 01-CV-155 |

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2004, I served a copy of the foregoing Motion for Summary Judgment and Memorandum in Support of Xerox's Motion for Summary Judgment by first class mail upon the following counsel for Plaintiff Creative Copier Services:

> Robert LaRocca
> Kohn, Swift & Graf, P.C.
> One South Broad Street – Suite 2100
> Philadelphia, PA 19107-3389

and

> Elias A. Alexiades
> 215 Church Street, 2nd Floor
> New Haven CT 06510

_____
Jonathan I. Gleklen     JJN
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000
fax: (202) 942-5999
email: jonathan_gleklen@aporter.com

*Counsel for Xerox Corporation*

Marshall Declaration

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CREATIVE COPIER SERVICES,<br><br>Plaintiff,<br><br>v.<br><br>XEROX CORPORATION,<br><br>Defendant. | Civil Action<br><br>No. 01-CV-155 |

**DECLARATION OF PETER W. MARSHALL IN SUPPORT OF DEFENDANT XEROX CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

I, Peter W. Marshall declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746 as follows:

1. I am more than 18 years of age, and I am competent in all respects to testify as to the matters stated herein. I make the statements in this Declaration on the basis of my personal knowledge.

2. I am Associate General Counsel at Xerox Corporation ("Xerox"). I have been employed by Xerox for over 29 years and in my current position since 1997. I submit this declaration in support of Xerox's motion for summary judgment.

3. I am familiar with the documents affixed herein as Exhibits A-F. They are true and correct copies of Xerox documents produced in the ordinary course of business. They have been produced to plaintiff in *R&D Business Systems v. Xerox*, 92-CV-042 (E.D. Tex.) or previously in the above-captioned litigation.

Exhibits:

A. April 17, 1984, Memorandum from Mr. C. Otto of Xerox, bates-labeled 6RD 0145851.

B. October 10, 1986, Letters from Ms. Denece Shields of Xerox to Mr. Apicella, bates-labeled 6RD 0063351-52, and to Ms. Pellegrino, bates-labeled 6RD 0063353.

C. October 14, 1986, Letter from Mr. Richard Young of Xerox to Mr. William Dixon of CCS, bates-labeled CCS 006632.

D. October 23, 1986, Letter from Ms. Denece Shields of Xerox to Mr. William Dixon of CSS, bates-labeled 6RD 003330.

E. March 10, 1987, Memorandum from Mr. Charles Ray of Xerox, bates-labeled 4RD 0009541.

F. June 1, 1989, Xerox Business Policy Statement Re: Independent Service Organizations (ISOs), bates-labeled 6RD 0145853.


I declare under penalty of perjury that the foregoing is true and correct.

Dated this 17th day of June, 2004.

*[signature]*

Peter W. Marshall
Associate General Counsel
Xerox Corporation
P.O. Box 1600
800 Long Ridge Road
Stamford, CT 06904
(203) 968-4590