## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

_____  :

CREATIVE COPIER SERVICES,    :
                            :    CIVIL ACTION

         Plaintiff    :
                            :    Civ. No.  3:01cv155 (SDU)

         v.    :
                            :

XEROX CORPORATION,    :    September 16, 2004
                            :

        Defendant    :

_____  :

## PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT, AND RESPONSE TO XEROX' MOTION FOR PARTIAL SUMMARY JUDGMENT

On June 25, 2004, Xerox moved for partial summary judgment on certain issues, specifically:

(1) statute of limitations as to conduct delineated at ¶¶6-34 of the Third Amended Complaint as applied to Count I (the federal antitrust claim);

(2) definition of the relevant market as to Count I; and

(3) mitigation of damages as to the conduct at issue in (1) above.

Numbers (1) and (3) are affirmative defenses as to which Xerox bears the burden of proof. Because Xerox has not mustered sufficient evidence to meet its burden, plaintiff hereby cross-moves for summary judgment on (1) and (3).  As to (2), plaintiff responds in opposition, showing why Xerox' motion should be denied.  Plaintiff relies upon the attached memorandum of law, and supporting appendix of record materials.

Respectfully submitted,

Dated: September 16, 2004          _____

Robert LaRocca CT 22901
Kohn, Swift & Graf, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
(215) 238-1700
(215) 238-1968 (fax)

Elias A. Alexiades CT03543
P.O. Box 3859
Amity Station
New Haven, CT 06525

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

_____     :
                                    :
CREATIVE COPIER SERVICES,           :
                                    :     CIVIL ACTION
            Plaintiff               :
                                    :     Civ. No.  3:01cv155 (SDU)
      v.                            :
                                    :
XEROX CORPORATION,                  :     September 15, 2004
                                    :
            Defendant               :
_____     :

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT, AND IN RESPONSE TO XEROX' MOTION FOR PARTIAL
SUMMARY JUDGMENT**

Xerox has moved for partial summary judgment on three issues.   Two of those are
affirmative defenses, as to which Xerox bears the burden of proof.  As to none of the issues has
Xerox acknowledged the record evidence in moving for summary judgment, as Rule 56 requires.
To illustrate:

- Xerox moves for summary judgment on statute of limitations (Point I), claiming
  that the federal antitrust claim arose before March 24, 1988 because Xerox
  supposedly implemented its parts policies before that date.  Xerox does not advise
  this Court that two separate federal judges in the MDL reviewing the evidentiary
  record have determined that Xerox did not enforce its parts policies until 1989.
  E.g., "Xerox did not enforce its parts policy until early 1989."*In re Independent
  Service Organization Antitrust Litigation*, 964 F.Supp. 1454, 1457 (D. Kan.
  1997).

- Xerox moves for summary judgment on market definition (Part II), claiming there is no evidence to support Xerox "parts" and "service" being considered as separate markets. Xerox does not advise the Court that: (1) its own internal documents refer to the separate Xerox "service market," e.g. Ex.36 in appendix submitted herewith; (2) in the MDL, the Court held that Xerox "does not contest that it has monopoly power in the relevant parts and service markets." *In re Independent Service Organization Antitrust Litigation,* 964 F.Supp. 1479, 1487 (D. Kan. 1997); (3) most importantly, Xerox was furnished with the expert report of plaintiff's economist, Ex. 38 hereto (and deposed the economist thereafter), who explains in detail why there are separate markets for Xerox photocopiers, service, and parts in this litigation. Xerox makes no mention of this expert's analysis or conclusions, and they obviously defeat Xerox' attempt to obtain summary judgment.

- Xerox moves for summary judgment on its affirmative defense of "mitigation of damages" (Point III), claiming CCS should have enlisted more than three customers to order parts, without referring to Mr. Dixon's declaration, Ex. 3, ¶¶65-69, filed in the MDL, which expressly rebuts this. Xerox has not offered evidence by a single other CCS customer that it would have been willing to order parts, or that, had they done so, it would have made any difference.

Xerox points are addressed in order.

# I.  STATUTE OF LIMITATIONS

## A. Introduction

Xerox has moved for summary judgment on its affirmative defense of statute of limitations, with respect to one aspect of Count I (the federal antitrust claim), i.e. that portion of Count I that relates to Xerox' parts policy during the years prior to 1995.  These are the actions set forth in ¶¶ 6-34 of the Third Amended Complaint as applied to Count I.[1]  Plaintiff cross-moves for summary judgment, to strike this affirmative defense.

The parties agree that the four year limitations period of 15 U.S.C. §15b applies to this claim.  The parties further agree that March 23, 1988 is the relevant date for statute of limitations purposes, i.e. the date that is four years before legal action was commenced.  (Xerox brief, p. 6, lines 2-3).[2]

---

[1]Xerox' motion is somewhat procedurally anomalous.  Because Xerox has moved to dismiss the Third Amended Complaint, it has not answered that complaint or pled any affirmative defenses.  Therefore, Xerox is moving for summary judgment on two affirmative defenses it has not yet pled of record.  However, Xerox asserted these same defenses to the same claim during the MDL proceeding, and they were briefed during the MDL proceeding, but not ruled upon. Taking a practical view, plaintiff does not therefore claim they are unripe because not yet technically re-pled.

[2]Mr. Dixon was initially part of a class action filed in federal court in Texas in March, 1992.  He, together with 21 other Independent Service Organizations (ISO's) opted out and filed a lawsuit in San Francisco in 1994, which the MDL Panel transferred to Kansas.  The class action tolled the statute of limitations, as the MDL Court subsequently determined.  *In re Independent Service Organization Antitrust Lit.*, 1997 WL 161940 (D.Kan. 1997).  While Xerox opens its present memorandum with the foreboding statement that "this case presents an archetypical example of a party that has slept on its rights," it is interesting to note that all Xerox customers and all ISO's who comprised that class action evidently "slept on their rights" as well, because all commenced legal action at the same time as CCS.  Yet, notwithstanding what it now claims is a dispositive defense, Xerox paid substantial sums to settle all of these actions.  The truth is that no one "slept on their rights", because the claims did not accrue until 1990, shortly before suit was filed.

3

In the MDL litigation, another ISO litigated the same issue against Xerox. The MDL Judge denied Xerox' motion for summary judgment on statute of limitations, and granted plaintiff's cross-motion for summary judgment on this affirmative defense. *In re Independent Service Organizations Antitrust*, 1997 WL 161940 (D. Kan. 1997). An identical result is warranted here.

### B. Antitrust Statute of Limitations

There are two principles of antitrust statute of limitations that are relevant, and application of either, or both, entitle CCS to summary judgment.

### (1) The Claim Accrues When Damages Are Ascertainable

The first principle is that an antitrust claim does not accrue until damages are ascertainable:

> The limitation period begins to run when a cause of action accrues: ordinarily, when the plaintiff suffers injury resulting from the antitrust violation.
>
> The cause of action does not necessarily accrue at the initiation of the violation, however, because **a cause of action does not accrue until damages are ascertainable.**

*Antitrust Law Developments,* Antitrust Law Section of the ABA, (5th Ed. 2002), pp. 892-893 (emphasis supplied).

Here, plaintiff's damage expert, Dr. Jonathan Cunitz, has analyzed plaintiff's injury, and determined that CCS first sustained ascertainable damage in the calendar year 1990:

> 2. It was my opinion then [when I first prepared the analysis] and is my opinion now, that CCS first sustained ascertainable damage from Xerox' practices in the calendar year 1990...

4

Ex. 1 hereto.[3]  Xerox has not offered the opinion of any economist or damage expert to opine that CCS' damages were ascertainable by March 23, 1988.[4]  Therefore, Xerox has failed to muster evidence to support its affirmative defense, and summary judgment should be granted against Xerox.

In its present motion, Xerox merely cites,  as its only supposed "countervailing" evidence as to when damages accrued, to a portion of Mr. Dixon's deposition testimony in which he testified that he received a telephone call in 1986 or 1987 from an unidentified equipment broker, and told the broker he had no plans to expand to New York, partially because of parts availability. (Xerox brief, pp. 13-14 and Ex. 4 to Xerox' "Statement of Undisputed Facts").  Xerox argues that this phone conversation "proves" CCS had "ascertainable injury" in 1986 or 1987, at the time of this telephone call.

Xerox is arguing out of both sides of its mouth with equal fervor and conviction.  In the MDL proceeding, another ISO (CSU) based its damage claim on its lack of ability to expand to other cities.  *In re Independent Service Organizations Antitrust Litigation*, 964 F.Supp. 1454, 1464 (D. Kan. 1997). Xerox argued that there was a rigorous "preparedness" test necessary before someone had standing to assert a damage claim for lost profits based upon an inability to expand the business to other cities.  This entailed  a concrete showing of a four part test: "(1) plaintiff's background and experience in the proposed business; (2) affirmative action on plaintiff's

---

[3]References are to the appendix of exhibits submitted with plaintiff's Rule 56 statement of facts.

[4]Xerox proffered Kenneth J. Barker in rebuttal to Dr. Cunitz initial report of 1966.  Ex. 2 hereto.  Mr. Barker did not opine as to when damages were ascertainable. *Id*. When Dr. Cunitz filed his supplemental declaration, in May, 1999, Ex. 1 hereto and quoted above, Mr. Barker did not file any responsive affidavit controverting Dr. Cunitz' statement.

part to engage in the proposed business; (3) ability to finance the business and purchase the

necessary equipment and facilities; and (4) consummation of contracts." *Id.* at 1465, and cases

cited therein. This same test was applied by this Court in dismissing an antitrust claim in *Jade*

*Aircraft Sales Inc. v. City of Bridgeport*, 1990 WL 12873 *2 (D.Conn. 1990).

 The telephone conversation Mr. Dixon received from an unidentified broker upon which

Xerox now relies obviously does not satisfy this test.  Plaintiff's damage claim in this litigation is

based upon contracts with existing customers which CCS **actually had and actually lost**, not on

hypothetical expansions to other cities like New York.  See Cunitz report, Ex. 1.

 Otherwise stated, if plaintiff had sought to claim damages for lost profits based on its

inability to expand to New York, and cited as its record support this telephone call, Xerox would

have moved for summary judgment, citing the authorities in two paragraphs above, and arguing

that CCS could not meet the four part preparedness test.  This Court would have been compelled

to grant that motion.  The evidence is legally insufficient to establish cognizable damages under

the antitrust law.  Therefore, Xerox cannot rely upon this same "evidence" to claim damages had

"accrued" because of this telephone call.  It is legally insufficient to defeat summary judgment as

to CCS' cross-motion (let alone grant Xerox' motion).

**(2) The Continuing Violation Doctrine**

 While Dr. Cunitz's declaration, and lack of any meaningful response by Xerox, are

sufficient to deny Xerox' motion, and to grant plaintiff's cross-motion, a related doctrine provides

an alternative basis for this same result:  the doctrine of "continuing violation" or "continuing

injury."  *See Bankers Trust Co v. Rhoades*, 859 F.2d 1096, 1104 (2d Cir. 1988) ("In the context

of a continuing antitrust violation with continuing injuries, this has usually been understood to

mean that each time plaintiff suffers an injury caused by an illegal act of defendants, a cause of

action accrues to plaintiff to recover damages based on that injury.")  *Accord Antitrust Law*

*Developments, supra,* at p. 893 . ("[A] new cause of action may arise from later overt acts in

furtherance of a challenged conspiracy or from each injury resulting from a continuing violation.")

Therefore, even if some injury were ascertainable by March 23, 1988, this would not bar

the claim as to additional injury caused by Xerox after that date, which are the damages CCS

seeks in this lawsuit (see Dr. Cunitz' declaration and report).  To illustrate, in a price fixing case,

the customer has a new cause of action each time it makes a purchase of a product that is price

fixed, even though the price fixing conspiracy may have begun many years earlier, and the

customer may have made purchases from the conspiracy prior to the limitations period.  *Klehr v.*

*A.O. Smith Corporation*, 521 U.S. 179, 189-190 (1997) ("Antitrust law provides that, in the case

of a continuing violation, say a price fixing conspiracy that brings about a series of unlawfully high

priced sales over a period of years, each overt act that is part of the violation and that injures the

plaintiff', e.g., **each sale to the plaintiff**, starts the statutory period running again, regardless of

the plaintiff's knowledge of the alleged illegally at much earlier times.") (emphasis supplied).[5]

This doctrine is applicable here, because the record is clear that after March, 1988,  Xerox

inflicted harm and injury upon CCS on a continuous and systematic basis, as shown in (C) below.

The Supreme Court has applied the doctrine of continuing violation in *Hanover Shoe v.*

*United Shoe Machinery*, 392 U.S. 481, 502 n. 15 (1968), a case that dramatically undercuts

---

[5]However, the plaintiff can only recover for the purchases it made during the most recent
four year limitations period prior to filing suit.  *Id*.  Thus, for example, if a plaintiff purchased
from a price fixing conspiracy for 20 years, and there were no fraudulent concealment, the
plaintiff has a new cause of action with each purchase, but can only recover damages for the four
years of purchases prior to filing the complaint.

Xerox' motion. There, defendant violated the antitrust law by only leasing, and refusing to sell outright, its shoe making equipment to its customers, including the plaintiff. It first began its practice of leasing in 1912, and never wavered from that policy between then and 1953. Plaintiff filed suit in 1955, 43 years after the policy was announced and implemented. 392 U.S. at 483. Under Xerox' argument that the statute of limitation runs when defendant sends a "clear and unequivocal message" about its policy (Xerox brief, p. 9), that "message" was clearly sent in 1912. However, the Court, rejecting defendants' argument of statute of limitations bar, held that Hanover Shoe was entitled to bring its antitrust claims at any time between 1912 and 1955 under the continuing violation theory:

> United has also advanced the argument that because the earliest impact on Hanover of United's lease only policy occurred in 1912, Hanover's cause of action arose during that year and is now barred by the applicable Pennsylvania statute of limitations. The Court of Appeals correctly rejected United's argument in its supplemental opinion....[W]e are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulated harm on Hanover. Although Hanover could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955.

392 U.S. at 502 n. 15.

In *Zenith Radio Crop v. Hazeltine Research Inc.*, 395 U.S. 100 (1969), on remand, 418 F.2d 21 (7th Cir. 1969), reversed, 401 U.S. 321 (1971), Zenith filed an antitrust claim in 1965, contending that Hazeltine and others had "pooled" their patents in Canada and elsewhere, in an anti-competitive manner to exclude Zenith from importing and distributing its radio and television sets into Canada. The Canadian anti-competitive patent pooling consortium had been in existence since 1926, and Hazeltine had joined the patent pool in 1943. 239 F.Supp. at 74. Zenith had

sought to enter the Canadian market many years prior to filing its antitrust claim, and had been foreclosed for " many years". 239 F. Supp. at 75. Hence, everything about the structure and existence if this illegal arrangement was clearly known to Zenith for years, if not decades, before it brought suit in 1965, and Zenith had been actively foreclosed by the pool's operation for many years. In the statutory four years prior to its initiating action, Zenith had made very little additional attempt to enter the Canadian market. 388 F.2d at 37. Nevertheless, the Court held that Zenith was entitled to file its claim in 1965, 39 years after the pool was formed, and 22 years after defendant Hazeltine joined the pool, because of the "continuing nature" of the violation to foreclose Zenith's entry into the Canadian market. 401 U.S. at 338-340. *Accord*, *Imperial Point Colonnades Condominium v. Mangurian*, 549 F.2d 1029 (5th Cir. 1977) (cause of action accrued each time defendant collected rent); Areeda & Turner, *Antitrust Law* Volume II, ¶338 p. 144-145 (Little Brown, 1995).

Similarly, in *DXS Inc v. Siemens Medical Systems, Inc.*, 100 F.3d 462 (6th Cir. 1996), a case which was cited with approval by the Supreme Court in *Klehr*, *supra*, 521 U.S. at 189, DXS had previously been an authorized Siemens dealer, but became an independent repair company, competing with Siemens to service medical equipment. On October 1, 1986, Siemens adopted a series of policies that DXS claimed were anti-competitive: (1) Siemens would not service a customer's equipment if DXS or another third party had serviced it, without conducting a safety inspection first; (2) Siemens would not provide a warranty on equipment it did not sell; (3) Siemens would not sell replacement parts to DXS, but rather would only sell to its own authorized dealers or to end-user customers. 100 F.3d at 465. DXS did not contact Siemens about this policy. "Nor did it attempt to purchase any parts from Siemens after January 12,

1987." Id. Instead, DXS bought parts from alternative sources. On April 12, 1991, more than

four years after both the 1986 notification and the January, 1987 last sale of parts, DXS filed its

antitrust claims, alleging both monopolization and tying. The District Court dismissed the claims

on summary judgment on statute of limitations grounds. The Sixth Circuit reversed. In its

discussion of the "continuing antitrust violation" precedent, the Court of Appeals held that:

> A continuing antitrust violation is one in which the plaintiff's
> interests are repeatedly invaded. [citation omitted]. When a
> continuing antitrust violation is alleged, a cause of action accrues
> each time a plaintiff is injured by an act of the defendants. [citation
> omitted]. Even when a plaintiff alleges a continuing violation, an
> overt act by the defendant is required to restart the statute of
> limitations and the statute runs from the last overt act.

100 F.2d at 467. The Court of Appeals found that Siemens was alleged to have committed three

additional acts during the four year statutory period (April 1987 to April, 1991), specifically it

made statements to three of DSX's customers that misrepresented DSX's warranties. 100 F.3d

465. Therefore, the case was a "continuing violation" case, and the three statements to customers

re-started the statute of limitations.

Accord, *Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144, 1171-74 (3d Cir.

1993), also cited with approval by Areeda & Turner, the conspiracy began in the 1950's, and

some plaintiffs had knowledge of the conspiracy as early as 1972. The Third Circuit held this did

not bar the lawsuit many years later, relying upon *Hanover Shoe, supra.*

Xerox relies upon a series of cases that are plainly inapposite. (Xerox, pp. 6-7). They

involve cases where, for example, a distributor is terminated with finality, and cannot "renew" the

statute of limitations by making subsequent futile requests which are rejected. For example, if a

distributor is terminated with finality in 1987, the cause of action for wrongful termination arises

at that time, and he or she cannot revive the statute of limitations by making requests which are rejected in 1992, 1996, 2000, and so forth.  (In contrast, if there were subsequent actions after the termination to hinder the distributor, these would revive the statute).

To take Xerox' cases in the order cited, in *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 261 F.Supp.2d 188 (E.D.N.Y. 2003), plaintiffs challenged as anti-competitive agreements the defendants made concerning generic drugs.  The anti-competitive agreements were made in January, 1997.  *Id*. at 195.  Advocacy groups ("organizational plaintiffs") joined the litigation late, in October, 2001, and tried to extend the statute of limitations to encompass their late filing by claiming that six periodic installment payments defendants made under the 1997 agreements were "continuing acts." *Id*. at 299.  The court rejected these as essentially ministerial acts.  *Id*.

In *Vitale v. Marlborough Gallery*, 1994 WL 654494 (S.D.N.Y. 1994), plaintiff, owner of a painting reputedly by Jackson Pollock, gave defendants her painting in 1969; got it back in 1974; and alleged that in 1979 defendants supplied false information that the painting was a forgery to use in a Yale University Press catalogue.  *Id*. at *2. She did not file suit until 1993. She claimed that a series of *inactions* by defendants in the intervening 14 year period since 1979 prevented a time bar . *Id*. *5.  (e.g. she alleged that  "defendants have taken no action to advise plaintiff that she may sell her painting at auction in New York.") The Court held these were legally insufficient.  The Court also held a **single overt act** against plaintiff during the limitations period was sufficient. ("An overt act resulting in injury to the plaintiff must occur within the statutory time frame." *Id*., *4).  Hence, under *Vitale*, this Court must deny defendant's motion,

11

and grant plaintiff's cross motion, if the record reflects a single overt act by Xerox against CCS after March 23, 1988.  As Section (C) below reflects, there were many.

In *Daniel v. American Bd. of Emergency Medicine*, 988 F.Supp. 112, 221 (W.D.N.Y. 1997), there was a permanent closing of a practice track, and no further action by defendant, after that date.  The Court acknowledged that even "a specific act or word of refusal by defendants during the limitations period" would revive the statute, but there was none.

In *Urban v. Manhattan Cable Television*, 1987 WL 14129 (S.D.N.Y. 1987), plaintiff leased time on a local television channel to carry his program.  He stopped paying the required lease fee, and his show was cancelled for non-payment on February 1, 1982.  He waited more than four years to begin suit, and the court held it was time barred.

In *Concord Boat Corp v. Brunswick Corp*., 207 F.3d 1039, 1050-53 (8th Cir. 2000), plaintiffs challenged a merger and acquisition as anti-competitive under Section 7 of the Clayton Act, 15 U.S.C. §18.  The acquisition occurred in December, 1986.  Plaintiff's damages were ascertainable, at the latest, by 1990.  *Id*. at 1053.  Plaintiffs did not file suit until December 7, 1995. *Id*. at 1053.  There was no action by defendants after 1986.  *Id*. at 1052 (rather, merely the "unabated inertial consequences of the initial acquisition.").  In essence, the court found no precedent for applying the "continuing violation" doctrine to merger/acquisitions under Clayton Section 7, because a completed merger by its nature always "continues," and there would be no statute of limitations of any kind.  *Id*. at 1052.

*DXS Inc. v. Siemens Med. System*, 100 F.3d 462 (6th Cir. 1996) has been discussed at length on pp. 9-10 above, and undercuts Xerox' argument.

12

In *Kaw Valley Electric Cooperative v. Kansas Electric Power Cooperative*, 872 F.2d 931 (10th Cir. 1989), the plaintiff had never bought electricity from the defendant, and defendant passed a formal resolution in October, 1979, stating it would never sell power to a non-member, such as plaintiff.  872 F.2d at 932.  Plaintiff did not sue until January, 1985, 5 ½ years later.  The Court held that because defendant's refusal to sell electricity was final in 1979, a subsequent request in 1984 by plaintiff that was refused did not revive the statute of limitations.  *Id*. at 934.

*Kaw Valley* cites *David Orgell, Inc. v. Geary's Stores Inc.*, 640 F.2d 936 (9th Cir. 1981), which Xerox also cites.  But *Kaw Valley* also cites *Hennegan v. Pacifico Creative Service*, 787 F.2d 1299 (9th Cir. 1986), which Xerox ignores, and in which the Ninth Circuit distinguished its prior decision in *Orgell*.  In *Hennegan*, the plaintiffs owned and operated a gift and souvenir shop, and alleged a conspiracy to divert business away from him. 787 F.2d at 1300.  The Ninth Circuit reversed summary judgment for defendants on statute of limitations, holding that there were "overt acts" during the limitations period by the defendants, that made it a "continuing accrual" type of case.  Those overt acts included "tour operators and the tour operators' shepherding of tourists away from the Hennegan's shop and to the shops of the souvenir vendors."  *Id*. at 1300-01.  In other words, these "overt acts" consisted merely of a continuation of the same kind of conduct that had occurred earlier.  This, however, was sufficient to prevent the bar of limitations.  In contrast, in *Orgell*, there had merely been a simple refusal to sell goods to the plaintiff "on several occasions over a period of 12 years," with no further action by defendant against plaintiff. *Id*.  Since the same refusal had occurred 12 years earlier, the later one it did not revive the statute.

Xerox also cites *Midwestern Waffles Inc. v. Waffle House, Inc.*, 734 F.2d 705 (1984).  In that case, defendants refused to grant plaintiffs a franchise. *Id*. at 715.  The Court denied defendant's motion for summary judgment, holding there was a disputed issue of fact as to whether this was final.  *Id*.  Further, the Court held that other parts of plaintiff's claims were within the "continuing accrual" doctrine, and that defendants had not even challenged those on statute of limitations grounds:

> Defendants do not contend plaintiffs' tying claim is barred because each payment under a contract which constitutes an illegal tie is new injury.

*Id*. at 714.

Finally, Xerox relies upon *Garelick v. Goerlich's Inc.*, 323 F.2d 854 (6th Cir. 1963). Defendant terminated plaintiff as a distributor in 1956.  Plaintiff did not sue until 1962.  The Court held that "all of the authorities are in accord that a right of action for a civil conspiracy under the antitrust laws accrues from the commission of the **last overt act causing injury or damage**." (*Id*. at 855) (emphasis supplied).  However, there were no such acts that caused any injury or damage during the four year period prior to filing the complaint.

## C. Xerox' Conduct

Xerox' bases its argument on a series of precursor parts policies it announced in 1984 and 1987, and a misunderstanding of the applicable precedent.

To cut through this, while Xerox did undoubtedly have earlier parts policies during the 1980's, these did not impact Mr. Dixon, for reasons he explains in his declaration, Ex. 3, at ¶¶ 32-49.[6]  Rather, it was Xerox' 1989 decision to amend and to strictly enforce its parts policy against

---

[6]Consistent with that declaration, he testified that while Xerox refused to sell him certain 10 series parts in 1987, he eventually got those parts.  Dixon dep., Ex. 4 to Xerox statement of

ISO's, and Xerox' continual anti-competitive acts subsequently, that caused CCS to lose its customers.  These were well after the March 23, 1988 limitations date.

Two MDL Judges have examined the record evidence of Xerox' parts policies, and both have reached the conclusion that 1989 was the critical year in which Xerox' anti-ISO policies took effect. Judge O'Connor, the original MDL Judge, adjudicated summary judgment motions with respect to another ISO plaintiff, named Copier Services Unlimited, or CSU.  Judge O'Connor stated:

> In 1984, Xerox developed its first 'parts policy', in which it declared it would not sell 'parts which are unique to the 10 series products in memory writers to any Independent Service Organization (ISO) unless the ISO also was an end-user of the product.  In January, 1987, the parts policy was expanded to apply to newer '9' series models and all '10' series copiers, plus all new Xerox products introduced after the effective date of the policy.
>
> **Xerox did not enforce its parts policy until early 1989**.  At that time, Xerox representatives decided that the only way to stop the competitive threat posed by ISO's such as CSU, was to cut off the parts availability to these parties.  In January, 1989, Xerox tightened enforcement of its existing policies and cut off CSU's direct purchase of restricted parts from Xerox.  Xerox also implemented an 'on site end-user verification' procedure when certain ISO's or their customers ordered parts from Xerox.  The policy, which was implemented in June, 1989, initially applied solely to the six most successful ISO's, including CSU.

*In re Independent Service Organization Antitrust Litigation*, 964 F.Supp. 1454, 1457 (D. Kan. 1997) (emphasis added).  (Another one of those six was present plaintiff CCS).

Judge Vratil became the MDL Judge after Judge O'Connor's death, and adjudicated motions with respect to Creative Copier Service.  She wrote in her summary judgment decision:

---

undisputed facts, pp. 351-52.

> On October 21, 1988, senior partners of Xerox developed an action plan against ISO's. The plan targeted six major ISO's in five districts, including CCS in the Hartford district.
>
> ....
>
> On January 11, 1989, Xerox formally adopted its "On-Site End-User Verification Procedure. Pursuant to that policy, Xerox would sell parts only to an 'end user'...In January, 1989, Xerox implemented this policy against the six target ISO's including CCS. The policy applied to the 1065, 1075, 1090, 9900, and 50 series copiers.
>
> .....
>
> Effective June 1, 1989, Xerox announced a new verification policy to ensure that ISO's complied with the parts policy.
>
> ....
>
> **In 1989, Xerox began to strictly enforce its restrictions on CCS parts orders.**

*In re Independent Service Organizations Antitrust Litigation*, 114 F.Supp.2d 1070, 1083-85 (K. Kan. 2000) (emphasis supplied). All of these events were well after the March, 1988 deadline. Xerox does not refer to any of them in its motion.

The record support for these statements is clear, and they could be expanded at much greater length in terms of anti-competitive conduct against the ISO's by Xerox taken after March, 1988. In essence, Xerox launched a continuing campaign in late 1988 and 1989 to put the ISO's out of business, through ever more stringent and anti-competitive measures. This campaign inflicted continuing and repeated harm to CCS. They buttress Dr. Cunitz' conclusion as to why damages first accrued to CCS in 1990. They also buttress the doctrine that Xerox committed "continuing violations" against CCS throughout the limitations period. As illustrations, set forth in roughly chronological order, all of the following occurred after March 23, 1988:

- Mr. Nugent, Xerox District Manager in the Hartford District, testified that Xerox did not perceive CCS to be a competitive threat when he first arrived in

16

Connecticut in April, 1987. He first began to perceive it as a threat at the "end of '87, '88." (Ex. 4, p. 23). As shown below, Xerox' perception of CCS' threat escalated dramatically after that, and Xerox put CCS in a "red" status in 1989, and kept CCS in that status for two years.

- In June, 1988, Xerox hired Kroll & Associates, internationally known investigators, to investigate ISO's practices, and to keep the investigations secret ("not put anything in writing"). (Ex. 5, 3 RD 36151-52).

- On August 18, 1988, a Xerox' employee wrote:

  Third party service of Xerox equipment is emerging as a multimillion dollar business. The result is a reduction in Xerox service revenue. D. Kerns and P. Allair [CEO of Xerox] have expressed concern about third party service and **have requested that a strategy be developed to stop the revenue loss**. ......Service accounts for more than half of Xerox' revenue. (Ex. 6, 5RD 20, emphasis supplied).

- At an internal meeting of the top regional employees of Xerox on October 21, 1988, a major new Action Plan was developed against ISO's[7]. (Ex. 7 at 1 RD 4456-4469). It stated that "ISO strength was concentrated in 5 Districts" (1 RD 4461), one of which was the Hartford, Connecticut district. It stated that "6 Major ISO's" were the target of Xerox' new action plan. One was CCS. (Ex. 7, 1 RD 4466 and Ex. 8, 3RD 36862). Among the new actions to be implemented against CCS were:

  - Strengthen our policy on sale of parts to ISO's
    –Concentrate on the 6 major ISO's

---

[7]Mr. Nugent explained at his deposition that "Senior Partners" were top regional employees. Nugent dep, Ex. 4, pp. 78-79.

        -Require verification upon each parts request that they are an end-user
        -On-site/physical tracing by District
        -An alternative is not to sell parts to ISO's at all

- Eliminate sale of all service bulletins/technical documentation to ISO's
- Refuse T & M [time and materials service calls] on all equipment serviced by anyone other than a Xerox CSE
- Negate equipment/parts warranties on all equipment serviced by anyone other than a Xerox CSE.  (Ex. 7, 1 RD 4458).

- As part of this anti-ISO offensive, in September 1988 Xerox drafted new measures to financially penalize customers, i.e. "to discourage customers from ever considering as ISO."  (Ex. 9, 1 RD 2911).

- On November 16, 1988, Mr. Spindel, Xerox national coordinator of anti-ISO activities, presented the various new anti-ISO policies to "the final decision maker", A. Barry Rand.  (Ex. 10, 1 RD 4427-4433).

- On November 18, 1988, Mr. Spindel summarized a meeting on November 17, 1988 which focused upon ways to eliminate CCS and the other five target ISO's.  (Ex. 11, 1 RD 4394).

- Joe Nugent, Xerox District Manager for the Hartford District, attended this meeting to report on CCS.  (Ex. 12, 1 RD 3085-3088, 3092).

- Mr. Nugent told the assembled group that CCS posed the following threat to Xerox: "Insurance industry is risk." (Ex. 12, 1 RD 3092).

- In late 1988 or early 1989, Xerox drafted policies and procedures designed to eliminate CSS and the other major ISO's, summarized on a "Status of Actions" sheet.  (Ex. 13, 2 RD 56946-47).  At this time, according to Xerox' memorandum,

the Hartford district had the fourth largest number of such units serviced by ISO's in the country. *Id*.

- On January 11, 1989, Xerox dramatically and formally tightened its "On Site End User Verification Procedure". Creative Copier Services was one of 6 ISO's nationwide targeted by this policy. (Ex. 14, 4 RD 9554-9558). This policy required an onerous nine step procedure before Xerox would send parts, including matching serial numbers for a specific machine to verification that parts were needed for that particular machine. *(Id,* 4 RD 9557-58).

- Xerox placed CCS on an April, 1989 list of companies targeted by this new verification procedure. (Ex. 39, 2 RD 49744).

- A Xerox employee in one of the other six key Districts wrote on March 8, 1989:

  I want you to know that you have our district's support, dedication and commitment to work with you in every way possible to stamp out the ISO's once and for all. The profitability of our company absolutely depends on us to keep fighting with everything we have so that the ISO's do not spread to other districts. (Ex. 15, 3 RD 47393).

- On June 1, 1989, Xerox adopted its new parts policy. (Ex. 16, 1 RD 3681). It restricted ISO's access to parts and documentation needed to service copiers. It applied to all 10 series machines. It stated in pertinent part:

  For our 9900 and 10 and 50 series copiers/duplicators, Memorywriter typewriters, Facsimile...we will not knowingly provide ISO's with parts, technical training, technical documentation, or other resources. 1 RD 3681

  The policy also stated:

19

> We will not sell such resources (including parts) to
> an end-user if we have reason to believe that such
> resources will be used for purposes other than
> maintenance of the unit of equipment of which these
> resources are ordered. <u>Id</u>.

This policy, by its own terms, "superseded" an earlier policy dated February 1, 1987.

- Mr. Dixon describes in his declaration how these new policies and their implementation differed from the policies in effect before. Ex. 3 ¶¶43-48.

- Xerox appointed two key employees to be in charge of this new end user verification program nationwide, one of whom was David Spindel. (Ex. 17, 3 RD 46754). Both were from Xerox "Service Marketing Center", i.e., the division of Xerox which competed directly for service business with Mr. Dixon and other ISO's.

- Xerox assigned two of its employees in the Hartford, Connecticut District office to monitor CCS under this new policy. (Ex. 18, 1 RD 13152, and Ex. 19, 1 RD 15417).

- CCS' customers generally required CCS to have a "response time" of four hours or less, and had an "uptime" requirement of 90% or more for their machines to be guaranteed up and running. Dixon declaration, Ex. 3, ¶¶ 13-15, 47. Xerox enforcement of its new policy made it impossible for CCS to meet these customer requirements. *Id*. ¶47.

20

- Xerox District Service Manager Nugent testified that whenever CCS ordered a part under this new 1989 procedure, Xerox required him to "verify" the purchase order. (Nugent dep., Ex. 4, pp. 28-41). Mr. Nugent testified he could not give any legitimate business justification for Xerox' "verification" procedures, p. 31.

- In January, 1989, at the same time it implemented this policy, Xerox placed CCS in a "red" status. (Ex. 20, 2 RD 59071). This is the first, or earliest, record of CCS being placed in such a status. Being placed in a "red" status meant, according to Xerox, that these ISO's "have a significant share of the service business, and they are growing or maintaining this share." *Id*. Mr. Nugent testified: "Looks like red must have been high alert, yellow is better atmosphere, better environment." (Ex. 4, p. 84). Only ten ISO's in the United States were designated in such a "red" status by Xerox in January, 1989. (Ex. 20, 2 RD 59071).

- On January 26, 1990, Xerox included CCS on a list of "Major ISO's" in the United States, at a meeting of Xerox Central Region District Managers. (Ex. 21, 4 RD 9434). Xerox described CCS as follows:

  - "CIGNA is Primary Account"

  - "Leverages Minority Ownership"

- Xerox kept CCS in its "red" status alert throughout 1990." (Ex. 22, 1 RD 10655).

- On August 22, 1990, John A. Swaim, Xerox' Vice President for customer services marketing, wrote to A. Barry Rand (the "final decision maker," Ex. 10):

21

Independent Service Organizations (ISO's) represent a threat to
our Services revenue stream, and more importantly to our overall
account relationships.  (Ex. 23, 1 RD 63976).

- On October 31, 1990, Xerox hired an additional employee to "monitor the activity

  of the ISO's" nationwide.  (Ex. 40, 2 RD 58366).

- On December 11, 1990, Mr. Swaim again wrote:

  [O]ur strategy with respect to Independent Service Organizations is
  critically important as part of preserving and enhancing the annuity
  stream.  (Ex. 24, 1 RD 63947).

- In January, 1991, after two years of keeping CCS in a "red" status, Xerox

  determined that its efforts against CCS were succeeding:

  "Activity by Creative Copier Service has decreased.  **Creative's
  level of service has deteriorated**." (emphasis supplied).  (Ex. 22, 1
  RD 10657, emphasis supplied. Accord, Ex. 25,  XO 9 4905).

- By February 7, 1991, David Spindel wrote to the Xerox senior staff, reported that

  "Creative Copier Service in Hartford...has lost business to Xerox...  (Ex. 26, 2 RD

  59071).

- Still monitoring CCS,  Xerox organized a three day seminar on March 4-7, 1991,

  which included as one of its topics : "Creative Copy –Hartford".  (Ex. 27, 1 RD

  10683).

- In January, 1991, Xerox organized a meeting on ISO's, which stated that Xerox

  parts were available to ISO's "only at Xerox discretion and/or at prices determined

  by Xerox."  Ex. 43, 1 RD 15095.

22

- Consistent with the above, Xerox priced parts to ISO's at 10 times what Xerox own service company was charged, when ISO's or ISO's customers <u>were</u> able to obtain these parts.  Dixon declaration, Ex. 3, ¶¶ 24-31 and Ex. B thereto.

- Theodore Bethea, who ordered parts for CCS, confirmed that Xerox' restrictions dramatically changed in "late '88, early '89."  (Ex. 28, pp. 14-15).

- In January, 1992, Xerox ordered a stepped up "on site" verification of CCS.  (Ex. 41, 2 RD 1039, and Ex. 42, 2 RD 6817).

- Xerox' own internal records document dozens of instances where Xerox cut back orders and delayed shipment of parts during 1990 and thereafter, so that  CCS could not respond to its customers' "up time" requirements.  See CCS' Rule 56.1 statement of facts at ¶69, and Ex. 29.  Each of these dozens of actions constitute a "continuing violation."

- Mrs. Dixon, who kept the books and oversaw the dispatch of technicians for CCS, testified that the difficulty of obtaining parts endured from 1988 through 1994.  (Jackie Dixon, Ex. 30, pp. 36-37).  "There were long delays sometimes during that period...Sometimes up to a week."  (P. 40-41).  "I think it started about '88, '89 when we placed orders for 10 series parts, and Xerox restricted them."  (P. 41):

  > And then they'd ask for a serial number, and we'd
  > give them a serial number on a machine that we
  > owned.  And then they'd say, well, they had to hold
  > up the order–they wouldn't call it holding it up, but I
  > don't know—review the order or something.  They
  > had to send somebody out to inspect the machines
  > and then–so it would be another day or two before
  > someone would actually come and inspect the
  > machines....So, it held us up for at least four or five

days, if not sometimes longer, because of the
process that they went through. (Pp. 40-43).

- Arthur Payne, director of Printing and Graphic Services for Fairfield University in

  Connecticut, a CCS customer, confirmed that the impact first occurred in 1989 or

  1990. He testified that CCS began servicing 25 Xerox copiers in 1984. (Ex. 31,

  p. 9). His University required a 4 hour response time. (P. 12). The response time

  is "very, very critical." (P. 38). He had specific uptime requirements when it was

  "imperative that those copiers be operating at those times and if they should go

  down, that we needed immediate response time." (P. 15). He was satisfied with

  CCS' service and technicians. (P. 16-17). However, the University began to

  experience significant "downtime" in 1989 and 1990. (P. 17). The problem got

  worse as time went on, and finally forced Fairfield to cancel the contract with CCS

  in 1992. (P. 19-20). It was caused by the delay in CCS receiving parts (p. 21). He

  tried to order parts himself. By 1993, Fairfield was forced to sever its relationship

  with CCS. (P. 27). He went back to Xerox, whose prices were 25% more than

  CCS' (P. 36). Mr. Payne stated the reason he severed the relationship with CCS

  was because of Xerox' parts restrictions to CCS:

  > Well, at that point there, come '92, I just knew that I had to
  > go with somebody that had direct access to the parts and
  > the–could give me better service response. (P. 39)

- Charles P. Lewis, director of support services at Choate Rosemary Hall since

  1971, confirmed that adverse impact occurred in 1990. He switched from Xerox

  to CCS in April, 1989 because CCS' price was "quite a bit less" than Xerox'. (Ex.

32, p. 13 and dep. exhibit 1).  Price and response time were both very important

considerations.  (P. 14).  CCS initially gave  good service time,  (Ex. 32, p. 16),

but by 1990 "down time" began to be a serious problem. (P. 20).    It caused

Choate Rosemary Hall production problems (21).  Sometimes the machines were

down as long as a week. (P. 21).  He testified he stopped using CCS because it

could not obtain parts from Xerox in a timely manner:

Q.    Did your awareness of the fact that Xerox wouldn't sell
      parts to Creative on any meaningful level affect your level of
      satisfaction with Creative Services?

A.    Absolutely.

(P. 24).  Choate returned to Xerox, even though Choate had to pay Xerox a

financial penalty to do so.  (P. 25, 33).

- Richard Barnes, Cigna's assistant director for copy services, testified that CCS'

  repair prices were significantly less than Xerox,' and its service was good.  "We

  have found them to be very conscientious and responsive to our needs." (Ex. 33,

  P. 35-36).  Mr. Barnes testified that Cigna's "uptime" requirement for these

  machines was 92-95%. (P. 95).  "It's very important for us to have the machines

  up." (P. 33). On April 26, 1990, Xerox changed its "verification" procedures at

  Cigna, forcing Cigna personnel themselves to place all orders, and not permitting

  CCS' repair men to call in the orders on Cigna's account number, on machines

  CCS was repairing.  Mr. Barnes testified that Xerox' verification procedure

  delayed emergency ordering of parts.  (75-80). On occasions when CCS could not

obtain the part in a timely manner, Cigna was forced to call Xerox to repair the machines. (96).

- DeRon Franklin, who purchased photocopiers for Aetna Insurance between 1988 and 1995, testified that CCS' inability to get parts was a significant factor in Aetna's decision making. (Ex. 34, p. 10). Franklin testified that previously "I was very satisfied with their service." (P. 6).

- CCS had serviced machines for the State of Connecticut since 1981. However, in 1989, when CCS and Xerox were the only two bidders, CCS was forced to cancel its bid because of Xerox' parts practices. (Ex. 35, pp. 12-13.)

- As late as 1994, Xerox stated that the "Goal" of its "ISO Strategy" was: "To capture 100% of the Service Market on Xerox Equipment." (Ex. 36, X02 20280).

- Xerox also sought to eliminate the ability of ISO's to obtain manuals and other service documentation, so they would not be able to repair their customers' machines. On April 17, 1989, Mr. Dixon placed an order through Cigna, his largest customer, for 7 product manuals for 9900 copiers, which he was servicing at Cigna and Aetna. (The 9900 was newer than the 10 series machines). The total amount of the order was $770.40. The order was canceled by Peggy Murphy of Xerox. (Ex. 37, 1 RD 57496).

- On April 19, 1989, David Spindel of Xerox (who monitored the "deterioration" of CCS, Ex. 22, 1 RD 10657) wrote:

Dear Mr. Dixon,

You recently placed an order with us for subscriptions on service documentation for our 9900 product with an indication that it was for Cigna Corporation. Xerox has made a **recent decision** to cease the sale of service documentation on its high-volume copier products as well as those on its restricted products. Therefore, we cannot fulfill your request at this time. (Ex. 37, 1RD 57498)

Xerox motion addresses none of this record evidence, although it was all set forth in briefing by CCS on statute of limitations during the MDL proceeding. The above is more than sufficient , as a matter of law under *Hanover Shoe*, *Zenith*, *Klehr,* and *Siemens*, to constitute "continuing violations", because, as *Hanover* put it, these acts "constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulated harm." 392 U.S. at 502 n. 15. For all of the foregoing reasons, the Court should grant CCS' cross-motion for summary judgment on this affirmative defense.

## II.  MARKET DEFINITION

The second issue as to which Xerox seeks summary judgment is market definition. Because CCS bears the burden of proof on this issue, CCS does not cross-move for summary judgment. Rather, CCS seeks denial of Xerox' motion.

The issue Xerox presents is whether there is record evidence to justify plaintiff's allegations that service and parts for Xerox photocopier machines can constitute two separate markets. Xerox contends that, as a matter of law, the Court should conclude these cannot be separate submarkets.  However, in the MDL proceeding, Xerox "does not contest that it has monopoly power in the relevant parts and service markets." *In re Independent Service Organization Antitrust Litigation,* 964 F.Supp. 1479, 1487 (D. Kan. 1997).  And Xerox' own

27

internal documents refer to the "service market." E.g., plaintiff's Ex. 36 ("GOAL: To capture 100% of the Service Market on Xerox Equipment.")

In this litigation, CCS has furnished to Xerox the expert report of an economist, Dr. Mackie-Mason, who has explained the separate markets or sub-markets applicable as to Xerox. Ex. 38. Xerox' memorandum, in seeking summary judgment on market definition, does not address this report or his conclusions. Dr. Mackie-Mason's expert report creates a triable jury issue under *Kodak* as to the relevant markets, and mandates the denial of Xerox' motion.

Xerox acknowledges at pp. 18-19 that *Eastman Kodak v. Image Technical Service*, 504 U.S. 451 (1992) is the controlling authority. That litigation was the mirror image of the present action. Both Kodak and Xerox were the only companies to manufacture and sell high-speed photocopiers during the 1980's, with Xerox having about 70% of the new equipment market, and Kodak about 30%. (Mackie Mason report, Ex. 38, at chart 17). Both competed for service with their respective ISO's. Both initially made parts available to the ISO's. Both Kodak and Xerox decided to put out of business their respective ISO's, so as to enhance their own service revenue, by implementing similar "end user only" parts sales policies (i.e. not providing parts to ISO's). See 504 U.S. at 457-458. The Senior Counsel of Xerox confirmed to the Chief Counsel of Kodak that the two companies had adopted "similar" parts policies as to ISO's. (Ex. 38, p. 10, note 19). Further, the companies communicated with each other about these decisions. (*Id.*, p. 16, note 36).

The Supreme Court decided in *Kodak* that there was record evidence of separate markets for service of high speed Kodak copiers and parts for those copiers. 504 U.S. at 481. ("[R]espondents have presented a triable claim that service and parts are separate markets, and

that Kodak has the power to control prices or exclude competition in service and parts.").  The

Court held:

> Kodak also contends that, as a matter of law, a single brand of a
> product or service can never be a relevant market under the
> Sherman Act.  We disagree. The relevant market for antitrust
> purposes is determined by the choices available to Kodak
> equipment owners.  Because service and parts for Kodak
> equipment are not interchangeable with other manufacturers'
> service and parts, the relevant market from the Kodak equipment
> owner's perspective is composed of only those companies that
> service Kodak machines.

504 U.S. at 481-482.  Here, Mr. Dixon's declaration makes it clear that, similarly, Xerox parts are

not interchangeable with other brands of parts, i.e. Xerox high speed photocopiers can only be

repaired using Xerox parts.  Ex. 3, ¶¶ 19-20.  The vast majority of those parts could only be

obtained from Xerox.  *Id*. ¶20.

The Court held that there was a genuine issue of material fact requiring trial as to whether

Kodak had illegally increased its market share in the service market, by seeking to put the ISO's

out of business by restricting and denying them parts.  There was evidence that "Kodak used its

control over parts to strengthen its monopoly share of the Kodak service market."  *Id*. at 483.

That is the same claim CCS asserts here as to Xerox.

On remand, the case was tried, and the Ninth Circuit upheld plaintiff's market definition

and proof of market power on a full trial record.  *Image Technical Service v. Eastman Kodak

Co.*, 125 F.3d 1195, 1201-13 (9th Cir. 1997), *cert. den.* 523 U.S. 1094 (1998).  Xerox claims at

pp. 18-20 to cite "every court of appeals to address the question of single-brand aftermarkets"

following the 1992 Supreme Court *Kodak* decision.  Conspicuously missing, however, is any

citation to or discussion of the actual *Eastman Kodak* case itself following remand, trial, and

subsequent court of appeals decision.  Dr. Mackie-Mason was the economist at trial for plaintiffs

in the *Kodak* case, and hence is very familiar with issues relating to both Kodak and Xerox market

definitions.

Xerox argues for two glosses on *Kodak*.  First, Xerox claims that *Kodak* requires there to

be a "change" by defendant of its policy.  (Xerox, p. 18).  While cases that Xerox cites, such as

*PSI Repair Services Inc. v. Honeywell Inc.*, 104 F.3d 811, 819-20 (6th Cir. 1997) have teased this

meaning from footnote 24 in *Kodak*, *PSI* candidly admit this is merely an "implication."  104 F.3d

at 819.  The Ninth Circuit's 1997 *Eastman Kodak* decision, in considering the Supreme Court's

decision at length in the context of the subsequent trial record, did not impose any such

requirement.  125 F.3d at 1201-13.  Further, in *Hanover Shoe*, p. 8 *supra*, there was no change of

policy, but rather consistent application of the same policy from 1912 through 1953.

In any event, the record is clear here that Xerox did change its policy, as Mr. Dixon's

declaration makes clear.  Ex 3, ¶¶ 32-49.   Thus, even if this gloss were imposed, it would not

entitle Xerox to summary judgment.

Second, Xerox argues that this "change" in policy must occur "during the relevant

limitations period." (Xerox, p. 21).  Xerox has simply invented this "requirement."  The one

district court case from Florida it cites at p. 21, *Metzler v. Bear Auto Service Equipment*, 19

F.Supp. 2d 1345, 1359 (S.D. Fla. 1998) is about "vertical integration", and acknowledges that

"*Kodak* has very little to say about vertical restraints."

In any event, Xerox' change occurred "within the limitations" period, for all of the reasons

set forth in Part I of this memorandum: during the period after March, 1988, Xerox adopted and

implemented ever more draconian policies designed to put CCS and other ISO's out of business.

At the end of the day, Xerox' argument for trying to distinguish this case from *Kodak* seems to collapse into the same statute of limitations argument addressed in Part I above. Just as Xerox cannot obtain summary judgment on statute of limitations, it cannot obtain summary judgment for a market definition argument that rests upon a statute of limitations premise.

### III.  MITIGATION OF DAMAGES

Finally, Xerox moves for summary judgment on another affirmative defense, "mitigation of damages."  CCS cross-moves for summary judgment on this defense.

As Section I of this memorandum showed, Xerox intentionally tried to put CCS out of business.  For Xerox to claim that CCS, the victim of this conduct, did not "do enough" to prevent Xerox from injuring CCS is somewhat akin to the schoolyard bully seeking to be absolved by accusing the victims of not "doing enough" to prevent the attacks.

 "Failure to mitigate" is an affirmative defense, as to which Xerox bears the burden of proof.  *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 436 (5th Cir. 1985); *Malcolm v. Marathon Oil*, 642 F.2d 845, 863 (5th Cir. 1981), *cert den.* 454 U.S. 1125.

In *Pierce*, *supra*, which is not cited by Xerox, and is subsequent to the Fifth Circuit decision upon which Xerox relies, *Golf City Inc. v. Wilson Sporting Goods Inc.*, 555 F.2d 426, 436 note 23 (5th Cir. 1977), the Fifth Circuit upheld a plaintiff's verdict in an antitrust case.  In dismissing defendant's "failure to mitigate" argument, the Court agreed with *Marathon Oil* as to the "duty" upon a plaintiff in a "refusal to deal" case: "We agree that in a refusal-to-deal case, a plaintiff who bypasses an obviously adequate alternative supplier should not recover for the loss of his business." *Id.* (emphasis supplied).

Xerox cites *Malcolm v. Marathon Oil*, *supra*, (Xerox brief p. 25) but fails to advise this Court of its holding:

> The defendants must show that the injured party's conduct was **unreasonable** and **aggravated the harm**. The defendants did no more than establish that Malcolm failed to contact a few known suppliers of gasoline. They did not establish that those dealers could or would have sold Malcolm the needed product in sufficient quantities to keep his business alive. The defendants, thus, did not prove a failure to mitigate damages.

642 F.2d at 863-64 (emphasis supplied).

In *In re Sumitomo Copper Litigation*, 182 F.R.D. 85, 95 (S.D.N.Y. 1998), the Court held that "the particular defense raised by the defendants (failure to mitigate) goes solely to the amount of damages, not the presence of the claim." *Accord, Borger v. Yamaha Corp*., 625 F.2d 390, 398 (2d Cir. 1980) (mitigation goes to how damages are calculated). Since CCS' damage expert has calculated CCS' damages on a customer-by-customer basis, Ex. 1, the burden is on Xerox to show, for each particular customer, how and why the damages should have been "mitigated."

Xerox has not met its burden. The sole basis on which it claims that CCS acted unreasonably is: "by refusing to request customers other than CIGNA, Connecticut Mutual, and Fairfield University to procure parts from Xerox, CCS failed to make reasonable efforts to mitigate." (Xerox, p. 26). Xerox has not come forward with evidence from any other CCS customer that it would have been able or willing to order Xerox parts.

At the threshold, the Court should consider the extraordinary nature of Xerox' argument. Xerox set up and enforced a policy and procedure whereby a Xerox repairman could have instantaneous access 24/7 to every part needed to repair a Xerox machine at a customer's location, but a CCS repairman could not. CCS and Xerox competed at numerous large

businesses with high-volume photocopying needs. Those businesses did not expect, and did not want, to get into the business of ordering the 2,400 separate parts needed to repair the photocopying machines. Rather, they expected the repair person to provide the parts. If one of CCS' customers had a leaky pipe or broken toilet, they expected the plumber to bring the necessary parts. If the customer had a broken ceiling, they expected the carpenter or roofer to bring the required materials. If one of their trucks needed a new clutch, and the customer took it to an independent repair garage, the customer expected the garage to obtain the parts, not that the customer would have to obtain the parts from GM (and, in addition, would have to telephone General Motors beforehand and have GM inspect and "verify" that the clutch was really needed for the particular truck before shipping the part to the customer).

In short, the "end user verification procedure" that Xerox set up was intentionally contrary to every expectation of every business in the U.S. which contracts with a service repair company.[8] That is why Xerox adopted it. Xerox competed with CCS at these companies, and knew that if such a policy applied to CCS, but not to itself in competition with CCS, it would put CCS out of business.

_____

[8]Under the "end user verification" procedure, CCS would first have to come to the customers' business and diagnose the problem. Since CCS could not order parts for that machine, a customer's employee would have to be found. The customer ("end user") itself would have to set up an account with Xerox for ordering parts, would have to physically order and pre-pay Xerox for the parts. The national Xerox parts office would then contact the local district, which would verify that the part was really going to be used to repair the particular machine at this particular CCS' customer. Only then would Xerox release the part order, but only to the customer's location. Since CCS' customers were large businesses (Aetna, Cigna, State of Connecticut) a part sent to a customer's freight receiving dock might not be identified for days. All of the while, the customer's machine was inoperable. See Ex.14, 4 RD 9557-9558 for the steps of this procedure.

33

Notwithstanding, CCS made what can only be considered heroic efforts to counteract Xerox' behavior and mitigate damages. First, CCS purchased Xerox machines in an effort to comply and assure itself of Xerox parts. CCS purchased from Xerox a new 1075 machine (at a cost of tens of thousands of dollars) with the express promise from Xerox (on which it then reneged) of a continued supply of parts. Dixon declaration, Ex. 3, ¶ 38. In 1987-88, CCS bought three additional Xerox 1075 machines, and registered their serial numbers with Xerox, in order to obtain parts to service customers. *Id*. ¶42.

Second, even after Xerox implemented its new procedure in 1989, CCS tried to comply, by allowing Xerox to "verify" which machines needed which parts, even though this substantially delayed the repairs and frustrated CCS' contractual ability to meet the customers 4 hour response time, and high "uptime" requirements. *Id*. at ¶45. Mrs. Dixon has described the problems caused by this verification procedure at p. 23 above.

Mr. Dixon was able to convince three customers to seek to comply with Xerox' onerous conditions for ordering parts for a brief period. He explains the practical difficulties of this arrangement at Ex. 3, ¶¶ 44-45 and ¶¶67-68. At Fairfield (one of the three customers that Xerox cites), CCS was able to convince Mr. Payne to order parts for a time. P. 24 above. However, Mr. Payne shortly became frustrated with Xerox' restrictions, and was forced to return to Xerox' service, even though it required a severe financial penalty. *Id*. The same thing happened at Cigna and the third customer. Ex. 3, ¶67.

In his declaration, Ex. 3 at ¶¶ 65-59, Mr. Dixon has explained the reason why he could not even convince his other customers to try ordering parts. In summary,

1) Some customers, such as the State of Connecticut, had written contracts which had a prohibition on ordering parts, ¶ 69;

2) The three where he was successful were the only customers he could have convinced to try this, ¶67;

3) Customers did not expect or want to be in the parts-ordering business, ¶68;

4) As a minority business, he would be perceived to be lacking capital, ¶69.

Xerox has not shown these reasons to be shams.  Xerox has not come forward with any evidence from any other CCS customer that it could or would have ordered parts.

And, perhaps most importantly, Xerox has not adduced any evidence that, even if CCS' customers had begun to order parts, it would have made a concrete difference.  The customers had a 4 hour "response" time, and greater than 90% "uptime" requirement.  Ex. 3, ¶¶13-15. The "end user verification" procedure required Xerox' parts people to hold up each customer's parts order for days while Xerox and its district office decided how and whether to "verify" that this part was needed for repair of the particular machine being serviced by the ISO.  *See* Dixon declaration, Ex. 3, ¶46; note 8 above; and Ex.14, 4 RD 9557-9558.   Xerox' procedure had a minimum 48 hour "turnaround time" built into it.  Ex.14, 4 RD 9557-9558.   That was true even where the customer itself ordered the part.  *In re Independent Service Organization Antitrust Litigation*, 964 F.Supp. 1454, 1457 (D. Kan. 1997) ("Xerox also implemented an 'on site end-user verification' procedure when certain ISO's **or their customers** ordered parts from Xerox.")

Hence, the exact same time delays would have been encountered even if customers had participated in the process by ordering parts.  The intentional built-in delays by Xerox would have been the same, and the eventual loss to CCS would have been identical, because the customers themselves could not meet their own "uptime" requirements under this procedure.  Mr. Payne's

35

testimony establishes this point vividly, p. 24 above. Xerox does not address this issue at all. The three customers where CCS tried the procedure, and failed, prove this point.

Xerox has failed in its burden to prove that CCS "bypassed an obviously adequate alternative supplier" or that CCS acted "unreasonably" so as to "aggravate the harm." Therefore, summary judgment should be granted to CCS on this affirmative defense.

## Conclusion

For all of the foregoing reasons, Xerox' motion for partial summary judgment should be denied, and plaintiff's cross-motion should be granted.

Respectfully,

Dated: September 16,  2004

_____
Robert LaRocca CT 22901
Kohn, Swift & Graf, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
(215) 238-1700
(215) 238-1968 (fax)

Elias A. Alexiades CT03543
P.O. Box 3859, Amity Station
New Haven, CT 06525

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing, together with plaintiff's Rule 56(a).1 Statement,  was served, by federal express, overnight delivery, upon Mr. Gleklen, and by first class mail upon other counsel, on September 16, 2004:

Jonathan Gleklen
Arnold & Porter
555 12th Street, N.W.
Washington, DC 20004-1202

Robert Dolian CT04278
Cummings & Lockwood
Four Stamford Plaza
107 Elm Street
Stamford, CN 06902

Peter W. Marshall
Xerox Corporation
800 Long Ridge Road
Stamford, CN 06904


_____
Robert LaRocca