**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

_____
                                          :
CREATIVE COPIER SERVICES,                 :
                                          :        CIVIL ACTION
                    Plaintiff             :
                                          :        Civ. No.  3:01cv155 (SDU)
          v.                              :
                                          :
XEROX CORPORATION,                        :        September 16, 2004
                                          :
                    Defendant             :
_____          :

**PLAINTIFF'S LOCAL RULE 56(a).1 AND 56(a).2 STATEMENTS**

Plaintiff sets forth the following in response in Xerox' motion of June 25, 2004 for partial

summary judgment, and in support of plaintiff's cross-motion for partial summary judgment.

Plaintiff responds to Xerox' statements (paragraphs 1-29 below).  Plaintiff then sets forth its own

statements of undisputed facts for its cross motion as to issues (1) and (3), and its statement of

disputed facts as to issue (2).

**I.  Plaintiff's Rule 56(a).2 Response to Xerox' Statement of Undisputed Facts**

1.        Admitted.

2.        Admitted.

3.        Denied as stated.  Admitted that Exhibit A to Mr. Marshall's declaration is an

authentic Xerox document.  Denied that this policy was "implemented" or enforced until 1989.

Two federal judges have found that Xerox did not implement its parts policy until 1989.   Judge

O'Connor, the original MDL Judge, adjudicated summary judgment motions with respect to

another ISO plaintiff, named Copier Services Unlimited, or CSU.  Judge O'Connor stated:

In 1984, Xerox developed its first 'parts policy', in which it declared it would not sell 'parts which are unique to the 10 series products in memory writers to any Independent Service Organization (ISO) unless the ISO also was an end-user of the product. In January, 1987, the parts policy was expanded to apply to newer '9' series models and all '10' series copiers, plus all new Xerox products introduced after the effective date of the policy.

**Xerox did not enforce its parts policy until early 1989**. At that time, Xerox representatives decided that the only way to stop the competitive threat posed by ISO's such as CSU, was to cut off the parts availability to these parties. In January, 1989, Xerox tightened enforcement of its existing policies and cut off CSU's direct purchase of restricted parts from Xerox. Xerox also implemented an 'on site end-user verification' procedure when certain ISO's or their customers ordered parts from Xerox. The policy, which was implemented in June, 1989, initially applied solely to the six most successful ISO's, including CSU.

*In re Independent Service Organization Antitrust Litigation*, 964 F.Supp. 1454, 1457 (D. Kan. 1997) (emphasis added).

Judge Vratil, who succeeded as the MDL Judge after Judge O'Connor's death, and adjudicated motions with respect to Creative Copier Service, wrote in her summary judgment decision:

On October 21, 1988, senior partners of Xerox developed an action plan against ISO's. The plan targeted six major ISO's in five districts, including CCS in the Hartford district.
....
On January 11, 1989, Xerox formally adopted its "On-Site End-User Verification Procedure. Pursuant to that policy, Xerox would sell parts only to an 'end user'...In January, 1989, Xerox implemented this policy against the six target ISO's including CCS. The policy applied to the 1065, 1075, 1090, 9900, and 50 series copiers.
.....
Effective June 1, 1989, Xerox announced a new verification policy to ensure that ISO's complied with the parts policy.
....

2

In 1989, Xerox began to strictly enforce its restrictions on CCS
parts orders.

*In re Independent Service Organizations Antitrust Litigation*, 114 F.Supp.2d 1070, 1083-85 (K.

Kan. 2000). Mr. Dixon's declaration explains how Xerox' parts policy was enforced and how it

impacted CCS. See Exhibit 3 in plaintiff's appendix hereto, ¶¶ 32-49.

4. Denied. Plaintiff has not alleged that it was injured by "this policy", i.e. the 1984

parts policy. Plaintiff alleges it was injured by Xerox' enforcement of its anti-ISO parts policies.

Those are described in the paragraph immediately above, and in Mr. Dixon's declaration, cited

above.

5. The first sentence is denied. Dr. Cunitz, plaintiff's damage expert, has opined that

plaintiff first suffered ascertainable damages in the calendar year 1990. Exhibit 1, ¶2. As to the

remainder of the paragraph, Mr. Dixon has explained the sequence and timing of the impact of

parts policy upon CCS, Dixon declaration, Ex. 3,  ¶¶ 32-49.

6. Plaintiff admits that Ex. B is an authentic Xerox document sent to CCS. The

remainder is denied as an improper legal conclusion, and furthermore because it is inaccurate:

Xerox' subsequently enforced and implemented its policies with many additional restrictions.

7. Admitted that Ex. C is an authentic Xerox document sent to CCS.

8. Admitted that Ex. D is an authentic Xerox document sent to CCS. The remainder

of the paragraph is denied, on the grounds it is legal argument, and is inaccurate. The timing and

sequence or Xerox' actions are fully set forth in Mr. Dixon's declaration, ¶¶32-49, and in the

documents described in the paragraphs below in Plaintiff's Rule 56(a).1 statement of undisputed

facts.

3

9.      Admitted that the sentence from CCS' interrogatory answer is accurately quoted. Denied that this caused CCS ascertainable damage, for reasons set forth in Mr. Dixon's declaration cited in ¶ 8 above.

10.     The first sentence is admitted, and Ex. E to Mr. Marshall's declaration is admitted to be an authentic Xerox document.  The enforcement of this policy occurred in 1989.  See paragraph 3 above.

11.     The first sentence is denied.  In the deposition passage quoted, Mr. Dixon testified that he was able to obtain the parts in question from A.B. Dick.  Ex. 4 to Xerox' appendix, p. 352.  The remainder is denied as an improper (and incorrect) legal conclusion.

12.     Admitted.

13.     Mr. Dixon's deposition testimony is admitted to be accurately set forth; to the extent Xerox' gloss augments it, such is denied.

14.     Denied as stated.  Mr. Dixon's statement to the unidentified broker, as recounted in his deposition, speaks for itself.  Xerox conclusion that this "prevented him from expanding to New York" is denied, because CCS had no concrete plans to expand to New York.

15.     Denied as stated.  Pp. 15-16 of Mr. Mangano's deposition transcript speaks for itself, and Xerox' characterization of the testimony is denied as inaccurate.

16.     Admitted that Mr. Withstandley's testimony has been accurately quoted.

17.     The first sentence is denied.  Mr. Dixon has explained the evolution and enforcement of Xerox' parts policy in his declaration, Ex. 3, ¶¶32-49.  In the deposition passage which Xerox quotes, Xerox is asking Mr. Dixon to comment upon Paragraph 58 of the First Amended Complaint.  That complaint is Ex. 3 to Xerox' appendix.  Paragraph 58 by its terms

4

references "these Xerox parts and other exclusionary policies and practices...", and is referring to a series of Xerox policies and practices, including those adopted and implemented in 1989, 1990, and subsequently. See Paragraphs 31-37 of that Complaint. Mr. Dixon is describing the situation as it existed at the culmination of these various policies and practices.

18. Admitted that CCS requested Cigna to order parts. Xerox parenthetical in the first sentence is denied ("regardless of whether or not they obtained service from ISO's"), to the extent Xerox is implying this was an even-handed policy applicable to Xerox service and to CCS service alike. Xerox required customers to order parts **only** when they were using ISO's, but not when they were using Xerox service.

19. Admitted that Mr. Dixon convinced three customers to order parts for various periods of time. See Mr. Dixon's declaration, Ex. 3 to plaintiff's appendix, at ¶¶65-69, and deposition testimony by Mr. Payne and Mr. Barnes, Exs. 31 and 33 to plaintiff's appendix, and summarized in paragraphs 71 and 73 below.

20. Admitted that, when an ISO serviced the high speed photocopier, Xerox would sell parts to the end user customer, but not to the ISO. Mr. Dixon's testimony speaks for itself.

21. Denied as stated. Xerox has misunderstood Mr. Blake's testimony. In the passage cited (p. 77 of his deposition) he is referring to matters that occurred after he ceased working for CCS. (See dep., p. 76, lines 3-4). As to Mr. Dixon, the passage of his deposition cited is consistent with his declaration, namely that he made the request at those customers that could do so. See declaration, Ex. 3, ¶¶65-69.

22. Denied that CCS could have asked other customers to order parts. See Dixon declaration, Ex. 3, ¶¶65-69. Further, Xerox erroneously relies upon a passage of testimony by

5

Mr. Blake, who is describing non-CCS customers, under different circumstances. See Blake

deposition at pp. 76 et seq.

23.     Denied as stated. The quotations from the First Amended Complaint are taken out

of context, because Xerox seeks to establish an inference, for purposes of arguing about "market

power", that customers understood the terms of service at the time they purchased Xerox high

speed photocopying machines. This is refuted in the expert report of plaintiff's economist, Dr.

Mackie-Mason, Ex. 38 to plaintiff's appendix, at pp. 16-17 thereof.

24.     Admitted that Exhibit F to Mr. Marshall's declaration is an authentic Xerox

document.

25.     Denied as argument.

26.     Denied. This new "on- site verification policy" caused extensive injury and

damage to CCS, see below. Contrary to Xerox' statements that "CCS itself was subject to only

two on-site inspections by Xerox personnel," Xerox' district manager Nugent himself testified to

the extensive verifications that his office performed on CCS. Ex. 4 to plaintiff's appendix, pp. 28-

41. So did Mrs. Dixon, who worked for CCS. Ex. 30, pp. 40-43. See also Ex. 41, 2 RD 1039.

Mr. Mangano, who was a technician at various times between 1985 and 1992, worked off-site,

and would not be aware of much of Xerox' verification inspections. Morever, as shown below,

the real issue was not how many actual "verifications" Xerox chose to do, but rather that Xerox

always delayed the parts shipment until the Xerox district employees decided whether or not to

come out and make a physical verification in each particular case, a process that typically took

several days. Hence, it was a procedure deliberately designed by Xerox to build in delay of parts

shipment. Finally, as to the sentence that reads "No CCS customer was ever subject to the 1989

verification policy", Xerox has taken Dr. Dixon's answer on p. 103 of his deposition out of context. Mr. Dixon has explained what he believed he was being asked in his declaration, Ex. 3, ¶49.

27. Admitted.

28. Admitted in part. Denied that Xerox has complied with its policy adopted pursuant to this settlement. See Third Amended Complaint, Ex. 2 to Xerox' appendix, at ¶¶57-65 for a fuller statement of plaintiff's response.

29. Denied as stated. This mischaracterizes the record evidence, as set forth below.


## II. Plaintiff's Local Rule 56(a).1 Statement of Undisputed Facts As To Plaintiff's Cross Motion for Partial Summary Judgment On Statute of Limitations And Mitigation of Damages (Relating to Points I and III of Xerox' Memorandum).

### A. Statute of Limitations

30. March 23, 1988 is the relevant date that is four years before when plaintiff commenced legal action. (Xerox brief, p. 6, line 3).

31. Plaintiff's damage expert, Dr. Jonathan Cunitz, stated in a declaration in May, 1999, that CCS' damages were first ascertainable in 1990:

> 2. It was my opinion then [when I first prepared the analysis] and is my opinion now, that CCS first sustained ascertainable damage from Xerox' practices in the calendar year 1990...

Ex. 1 hereto.

32. Xerox has not furnished any rebuttal affidavit from any expert stating that CCS' damages were ascertainable prior to 1990.

33.    Judge O'Connor found that "Xerox did not enforce its parts policy until early 1989." *In re Independent Service Organization Antitrust Litigation*, 964 F.Supp. 1454, 1457 (D. Kan. 1997).

34.    Judge Vratil found that "In 1989, Xerox began to strictly enforce its restrictions on CCS parts orders." *In Independent Service Organizations Antitrust Litigation*, 114 F.Supp.2d 1070, 1083-85 (K. Kan. 2000).

35.    Mr. Nugent, Xerox District Manager in the Hartford District,  testified that Xerox did not perceive CCS to be a competitive threat when he first arrived in Connecticut in April, 1987.  He first began to perceive it as a threat at the "end of '87, '88."  Ex. 4, p. 23.

36.    In June, 1988, Xerox hired Kroll & Associates, internationally known investigators, to investigate ISO's practices, and to keep the investigations secret ("not put anything in writing").  Ex. 5, 3 RD 36151-52.

37.    On August 18, 1988,  a Xerox' employee wrote:

> Third party service of Xerox equipment is emerging as a multimillion dollar business.  The result is a reduction in Xerox service revenue.  D. Kerns and P. Allair [CEO of Xerox] have expressed concern about third party service and **have requested that a strategy be developed to stop the revenue loss**.
> ......Service accounts for more than half of Xerox' revenue.  Ex. 6, 5RD 20, emphasis supplied.

38.    At an internal meeting of the top regional employees of Xerox on October 21, 1988, a major new Action Plan was developed against ISO's[1].  Ex. 7 at 1 RD 4456-4469.  It stated that "ISO strength was concentrated in 5 Districts" (1 RD 4461), one of which was the

---

[1]Mr. Nugent explained at his deposition that "Senior Partners" were top regional employees.  Nugent dep, Ex. 4, pp. 78-79.

Hartford, Connecticut district.  It stated that "6 Major ISO's"  were the target of Xerox' new action plan.  One was CCS.   Ex. 7, 1 RD 4466 and Ex. 8, 3RD 36862.  Among the new actions to be implemented against CCS were:

- Strengthen our policy on sale of parts to ISO's
  – Concentrate on the 6 major ISO's
  - Require verification upon each parts request that they are an end-user
  - On-site/physical tracing by District
  - An alternative is not to sell parts to ISO's at all
- Eliminate sale of all service bulletins/technical documentation to ISO's
- Refuse T & M [time and materials service calls] on all equipment serviced by anyone other than a Xerox CSE
- Negate equipment/parts warranties on all equipment serviced by anyone other than a Xerox CSE.  Ex. 7, 1 RD 4458.

39.    As part of this anti-ISO offensive, in September 1988 Xerox drafted new measures to financially penalize customers who used ISO's, i.e. "to discourage customers from ever considering as ISO."  Ex. 9, 1 RD 2911.

40.    On November 16, 1988, Mr. Spindel, Xerox national coordinator of anti-ISO activities, presented the various new anti-ISO policies to "the final decision maker", A. Barry Rand.  Ex. 10, 1 RD 4427-4433.

41.    On November 18, 1988, Mr. Spindel summarized a  meeting on November 17, 1988 which focused upon ways to eliminate CCS and the other five target ISO's.  Ex. 11, 1 RD 4394.

42.    Joe Nugent, Xerox District Manager for the Hartford District,  attended this meeting to report on CCS.  Ex. 12, 1 RD 3085-3088, 3092.

43.    Mr. Nugent told the assembled group that CCS posed the following threat to Xerox: "Insurance industry is risk."  Ex. 12, 1 RD 3092.

44.     In late 1988 or early 1989, Xerox drafted policies and procedures designed to eliminate CSS and the other major ISO's, summarized on a "Status of Actions" sheet.  Ex. 13, 2 RD 56946-47.  At this time, according to Xerox' memorandum, the Hartford district had the fourth largest number of such units serviced by ISO's in the country.  *Id.*

45.     On January 11, 1989, Xerox dramatically and formally tightened its  "On Site End User Verification Procedure".  Creative Copier Services was one of 6 ISO's nationwide targeted by this policy.  Ex. 14, 4 RD 9554-9558.  This policy required an eight step procedure before Xerox would send parts,  including matching serial numbers for a specific machine to verification that parts were needed for that particular machine.  *Id.*, 4 RD 9557-58.

46.     Xerox again placed CCS on its April, 1989 list of companies targeted by this new verification procedure.  Ex. 39, 2 RD 49744.

47.     A Xerox employee in one of the other six key Districts wrote on March 8, 1989:

> I want you to know that you have our district's support, dedication
> and commitment to work with you in every way possible to stamp
> out the ISO's once and for all.  The profitability of our company
> absolutely depends on us to keep fighting with everything we have
> so that the ISO's do not spread to other districts.  Ex. 15, 3 RD
> 47393.

48.     In addition to restricting , reducing, and delaying parts, Xerox sought to eliminate the ability of ISO's to obtain manuals and other service documentation, so they would not be able to repair their customers' machines.  On April 17, 1989, Mr. Dixon placed an order through Cigna, his largest customer, for 7 product manuals for 9900 copiers, which he was servicing at Cigna and Aetna.  (The 9900 was newer than the 10 series machines).  The total amount of the order was $770.40.  The order was canceled by Peggy Murphy of Xerox.  Ex. 37, 1 RD 57496

49.     On April 19, 1989, David Spindel of Xerox wrote:

> Dear Mr. Dixon,
> You recently placed an order with us for subscriptions on service
> documentation for our 9900 product with an indication that it was
> for Cigna Corporation.  Xerox has made a **recent decision** to cease
> the sale of service documentation on its high-volume copier
> products as well as those on its restricted products.  Therefore, we
> cannot fulfill your request at this time.  Ex. 37, 1 RD 57498
> (emphasis supplied).

50.     On June 1, 1989,  Xerox adopted its policy labeled BP 2021.  Ex. 16, 1 RD 3681.
It restricted ISO's access to parts and documentation needed to service copiers.  It applied to all
10 series machines.  It stated in pertinent part:

> For our 9900 and 10 and 50 series copiers/duplicators,
> Memorywriter typewriters, Facsimile...we will not knowingly
> provide ISO's with parts, technical training, technical
> documentation, or other resources.  1 RD 3681

The policy also stated:

> We will not sell such resources (including parts) to an end-user if
> we have reason to believe that such resources will be used for
> purposes other than maintenance of the unit of equipment of which
> these resources are ordered.  Id

This policy, by its own terms, "superseded" an earlier policy dated February 1,
1987.

51.     Mr. Dixon describes in his declaration how these new 1989 policies and their
implementation differed from the policies in effect before.  Ex. 3 ¶43-48.

52.     Xerox appointed two key employees to be in charge of this new end user
verification program nationwide, one of whom was David Spindel. Ex. 17, 3 RD 46754.  Both

were from Xerox "Service Marketing Center", i.e., the division of Xerox which competed directly for service business with Mr. Dixon and other ISO's.

53.     Xerox assigned two of its employees in the Hartford, Connecticut District office to monitor CCS under this new policy.  Ex. 18, 1 RD 13152, and Ex. 19, 1 RD 15417.

54.     CCS' customers generally required CCS to have a "response time" of four hours or less, and had an "uptime" requirement of 90% or more for their machines to be guaranteed up and running.  Dixon declaration, Ex. 3, ¶ 13-15, 47.   Xerox enforcement of its new policy made it impossible for CCS to meet these customer requirements.  *Id.* ¶47.

55.     Xerox District Service Manager Nugent testified that whenever CCS ordered a part under this new 1989 procedure, Xerox required him to "verify" the purchase order. Nugent dep., Ex. 4, pp. 28-41. Mr. Nugent testified he could not give any legitimate business justification for Xerox' "verification" procedures. p. 31.

56.     In January, 1989, at the same time it implemented this policy, Xerox placed CCS in a "red" status.  Ex. 20, 2 RD 59071.  This is the first, or earliest,  record of CCS being placed in such a status.  Being placed in a "red" status meant, according to Xerox, that these ISO's "have a significant share of the service business, and they are growing or maintaining this share."  *Id.* Mr. Nugent testified: "Looks like red must have been high alert, yellow is better atmosphere, better environment."  Ex. 4, p. 84.  Only ten ISO's in the United States were designated in such a "red" status by Xerox in January, 1989.  Ex. 20, 2 RD 59071.

57.     On January 26, 1990, Xerox included CCS on a list of "Major ISO's" in the United States, at a meeting of Xerox Central Region District Managers.  Ex. 21, 4 RD 9434. Xerox described CCS as follows:

- "CIGNA is Primary Account"

- "Leverages Minority Ownership"   (Ex. 21,  4 RD 9434)

58.    Xerox kept CCS in its "red" status alert throughout 1990."  (Ex. 22, RD 10655.)

59.    During this time period, on August 22, 1990, John A. Swaim, Xerox' Vice

President for customer services marketing, wrote to A. Barry Rand (the "final decision maker,"

Ex. 10):

> Independent Service Organizations (ISO's) represent a threat to
> our Services revenue stream, and more importantly to our overall
> account relationships.  Ex. 23, 1 RD 63976.

60.    On October 31, 1990, Xerox hired an additional employee to "monitor the activity

of the ISO's" nationwide.  Ex. 40, 2 RD 58366.

61.    On December 11, 1990, Mr. Swaim again wrote:

> [O]ur strategy with respect to Independent Service Organizations is
> critically important as part of preserving and enhancing the annuity
> stream.  Ex. 24, 1 RD 63947

62.    In January, 1991, after two years of keeping CCS in a "red" status, Xerox

determined that its efforts against CCS were succeeding:

> "Activity by Creative Copier Service has decreased.  **Creative's
> level of service has deteriorated**." Ex. 22, 1 RD 10657, emphasis
> supplied.  Accord, Ex. 25, XO 9 4905.

63.    By February 7, 1991, David Spindel reported that "Creative Copier Service in

Hartford...has lost business to Xerox...  Ex. 26, 2 RD 59071.

64.    Still monitoring CCS,  Xerox organized a three day seminar on March 4-7, 1991,

which included as one of its topics : "Creative Copy –Hartford".  Ex. 27, 1 RD 10683.

13

65.     In January, 1991, Xerox organized a meeting on ISO's, which stated that Xerox parts were available to ISO's "only at Xerox discretion and/or at prices determined by Xerox." Ex. 43, 1 RD 15095.

66.     Consistent with the above, Xerox priced its parts to ISO's and ISO's customers at 10 times what Xerox own service company was charged, when ISO's or ISO's customers were able to obtain these parts.  Dixon declaration, Ex. 3, ¶¶ 24-31 and Ex. B thereto.

67.     Theodore Bethea, who ordered parts for CCS, confirmed that Xerox' restrictions dramatically changed in "late '88, early '89."  Ex. 28, pp. 14-15.

68.     In January, 1992, Xerox ordered a stepped up "on site" verification of CCS.  Ex. 41, 2 RD 1039, and Ex. 42, 2 RD 6817.

69.     CCS purchased four Xerox machines, and registered their serial numbers with Xerox, in an effort to comply with Xerox "end user verification procedures" and not lose customers' business.  Dixon declaration; Ex. 3, ¶¶ 41-42.  Notwithstanding Xerox' own internal records document many instances where Xerox cut back orders and delayed shipment of parts during 1990 and thereafter, so that  CCS could not respond to its customers' "up time" requirements.  See Ex. 29, a group exhibit of these records.  Each of these dozens of actions constitute a "continuing violation."  For example:

•       On February 6, 1989, CCS employee Theodis Bethea placed an order for $1,194.30 for parts.  It was telecopied by Xerox' parts department to Peggy Murphy, the national Xerox person in charge of ISO's parts ordering , in Rochester.   The order had to be canceled.  Ex. 29, 1 RD 28887.

14

- On June 5, 1989, Mr. Dixon placed an order for fifteen items CCS needed to be shipped for overnight delivery to be received the next day. These included a switch assembly, a drive shaft, a belt transport, a side guide assembly, two kinds of dicorotrons, clutches, a thermistor, a lamp, a neon assembly, a striker plate, and bearings. CCS was forced to cancel the entire order. Ex. 29, 1 RD 58595, 1 RD 28870.

- On January 26, 1990, Mr. Dixon telephoned an order for numerous parts, requesting immediate air shipment. Xerox decided he had ordered too many parts, and that Xerox unilaterally would not ship the parts he ordered. Xerox reduced his order of $5.75 belt synchronizes from 6 to 2; reduced another $5 model of belt synchronizers from 8 to 2; reduced a feed-head part from 4 to 2; reduced a finger assembly part from 10 to 2; reduced a spring leaf from 10 to 2. The order form states: "Quantities reduced." Xerox delayed approving the remaining order until January 30, 1990. Ex. 29, 1 RD 58571.

- On February 5, 1990, Mr. Dixon telephoned an order for a fuser metering part for $43.25, a fuser cleaning part for $36.05, a doctor blade for $7, a pinch roll for $32.50, another roll for $63.60. He requested shipment that day by overnight delivery, for receipt the next day. Xerox did not approve the order until February 7, 1990, and reduced the order substantially. Ex. 29, 1 RD 58569.

- On February 27, 1990 CCS telephoned an order for a transmission part for $371.45. The order form states: "Next day delivery required " Xerox refused to approve the order until the next day. Ex. 29, 1 RD 58567.

15

- On March 2, 1990, Mr. Dixon placed a telephone order for a corotron end, bellow assembly, baffle assembly, filter kit, feed belt, belt retard part, for a total of $813.81. He stated he required next day delivery. Xerox did not approve the order until March 5th. Ex. 29, 1 RD 58565.

- On March 9, 1990, Mrs. Dixon telephoned an order for seven kinds of parts, for receipt the next day. Xerox unilaterally reduced quantities from 5 to 2 on two of the parts, and did not approve any portion of the order until March 12. Ex. 29, 1 RD 58563.

- On March 13, 1990, Mr. Dixon telephoned an order for 8 items for a total of $105.95, for receipt the next day. Xerox deleted one part, a crank. It did not approve any of the rest for shipment until two days later, on March 15. Ex. 29, 1 RD 58562.

- On March 15, 1990, Mr. Dixon placed an order for five pulley assemblies, with next day delivery required. Xerox cut back the order to 2 pulley assemblies, and delayed the order. Ex. 29, 1 RD 58561

- On March 16, 1990, Mrs. Dixon telephoned an order for two parts, for $34 plus shipping, to be received the next day. Xerox did not approve the order until March 19. Ex. 29, 1 RD 58560.

- On March 19, 1990, June Roberts of Cigna placed an order for a pulley assembly and several other parts, for a total of $55.80. She required next day delivery. The order was cancelled because, as Xerox itself noted, it was "not released on time." Ex. 29, 1 RD 57500.

16

- On March 20, 1990, Mr. Dixon ordered parts. Xerox eliminated two of the items because he had ordered the same part on March 9th, and Xerox decided he should not receive the additional items. Ex. 29, 1 RD 28024.

- On March 21, 1990 Xerox then called the warehouse "to release w/ quantities reduced." Ex. 29, 1 RD 28023

- On March 22, 1990, Mr. Dixon telephoned an order for three parts, for over $1,100, plus freight, for receipt the next day. Xerox did not approve the order until March 27. Ex. 29, 1 RD 58558.

- On March 28, 1990, Xerox called its warehouse to cancel an order CCS had placed for seven parts, because Xerox determined CCS had ordered too many in the preceding seven months. Ex. 29, 1 RD 28019.

- On March 30, 1990, Mr. Dixon telephoned an order for six parts plus freight and handling, for $489.91, for receipt the next day. Xerox' order form states "okay to release per p.m. 4/2/90". Ex. 29, 1 RD 58556.

- On April 20, 1990, CCS' employee Theodis Bethea telephoned an order for a repair kit and a spring, for $51.95. Xerox did not approve the order until April 23. Ex. 29, 1 RD 58581.

- In April, 1990, on one parts order, Xerox documented its elaborate verification procedure:

  "--4/10. Called Bill Dixon
  –Provided S/N's [serial numbers] as shown
  –On-site agreed [verification] agreed to

-4/10. Called Ward Rodgers in District. Joe Nugent–left message for them to call me back.

Joe Nugent called–will get info to Ward Rogers

Called Bud Pinoon—will try to do on-site [verification] in Charleston and call me back

–4/12 Ward Rogers VMX'ed [voice mailed] that he did on-site [verification] at Middletown [Connecticut, location of CCS]
  1075  C 55-091343
  1035 531-168343

—Called Todd to ship"

Only after this verification process had been accomplished did

Xerox release the parts order. Ex. 29, 1RD 28873

- On April 12, 1990, evidently in connection with the above, a Xerox employee

  wrote to Peggy Murphy:

  ISO Creative Copier
  Serial # 1090 M0 9060372
      1055 H 22026774
  Has Tracings. Do you want them?    Ex. 29, 1 RD 28869


- On May 3, 1990. Mr. Dixon ordered six parts for a total of $1,753.62, for

  delivery the next day. Xerox did not approve the order until May 7. Ex.

  29, 1 RD 28011.

- On May 31, 1990, Mrs. Dixon ordered five parts, for a total of $743. CCS

  stated the "next day delivery" was required. Xerox did not release the

  order until June 7th. Ex. 29, 1 RD 28009.

- On June 6, 1990, Mr. Dixon ordered six parts, for a total of over $650. CCS required next day shipment by Fed Ex. Xerox did not approve the order until June 11th. Ex. 29, 1 RD 28008. The Xerox internal invoice stated that "David [Spindel] reviewed this."

- On June 15, 1990, Mr. Dixon ordered 11 parts, for a total of $1,439. He stated that next day delivery was required. Xerox did not release the order until June 20th. Ex. 29, 1 RD 28007. Certain of the items were evidently disapproved by Xerox. For example, next to the item 11, for 2 dicorotron assemblies, Xerox wrote the notation "we sent them 3 on 6/11". The companion invoice shows the "2" was changed to "0", meaning Xerox refused to ship the 2 dicorotrons. Ex. 29, 1 RD 58576.

- On June 26, 1990, Mrs. Dixon ordered six parts, stating next day delivery was required. Xerox did not approve the order for two days. Ex. 29, 1 RD 58575.

- On June 28, 1990, Mr. Dixon ordered four parts for a total of $90.60. Xerox did not approve the order until July 11, 1990. Ex. 29, 1 RD 58572.

- On June 26, 1990, Mrs. Dixon ordered five parts, for a total of more than $2,000. She stated that next day shipment was required. Xerox did not approve the order for two days. Ex. 29, 1 RD 58574.

- In July, 1990, Xerox compiled a list of parts CCS had ordered, the order date, the quantities, and the machine for which they had been ordered, to enforce its verification policy. Ex. 29, 1RD 28002

- On August 7, 1990, Mr. Dixon called an order with next day delivery required . Xerox decided it would not send him many of the parts ordered.  It reduced his order shield assemblies (part 55 K 520) from seven (7) to two (2), and reduced other parts.  Ex. 29, 1 RD 58573.

- On August 8, 1990, Xerox spent time verifying a serial number with Mr. Dixon, then "called Todd to release" the order.  However, Xerox lost the serial number.  The memorandum states: "Time lag" because of this lost serial number.  Ex. 29, 1 RD 28857.

- A January 7, 1991, document demonstrates that Xerox kept meticulous track of the precise quantities of parts CCS had ordered pursuant to Xerox verification procedure.  Ex. 29, 1 RD 58602

- On December 13, 1991, Jake Newman telephoned an order for six parts, for a total of $775.55.  Xerox telephoned Mr. Newman to state they needed the bill of sale for the machine before releasing the parts.  Mr. Newman informed them that Bill and Jackie Dixon were out of the country, and he did not have access to the bill of sale.  Xerox threatened to delay the entire order unless he deleted the order for a blower assembly, 127 EO 2523, for $166.  Mr. Newman "agreed to delete [the blower assembly] so as not to hold up rest of order."  Ex. 29, 1 RD 58586

- On January 7, 1992, Lynda Vannozzi, a Xerox "ISO Specialist", wrote to Sharon Varalli, who helped coordinate Xerox ISO policies:

During the past two weeks, the Customer Parts and Product Support Center files containing all Bill of Sale records relative to the I.S.O. gatekeeping policy process, were reviewed for accuracy and completeness of documentation. All necessary updates have been made to the master Bill of Sale listing. As a result of inconsistencies noted within these files, I am requesting an on-site visit to verify ownership of equipment for each of the following high volume ordering companies:

> Cigna Corporation         Bloomfield CT
>                           Philadelphia PA
>
> .....
> * Creative Copier          Middleton, CT
> .......
> * These companies were verified by Service Marketing but no date was noted.

Ex. 41, 2 RD 1039[2]

- On January 31, 1992, CCS placed an order for 13 parts, requiring next day delivery. Xerox required repeated calls to verify the location and serial number of each specific machine for each part. The invoice states that "[Sharon] Varalli will check into it and call back." The entire order was held up while this verification took place. Ex. 29, 1 RD 58619. By February 3rd, Xerox had still not released the order. Id.

70.    Mrs. Dixon, who kept the books and oversaw the dispatch of technicians for CCS, testified that the difficulty of obtaining parts endured from 1988 through 1994. (Jackie Dixon, Ex. 30, pp. 36-37). "There were long delays sometimes during that period...Sometimes up to a

---

[2]Sharon Varalli had been hired by Xerox to "work with [district managers] to monitor the activity of the Independent Service Organizations in your district. She will be available to support you in any questions or concerns you may have in dealing with ISO activity." Ex. 40, 2 RD 58366.

week." (P. 40-41). "I think it started about '88, '89 when we placed orders for 10 series parts, and Xerox restricted them." (P. 41):

> And then they'd ask for a serial number, and we'd give them a
> serial number on a machine that we owned. And then they'd say,
> well, they had to hold up the order–they wouldn't call it holding it
> up, but I don't know—review the order or something. They had to
> send somebody out to inspect the machines and then–so it would be
> another day or two before someone would actually come and
> inspect the machines....So, it held us up for at least four or five
> days, if not sometimes longer, because of the process that they went
> through. (Pp. 40-43).

71.    Arthur Payne, director of Printing and Graphic Services for Fairfield University in Connecticut, a CCS customer, confirmed that the impact first occurred in 1989 or 1990. He testified that CCS began servicing their copiers in 1984 (approximately 25 Xerox copiers. Ex. 31, p. 9. His University required a 4 hour response time. (P. 12). The response time is "very, very critical." (P. 38). He had specific uptime requirements when it was "imperative that those copiers be operating at those times and if they should go down, that we needed immediate response time." (P. 15). He was satisfied with CCS' service and technicians. (P. 16-17). However, the University began to experience significant "downtime" in 1989 and 1990. (P. 17). The problem got worse as time went on, and finally forced Fairfield to cancel the contract with CCS in 1992. (P. 19-20). It was caused by the delay in CCS receiving parts (p. 21). He tried to order parts himself. By 1993, Fairfield was forced to sever its relationship with CCS. (P. 27). He went back to Xerox, whose prices were 25% more than CCS' (P. 36). Mr. Payne stated the reason he severed the relationship with CCS was because of Xerox' parts restrictions to CCS:

Well, at that point there, come '92, I just knew that I had to go
with somebody that had direct access to the parts and the–could
give me better service response.  (P. 39)

72.     Charles P. Lewis, director of support services at Choate Rosemary Hall since

1971, confirmed that adverse impact occurred in 1990.  He switched from Xerox to CCS in April,

1989 because CCS' price was "quite a bit less" than Xerox'. Ex. 32, p. 13 and dep. exhibit 1.

Price and response time were both very important considerations.  (P. 14).  CCS initially gave

good service time,  (Ex. 32, p. 16), but by 1990 "down time" began to be a serious problem. (P.

20).  It caused Choate Rosemary Hall production problems (p. 21).  Sometimes the machines

were down as long as a week. (P. 21).  He testified he stopped using CCS because it could not

obtain parts from Xerox in a timely manner:

Q.     Did your awareness of the fact that Xerox wouldn't sell
parts to Creative on any meaningful level affect your level of
satisfaction with Creative Services?

A.     Absolutely.

(P. 24).  Choate returned to Xerox, even though Choate had to pay Xerox a

financial penalty to do so.  (P. 25, 33).

73.     Richard Barnes, Cigna's assistant director for copy services, testified that CCS'

repair prices were significantly less than Xerox,' and its service was good.  "We have found them

to be very conscientious and responsive to our needs." (Ex. 33, p. 35-36).  Mr. Barnes testified

that Cigna's "uptime" requirement for these machines was 92-95%. (P. 95).  "It's very important

for us to have the machines up." (P. 33). On April 26, 1990, Xerox changed its "verification"

procedures at Cigna, forcing Cigna personnel themselves to place all orders, and not permitting

CCS' repair men to call in the orders on Cigna's account number, on machines CCS was

repairing.  Mr. Barnes testified that Xerox' verification procedure delayed emergency ordering of parts.  (P. 75-80). On occasions when CCS could not obtain the part in a timely manner, Cigna was forced to call Xerox to repair the machines. (P. 96).

74.    DeRon Franklin, who purchased photocopiers for Aetna Insurance between 1988 and 1995, testified that CCS' inability to get parts was a significant factor in Aetna's decision making.  Ex. 34, p. 10.  Franklin testified that previously "I was very satisfied with their service." (P. 6).

75.    CCS had serviced machines for the State of Connecticut since 1981.  However, in 1989, when CCS and Xerox were the only two bidders, CCS was forced to cancel its bid because of Xerox' parts practices.  Ex. 35, pp. 12-13.

76.    As late as 1994, Xerox stated that the "Goal" of its "ISO Strategy" was: "To capture 100% of the Service Market on Xerox Equipment."  Ex. 36, X02 20280.

## B.  Mitigation of Damages

77.    Xerox' only contention as to mitigation of damages is that while CCS succeeded in convincing three customers, for a brief period,  to order parts from Xerox to repair Xerox photocopiers,  that  CCS "failed to ask other customers to order parts." (Xerox, p. 24).

78.    Xerox has not produced any admissible evidence from any additional CCS customer stating that the customer would have been willing to order parts.

79.    Whenever Mr. Dixon had a relationship with a customer that would permit him to do so, he tried to set up this parts-ordering procedure.  Dixon declaration, Ex. 3, ¶67.

80.    Some CCS customers had a prohibition against ordering parts.  Dixon declaration, Ex. 3, ¶65.

81.     CCS' customers did not want or expect to be in the parts- ordering business. Dixon declaration, Ex. 3, ¶68.

82.     Further, particularly as a minority businessman, Mr. Dixon's asking customers to order (and prepay for parts) would risk being seen by the customer as CCS having inadequate capital to run its business.  Dixon declaration, Ex. 3, ¶69.

83.     Xerox' parts-ordering procedure was an elaborate procedure which required that, when the Xerox parts department received an order, the customer had to supply the serial number for each piece of equipment for which the part was ordered.  Ex. 14, 4 RD 9557.  The Xerox District Office then decided whether to make an on-site verification of the premises, to verify that the machine in question needed the part in question.  *Id*.  There was, at a minimum, a "48 hour turnaround" built into the procedure.  *Id*. at 4 RD 9558.

84.     CCS' customers required a 4 hour response time, and an "uptime" for the machines of greater than 90%.  Ex. 3, ¶¶13-15.

85.     Even if CCS had convinced customers to order parts, those customers would be subject to Xerox' parts-ordering verification procedures, and parts orders would have been delayed. Dixon declaration, Ex. 3, ¶67.  *ISO Antitrust Litigation*, *supra*, 964 F.Supp. at 1457 ("Xerox implemented an on site end user verification procedure when certain ISO's *or their customers* ordered parts from Xerox").

86.     Mr. Barnes, of Cigna (one of the three customers CCS convinced to order parts for a period of time) testified that Xerox' parts-ordering procedures caused unacceptable delays in ordering parts.  See testimony cited in ¶73 above.

87.    Mr. Payne of Fairfield University, another customer CCS convinced to order parts for a period, found the procedure unreasonable and unacceptable.  See testimony cited in paragraph 71 above.

88.    Each of the three customers that CCS convinced to order parts had to stop because of the inconvenience.  Dixon declaration, Ex. 3, ¶67.


III.    **Plaintiff's Local Rule 56(a).2 Statement of Disputed Facts As To Xerox Motion For Partial Summary Judgment On Existence of Market Power (Relating to Point II, pp. 16-24 of Xerox' Memorandum).**

89.    The Xerox 1075 has about 2,600 parts, and the Xerox 1090 machine about 2,000 parts, almost all of which are the same as the 1075's parts. Ex. 3, ¶19.  These parts are unique to Xerox machines, and not interchangeable with other manufacturers' machines.  Kodak parts and other manufacturers' parts will not work in the Xerox 10 series machines. *Id*., ¶20.

90.    The vast majority of those parts could be obtained only from Xerox.  Ex. 3, ¶20.

91.    The MDL Court found that Xerox "does not contest that it has monopoly power in the relevant parts and service markets." *In re Independent Service Organization Antitrust Litigation,* 964 F.Supp. 1479, 1487 (D. Kan. 1997).

92.    Xerox' internal documents refer to separate markets.  See, e.g. Ex. 36, which states that Xerox' goal is  "to capture 100% of the **Service Market on Xerox Equipment**."  Ex. 36, X02 20280 (emphasis supplied).

93.    CCS furnished to Xerox in October, 1996, the expert report of Dr. Mackie-Mason. A copy of that Report is Ex. 38 to plaintiff's appendix.  Xerox subsequently took his deposition.

94.    In that report, Dr. Mackie-Mason states his opinions, *inter alia*, to the existence of separate relevant Xerox parts and service markets, and Xerox' monopoly power and control in those markets.

95.    The report sets forth opinions that Dr. Mackie-Mason is prepared to present at trial in this action.

96.    Xerox has not challenged in its summary judgment motion any of Dr. Mackie-Mason's opinions, or the bases therefor.

97.    Dr. Mackie-Mason's qualifications were accepted by the Federal District Court to give expert testimony on relevant markets and monopoly power in those markets in the civil action, *Kodak v. Image Technical Service*, which action concerned efforts by Kodak to mis-use its market power against independent service organizations (ISO's) in the high volume photocopier market.  The judgment was upheld on appeal.  *Image Technical Service v. Eastman Kodak Co.*, 125 F.3d 1195, 1201-13 (9th Cir. 1997), *cert. den.*, 523 U.S. 1094 (1998).

Respectfully submitted,


Dated: September 16, 2004        _____
                                Robert LaRocca CT 22901
                                Kohn, Swift & Graf, P.C.
                                One South Broad Street
                                Suite 2100
                                Philadelphia, PA 19107
                                (215) 238-1700
                                (215) 238-1968 (fax)

                                Elias A. Alexiades CT03543
                                P.O. Box 3859
                                Amity Station
                                New Haven, CT 06525