**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CREATIVE COPIER SERVICES, | : | |
|     Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
|     v. | : | 3:01cv155 (SRU) |
| | : | |
| XEROX CORPORATION, | : | |
|     Defendant. | : | |
| | : | |

## RULING ON MOTION TO DISMISS

Creative Copier Services ("CCS") sued Xerox Corporation ("Xerox") for illegal

monopolization, violation of various state laws, and violation of the Lanham Act. Xerox moves

to dismiss all claims. Though some of CCS's allegations do not state a claim for relief, most do.

Accordingly, Xerox's motion is denied in part and granted in part.

**I.      Statement of Facts**

In its Third Amended Complaint, CCS alleges the following facts, which are assumed to

be true for purposes of this motion.

CCS and Xerox compete in the market for service of Xerox high volume copiers. CCS

defines the term "high volume copiers" to mean "durable photocopying machines with measured

throughput greater than 50 copies per minute, rated maximum monthly copy volume in excess of

150,000 copies, and exceeding 1,000 pounds."

Anyone wishing to service Xerox high volume copiers needs access to replacement parts.

Those parts are, by and large, unique; parts for other brands of copiers will not work in Xerox

machines. Xerox controls over 90% of the market for Xerox replacement parts.

Before CCS entered the business of servicing Xerox copiers, it obtained a representation

from Xerox that Xerox would supply CCS with replacement parts. CCS relied on this

representation when entering into service contracts with customers.

Despite its representation, Xerox took the following actions, which, according to CCS, were intended reduce competition in the market for service of Xerox high volume copiers.

From 1989 through 1994, Xerox made it extremely difficult for Independent Service Organizations ("ISOs"), including CCS, to get replacement parts. It did this by instituting a policy of only selling parts to "end-users" of its copiers. Under this policy, a user of a Xerox copier could only place an order for a part if the part was actually needed in that user's machine. This policy prevented ISOs from keeping an inventory of parts, and so prevented them from promptly responding to service requests. Even when Xerox did fill a parts orders, the delay occasioned by the verification process prevented quick response to clients' service requests.

In 1994, Xerox ended this "end-user verification" policy as part of a global class action settlement. Nevertheless, Xerox continued to take a number of actions that decreased CCS's ability to compete in the market for service of Xerox high speed copiers.

First, it charged CCS more than 10 times the amount it charged its own subsidiary service companies for parts.

Second, it refused to allow CCS to exercise "buy out" provisions of leases on behalf of lessees of Xerox copiers. Moreover, Xerox increased the "buy out" price to an amount well above the actual residual value of the copiers, if Xerox believed that CCS would service those copiers once purchased.

Third, Xerox priced some of its service contracts below cost.

Fourth, Xerox began to charge licensing fees for CCS's use of diagnostic software contained in Xerox copiers, though Xerox's own service providers pay no such fee when they

service copiers.

Fifth, Xerox changed the names of various replacement parts to enable it to raise prices without ostensibly violating the terms of its previous settlement agreement.

Sixth, Xerox designated various replacement parts as "supply items," and refused to sell them to anyone but end-users, effectively reviving its "end-user verification" policy.

Seventh, Xerox disparaged CCS by telling one of CCS's clients that CCS's technicians were untrained.

Not only did Xerox make it more difficult for CCS to compete in the market for service of Xerox copiers, but CCS also alleges that Xerox interfered with CCS's ability to sell refurbished Xerox copiers.  Specifically, CCS alleges that Xerox sold several supposedly "new" machines, which were actually re-labeled older models.  CCS had also wanted to bid for these sales, but could not because it could only offer to sell refurbished machines.  Xerox obtained these sales despite the fact that in reality Xerox was also selling refurbished machines.

## II.    Antitrust Claim

The heart of CCS's complaint is its antitrust claim.  CCS alleges that Xerox "leveraged" its monopoly in the parts market to gain a monopoly in the service market, violating section 2 of the Sherman Act.

Xerox moves to dismiss CCS's claim on two grounds: (1) failure to allege a relevant market, and (2) failure to allege anticompetitive conduct.

### A.    Relevant Market

CCS defines the relevant market as the market for service of Xerox high volume copiers,

namely, "durable photocopying machines with measured throughput greater than 50 copies per minute, rated maximum monthly copy volume in excess of 150,000 copies, and exceeding 1,000 pounds." Xerox argues that this allegation is insufficient because it gives no indication why this is the relevant market.

The general rule is that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 86 (2d Cir. 2000) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962)). To survive a motion to dismiss, a plaintiff must allege a "plausible" market. *Id.*

Because market definition is a deeply fact-intensive inquiry, courts are hesitant to grant motions to dismiss for failure to plead the relevant product market. *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001). Nevertheless, if there is no plausible explanation for the alleged market, dismissal is appropriate. *See, e.g.*, *Subsolutions, Inc. v. Doctor's Associates, Inc.*, 62 F. Supp. 2d 616, 625 (D. Conn. 1999) ("The plaintiffs' amended complaint contains no allegations regarding substitute products, does not differentiate the Subway franchise from comparable franchise opportunities, and does not include any facts regarding cross-elasticity of demand."). I do not, however, think a plaintiff must put the reasons for his market definition in the complaint itself.

> It has been very persuasively argued that an antitrust plaintiff whose complaint is challenged must articulate "a careful statement of his legal theory." Phillip Areeda & Donald F. Turner, Antitrust Law, ¶ 317e (1978). It is not clear however, in the Second Circuit, that the theory--as distinguished from the facts supporting it--must be set forth in the complaint itself, *see George C. Frey*, 554 F.2d at 554, but it is nevertheless not too much to ask that the theory--or "[a]lternative or multiple legal theories," Areeda & Turner,

¶ 317e--at least be fully argued in response to a dispositive motion.

*International Audiotext Network, Inc. v. American Tel. & Tel. Co.*, 893 F. Supp.1207, 1213

(S.D.N.Y. 1994).  Of course, any facts necessary to support the argument for plausibility should

be in the complaint.

With this pleading standard in mind, the question is whether CCS can provide a rational

explanation for its proposed market definition, i.e., an explanation based on cross-elasticity of

demand and product interchangeability.  *Todd*, 275 F.3d at 200.

Xerox argues that interchangeability analysis must focus on both demand

interchangeability and supply interchangeability.  This makes sense.  Products are typically

considered in the same market if the price of one product is controlled by its interchangeability

with another product.  The simplest example is "demand interchangeability."  If consumers will

easily switch from Widget A to Widget B, then the price of each will affect the other.  If the

maker of Widget A raises prices, consumers will switch to Widget B, and, absent collusion,

Widget A's manufacturer will be forced to lower prices.  Thus, for antitrust purposes, Widget A

and Widget B would be considered in the same market because of this "demand

interchangeability."

It is also possible for two products to affect each other's prices, even if consumers would

not substitute one for the other, so long as suppliers of one product can easily supply the other

product.  If consumers will not switch between Widget A and Widget B, but manufacturers of

Widget B can easily make Widget A, Widget A's prices should remain competitive.  If Widget

A's manufacturer raises prices, then Widget B's manufacturer will simply start making Widget

A, forcing Widget A's initial manufacturer to lower prices to compete.  Thus, even though

consumers are not willing to substitute the two products, the fact that suppliers can shift

production – "supply interchangeability" – means for antitrust purposes the products should be

considered in the same market. *See Intellective, Inc. v. Massachusetts Mutual Life Insurance*

*Co.*, 190 F. Supp. 2d 600, 612 (S.D.N.Y. 2002) ("'Supply substitution' exists if suppliers of other

products or services could easily modify their activities to provide the product or service at issue

– i.e., if the customer has a choice of suppliers").

      Xerox argues that CCS's proposed market does not meet the "demand interchangeability"

test because CCS cannot explain why the market should be only that for service of *Xerox* high

volume copiers, and not *all* high volume copiers. The second definition is more appropriate,

argues Xerox, because, should Xerox – or any other provider of service for Xerox copiers – raise

service prices, consumers will stop buying Xerox copiers and turn to a competitor's machines.

      CCS responds – relying heavily on the Supreme Court's decision in *Eastman Kodak Co.*

*v. Image Tech. Svcs. Inc.*, 504 U.S. 451 (1992) – that it is possible for an "aftermarket" for

service of a particular brand to constitute a distinct market, if there are costs that prevent

competition in the primary market from regulating price in the aftermarket. These costs may be

information costs, i.e., consumer inability to calculate future service costs when making their

initial purchasing decision. Or, more likely, the costs may be costs of switching brands, e.g.,

selling the old machines, retraining employees on new machines, etc. In other words, consumers

may be effectively "locked-in" to a particular brand of copier. Under either scenario, it would be

possible for Xerox to raise prices in the aftermarket without causing demand drop off in the

primary market, or at least, without causing sufficient demand drop off to make the price increase

unprofitable.

Admittedly, CCS will bear a heavy burden in proving the distinctness of the aftermarket. Nevertheless, such proof is theoretically possible, and therefore, at the motion to dismiss stage, when all inferences must be drawn in CCS's favor, it cannot be said that CCS has not alleged a rational market from the perspective of demand interchangeability.

Xerox argues that, even if CCS's market is rational from a demand perspective, it is not from a supply perspective. According to Xerox, CCS has not explained why providers of service for other brands of high volume copiers or for lower volume Xerox copiers could not switch to providing service to Xerox high volume copiers. If they could, then if Xerox raises prices in the market for service of Xerox high volume copiers, these service providers would start offering the same service at a lower price, indicating that those providers should be included in the relevant market definition.

CCS has alleged sufficient facts to support the inference that supply interchangeability is not possible. First, CCS has alleged in detail a number of the costs associated with providing service to Xerox copiers. Drawing all inferences in CCS's favor, it is possible that these costs are high enough to prevent easy switching of suppliers. For example, given the extensive training CCS employees had to undergo to service Xerox high volume copiers, it is a plausible inference that providers who service low volume copiers – even Xerox copiers – could not cheaply switch to providing high volume copier repair service. Second, the complaint is filled with allegations concerning numerous ways in which Xerox made it difficult – i.e., costly – to compete with it in the market for service of its copiers, including raising the cost of parts, refusing to sell parts, and charging high licensing fees. Accepting these allegations as true – as must be done for this motion – it is certainly possible to infer that providers of service to other

brand copiers would be extremely hesitant to switch to supplying service to Xerox copiers.

Accordingly, though CCS's allegations are bare, and though its burden of proof at summary judgment or trial will be heavy, it has alleged a rationally supportable market, sufficient to withstand a motion to dismiss.[1]

B.    Anticompetitive Conduct

To be liable under section 2 of the Sherman Act, the firm monopolizing or attempting to monopolize the relevant market must do so through anticompetitive conduct, as opposed to through "a superior product, business acumen, or historic accident."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

There is no simple rule for determining when behavior is anticompetitive and when it is efficient and pro-competitive.  The question to be answered is the fact-specific question whether the challenged conduct is "exclusionary" or "predatory."  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985).

Here, CCS principally complains of Xerox's "refusal to deal."  Refusing to deal with a competitor rarely constitutes anticompetitive behavior.  Under the antitrust laws, a business "generally has a right to deal, or refuse to deal, with whomever it likes as long as it does so independently."  *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761 (1984).

---

[1] Xerox also argues that, even if there is an aftermarket for Xerox high volume copiers, that does not explain the various restrictions put on CCS's definition, such as the requirement that the copiers' weight exceed 1,000 pounds.  I agree that the more narrowly tailored a market specification is, the more difficult it will be to justify, but, I am unclear whether all the elements in CCS's definition are restrictive, or if some are merely descriptive.  For example, I am not clear whether CCS means to define the market as high volume copiers *that* weigh more than 1,000 pounds, or, if it merely means, high volume copiers, *which* weigh more than 1,000 pounds.  Because this is a motion to dismiss, I assume CCS intends the less restrictive form.

Nevertheless, the Supreme Court explained in the seminal *Aspen Skiing* decision that this right is not unqualified. *Aspen Skiing*, 472 U.S. at 601. If a monopolist acts without business justification in a way that either does not further competition on the merits or does so in an unnecessarily restrictive way, then his conduct, even if it is merely a refusal to deal, can be an antitrust violation. *Id.* at 605.

In *Aspen Skiing*, the Court concluded that when one ski resort refused to sell tickets to a competitor at retail price, it was reasonable for a jury to conclude that the resort was more interested in reducing competition over the long run than in conducting a business that was efficient and profitable in a competitive market. *Id.* at 608-09. In particular, the Court held the jury was permitted to find anticompetitive behavior when there was no rational explanation – other than anticompetitive intent – for the resort's abandonment of the short-term profit from increased ticket sales. *Id.*

More recently, the Supreme Court in the *Trinko* case emphasized that *Aspen Skiing* represents an exception to the normal rule that even a monopolist may deal or not deal with whomever it likes. *Verizon Communications Inc. v. Trinko*, 124 S.Ct. 872 (2004). In *Trinko*, the Court upheld the dismissal of an antitrust claim against a telephone company, holding that a business did not violate the antitrust laws by refusing to engage in dealings that, save for the existence of government regulations, it would never have any reason to conduct. *Trinko*, 124 S.Ct. at 880. There, regulations required Verizon to provide unbundled telecommunications services to its rivals. It was clear, however, that absent those regulations Verizon would never have offered unbundled services because unbundling required "considerable expense and effort." *Id.* Accordingly, the Court found the situation quite different from *Aspen Skiing* because, in

contrast to the ski resort's refusal to sell tickets, Verizon's refusal to unbundle – though possibly

a violation of telecommunication regulations – made perfect business sense.

Xerox argues that *Trinko* established a new rule in refusal to deal cases, namely, that a

complaint is deficient unless the plaintiff has specifically alleged that the defendant could not

possibly make a short-term profit from the challenged conduct. The *Trinko* court held that a

motion to dismiss was appropriate when it was abundantly clear that unbundling – the *alternative*

to the alleged anticompetitive conduct – was manifestly inefficient. It distinguished that situation

from *Aspen Skiing* where a jury was permitted to infer anticompetitive conduct from a lack of

short-term profits. But nowhere in *Trinko* did the Court indicate that a complaint should be

dismissed if it fails to recite the magic words "no short-term profit."

Accordingly, though *Trinko* did highlight that anticompetitive "refusal to deal" is the

exception, and not the rule, I do not think *Trinko* heightened the pleading standard in section 2

cases.[2] The plaintiff must, as always, allege facts that if proven would allow a jury to find that

the defendant's actions were anticompetitive, and not the result of a superior product, superior

skill, or luck.

Most of CCS's allegations are sufficient to state a claim of anticompetitive conduct. It

alleges that (1) Xerox agreed to deal with CCS, (2) actually did deal with it for some time, (3)

then stopped dealing with CCS or made it difficult for CCS to deal with Xerox, (4) and that this

cessation served no business purpose. In short, CCS alleges that, despite a history of making

parts readily available to ISOs, Xerox decided, for no apparent reason, to:

---

[2] Of course the existence of a bona fide short-term profit motivation may be strong, or
even conclusive, evidence that the challenged conduct is not anticompetitive, but that is a
question for summary judgment or trial, not a motion to dismiss.

- Delay shipping
- Make parts unavailable
- Raise prices on other parts,[3] and
- Refuse to sell copiers to lessees who wished to use CCS as their service provider.[4]

Xerox raises two arguments against these allegations of anticompetitive conduct. First, Xerox in fact had an entirely legitimate reason for engaging in the challenged conduct. For example, Xerox claims that it simply made more business sense for it to sell service to end-users, than to sell service to end-users and parts to ISOs. Second, the antitrust laws cannot tell a company how to run its business. For example, Xerox argues that "There is no right to Federal Express written into the Sherman Act."

The answer to Xerox's first argument – the presence of a business justification – is that such an argument is not appropriately raised at this stage. CCS has challenged certain conduct, it alleges that the challenged conduct affected competition, and it alleges that there was no legitimate purpose for undertaking that conduct. It is not required to allege the negative of every possible justification Xerox may offer for its conduct.

The answer to Xerox's second argument is that it proves too much. Xerox is, in general, entitled to ship its parts however it chooses, charge whatever price it likes for its products, and license any of its intellectual property under what terms it sees fit. It may not, however, do so if

---

[3] To the extent that CCS is alleging that because some of Xerox's price increases violated the terms of its prior settlement agreement they are necessarily anticompetitive, the argument is without merit. Xerox's prior settlements did not alter the antitrust laws.

[4] Xerox argues that this allegation does not allege an antitrust injury, but simply an injury to CCS, i.e., harm to a competitor not competition. I am not persuaded. One could infer from CCS's allegations that Xerox was effectively prohibiting customers from buying machines if the customers indicated a desire to use an ISO for service. Ultimately CCS may not be able to prove such general activity, but that does not matter at this stage.

the sole reason for and effect of so doing is to stifle or unnecessarily impair competition. Yet

that is exactly what CCS alleges Xerox has done. That CCS may ultimately fail to prove its

allegations (or Xerox may prove otherwise) is not grounds for dismissing the complaint.

     C.    <u>Specific Instances of Anticompetitive Conduct</u>

     Xerox has stronger arguments regarding several specific instances of challenged conduct.

     First, CCS alleges that Xerox acted anticompetitively in selling supposedly new machines

that were actually refurbished. CCS gives no indication, in its complaint or in its papers, how

that injured CCS's ability to compete in the market for *service* of high volume Xerox copiers.

All CCS contends is that, had it made the sales instead of Xerox, it would then have serviced the

machines. That may be, but it does not explain why CCS could not have also serviced the

machines sold by Xerox. Even drawing all inferences in favor of CCS, it is impossible to see

how this conduct could have had any effect on the service market.

     Second, CCS alleges that Xerox priced one of its service contracts – a contract with

Aetna – below cost. Courts are skeptical of allegations of "predatory pricing," and to establish

such a claim a plaintiff must prove that (1) the prices are below an appropriate measure of the

rival's costs, and (2) the rival has a dangerous probability of recouping its below-price losses.

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993). CCS has

alleged nothing in support of the second element, other than the vague – and insufficient –

allegations that Xerox hoped to have a monopoly in the service market.

     Third, unlike its allegations with respect to Xerox's parts policies, CCS's allegations

regarding Xerox's charging for diagnostic software do not pass muster under either *Aspen Skiing*

or *Trinko*. CCS alleges that it was anticompetitive for Xerox to charge *any* price for its

copyrighted diagnostic software.  I cannot see how that conduct is anticompetitive.  There is no

dispute that it is more profitable for Xerox to charge some price for its software, than it is for

Xerox to charge nothing.[5]  CCS's only explanation for why this conduct is anticompetitive is

that, at one time, Xerox offered the software for free.  But it cannot be that any time an owner of

intellectual property offers a free license of that property, the antitrust laws preclude the owner

from ever charging for a license in the future.  Accordingly, in the absence of any explanation

why this conduct was anticompetitive, it fails to state a claim for relief.

## III.    Defamation

CCS alleges that Xerox employees defamed CCS.  CCS's allegations are bare, but they

are sufficient to give Xerox notice of the alleged conduct, all that Rule 8 of the Federal Rules

requires.

## IV.    Lanham Act Section 43(a)

CCS claims that Xerox's selling of refurbished machines labeled as new violated the

Lanham Act and harmed CCS by depriving it of sales it would otherwise have made.

Xerox argues that CCS fails to state a claim with respect to Xerox's alleged sales to the

State of Connecticut because CCS acknowledges in its complaint that the State had instituted a

policy of only buying new machines.  Thus, even if Xerox gained the sale by false means, the

sale would not have otherwise gone to CCS, who had no new machines to sell.  CCS's only

counter is that perhaps the State would have changed its policy.  That is nothing but speculation

---

[5] This is in contrast to CCS's other allegations where it is, in part, alleging that Xerox charged too high a price – not that Xerox charged *some* price.  It is certainly possible to lose profit by charging too high a price, but it is difficult to see how it could be less profitable to charge *some* price than to charge *no* price.  Even if such a situation exists, CCS has not alleged facts that support the inference that this is such a situation.

and is alleged nowhere in the complaint. Accordingly, these allegations do not state a claim for relief under the Lanham Act.

By contrast, the other sale that Xerox allegedly procured by representing a refurbished machine as new was to Aetna, which had no policy of only buying new machines. Xerox argues that this claim should be dismissed because CCS only alleges that it inspected *a* model 5388 copier and not *the* model 5388 copier sold to Aetna. Therefore, concludes Xerox, the complaint does not allege that Xerox actually sold a mislabeled copier. If CCS proves that some 5388 copiers were actually refurbished older copiers, it would be possible for reasonable jurors to infer that the actual copier sold to Aetna was also refurbished. This claim cannot, therefore, be dismissed.

## V.    Other Claims

Xerox argues that CCS fails to state a claim for tortious interference or a CUTPA violation because, insofar as the challenged conduct does not constitute an antitrust violation, it cannot serve as the basis for either of these state law claims.

With respect to most of the alleged conduct, this argument – even assuming its premise is correct – fails, because, as just explained, the alleged conduct does state a claim under the antitrust laws. With respect to the allegations that I have concluded are insufficient to state antitrust claims, this general argument is also largely inapplicable. First, with respect to the mislabeling claim, I held that claim insufficient under antitrust law because it does not relate to the market for service. That does not mean the conduct is not anticompetitive or tortious in any other respect, e.g., with respect to a different market. Second, I held the predatory pricing claim insufficient because it fails to state sufficient facts to overcome the general presumption against

-14-

that type of antitrust claim.  Xerox has cited no authority holding that a similar pleading standard applies to the relevant state law causes of action.

With respect to the allegations concerning charging for diagnostic software, I agree with Xerox that this does not state a cause of action for either tortious interference or a violation of CUTPA.  Simply put, bare statements that a copyright holder charged a greater-than-zero price for a license after not charging for some period of time do not allege tortious conduct or unfair competition.

**VI.    Conclusion**

Xerox's motion to dismiss (doc. # 74) is GRANTED in part and DENIED in part.  Count I is dismissed to the extent it alleges (1) mislabeling of refurbished machines, (2) predatory pricing, and (3) improper licensing of diagnostic software.  Counts II and IV are dismissed to the extent they allege improper licensing of diagnostic software.  Count V is dismissed to the extent it alleges that Xerox's dealings with the State of Connecticut violated the Lanham Act.


It is so ordered.

Dated at Bridgeport, Connecticut, this 15th day of November 2004.


　　　　　　　　　　　 __/s/ Stefan R. Underhill____
　　　　　　　　　　　　　　Stefan R. Underhill
　　　　　　　　　　　　　　United States District Judge