**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CREATIVE COPIER SERVICES, | ) |
| | ) |
| Plaintiff, | )    Civil Action |
| | ) |
| v. | )    No. 01-CV-155 |
| | ) |
| XEROX CORPORATION, | ) |
| | ) |
| Defendant. | )    January 18, 2005 |
| | ) |

**XEROX CORPORATION'S REPLY MEMORANDUM
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFF'S ANTITRUST CLAIMS, AND RESPONSE TO
PLAINTIFF'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

## **Table of Contents**

Page

INTRODUCTION AND SUMMARY ............................................................................1

ARGUMENT ....................................................................................................................3

I.    CCS'S OPPOSITION AND CROSS-MOTION FAILS TO REBUT XEROX'S
SHOWING THAT ITS ANTITRUST CLAIMS ARE BARRED BY THE FOUR-
YEAR ANTITRUST STATUTE OF LIMITATIONS. .........................................3

    A.    CCS Misrepresents The Decisions Of The Court In Kansas Concerning
Xerox's Parts Policies................................................................................4

    B.    CCS's Refusal To Deal Claim Accrued When Xerox's Refusal To Deal
Was Final And Unequivocal. ......................................................................6

        1.    CCS's Citations To "Ascertainable Injury" And "Continuing
Violation" Cases Are Inapposite In This Unilateral Refusal To
Deal Case.......................................................................................7

            a.    Xerox's Refusal To Deal Prior To 1988 Caused An
"Ascertainable" Injury To CCS..........................................8

            b.    "Continuing Violation" Cases Are Inapplicable To Xerox's
Unilateral Refusal To Deal With CCS. .............................11

            c.    Xerox's Post-1988 Conduct Is Irrelevant To Its Refusal To
Deal With CCS. .................................................................14

        2.    By Its Own Admission, CCS Had An Ascertainable Injury Prior
To March 1988. ............................................................................15

II.    CCS'S SINGLE-BRAND AFTERMARKET CLAIM FAILS BECAUSE CCS
HAS PRESENTED NO EVIDENCE THAT XEROX HAS CHANGED ITS
POLICIES TO "LOCK-IN" CONSUMERS WITHIN THE RELEVANT
LIMITATIONS PERIOD. ...................................................................................17

    A.    Xerox Has Not Conceded The Propriety Of An Aftermarket. ..................17

    B.    CCS Has Not Established A Genuine Issue Of Material Fact...................19

        1.    CCS Cannot Rely On Its Economist's Declaration To Avoid
Summary Judgment. ......................................................................19

        2.    Only A Policy Change Within The Limitations Period Is Relevant
To Establishing An Aftermarket. ..................................................21

**Table of Contents** (cont'd)

Page

3.    The Facts Show No Exploitation Of Customers By A Policy
Change Within The Limitations Period..........................................22

4.    There Is No Evidence That Customers Were Actually Locked-In. 23

5.    The *Kodak* Decisions Do Not Require A Different Result . .........24

III.    CCS HAS FAILED TO SHOW AN ATTEMPT TO MITIGATE ITS
DAMAGES. ........................................................................................25

CONCLUSION ............................................................................................30

## **Table of Authorities**

**Cases:**                                                                              Page(s)

*AD/SAT v. Associated Press*, 920 F. Supp. 1287 (S.D.N.Y. 1996), *aff'd*,
    181 F.3d 216 (2d Cir. 1999) ...................................................................................18, 19

*Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271 (5th Cir. 1991) ...........................13

*Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772 (5th Cir. 1999) .....................18, 21

*Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38 (2d Cir. 1986).....................................29

*Barnosky Oils Co., Inc. v. Union Oil Co. of California*, 665 F.2d 74
    (6th Cir. 1981) ...........................................................................................................11

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977).............................21

*Burns v. Hartford Hosp.*, 472 A.2d 1257 (Conn. 1984) ...................................................8

*Commercial Data Servers, Inc. v. IBM Corp.*, 166 F. Supp. 2d 891
    (S.D.N.Y. 2001)..........................................................................................................19

*Commercial Data Servers, Inc. v. International Bus. Mach. Inc.*,
    262 F. Supp. 2d 50 (S.D.N.Y. 2003) .........................................................................23

*Commercial Data Servers, Inc. v. International Bus. Mach. Corp.*,
    2002 WL 1205740 (S.D.N.Y. Mar. 15, 2002)..........................................................20

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000) .......................6

*Curtis v. Campbell-Taggart, Inc.*, 687 F.2d 336 (10th Cir. 1982) .................................11

*DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462 (6th Cir. 1996) ..........................6, 14

*Daniel v. American Bd. of Emergency Med.*, 988 F. Supp. 112
    (W.D.N.Y. 1997) ..........................................................................................................6

*David Orgell, Inc. v. Geary's Stores, Inc.*, 640 F.2d 936 (9th Cir. 1981) ...................7, 11

*Digital Equip. Corp v. Uniq Digital Techs., Inc.*, 73 F.3d 756 (7th Cir. 1996) ........20, 21

*Eastman Kodak v. Image Technical Serv.*, 504 U.S. 451 (1992) ...............................22, 24

*Erie Conduit Corp. v. Mapa*, 102 F.R.D. 877 (E.D.N.Y. 1984)......................................29

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968)....................12, 25

**Table of Authorities (cont'd)**

Page(s)

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 110 F. Supp. 295 (D. Mass.1953) ................................................................................................................12

*Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964 (5th Cir. 1977) ................................10

*Heil v. Santoro*, 147 F.3d 103 (2d Cir. 1998)..............................................................................26

*Hennegan v. Pacifico Creative Serv.*, 787 F.2d 1299 (9th Cir. 1986)...........................................13

*Higgins v. New York Stock Exch.*, 942 F.2d 829 (2d Cir. 1991) .................................................9, 16

*Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*, 510 F.2d 1140 (2d Cir.), *cert. denied*, 421 U.S. 1011 (1975)..................................................29

*ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622 (E.D. Pa. 2003) ......................................................................................................21

*Imperial Point Colonnades Condominium, Inc. v. Mangurian*, 549 F.2d 1029 (5th Cir. 1977) .........................................................................................13

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188 (E.D.N.Y. 2003) .........................................................................................................6

*In re Independent Serv. Orgs. Antitrust Litig.*, 114 F. Supp. 2d 1070 (D. Kan. 2000)....................................................................................................................15, 26

*In re Independent Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322 (Fed. Cir. 2000) ....................26, 29

*In re Independent Serv. Orgs. Antitrust Litig.*, 85 F. Supp. 2d 1130 (D. Kan. 2000)....................................................................................................................5

*In re Independent Serv. Orgs. Antitrust Litig.*, 964 F. Supp. 1479 (D. Kan. 1997) ......................................................................................................17

*In re Independent Serv. Orgs. Antitrust Litig.*, 964 F. Supp. 1454 (D. Kan. 1997)....................................................................................................................4, 10

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (6th Cir. 1993) ......................................................................................................13

*Independent Ink, Inc. v. Trident, Inc.*, 210 F. Supp. 2d 1155 (C.D. Cal. 2002) ...........................18

*Kaw Valley Elec. Coop. Co. v. Kansas Elec. Power Coop., Inc.*,

**Table of Authorities** (cont'd)

Page(s)

872 F.2d 931 (10th Cir. 1989) ........................................................................6

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) .........................................11

*Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986) .............................27

*Litton Sys., Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785 (2d Cir. 1983) ..................................25

*Mack v. United States*, 814 F.2d 120 (2d Cir. 1987) ..................................26

*Malcolm v. Marathon Oil*, 642 F.2d 845 (5th Cir. 1985) ......................27, 28

*Martinez v. Western Ohio Health Care Corp.*, 872 F. Supp. 469
(S.D. Ohio 1994) ............................................................................12

*Mathias v. Daily News*, 152 F. Supp. 2d 465 (S.D.N.Y. 2001) ...................19

*Metzler v. Bear Auto Serv. Equip. Co.*, 19 F. Supp. 2d 1345 (S.D. Fla. 1998) ...............2, 22, 23

*Midwestern Mach. Co. v. Northwest Airlines, Inc.*,
392 F.3d 265 (8th Cir. Dec. 2004) ...............................................1, 11

*Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705 (11th Cir. 1984) .................7, 11

*Nobel Scientific Indus., Inc. v. Beckman Instruments, Inc.*,
670 F. Supp. 1313 (D. Md. 1986), *aff'd*, 831 F.2d 537 (4th Cir. 1987) ..................18

*PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir. 1997) ...................2, 20, 21

*Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234 (9th Cir. 1987) .........................12

*Pierce v. Ramsey Winch Co.*, 753 F.2d 416 (5th Cir. 1985) ........................28

*SMS Sys. Maint. Servs. v. Digital Equip. Corp.*, 188 F.3d 11 (1st Cir. 1999) ...............24

*Subsolutions, Inc. v. Doctor's Assocs., Inc.*, 62 F. Supp. 2d 616
(D. Conn. 1999) ............................................................................22

*United States v. Kubrick*, 444 U.S. 111 (1979) .............................................8

*Universal Avionics Sys. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947
(D. Ariz. 2001) ..............................................................................23

## **Table of Authorities (cont'd)**

Page(s)

*Urban v. Manhattan Cable Television, Inc.*, 1987 WL 14129 (S.D.N.Y. Oct. 13, 1989)...............................................................................................................6

*Vitale v. Marlborough Gallery*, 1994 WL 654494 (S.D.N.Y. July 5, 1994)...................................6

*Westman Comm'n Co. v. Hobart Corp.*, 541 F. Supp. 307 (D. Colo. 1982) ................................27

*Zenith Radio Corp v. Hazeltine Research Inc.*, 401 U.S. 321 (1971) ........................................8, 13

**Statutes:**

Fed. R. Civ. P. 26(a)(2) .................................................................................................15

Rule 26(a)(2)(B) .............................................................................................................15

Rule 37(c)(1)...................................................................................................................15

Fed. R. Evid. 702 ...........................................................................................................15

**Miscellaneous:**

American Bar Association Section of Antitrust Law, *Antitrust Law Developments (Fifth)* 893 (2002) ...............................................................................8

David A. J. Goldfine & Kenneth M. Vorrasi, *The Fall of the Kodak Aftermarket Doctrine: Dying a Slow Death in the Lower Courts*, 72 Antitrust L. J. 209, 220-24 (2004)......................................................................20

II Philip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320c3 (2002) ...................................7, 13

## INTRODUCTION AND SUMMARY

In its opening brief, Defendant Xerox Corporation ("Xerox") demonstrated that CCS's antitrust claims based on Xerox's unilateral refusal to sell parts to CCS failed on three separate grounds: (1) CCS's claim is barred by the statute of limitations because Xerox's refusal to deal with CCS was final and unequivocal in 1986 or 1987; (2) CCS has failed to adduce any evidence of a service aftermarket because Xerox did not change any policies that would have affected purchasers of Xerox high speed copiers during the limitations period; and (3) CCS failed to mitigate its damages by purchasing Xerox replacement parts through its customers, and thus is barred from relief in this Court.

### A.    STATUTE OF LIMITATIONS

CCS attempts to misdirect the Court from Xerox's conclusive showing that its unilateral refusal to sell CCS parts was final and unequivocal prior to March 23, 1988, in several ways:

- First, CCS misrepresents prior decisions by Judge O'Connor and Judge Vratil concerning Xerox's enforcement of its parts policies. Neither Judge O'Connor nor Judge Vratil ever ruled on the issue of when Xerox finally and unequivocally refused to sell parts to CCS. Moreover, CCS's representations of those decisions clash with the undisputed record, which shows that Xerox began to refuse to sell parts to CCS as early as 1985 or 1986 and never equivocated in its refusal to sell parts.

- Second, CCS mistakenly argues that Xerox's unilateral refusal to deal with CCS can be considered a "continuing violation" that extended into the limitations period. As noted in Xerox's opening brief, in a refusal to deal case, the established rule is that the limitations period begins to run when a refusal to deal is final and unequivocal. Moreover, as the Eighth Circuit very recently noted in *Midwestern Machinery Co. v. Northwest Airlines, Inc.*, 392 F.3d 265, 270 (8th Cir. 2004), "[c]ontinuing violations have not been found outside the RICO or Sherman Act conspiracy context because acts that simply reflect or implement a prior refusal to deal or acts that are merely unabated inertial consequences (of a single act) do not restart the statute of limitations." (internal quotations omitted).

- Third, CCS suggests that the limitations period cannot run on its antitrust claims until it has "ascertainable damages." Again, CCS fails to recognize that the only question relevant to limitations purposes in refusal to deal cases is when the refusal to deal is final and unequivocal. Even if the question were "when did CCS suffer ascertainable

harm," the testimony of CCS's own sole proprietor and CCS's binding admissions in its interrogatory responses establish that CCS suffered ascertainable harm no later than 1987.

## B.    MARKET DEFINITION

As with its response to Xerox's statute of limitations defense, CCS responds to Xerox's market definition argument by misrepresenting prior decisions in the District of Kansas and by proffering misleading quotations of internal Xerox documents. However, CCS ultimately fails to address the key question of law and fact for the purposes of establishing the viability of CCS's alleged aftermarket, i.e., did Xerox implement a change in its policy during the limitations period that affected customers who had already purchased Xerox equipment. The answer to that question, based on the undisputed record, is that Xerox did not implement any policy change since March 23, 1988. CCS's aftermarket definition thus fails as a matter of law.

CCS's only other responses to Xerox's aftermarket contentions are to cite to the testimony of its antitrust expert, Dr. MacKie-Mason, and to argue that the limitations period is somehow irrelevant to an aftermarket claim. However, Dr. MacKie-Mason's economic hypotheses concerning aftermarkets cannot overcome the antitrust law on this point; an aftermarket may only exist, as a matter of antitrust law, if Xerox changed its policies to disadvantage consumers within the relevant limitations period. *See, e.g., PSI Repair Servs., Inc. v. Honeywell, Inc.,* 104 F.3d 811, 820 (6th Cir. 1997); *Metzler v. Bear Auto Serv. Equip. Co.,* 19 F. Supp. 2d 1345, 1359 (S.D. Fla. 1998).

## C.    MITIGATION

In response to Xerox's demonstration that CCS failed to mitigate its damages by asking its customers to order parts on its behalf, CCS does not contest its duty to mitigate. Instead, CCS bleats, based on the speculative declaration of William Dixon (CCS's sole proprietor) that it

would have been "too difficult" to ask its customers to order parts on its behalf. However, that declaration directly contradicts Mr. Dixon's prior sworn testimony. Mr. Dixon admitted both that CCS had asked certain customers to order parts on CCS's behalf and that none of the customers he asked ever refused him that courtesy. Mr. Dixon further testified that he never even asked CCS's other customers to order parts – and thus cannot testify as to whether they would have ordered parts for CCS or not.

Furthermore, CCS's newfound belief that mitigation would have been futile is incompatible with its position in its motion for reconsideration that it could have survived had Xerox sold only unpatented parts because it could have convinced its customers to order the patented parts. CCS cannot have it both ways; it cannot argue that *but for* Xerox's refusal to sell it unpatented parts it was injured because its customers could have ordered patented parts and then deny that its customers could have ordered *any* parts on its behalf. As such, there is no genuine issue of material fact that CCS could have mitigated its damages by ordering parts through its customers, and that it refused to do so out of either obduracy or indolency. CCS's antitrust claims fail because it failed to mitigate its damages.

## ARGUMENT

**I.    CCS'S OPPOSITION AND CROSS-MOTION FAILS TO REBUT XEROX'S SHOWING THAT ITS ANTITRUST CLAIMS ARE BARRED BY THE FOUR-YEAR ANTITRUST STATUTE OF LIMITATIONS.**

Xerox established in its Motion for Summary Judgment that CCS's antitrust claims based on Xerox's refusal to sell parts to ISOs were time-barred because Xerox first refused to deal with CCS in 1986 or 1987 and that its subsequent refusals to deal did not serve to restart the limitations period. *See* Memorandum in Support of Xerox Corporation's Motion for Summary Judgment on CCS's Antitrust Claims ("Xerox S.J. Mem. ") at 5-7. CCS's response in its Cross-

Motion for Partial Summary Judgment, And Response To Xerox's Motion for Partial Summary Judgment ("CCS Resp.") is to misstate the facts and the law as well as to ply us with irrelevant, post-limitations examples of Xerox's alleged conduct.

### A.    CCS Misrepresents The Decisions Of The Court In Kansas Concerning Xerox's Parts Policies.

CCS begins its Opposition and Cross-Motion with a flat-out misrepresentation of the rulings of Judge O'Connor and Judge Vratil in the District of Kansas. CCS falsely contends that both Judge O'Connor and Judge Vratil "found" or "held" that Xerox did not enforce its parts policies until 1989. Not only is that a mischaracterization of the opinions that CCS cites, but it also belies the sworn testimony of CCS's sole proprietor, William Dixon, who testified that Xerox actually refused to sell CCS parts beginning no later than 1987.

In its opening page, CCS contends that "two separate federal judges in the MDL reviewing the evidentiary record have determined that Xerox did not enforce its parts policies until 1989." CCS Resp. at 1. That is an outright falsehood, repeated before this Court even though Xerox pointed out the misrepresentation to CCS in the prior briefing of this issue in the District of Kansas. Apparently hoping that this Court will not actually read the District of Kansas decisions, CCS ignores the fact that, immediately before the language cited by CCS, Judge O'Connor stated that "[t]he remaining facts presented in this section are uncontroverted by Xerox *for purposes of this motion only.*" *In re Independent Service Organization Antitrust Litigation*, 964 F. Supp. 1454, 1457 (D. Kan. 1997) (emphasis added). Xerox conceded the facts discussed in Judge O'Connor's opinion for purposes of its motion because they had no bearing on Xerox's core argument – that its refusal to sell patented parts was lawful. Judge O'Connor

did not find or hold that Xerox did not enforce its parts policy until 1989, and it is, frankly,

stunning for CCS to have suggested otherwise in its papers filed with this Court.

CCS similarly misrepresents the proceedings before Judge Vratil in intimating that Judge

Vratil determined that Xerox did not enforce its parts policies until 1989. In fact, Judge Vratil's

opinion states that:

> In 1984, Xerox decided that it would sell replacement parts for its "10 series"
> copiers to end users and authorized service resellers, but not to ISOs. In January
> 1987, Xerox extended this policy to its newer 9 series and 50 series copiers. CCS
> alleges that as a result of this policy, its ability to purchase restricted parts from
> Xerox became the exception rather than the norm.

*In re Indep. Serv. Orgs. Antitrust Litig.*, 85 F. Supp. 2d 1130, 1145 (D. Kan. 2000) (footnote and

internal citations omitted). Judge Vratil only mentioned the restriction on parts orders after 1988

in terms of the level of the policy's enforcement, rather than the refusal to deal, stating that "[i]n

1989, Xerox began to strictly enforce its restrictions on CCS parts orders." *Id.* at 1147. Thus

understood, there has been no ruling that Xerox "did not enforce its parts policies" before 1989,

and any statement by CCS to the contrary is false. Indeed, Judge Vratil specifically deferred

ruling on Xerox's statute of limitations defense in her Order dismissing CCS's antitrust claims.

*See id.* at 1158 n.18. Judge Vratil's actual ruling thus contradicts CCS's contention that she

"found" that Xerox did not enforce its parts policies until 1989.

Judge O'Connor and Judge Vratil could not have held that Xerox freely sold parts to CCS

before 1989 because there is, in fact, no evidence to support such a claim. William Dixon,

CCS's sole proprietor, testified without equivocation that:

> Q: In 1987, did Xerox ever refuse to sell parts to Creative?
> A: Yes.
>
> Q: What parts did you order that Xerox refused to sell?
> A: 10 Series parts.

> Q:  Did Xerox refuse outright or did it just delay delivering the parts?
> A:  They've refused.
>
> Q:  In 1987, did Xerox actually refuse?
> A:  Yes.

Def.'s Ex. 4, 3/11/96 Dixon Dep. Tr. at 348-52.  Furthermore, Mr. Dixon testified that he learned

of Xerox's policy of refusing to sell parts to ISOs in "1985 or 1986" when Xerox refused to ship

parts to CCS for "10 Series" copiers, specifically the Model 1075 and Model 1090.  *See* Local

Rule 56.1 Statement of Facts ("SOF") ¶ 5.  Given this sworn testimony – which is entirely

consistent with the documentary evidence submitted by Xerox showing actual refusals to sell

CCS parts in 1986, *see* SOF ¶¶ 8-9 – it is misleading and inappropriate for CCS to contend that

Xerox did not enforce its parts policies with respect to CCS before 1989.

### B.     CCS's Refusal To Deal Claim Accrued When Xerox's Refusal To Deal Was Final And Unequivocal.

When Section 2 antitrust claims such as CCS's are based on a unilateral refusal to deal,

the sole question for the purposes of ascertaining when the antitrust claim accrued is when the

refusal to deal was final and unequivocal.  *See In re Ciprofloxacin Hydrochloride Antitrust*

*Litig.*, 261 F. Supp. 2d 188, 228 (E.D.N.Y. 2003) (citing with approval *Vitale v. Marlborough*

*Gallery*, 1994 WL 654494, at *5 (S.D.N.Y. July 5, 1994) for the proposition that "the statute of

limitations began to run at the initial refusal to deal and does not restart when the plaintiff makes

subsequent unsuccessful efforts to deal with the defendant"); *Daniel v. American Bd. of*

*Emergency Med.*, 988 F. Supp. 112, 121 (W.D.N.Y. 1997); *Urban v. Manhattan Cable*

*Television, Inc.*, 1987 WL 14129, at *3 (S.D.N.Y. Oct. 13, 1987); *Concord Boat Corp. v.*

*Brunswick Corp.*, 207 F.3d 1039, 1052 (8th Cir. 2000) ("acts that 'simply reflect or implement a

prior refusal to deal or acts that are merely unabated inertial consequences (of a single act) do not

restart the statute of limitations.'"); *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467-68

(6th Cir. 1996); *Kaw Valley Elec. Coop. Co. v. Kansas Elec. Power Coop., Inc.*, 872 F.2d 931,

933-34 (10th Cir. 1989); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 715 (11th

Cir. 1984); *David Orgell, Inc. v. Geary's Stores, Inc.*, 640 F.2d 936, 938 (9th Cir. 1981). As the

leading treatise in antitrust law states:

> *An illegal unilateral refusal to deal*, following a termination of prior dealings or
> otherwise, *creates a cause of action when it occurs or when it becomes final*. . . . .
> Most courts see no continuing violation when the initial refusal to deal is
> "irrevocable, immutable, permanent and final." These courts emphasize that *the
> plaintiff's injury resulted from the initial refusal*.

II Philip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320c3 (2002) (emphasis added).

Despite the compelling authority addressing when a unilateral refusal to deal claim arises

for the purposes of the statute of limitations, CCS contends that its claim accrued only when

CCS's damages were "ascertainable" by CCS's expert witness and that its claims are not barred

because of the "continuing violation" doctrine. As anticipated in Xerox's opening brief, these

arguments are inapposite. *First*, the "ascertainable damages" and "continuing violation"

authorities cited by CCS are unrelated to antitrust claims based on unilateral refusals to deal.

*Second*, even if that were not the case, CCS's injury was ascertainable before March 1988.

      1.      **CCS's Citations To "Ascertainable Injury" And "Continuing
                    Violation" Cases Are Inapposite In This Unilateral Refusal To Deal
                    Case.**

CCS's arguments that its antitrust claim against Xerox did not accrue until it suffered

"ascertainable injury" and that Xerox's conduct amounts to a "continuing violation" of the

antitrust laws are based on authorities that have no bearing on its unilateral refusal to deal claim.

Moreover, CCS's very citations to those authorities are filled with critical omissions and

misleading excerpts.

a.    **Xerox's Refusal To Deal Prior To 1988 Caused An "Ascertainable" Injury To CCS.**

CCS cites to the American Bar Association's *Antitrust Law Developments* for the principle that "a cause of action does not accrue until damages are ascertainable." CCS Resp. at 4. However, CCS omits the very next sentence in the paragraph it cites, which states that "[m]ere uncertainty as to the extent or amount of the damages, however, does not make the damages speculative so as to delay the accrual of the cause of action." American Bar Association Section of Antitrust Law, *Antitrust Law Developments (Fifth)* 893 (2002).

The Supreme Court made clear in *Zenith Radio Corp v. Hazeltine Research Inc.*, 401 U.S. 321, 338 (1971), that an antitrust "cause of action accrues and the statute begins to run when a defendant commits an act that injures the plaintiff's business." It is *injury* that triggers the running of the statute of limitations, not damages. Indeed, it is a consistent theme across federal and state law that a cause of action accrues when a plaintiff knows that he has been injured, not when he knows the full extent of his damages. *See, e.g., United States v. Kubrick*, 444 U.S. 111, 121 (1979) (holding that the statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action under the Federal Torts Claims Act); *Burns v. Hartford Hosp.*, 472 A.2d 1257, 1261 (Conn. 1984) (holding that "harm need not have reached its fullest manifestation before the statute begins to run").

The only exception to this rule that the statute begins to run as soon as the plaintiff is injured is where the injury causes only speculative future damages. For example, in *Zenith* the Supreme Court held that limitations did not bar claims for damages suffered ten years after the anticompetitive conduct where the *Zenith* plaintiff *did not even compete* in the market at the time of the anticompetitive agreement. 401 U.S. at 341-42. Accordingly, the Second Circuit has

8

recognized that it is the "rare case" in which a court will toll the running of the statute of limitations in an antitrust case because damages are "too speculative." *Higgins v. New York Stock Exch.*, 942 F.2d 829, 832 (2d Cir. 1991) (noting that plaintiff "wisely does not press this meritless issue on appeal").

Unlike the plaintiff in *Zenith*, but similar to the plaintiff in *Higgins*, CCS competed in the relevant market at the time of Xerox's initial refusal to deal. As such, CCS falls within the rule of *Zenith* rather than the exception. CCS's future injury from Xerox's refusal to deal was not the speculative injury of a firm that did not compete in the relevant market. Indeed, the report of CCS's own liability expert establishes that CCS should have been on notice regarding its ability to claim damages as soon as Xerox refused to deal. Dr. Mackie-Mason testified that an ISO that does not have access to all parts all of the time as a result of Xerox's refusal to deal will eventually go out of business, even if not necessarily right away. *See* Pl.'s Ex. 38, MacKie-Mason Decl. at 21; 4/6/99 MacKie-Mason Dep. Tr. at 149 ("That doesn't mean that [ISOs] can't be in business for some period of time.") (Attachment A). Because CCS suffered ascertainable injury in 1986 or 1987, before the statute of limitations began to run, its claims relating to Xerox's refusal to sell parts are barred by limitations.

Xerox established in its Motion that CCS believes it was forced to refuse to bid to provide service in New York as a result of Xerox's conduct in 1986 or 1987 – before the limitations period began to run because of Xerox's parts restrictions. Xerox S.J. Mem. at 13-14. CCS claims that Xerox is "arguing out of both sides of its mouth" because Xerox argued in the CSU case that CSU could not claim damages because it lacked the requisite intent and preparedness to expand. CCS Resp. at 5. But the intent and preparedness test is irrelevant here, and even if it were not, Xerox *lost* its intent and preparedness argument in CSU. First, the test is

9

irrelevant because it applies only when a plaintiff claims it would have expanded to a new geographic market. *See, e.g., Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 986 (5th Cir. 1977) (distinguishing between "expansion into new areas and growth in established ones"); *In re ISO Antitrust Litig.*, 964 F. Supp. at 1465-66.  CCS claims a single nationwide geographic market (CCS Third Am. Complt., ¶ 67), and even if it did not there is no reason to think that New York City, an hour away from where CCS provides service, is in a separate geographic market.  Indeed, CCS "provided service in Philadelphia working out of Middletown." Def.'s Ex. 4, Dixon 3/11/96 Dep. Tr. at 345.

Regardless, even if Xerox did claim that CSU lacked "intent and preparedness," the Kansas court *rejected* that argument, holding that CSU had standing to seek damages as long as it could show that "it intended to and was prepared to expand its business in the domestic market, but was precluded from doing so because of Xerox's conduct." *In re ISO Antitrust Litig.*, 964 F. Supp. at 1466.  The Court therefore held that Xerox's arguments went to "proximate cause and the amount of CSU's damages, not the fact of injury." *Id.* at 1467.  Even though "the actual names of the cities" where CSU would have expanded "may be speculative, the fact of injury [was] reasonably certain." *Id.*  CCS's injury in New York is indistinguishable from that which the Kansas court held sufficient in CSU, and the fact that CCS was injured in 1986 or 1987 mandates entry of summary judgment on limitations grounds.

The fact that CCS had *additional* injury within the limitations period is irrelevant in a refusal to deal case.  As the Sixth Circuit has noted:

> "That [the antitrust plaintiff] may have suffered, and [the antitrust defendant] may have benefited, from the consequences of [defendant's pre-limitations] conduct during the limitations period does not render the act a continuing violation of the antitrust laws."

*Barnosky Oils Co. v. Union Oil Co. of California*, 665 F.2d 74, 82 (6th Cir. 1981). As courts have consistently held, the mere reiteration of a refusal to deal within a limitations period cannot restart the limitations period. *See Curtis v. Campbell-Taggart, Inc.*, 687 F.2d 336, 337 (10th Cir. 1982); *Midwestern Waffles*, 734 F.2d at 714-15; *David Orgell*, 640 F.2d at 938.

**b.    "Continuing Violation" Cases Are Inapplicable To Xerox's Unilateral Refusal To Deal With CCS.**

CCS's argument that Xerox's conduct constitutes a "continuing violation" is based upon precedents that are inapplicable in a unilateral refusal to deal case. CCS begins with a citation to the Supreme Court's decision in *Klehr v. A.O. Smith Corporation*, 521 U.S. 179 (1997). CCS Motion at 7. As quoted by CCS, the *Klehr* Court stated:

> Antitrust law provides that, in the case of a "continuing violation," say a price fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, "each overt act that is part of the violation and that injures the plaintiff," e.g., each sale to the plaintiff, "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.

*Id.* at 189-90 (citations omitted). *Klehr* is distinguishable from the facts of this case because it involved a price fixing *conspiracy*, not a unilateral refusal to deal. As the cases cited by Xerox and the Areeda treatise make clear, conspiracies are treated differently because each new sale at a fixed price is unlawful, while subsequent refusals to deal are nothing more than the "unabated consequences" of the initial refusal to deal. The Eighth Circuit recently noted in *Midwestern Mach. Co. v. Northwest Airlines, Inc.*, 392 F.3d 265, 270 (8th Cir. 2004), that "[c]ontinuing violations have not been found outside the RICO or Sherman Act conspiracy context because acts that simply reflect or implement a prior refusal to deal or acts that are merely unabated inertial consequences (of a single act) do not restart the statute of limitations." (internal quotations omitted). Xerox's reiteration of its refusal to sell CCS parts beyond those necessary

11

subsequent limited sales of parts to CCS were not a vehicle of the allegedly anticompetitive refusal to deal, they do not restart the limitations period as the new leases in *Hanover Shoe* did.

CCS's reliance on the other cases its cites is similarly misguided. Several of the cases cited by CCS involve ongoing antitrust conspiracies in violation of Section 1 of the Sherman Act, which render them distinguishable from this case. See CCS Resp. at 8-9. *Zenith Radio Corp.* is another Section 1 conspiracy case (one involving a "continuing conspiracy to violate the antitrust laws," 401 U.S. at 338), and thus inapplicable in the unilateral refusal to deal context for the reasons described above. Moreover, the *Zenith* antitrust defendants engaged in a new and different affirmative act -- illegally suing for infringement of the pooled patents -- within the limitations period. *Id.* at 323, 326. Similarly, *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144, 1172 (6th Cir. 1993), is distinguishable because there the "plaintiffs [met] their burden of showing that the [Section 1] conspiracy continued into the limitations period." Along the same lines, *Hennegan v. Pacifico Creative Serv.*, 787 F.2d 1299, 1300-01 (9th Cir. 1986), is a Section 1 conspiracy case in which the court found that the conspiracy committed several anticompetitive overt acts *within* the limitations period. The Fifth Circuit case cited by CCS, *Imperial Point Colonnades Condominium, Inc. v. Mangurian*, 549 F.2d 1029 (5th Cir. 1977) was also a Section 1 conspiracy case that drew upon the Supreme Court's *Zenith* opinion and is therefore inapplicable to the instant case.[1]

---

[1] The Fifth Circuit has recognized that in the context of *unilateral* actions, mere consequences within the limitations period do not restart the limitations period. *See Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1274-75 (5th Cir. 1991) (holding that the statute of limitations bars an antitrust challenge to a patent infringement action filed six years earlier as the statute of limitations had begun to run with the filing of the challenged patent lawsuit because the allegedly anticompetitive prosecution of the lawsuit within the limitations period was "merely the abatable but unabated inertial consequences of some pre-limitations action"). Professor Areeda has called the line of cases cited by CCS one of the "occasional" objections to the general rule. *See* II Areeda & Hovencamp, *Antitrust Law* at ¶338b.

to service CCS's own machines during the limitations period is immaterial; a reaffirmation of a refusal to deal cannot restart the limitations period. *See Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987); *Martinez v. Western Ohio Health Care Corp.*, 872 F. Supp. 469, 471 (S.D. Ohio 1994).

Another case upon which CCS relies, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), is similarly distinguishable. CCS relies on a footnote of that opinion to argue that "refusal to deal" cases involve continuing violations that restart the limitations period. CCS Resp. at 8. However, *Hanover Shoe* cannot be stretched to make such a point. In *Hanover Shoe*, the anticompetitive behavior was a lease-only policy in which the defendant continually negotiated and executed contracts containing what would be found to be an anticompetitive provision – that the plaintiff would lease its machinery. *See id.* at 483-84. As the district court in that case stated, the defendant "has used its *leases* to monopolize the shoe machinery market. And if leasing continues without an alternative sales system, [the defendant] will still be able to monopolize that market." *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 110 F. Supp. 295, 350 (D. Mass. 1953) (Emphasis added). Accordingly, in *Hanover Shoe*, the leases were the vehicles through which the defendant carried out its anticompetitive behavior. In contrast, CCS does not argue that Xerox's limited sales of parts to CCS after the implementation of the parts policy were anticompetitive *vehicles* by which Xerox carried out its parts policy. Instead, CCS admits those sales were the only respite from Xerox's otherwise "repressive" parts policy. *See* Def.'s Ex. 1, 3/4/96 Dixon Dep. Tr. at 120 ("[I]f we didn't own a particular piece of equipment, we couldn't buy parts for it."); Pl.'s Ex. 9, Dixon Declaration ¶42 ("We were allowed to order parts for all three [1075 copiers that CCS owned]"). Accordingly, because Xerox's

The remaining cases cited by CCS simply have no bearing on CCS's position. *DXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F.3d 462 (6th Cir. 1996), actually supports Xerox's position. In its explanation of the relevant law, the *DXS* Court stated:

> An overt act that restarts the statute of limitations is characterized by two elements: (1) it must 'be a new and independent act that is not merely a reaffirmation of a previous act'; and (2) it must 'inflict new and accumulating injury on the plaintiff.' Acts that simply reflect or implement a prior refusal to deal, or acts that are merely 'unabated inertial consequences' (of a single act), do not restart the limitations period'

*Id.* at 467-68. The holding of *DXS* is thus fully consistent with the prevailing law as demonstrated in Xerox's Memorandum in Support of its Motion for Summary Judgment. Moreover, in *DXS* the Sixth Circuit reversed a grant of summary judgment because "viewed in the light most favorable to *DXS*, the record reflects that Siemens did not immediately implement [its allegedly anticompetitive policies]." *Id.* at 468. The *DXS* Court concluded that because Siemens did not enforce its policies, its acts within the limitations period were "new and independent acts that inflicted new and accumulating injury." *Id.* *DXS* thus stands for the precise opposite of CCS's argument, i.e., if a policy is actually enforced before the limitations period, the statute of limitations bars antitrust claims based on the subsequent continued enforcement of that policy.

      c.      **Xerox's Post-1988 Conduct Is Irrelevant To Its Refusal To Deal With CCS.**

CCS spends several pages of its brief making a bullet point list of Xerox's "conduct" after March 23, 1988. CCS Resp. at 15-25. This laundry list, however, is notable for its complete absence of material facts. The only relevant question is whether Xerox refused to deal with CCS *before* March 23, 1988. As Xerox has established, its conduct *after* that date cannot restart the limitations period on a final, unequivocal, refusal to deal.

14

**2.     By Its Own Admission, CCS Had An Ascertainable Injury Prior To March 1988.**

Even if Xerox's final and unequivocal refusal to sell CCS parts in 1986 were not sufficient under the precedent above, and even if CCS's contention that it had not suffered "ascertainable damages" were applicable to a unilateral refusal to deal case, summary judgment on Xerox's statute of limitations defense would still be appropriate. There is no genuine dispute that CCS's sole proprietor, Bill Dixon, was fully aware of the injury and damages he was suffering as a result of Xerox's parts policies prior to March 23, 1988.

Instead, CCS bases its argument on an unsupported, untimely declaration from an accountant, Dr. Cunitz. *See* Pl.'s Ex. 1 (Cunitz Decl.) But Dr. Cunitz's inadmissible supplemental declaration cannot create a genuine issue of material fact sufficient to bar entry of summary judgment. Dr. Cunitz does not claim to have any personal knowledge of the facts, but offers only an opinion. Federal Rule of Civil Procedure 26(a)(2)(B) requires Dr. Cunitz to submit a report containing "a complete statement of all opinions to be expressed and the basis and reasons therefor," but Dr. Cunitz's declaration contains no such "basis" or "reasons" for his opinion. Dr. Cunitz's statement is therefore not admissible evidence because it is a bare opinion, unsupported by *any* facts or data, let alone the "sufficient facts or data" required by Fed. R. Evid. 702.

Moreover, Dr. Cunitz's opinion is inadmissible under Federal Rule of Civil Procedure 26(a)(2) because it was not timely filed. The deadline for submission of expert reports in this case was December 2, 1996. *See In re ISO Antitrust Litig.*, 114 F. Supp. 2d 1070, 1099-1100 (D. Kan. 2000). Indeed, Judge Vratil previously struck an expert declaration in this case that was filed by CCS in December 1999. *See id.* CCS's untimely, unsupported 1999 declaration thus cannot support the denial of summary judgment to Xerox.

Additionally, CCS cannot create a disputed issue of fact by attacking the testimony of its own sole proprietor concerning CCS's expansion to New York City. Mr. Dixon testified that CCS had the opportunity to expand its business to New York City in 1986 or 1987 but did not do so because of Xerox's unilateral refusal to deal with CCS. *See* SOF ¶ 14. CCS now asks the Court to disregard that testimony. However, CCS's aborted "expansion" into New York City was exactly the type of harm that CCS alleges to have been resulted from Xerox's parts policy and entitle it to damages. *See* Pl.'s Ex. 1 (Cunitz Report) at 5 (referring to damages from lost potential new customers). Xerox's previously rejected argument in the *CSU* case that CSU's evidence of lost customers was insufficient to meet a "preparedness" test is irrelevant; the only question for the purposes of *this case* is whether CCS knew (or believed) it was being damaged by Xerox's conduct before March 23, 1988. *See Higgins,* 942 F.2d at 832 (2d Cir. 1991) (antitrust cause of action accrues when defendant's act "injures a plaintiff's business"). Because Mr. Dixon's testimony establishes that CCS was aware it was being damaged by Xerox's parts policy in 1986 or 1987, CCS's claim is barred as a matter of law.[2]

Further, in addition to Mr. Dixon's own testimony, CCS has failed to respond to the fact that it made a *binding admission* that it had suffered harm from Xerox's parts policies prior to March 23, 1988. In its response to one of Xerox's interrogatories, CCS stated that "[p]rior to 1987, Xerox had already imposed limitations on the quantity of 10 series parts that would be supplied to CCS, and CCS was thereby experiencing difficulty in obtaining parts sufficient to service the copiers it had under contract." SOF ¶ 9. Indeed, soon after Xerox first refused to sell

---

[2] To the extent that Mr. Dixon's declaration contradicts his sworn testimony, such contradiction is insufficient to create a genuine issue of material fact and preclude the entry of summary judgment. *See, e.g., Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir. 2001).

16

CCS replacement parts in 1986, CCS started using its customers or other end users to order parts

for CCS. *See* Def.'s Ex. 1, 3/4/96 Dixon Dep. Tr. at 241; Def.'s Ex. 4, 3/11/96 Dixon Dep. Tr. at

456 ("Cigna started ordering parts in 1987"). CCS's reasons for doing so were clear; it needed to

order parts through its customers or it would lose business from those customers. Accordingly,

because CCS was aware that Xerox's parts policies were causing it injury before March 24,

1988, CCS's claims are barred by the statute of limitations.

**II.    CCS'S SINGLE-BRAND AFTERMARKET CLAIM FAILS BECAUSE CCS HAS
        PRESENTED NO EVIDENCE THAT XEROX HAS CHANGED ITS POLICIES
        TO "LOCK-IN" CONSUMERS WITHIN THE RELEVANT LIMITATIONS
        PERIOD.**

Xerox established in its Motion that the market CCS asserts Xerox has monopolized – an

aftermarket limited to the service of Xerox-brand high-speed photocopiers "with measured

throughput greater than 50 copies per minutes, rated maximum monthly copy volume in excess

of 150,000 copies, and exceeding 1,000 pounds" – is not a proper antitrust market based on the

facts present in this case. *See* Xerox S.J. Mem. at 16-24. CCS's response fails to undermine this

contention.

**A.    Xerox Has Not Conceded The Propriety Of An Aftermarket.**

CCS again begins with an attempt to claim that the Kansas court has already found the

existence of a service market based on Xerox's "concession" of that fact. *See* CCS Resp. at 27.

But CCS has again ignored the fact – recognized in the very sentence from which it has

selectively quoted – that Xerox's concession was a limited one for purposes of a motion where

market definition and monopoly power were irrelevant. *See In re Independent Serv. Orgs.*

*Antitrust Litig.*, 964 F. Supp. at 1487 ("*For the purposes of this motion only,* Xerox does not

17

contest that it has monopoly power in the relevant parts and service markets.") (emphasis added).[3] CCS's selective quotation thus does not create a genuine issue of material fact for trial.

CCS also relies upon an internal Xerox document that supposedly indicates that Xerox considered the service market to be a separate market. CCS Resp. at 28. Setting aside the fact that the document does not actually include the quotation cited in CCS's brief, even if the document *did* say what CCS claims, it would still have no bearing on the market definition in this case. Courts have consistently rejected efforts by plaintiffs to define the relevant market based on citations to defendants' internal documents or employee testimony. *See AD/SAT v. Associated Press*, 920 F. Supp. 1287, 1297 n.7 (S.D.N.Y. 1996), *aff'd*, 181 F.3d 216 (2d Cir. 1999) (disregarding "internal documents" in which defendants' officers stated that they hoped to "capture" a certain market); *see also Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 782-84 (5th Cir. 1999) (disregarding evidence that defendants' officers, employees, customers, and internal documents defined market in certain way, focusing instead on "market realities"); *Independent Ink, Inc. v. Trident, Inc.*, 210 F. Supp. 2d 1155, 1170 (C.D. Cal. 2002) (holding that, for antitrust purposes, the relevant market cannot be defined by a defendant's marketing materials or from the opinions of investment analysts); *Nobel Scientific Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1318-19 (D. Md. 1986), *aff'd*, 831 F.2d 537 (4th Cir. 1987) ("the fact that a company may refer to a 'market' does not necessarily mean that its reference will be to a market for purposes of the Sherman Act.").

Rather, as discussed in Xerox's Summary Judgment brief at pages 16-18, for antitrust purposes "the relevant market is determined by reasonable interchangeability, as evidenced by

---

[3] Xerox accepted *arguendo* the claim that it possessed monopoly power because, as the court ultimately held, even if Xerox had such power, its refusal to sell patented parts was lawful.

cross-elasticity of demand and supply, not by a laymen's comments made in a competitive business environment." *AD/SAT*, 920 F. Supp. at 1297.  This standard requiring interchangeability has led courts within the Second Circuit consistently to reject markets limited to a single brand.  *See, e.g., Commercial Data Servers, Inc. v. IBM Corp.*, 166 F. Supp. 2d 891, 897 (S.D.N.Y. 2001) (dismissing plaintiff's complaint because its market definition limited to "mainframes compatible with IBM's licensed" operating system failed to allege any specific facts explaining why the market excluded other operating systems); *Mathias v. Daily News*, 152 F. Supp. 2d 465, 481-83 (S.D.N.Y. 2001) (dismissing complaint because plaintiff failed to reference the rule of reasonable interchangeability in alleging a single-brand market).

**B.    CCS Has Not Established A Genuine Issue Of Material Fact.**

**1.    CCS Cannot Rely On Its Economist's Declaration To Avoid Summary Judgment.**

CCS cannot avoid summary judgment by relying upon the report of its economist, Dr. MacKie-Mason, to create a disputed issue of fact.  *See* Pl.'s Ex. 38, MacKie-Mason Decl. Regardless of whether Dr. MacKie-Mason possesses the qualifications to offer an opinion on the market definition question, his opinion is inconsistent with the *law* of market definition, and it is the law that controls.  Courts that have addressed the existence of a service aftermarket, including the Supreme Court in *Kodak* and every appellate court to address the issue, conclude that in order for CCS to sustain its market definition as a matter of law, it would have to show that Xerox's customers were unable to assess product costs as a result of a surprise change in policy during the relevant limitations period.  As Xerox has shown in its Motion for Summary Judgment, CCS cannot meet this burden.

CCS, along with Dr. MacKie-Mason, ignores the fundamental difference between the facts in *Kodak* and those in this case that preclude the existence of an aftermarket here. Dr. MacKie-Mason asserts that there is an aftermarket because Xerox customers faced substantial switching and information costs. *See id.* at 14-16. This assertion is legally insufficient to show the existence of an aftermarket. Rather, to avoid summary judgment here, CCS would have to produce evidence that Xerox attempted to exploit its locked-in customers by surprising its end-user customers with a change in its parts policy. *See, e.g., PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997) ("an antitrust plaintiff cannot succeed on a *Kodak*-type theory when the defendant has not changed its policy after locking in some of its customers...."); *Digital Equip. Corp v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996) (same); *Commercial Data Servers, Inc. v. International Bus. Mach. Corp.*, 2002 WL 1205740, at *5-6 (S.D.N.Y. March 15, 2002) (agreeing that *Kodak's* holding relies on the fact that there was an abrupt change in policy that precluded customers from assessing the applicable costs and risks at the time of initial purchase); David A. J. Goldfine & Kenneth M. Vorrasi, *The Fall of the Kodak Aftermarket Doctrine: Dying a Slow Death in the Lower Courts*, 72 Antitrust L. J. 209, 220-24 (2004).

In the aftermarket cases that have been decided on summary judgment, plaintiffs have presented evidence, including presumably reports by economic experts, to establish the existence of a lock-in. The courts have nevertheless rejected those lock-in claims as a matter of law where there was no surprise change in the defendant's policies. For example, in *PSI* the defendant's own employees testified that it would be difficult for customers to calculate the life cycle costs of its equipment, indicating the existence of a lock-in. *Id.* at 820. Despite these admissions, the court still granted summary judgment in favor of the defendants because the plaintiff failed to

present any evidence that the defendant changed it policy after customers were locked in or that

its policy was not generally known. *Id. See also Digital Equip.*, 73 F.3d at 763.

> "The [Supreme] Court did not doubt in *Kodak* that if spare parts had been
> bundled with Kodak's copiers from the outset, or Kodak had informed
> customers about its policies before they bought its machines, purchasers could
> have shopped around for competitive life-cycle prices. The material dispute
> that called for a trial was whether the change in policy enabled Kodak to
> extract supra-competitive prices from customers who had already purchased
> the machines.

*Id. See also Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 783 (5th Cir. 1999) (holding

that no aftermarket existed because no change in policy occurred that could have "substantially

increase[d] the information costs for [defendant's customers]."); *ID Sec. Sys. Canada, Inc. v.*

*Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 645 (E.D. Pa. 2003) (finding no aftermarket existed

because there was no evidence that defendant exploited its locked-in customers by changing its

pricing policy).

> **2.    Only A Policy Change Within The Limitations Period Is Relevant To
> Establishing An Aftermarket.**

Xerox of course concedes that it did not refuse to sell parts to ISOs from the moment of

its incorporation.  But the relevant question is whether Xerox changed its policy within the

limitations period; if the rule were otherwise, the exception would swallow it as companies could

never change their policies without risking antitrust suits.  Competitors have standing to sue

under the antitrust laws only where the defendant's conduct has injured consumers. *See, e.g.,*

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 480-81 (1977).  Only a change in

policy within the limitations period could harm a customer because customers could protect

themselves by considering any pre-limitations policy change when choosing between competing

copier brands. Because customers could sue only for policy changes within the limitations period, the same rule applies to CCS.

The cases are consistent with this rule. The only case to directly address the question held that a change in policy must occur within the limitations period. *See Metzler v. Bear Auto Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1359 (S.D. Fla. 1998) (rejecting plaintiff's aftermarket claim because "the defendant's decision to vertically integrate was made in the early 1980s, many years outside the statute of limitations period in [the] case."). As noted, *Kodak* does not require a different result because Kodak changed its parts policy and stopped selling parts to ISOs in 1985 and 1986, only a year or two before the ISOs filed suit in 1987. 504 U.S. at 458-59. Similarly, in *Subsolutions, Inc. v. Doctor's Assocs., Inc.*, 62 F. Supp. 2d 616, 619 (D. Conn. 1999), the defendant enacted the restrictive policy change in March 1998 and the plaintiffs filed suit one month later.

In sum, CCS is unable to show that a genuine issue of material fact exists as to the existence of an aftermarket. Xerox's evidence remains uncontested: its parts policy began in 1984 and remained constant at all relevant times and customers were aware of its parts policy throughout this period. Accordingly, CCS's market definition fails as a matter of law and summary judgment is appropriate.

**3.     The Facts Show No Exploitation Of Customers By A Policy Change Within The Limitations Period.**

Dr. MacKie-Mason's declaration, Pl.'s Ex. 38 at 18, along with all other evidence in this case, indicates that Xerox's restrictive parts policy was in place, known and enforced by 1987 at the latest, foreclosing any argument that a change in policy occurred during the limitations period that commenced in March, 1988. *See* SOF ¶¶ 3-17. Further, the uncontroverted record

22

shows that Xerox's restrictive parts policy was widely known among Xerox customers. *See* Xerox S.J. Mem. at 22-24; SOF ¶ 23. There can be no aftermarket in such circumstances. *See Commercial Data Servers, Inc. v. International Bus. Mach. Inc.*, 262 F. Supp. 2d 50, 70 (S.D.N.Y. 2003) (holding that the plaintiff could not establish the existence of an aftermarket because "there is no record evidence that any ... customer was unable to make a fully informed decision regarding the attendant costs and benefits of owning" defendant's computer products); *Universal Avionics Sys. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947, 956 (D. Ariz. 2001) (rejecting an aftermarket claim where plaintiff's evidence, including testimony by its economic expert, failed to show that customers were unable to learn about defendant's policies); *Metzler*, 19 F. Supp 2d. at 1359 (holding that there can be no aftermarket if "customers knew or could readily obtain information about the defendants' parts and service policies."). Accordingly, as CCS has failed to present any evidence either that Xerox changed its policy after locking-in some of its customers or that its customers were unaware of Xerox's policies, CCS's efforts to establish a distinct service aftermarket should be rejected and summary judgment on its antitrust claim is appropriate.

### 4. There Is No Evidence That Customers Were Actually Locked-In.

Even if Xerox had changed its policy within the limitations period – and it did not – CCS cannot show an aftermarket because the evidence indicates that there was no lock-in. CCS points to Dr. MacKie-Mason's declaration, Pl.'s Ex. 38, but his report consists entirely of theoretical musings suggesting that the preconditions for lock-in were present. Neither he, nor CCS, presents any evidence of actual lock-in, i.e., evidence that a particular customer wanted to leave Xerox but was unable to do so.

In fact, the undisputed record evidence in this case contradicts Dr. MacKie-Mason's opinion. He believes that Xerox customers are locked in because they cannot replace their Xerox copiers. *See* Pl.'s Ex. 38 at 14. But the undisputed evidence indicates that if customers did not like the results of Xerox's parts policy, they could and did switch to competing copier brands. *See SMS Sys. Maint. Servs.*, 188 F.3d at 19-20 (rejecting the finding of a lock-in because the customer's actual behavior indicated that they were willing and able to switch to other suppliers). For example, when Fairfield University became dissatisfied with CCS's service of its Xerox copiers (allegedly because of Xerox's parts policy), it did not return to Xerox service; it replaced those Xerox copiers with copiers from Ricoh. Cigna did the same thing, replacing Xerox copiers with copiers from Canon. *See* Dixon 3/11/96 Dep. Tr. at 339-40 (Attachment B). These examples demonstrate that the equipment foremarket disciplines the aftermarket for service, militating against the finding of a separate aftermarket for service. *See Eastman Kodak*, 504 U.S. at 486 (stating that no service aftermarket would exist if defendant could show that the "equipment market disciplines the aftermarket.").

### 5. The *Kodak* Decisions Do Not Require A Different Result.

CCS also makes much of the fact that both the Supreme Court and Ninth Circuit on remand found that Kodak could be found guilty of monopolizing a single-brand aftermarket for copier service. *See* CCS Resp. at 28-29. However, CCS ignores the fact that the evidence presented by the plaintiffs in the *Kodak* cases indicated that Kodak had changed its parts policy during the relevant limitations period in an effort to exploit locked-in customers. The record shows that Kodak implemented its restrictive parts policy in 1985 and 1986 and the ISOs filed suit soon thereafter in 1987. *See Eastman Kodak v. Image Technical Serv.*, 504 U.S. 451, 458-59 (1992). Accordingly, there was no need for the Ninth Circuit on remand to address the issue of a

change in policy and the decision lacks any ruling regarding the applicable scope of the Supreme Court's decision in *Kodak* in circumstances where there has been no change in the defendant's after-market policy.[4]

### III.    CCS HAS FAILED TO SHOW AN ATTEMPT TO MITIGATE ITS DAMAGES.

CCS does not contest that an antitrust plaintiff has a duty to mitigate its damages. *See, e.g., Litton Sys., Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785, 820 n.47 (2d Cir. 1983). In its Summary Judgment Motion, Xerox demonstrated that CCS failed to mitigate because it did not request that more of its customers order parts on its behalf. *See* Xerox S.J. Mem. at 24-26. CCS responds to this argument by contending that it would have been difficult for CCS to convince most of its customers to order parts. *See* CCS Resp. at 35. However, this statement flies in the face of the admissible evidence demonstrating that: 1) CCS did not even try to mitigate its damages by asking most of its customers to order parts; and 2) that it would have been feasible to do so because Xerox readily sold parts to end users, who could and did supply those parts to CCS. *See* SOF ¶¶ 18-22.

As Xerox pointed out in its original motion for summary judgment in Kansas, CCS must pick which version of the world it believes to be true: either customers were willing to buy parts for CCS or they were not. At the end of the day, it does not matter which version CCS picks because Xerox is entitled to summary judgment either way. If customers were unwilling to order parts, then CCS cannot show but-for causation from Xerox's refusal to sell unpatented parts because customers also would not have ordered the *patented* parts CCS needed to stay in

---

[4] CCS citation to *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), in this context is misplaced. *Hanover Shoe* does not address issues of market definition and its holding has no implications for the existence of an aftermarket in the present context.

business but that Xerox was not required to sell. *See In re Independent Serv. Orgs. Antitrust Litig*, 203 F.3d 1322, 1327-28 (Fed. Cir. 2000) (holding that copier manufacturer was under no obligation to sell or license its patented parts and did not violate antitrust laws by refusing to do so). And if customers were willing to order parts, then CCS's claims fail because of its failure to mitigate. In order to prevail on its Motion for Reconsideration, CCS picked the first version of the world, claiming that customers would have been willing to order and stockpile the patented parts CCS needed to survive. But, having picked this version, CCS's antitrust claims cannot proceed because of its failure to mitigate.

In order to prevail on its Motion for Reconsideration, CCS's founder and president William Dixon stated that CCS could have remained in business by "cajoling 'most' of its customers to stockpile spare parts." *See In re Indep. Serv. Orgs. Antitrust Litig.*, 114 F. Supp. 2d at 1093 (citing Decl. of William Dixon, President of CCS, ¶¶ 62-63). Having picked this version of the way the world works, CCS cannot now come into court claiming that it would have been futile for CCS even to ask customers to order parts on its behalf. *See* CCS Resp. at 34-36. CCS cannot have it both ways, and this Court should not credit Mr. Dixon's purported belief that, in fact, 1) most customers could not be convinced to order parts (Pl.'s Ex. 3, Dixon Decl. ¶ 67); 2) most customers did not want to be in the parts ordering business (*Id.* ¶ 68); and 3) as a minority businessman, if he were to ask customers to order parts, he would be perceived as lacking capital (*Id.* ¶ 69). A party's own contradictory statements cannot generate a material issue of disputed fact necessary to survive a summary judgment motion. *See, e.g., Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir. 1998) (holding that party opposing summary judgment cannot create a triable issue by denying or contradicting his own previously sworn statements); *Mack v. United States*, 814 F.2d 120, 124-25 (2d Cir. 1987) ("it is well settled in this circuit that a party's affidavit which

26

contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").

Except for Mr. Dixon's self-contradictory statements, there are no disputed material facts regarding CCS's failure to mitigate. To establish a failure to mitigate, Xerox must demonstrate only that it would have been feasible for CCS's customers to purchase parts and that CCS failed to request that they do so. *See Westman Comm'n Co. v. Hobart Corp.*, 541 F. Supp. 307, 314 (D. Colo. 1982). There is no dispute that it was feasible for CCS's customers to order parts; Xerox's policy permitted end-users of Xerox products to purchase replacement parts, SOF ¶ 3, and at least three CCS customers did in fact order parts for CCS's use. SOF ¶¶ 18-19. It is also undisputed that every customer that CCS asked to order parts agreed to do so, and that Xerox never refused to sell parts to a CCS end user. SOF ¶¶ 20-21. Nevertheless, and despite CCS's newfound belief that it could have persuaded its customers to order and stockpile parts, CCS concedes that it failed even to ask any customer to order parts other than the three that agreed to do so. *See SOF ¶¶ 21-22.* Mr. Dixon's contradictory declaration is thus nothing more than speculation and cannot thwart summary judgment. *See Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (holding that a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment"). The fact remains that CCS was obligated to attempt to mitigate its damages by at least asking its customers whether they would be willing to order parts.[5]

---

[5] CCS alleges that certain CCS customers were prohibited from ordering parts. *See* CCS Resp. at 35. This is, of course, inconsistent with CCS's claim that it could have survived by having customers order parts had Xerox refused to sell only patented parts. Regardless, Mr. Dixon is not competent to testify whether the State of Connecticut or any other customers' policies would have barred them from ordering parts on CCS's behalf because he is not a representative of the State or of any other customer.

CCS cites *Malcolm v. Marathon Oil*, 642 F.2d 845, 863 (5th Cir. 1985), for the proposition that Xerox must show that any CCS customer other than the three who did order parts would have been willing to do so. *See* CCS Resp. at 32.[6] However, CCS ignores the court's requirement that the plaintiff still must "show the reasonableness of [its] mitigation efforts." *Malcolm*, 642 F.2d at 863. In *Malcolm*, plaintiff's mitigation efforts consisted of the plaintiff's "numerous calls to gasoline owners" that failed to secure any alternative fuel supply. *Id.* Here, unlike the plaintiff in *Malcolm* who made an effort to mitigate damages by calling alternative suppliers, CCS failed to make any effort to convince its customers to order parts (other than the three that actually did so). *See Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 436 n.23 (5th Cir. 1985)("a plaintiff who bypasses an obviously adequate alternative supplier should not recover for the loss of his business."). Accordingly, summary judgement is appropriate because CCS failed to take steps to minimize its damages.

CCS attempts to overcome Xerox's mitigation argument by contending that mitigation would have made little difference because customers were subject to delays in receiving parts, speculating that even if customers had ordered parts, CCS would have lost their business. *See* CCS Resp. at 35. This effort is unavailing.

First, CCS presents no admissible evidence that delays in parts shipments would have made mitigation futile. CCS claims that there would be a 48-hour delay in parts delivery, CCS Resp. at 35, but CCS presents no evidence of any end user customer that actually ordered parts on its behalf suffering such a delay. And CCS has nothing beyond utter speculation that *other*

---

[6] CCS also contends that the failure to mitigate defense goes to damages rather than liability. *See* CCS Resp. at 32. Regardless, if CCS has no damages, then it has no antitrust case and summary judgment on the antitrust claims is appropriate.

customers might have suffered such delays if only CCS had asked them to order parts. Indeed, the policy to which CCS points relates to the on-site verification procedure (and any accompanying delays) when parts are ordered by ISOs, not their customers. *See* Pl.'s Ex. 14 at 4RD 000955 (document is to "clarify our policy relative to parts sales to independent service organizations").

Second, CCS does not and cannot address the inconsistency between its position that it would have been futile for customers to order parts because of parts delays and its position in its Motion for Reconsideration. If it is true that CCS would have lost customers anyway as a result of Xerox's lawful delays in shipments of patented parts,[7] then CCS had no basis to seek reconsideration of the summary judgment granted against it on the grounds of lack of but-for causation. *See Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986) ("an essential element in plaintiff's claim is that the injuries alleged would not have occurred but for [defendant's] antitrust violation."); *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*, 510 F.2d 1140, 1142 (2d Cir.)("[Plaintiff's] failure to prove it was injured 'by reason of' defendants' alleged antitrust violation is of course sufficient to defeat [plaintiff's] claims."), *cert. denied*, 421 U.S. 1011 (1975); *Erie Conduit Corp. v. Mapa*, 102 F.R.D. 877, 879 (E.D.N.Y. 1984) (rejecting antitrust claim because the plaintiff would have sustained similar damages absent the defendant's alleged antitrust violations). CCS cannot have it both ways. Xerox is accordingly entitled to summary judgment against CCS on all of its damage claims flowing from Xerox's refusal to sell parts.

---

[7] If an outright refusal to sell patented parts is not unlawful, *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F. 3d at 1328-29, delays in shipping such parts could not be unlawful either.

## CONCLUSION

CCS has not raised a genuine issue of material fact in response to Xerox's Motion for

Summary Judgment, mandating entry of judgment against CCS. CCS's own cross motion for

summary judgment must be denied for the same reasons that Xerox's motion should be granted.

Respectfully submitted,

Jonathan I. Gleklen
Christopher F. Winters
Jon J. Nathan
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000
fax: (202)-942-5999
email: jonathan_gleklen@aporter.com

Robert Dolian (ct04278)
CUMMINGS & LOCKWOOD
Four Stamford Plaza
Stamford, Connecticut 06904
(203) 351-4307
fax: (203) 708-3948
email: rdolian@cl-law.com

*Attorneys For Defendant Xerox Corporation*

30

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2005, I served a copy of the foregoing Xerox Corporation's Reply Memorandum In Support Of Its Motion For Summary Judgment On Plaintiff's Antitrust Claims, And Response To Plaintiff's Cross Motion For Partial Summary Judgment by first-class mail upon the following counsel for Plaintiff Creative Copier Services:

>       Robert LaRocca
>       Kohn, Swift & Graf, P.C.
>       One South Broad Street – Suite 2100
>       Philadelphia, PA 19107-3389

and

>       Elias A. Alexiades
>       215 Church Street, 2nd Floor
>       New Haven CT 06510

Robert Dolian (ct04278)
CUMMINGS & LOCKWOOD
Four Stamford Plaza
Stamford, Connecticut  06904
(203) 351-4307
fax: (203) 708-3948
email: rdolian@cl-law.com

***Counsel for Xerox Corporation***

2081861_1.doc 1/18/2005

31