# ATTACHMENT A

# TRANSCRIPT OF PROCEEDINGS

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

- - - - - - - - - - - - - - - - - - - - - -x
                                            :
IN RE:                                      :         Case Number
                                            :
INDEPENDENT SERVICE ORGANIZATIONS           :         MDL-1021
ANTITRUST LITIGATION.                       :
                                            :
- - - - - - - - - - - - - - - - - - - - - -x

DEPOSITION OF JEFFREY K. MACKIE-MASON

Washington, D. C.

Tuesday, April 6, 1999

**ACE - FEDERAL REPORTERS, INC.**

*Stenotype Reporters*

1120 G Street, NW
Washington, D.C. 20005
(202) 347-3700

**NATIONWIDE COVERAGE**
**800-336-6646**

1  lists in them. Whether or not they're before or
2  after the policy change, I don't recall.
3       Q    Would you turn to page 21 of your report.
4       A    Sure.
5       Q    The section on page 21 is entitled "4.3.2,
6  consumers need assured source of all parts."
7       A    Yes.
8       Q    You state, "a service provider that has
9  access to most but not all of the parts necessary to
10 and keep an end user's copier running cannot remain
11 in business. Since it is impossible to tell at the
12 time the contract is signed which parts must fail, in
13 order to fulfill a service contract, the service
14 provider must have access to all parts all of the
15 time."
16           Did I quote that correctly?
17      A    Yes, you did.
18      Q    Is that your opinion today?
19      A    In context, if it's understood correctly,
20 it's my opinion, yes.
21      Q    What is the context that we have to
22 understand in order for it to be correct?

1    A    Well, it's not the most elegantly written
2 couple of sentences, but for instance, when it says a
3 service provider cannot remain in business, that
4 refers to a service provider over time, and it's my
5 view that if a service provider doesn't have access
6 to all parts necessary to actually keep its user's
7 copiers running; in other words, if it can't get
8 parts and the copiers have downtime and can't run,
9 they'll lose contracts and they'll go out of
10 business.

11    That doesn't mean they can't be in business
12 for some period of time.  As long as the customers
13 believe that the provider has access to the parts and
14 as long as the service provider can keep the machines
15 running, it can stay in business, but at some point,
16 if it doesn't have access to parts that it actually
17 needs to repair machines, it will lose the contracts
18 and go out of business.  So that sentence is stated
19 in a static form, but it refers to behavior in a
20 market over time.
21    The next sentence is essentially correct,
22 again, as long as you understand this is in terms of

1  the way markets work and market perceptions. The
2  service provider must have access to all parts all of
3  the time is, for an insurance product market, as I
4  described this at the beginning of the paragraph, a
5  necessary condition in terms of customer
6  perceptions. If customers think that the service
7  provider doesn't have access to needed parts, the
8  service provider won't succeed in business, and if
9  the service provider can't deliver on that promise
10 when it actually comes time to put in a part that's
11 needed, if they don't have it, they'll lose the
12 business.
13         So understanding that to take place over
14 time with the usual ups and downs with the business,
15 I think it's correct, yes.
16     Q    Would it be your testimony that ISOs must
17 have access to all parts all of the time, copier
18 ISOs?
19     A    To succeed in business over time, they must
20 have access to all parts that they need as they need
21 them, and if it turns out that they -- they have to
22 certainly believe that they are going to have access

30.0

151

1  to parts to be able to enter into contracts unless
2  they're perpetrating fraud.  Their customers are
3  going to have to believe they have the parts if they
4  want to enter an insurance contract with them, and if
5  it turns out that those beliefs are wrong, they'll go
6  out of business.
7     Q   And if they have access to some parts and
8  not others, they'll go out of business; is that
9  right?
10    A   If they have access to some parts but not
11 others that they actually turn out to need and they
12 can't get access to them when they need them, whether
13 they'll go completely out of business or their
14 business will be severely harmed, it's hard to say,
15 but they'll certainly be severely harmed and possibly
16 go out of business.
17    Q   Is it your opinion that CCS needed access
18 to all parts all of the time in order to remain in
19 business?
20    A   Within the description of the way the
21 market works that I just gave you, that's essentially
22 correct.  If CCS thinks that it's not going to have

1  access to needed parts, then it's going to be
2  entering contracts either fraudulently, which I have
3  no reason to believe it did, or entering into
4  contracts under which it can't perform. So if it
5  thinks it doesn't have access to parts it needs, it
6  won't enter into those contracts or will expect to
7  lose the business.
8      If it turns out that it believed it had
9  access to those parts and the customers believed it
10 but they're wrong, they'll end up losing the
11 contracts and go out of business.
12     Q   Do you know which of the parts that Xerox
13 sold during the period of the parts policy were
14 patented and which ones weren't?
15     A   I've seen a list provided by Xerox that
16 identifies parts that I believe Xerox claims were
17 patented at issue in this case, yes.
18     Q   Do you have any doubt, any reason to doubt
19 Xerox's claim that it has patents?
20     A   Any specific reason, no.
21     Q   In your opinion, did CCS need to have
22 access to all patented parts all of the time in order

# ATTACHMENT B

Depo of: WILLIAM DAVID DIXON (In Re:XEROX) March 11, 1996 Cr63810.0

ACE-FEDERAL REPORTERS, INC.

Page 268 to Page 495

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

ACE-FEDERAL REPORTERS, INC.
1120 G Street, N.W.
Suite 500
Washington, DC   20005
Phone:   800-336-6646
FAX:   202-737-3638

Depo of: WILLIAM DAVID DIXON (In Re: XEROX) March 11, 1996 Cr63810.0

Page 268

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ACQUISITION SPECIALISTS, et al. :
Plaintiffs :

vs. : Docket No. MDL-1021

XEROX CORPORATION, :
Defendant :

IN RE:  INDEPENDENT SERVICE :
ORGANIZATIONS ANTITRUST :
LITIGATION :

Video deposition of WILLIAM DAVID DIXON
(continued)
HIGHLY CONFIDENTIAL

APPEARANCES:

LABRUM & DOAK
By: Stephen Springer, Esq.
By: Kellie Ann Allen
1818 Market Street, Suite 2900
Philadelphia, PA 19103-3629
Counsel for William Dixon and Creative Copier Services

ARNOLD & PORTER
By: Jonathan I. Gleklen, Esq.
555 Twelfth Street, N.W.,
Washington, D.C., 20004-1202
Counsel for the Defendant

OFFICE OF GENERAL COUNSEL, XEROX
By: Peter W. Marshall, Esq.
Xerox Corporation
800 Long Ridge Road
Stamford, Connecticut 06904
Counsel for Xerox Corporation

Page 269

TAKEN AT THE OFFICES OF:
LaBrum & Doak Monday
1818 Market Street March 11, 1996
Philadelphia, PA 19103 10:00 a.m.

INDEX

WITNESS:    EXAMINED BY:  PAGE NUMBER
William David Dixon  Mr. Gleklen 271, 487
                     Mr. Springer 484

EXHIBITS
NUMBER MARKED
7 Answers to Interrogatories ............... 429
8 Letter, dated 09/27/89 .................. 438
9 Letter, dated 06/18/90 .................. 474
10 Letter, dated 04/25/94 ................. 479
11 Letter, dated 04/15/94 ................. 482

******

MONICK COURT REPORTERS, INC.
1413 Old Mill Road
Wyomissing, PA 19610
  PHONE: 610/375-3931
Reported by Curtis R. Cloward, CSR

Page 270

-----

P R O C E E D I N G S
-----

MR. SPRINGER:  I wanted to indicate to Xerox's counsel that we have notified them that Bill Dixon is being proffered as a witness pursuant to a notice of the taking of his deposition. This is a resumption of his deposition from last week.

We have told Mr. Gleklen, orally and through written correspondence, that Mr. Dixon is here to be deposed about any subjects which Mr. Gleklen wants to cover, including the question of remanufacturing of Xerox equipment.

In the original notice that was sent, that was one of the subjects that was to be covered. That was a 30(b)(6) notice, and it is my recollection that there were at least some questions at last week's deposition asked of Mr. Dixon relating to remanufacturing. Mr. Gleklen, I'm sure, can set out his own position on this matter; we have, however, in fairness, received correspondence from Mr. Gleklen indicating that it is Xerox's belief that they're entitled to depose

Page 271

Mr. Dixon again in Connecticut later this week on the remanufacturing issue. We take a contrary position on that.

MR. GLEKLEN:  My response is in my letter, so I'm not going to waste money on transcript pages going through it.

Do you want to go on the video record now?

(Whereupon, there was a discussion held off the record.)

VIDEO SPECIALIST:  This is day two of the continuation of the witness William David Dixon, taken in the matter of Acquisition Specialists versus Xerox, et al.

-----

WILLIAM DAVID DIXON.

```
          A.  Cigna was.
          Q.  What did Cigna do in 1994?
          A.  Moved from Xerox 1065s into Canon. That had
     been ongoing for a couple of years.
          Q.  Were you told why Canon moved - excuse me.
     Were you told why Cigna moved from the Xerox
     1065 into Canon equipment?
          A.  No.
          Q.  As Cigna moved from the Xerox 1065 into
     Canon, did Creative lose that service business?
          A.  Yes.
          Q.  Do you know approximately how much Creative
     lost in service revenue as a result of that move by
     Cigna?
          A.  Exact dollars, no; but, we lost quite a bit
```
Page 339
```
     of money.
          Q.  Was it more than $100,000?
          MR. SPRINGER:  Just so I understand the
     question is referring to, is this over a period of time,
     is this in one year, or what?
          MR. GLEKLEN:  In one year in annual service
     revenue.
          THE WITNESS:  Okay, now - I'm sorry?
          (BY MR. GLEKLEN: )
          Q.  When Cigna moved their 1065s into Canon
     equipment, did they - did Creative lose more than
     $100,000 in annual service billing?
          A.  In a particular year?
          Q.  Yes.
          A.  I couldn't - I couldn't - no, I can't
     answer that definitively.
          Q.  Do you attribute Cigna's move from the 1065
     into Canon equipment to any conduct by Xerox?
          A.  Yes.
          Q.  What conduct is that?
          A.  Lack of availability of parts, disparagement.
     Xerox created some situations with us at Cigna. Cigna
```
Page 340
```
     was supporting us in the parts area where Cigna, at a
     point in time, decided that they wanted to get out of
     the parts support business.
          And, at that point in time, when that
     happened, we got fewer opportunities to service
     equipment with them.
          Q.  When did Cigna start its move from the 1065,
     over towards Canon equipment?
          A.  1992, '93.
          Q.  Did anybody from Cigna ever tell you that
     Xerox's disparagement caused them to move from 1065s
     into Canon equipment?
          A.  No.
          Q.  Did anybody from Cigna ever tell you that the
     availability of parts was an issue in causing them to
     move from 1065s into Canon equipment?
```

```
          A.  Wait a minute. Back up, give me the
     question again.
          Q.  Did anybody from Cigna ever tell you that the
     availability of parts was an issue that caused them to
     move from 1065s into Canon equipment?
          A.  No.
```
Page 341
```
          Q.  What's the basis for your belief that the
     availability of parts caused Cigna to move from Xerox
     1065s into Canon equipment?
          A.  Xerox came in and made claims to Cigna that
     we were using parts in the facility in the Philadelphia
     area to support our expansion in that particular area.
     That resulted in a audit by Cigna of our parts
     relationship with - with them. We went through the
     audit; there was - no problems were found in it. And,
     at that time, Dick Barnes explained to me that he felt
     that, at this point in time, he wanted to get out of
     supporting us in terms of buying parts to service
     Cigna's equipment.
          From that point on, we weren't asked to submit
     proposals to service equipment any more.
          Q.  Okay.
          A.  He didn't directly say the part - from that
     point on we weren't asked to service equipment.
          Q.  Does Creative service Canon equipment?
          A.  Yes, we do.
          Q.  What model Canon copier did Cigna get in
     order to replace the 1065s?
```
Page 342
```
          A.  I'm sorry. No, we don't service Canon
     equipment.
          Q.  Okay.
          What - let me go back to the same question.
     What model Canon copier did Cigna get to
     replace the 1065?
          A.  6650s.
          Q.  How fast does that copier work?
          A.  Fifty copies a minute.
          Q.  And how fast does the 1065 work?
          A.  Sixty-five a minute, I believe.
          Q.  Do you know whether Cigna replaced the 1065s,
     one-for-one with the 6650s?
          A.  I'm sorry?
          Q.  Did Canon replace each 1065 with one Canon
     6650?
          A.  No.
          Q.  Did they use more than one 6650 to replace
     each 1065?
          A.  No.
          Q.  Did they use less than one 6650 to replace
     each 1065?
```
Page 343
```
          A.  No.
          Q.  How many 1065s did Cigna have in 1994?
          A.  Left, probably two.
```