# KOHN, SWIFT & GRAF, P.C.

ONE SOUTH BROAD STREET, SUITE 2100
PHILADELPHIA, PENNSYLVANIA 19107-

JOSEPH C. KOHN
ROBERT A. SWIFT
GEORGE W. CRONER
ROBERT J. LAROCCA
MICHAEL J. BONI
DENIS F. SHEILS
DOUGLAS A. ABRAHAMS
WILLIAM E. HOESE
MARTIN J. D'URSO
STEVEN M. STEINGARD
STEPHEN H. SCHWARTZ *
ELKAN M. KATZ
CRAIG W. HILLWIG
HILARY E. COHEN
CHRISTINA D. SALER
KATE REZNICK

* ADMITTED IN N.Y. ONLY

(215) 238-1700
TELECOPIER (215) 238-1968
FIRM E-MAIL: info@kohnswift.com
WEB SITE: www.kohnswift.com
E-MAIL: RLAROCCA@KOHNSWIFT.COM

HAROLD E. KOHN
1914-1999

SPECIAL COUNSEL
JOSEPH M. HOEFFEL

OF COUNSEL
MERLE A. WOLFSON
LISA PALFY KOHN

May 13, 2005

**VIA TELEFAX AND REGULAR MAIL**

Honorable Stefan R. Underhill
United States District Judge
District of Connecticut
915 Lafayette Boulevard
Bridgeport, CT 06604

    Re:    *Creative Copier Services v. Xerox*, 01 CV 155 (SDU)

Dear Judge Underhill:

    I am responding to Mr. Gleklen's post-argument letter of May 10, 2005, and record evidence of "lock-ins" addressed in his letter and inquired about by Your Honor at the hearing.

    The internal 1984 Xerox memorandum which Mr. Gleklen references states that parts will be restricted for the Xerox 10 series machines, which were already on the market ("recently introduced products"). It acknowledged that Xerox had a "long standing policy of selling parts at commercial list price to **all** third parties...." (Marshall Ex. A, emphasis supplied). Thus, how and when Xerox actually implemented a new policy on 10 series machines which changed a previous "long standing policy," and how and when Xerox communicated this so that all customers would understand its ramifications, are important. As Dr. Mackie-Mason observed, this is a market where customers have poor knowledge about service costs. (Our appendix Ex. 38, Mackie-Mason Report at pp. 16-17 and note 40). This was a factor emphasized by the Supreme Court in *Kodak*, 504 U.S. at 473.

    This 1984 policy was not enforced until much later, and therefore customers could not and did not understand its ramifications when they purchased series 10 machines. Indeed, the 1984 internal memorandum Mr. Gleklen cites appears to have been its only written expression at that time. (Ex. 38, Mackie-Mason at pp. 40-41 and footnote 139.) Instead, as Judge Vratil stated in her detailed summary judgment opinion, "In 1989, Xerox **began** to strictly enforce its restrictions on CCS parts orders." *In re ISO Antitrust Litigation*, 114 F.Supp.2d 1070, 1085 (D. Kan. 2000) (emphasis supplied). As she also observed, Xerox communicated this restrictive policy to CCS customer Cessna Aircraft on June 30, 1989. *Id.*

4349_1

KOHN, SWIFT & GRAF, P.C.   CONTINUATION SHEET NO. 2   HONORABLE STEFAN R. UNDERHILL
MAY 12, 2005

Customers did not understand these restrictions until they were implemented, well after they were "locked into" their 10-series machines. The experience at Fairfield University is illustrative. (Our brief, p. 24, and appendix Ex. 31). In the mid-1980's, Fairfield began to replace its old machines with new Xerox machines. (Ex. 31, pp. 8-10). Fairfield expected and intended that CCS would service these machines, and would continue to receive parts in order to service them. (Ex. 31, p.16.)

Mr. Payne, the Fairfield director of printing services, testified that it was not until 1989-1990, clearly after the machines were purchased and CCS had been satisfactorily servicing them for an extended period, that CCS began to experience problems in obtaining the parts needed to service these machines. (Ex. 31, pp. 17, 19.) The problems were at first "sporadic," but then increased in severity, causing substantial "downtime" at Fairfield. (P. 19). The "downtime" problems escalated until Fairfield was forced to cease using CCS in 1993. (Id. p. 27). Fairfield was forced to return to Xerox service, paying a 25% premium. (P. 36.)

Mr. Payne's testimony demonstrates that Xerox' restrictive policy was not implemented until customers had the machines in place, with the expectation that CCS would service them. This illustration also buttresses the chart attached to Dr. Cunitz' declaration (Ex. 1 to our appendix). His bar graphs show that during 1988 and 1989, CCS' revenue was growing in "head to head" competition with Xerox for the same customers. However, once Xerox' parts policies took effect, the trend reversed itself dramatically.

For these and other reasons advanced, Xerox' motion for summary judgment on "market definition" should be denied, (and CCS' cross-motion on the statute of limitations defense should be granted).

Respectfully submitted,

Robert J. LaRocca

RJL/dp
Enclosures
cc:   Jonathan Gleklen, Esquire

4349_1