UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CREATIVE COPIER SERVICES,<br>    Plaintiff,<br><br>v.<br><br>XEROX CORPORATION,<br>    Defendant. | CIVIL ACTION NO.<br>3:01cv155 (SRU) |

**RULING ON MOTIONS FOR SUMMARY JUDGMENT**

Creative Copier Services ("CCS") sued Xerox Corporation ("Xerox") for attempted monopolization of the market for service of Xerox high-speed copiers in violation of the Sherman Act, 15 U.S.C. § 2. Xerox has moved for summary judgment on its affirmative defenses of statute of limitations and failure to mitigate damages, as well as for summary judgment against CCS's monopolization claim on the theory that CCS has failed to establish a relevant market. CCS has moved for summary judgment against Xerox's two affirmative defenses. Both parties' motions are denied.

**I.    Background**

The following facts are not subject to any genuine dispute.

Xerox is in the business of manufacturing, selling, and servicing photocopy machines.

On April 17, 1984, Xerox established a new policy concerning the sale of replacement parts for its "10 Series" copiers. That policy stated in part:

> The sale of parts which are unique to the 10 series products . . . will not be permitted to any third party, unless that third party is an end user purchaser . . ., or unless that third party is an authorized service dealer/retailer for those products under the Xerox reseller program.

(Xerox Ex. A)

In 1987, Xerox extended its parts policy to cover replacement parts for additional models

of Xerox copiers. (Xerox Ex. E)

On June 1, 1989, Xerox issued a revised parts policy. The revised policy reiterated Xerox's policy of only selling parts to end-users and also established an "end-user verification" procedure, designed to ensure that Xerox did not "knowingly provide ISOs with parts, technical training, technical documentation, or other resources." (Xerox Ex. F)

As part of a 1994 consent decree, Xerox agreed to change its policy to allow ISOs to purchase replacement parts.

CCS is an independent service organization ("ISO") that services Xerox copiers.

**II.    Discussion**

 A. Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986). When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255. It follows that, when faced with cross-motions for summary judgment, a court must consider the evidence differently depending on which motion is being addressed.

 B. Statute of Limitations

An action brought under the Sherman Act "shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a

plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). Although a separate cause of action accrues for each distinct violation that injures the plaintiff, "not every act by an antitrust defendant is sufficient to restart the statute of limitations." *Pace Industries v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987). Specifically, an act must (1) be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff. *Id.* at 238. The actions cannot be merely the "abatable but unabated inertial consequences of some pre-limitations action." *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 26 F. Supp. 2d 188, 229 (E.D.N.Y. 2003) (quoting *Al George v. Envirotech Corp.*, 939 F.2d 1271 (5th Cir. 1991)).

In the "refusal to deal" context, whether a particular refusal is an independent act or simply a "reaffirmation" of a prior refusal will typically turn on whether the "initial refusal to deal is irrevocable, immutable, permanent and final." 2 Philip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320 (2d ed. 2000). Consistent with that "finality" test, courts have found that the statute does not run if, despite announcing a policy prior to the limitations period, the policy is not enforced until a period after the start of the limitations period. *DXS, Inc. v. Siemens Medical Systems*, 100 F.3d 462 (6th Cir. 1996).

Both parties agree that the statute of limitations bars CCS from asserting any claims that accrued prior to March 23, 1988.

      1.      *Xerox's Motion for Summary Judgment*

Xerox argues that it is entitled to summary judgment[1] on its affirmative defense of statute of limitations on the grounds that: (1) it is undisputed that Xerox's parts policy was finalized no later than 1987, and therefore any subsequent actions taken were merely "reaffirmations" of that policy, not independent violations; and (2) even if Xerox's actions in the limitations period did constitute independent acts, there is no evidence that those actions inflicted any new injury on CCS. Construing the evidence in the light most favorable to CCS, I conclude summary judgment is inappropriate on either ground.

      a.      Independent Violation

Xerox argues it is undisputed that since 1984 – and certainly since 1987 – it has had a firm policy of not selling parts to ISOs, and its 1989 revision to the policy only changed the mechanism for enforcing that policy, not the policy itself. I agree that since 1984 Xerox has had a policy of not selling parts to ISOs. Nevertheless, I think reasonable jurors could find that from 1984 to 1989 that policy contained a fairly broad exception for ISOs who personally owned Xerox equipment, and it was not until 1989 that Xerox extended its refusal to deal to include those ISOs. In other words, jurors could reasonably find that prior to 1989 Xerox was generally willing to deal with an ISO if that ISO owned Xerox equipment, but after 1989 Xerox substantially limited the circumstances under which it would allow such equipment-owning ISOs to purchase parts. Several pieces of evidence permit such a finding.

---

[1] Xerox's motion is only a motion for partial summary judgment. It does not, for example, address (a) CCS's claim that Xerox engaged in anti-competitive conduct other than "refusal to deal," or (b) CCS's claim that Xerox restarted its refusal to deal after the 1994 consent decree.

First, the plain language of Xerox's two policies admits of this interpretation. The 1984 policy forbade sale of replacement parts subject to the following broad exception: "unless that third party is an end user purchaser." The 1989 policy, by contrast, restricted the definition of an end-user to only someone who used the copier "to make internal copies or to sell copies to the public or in a Facilities Management Operation." The policy went on to explain:

> we will not sell . . . to an end-user if we have reason to believe that such resources will be used for purposes other than maintenance of the unit of equipment for which these resources are ordered. . . .
>
> As a general rule, ISOs . . . are not considered to be eligible for sale of resources, including parts, on restricted products.

(Xerox Ex. F at 1) Thus, jurors could reasonably read the 1984 policy to mean that Xerox would deal with anyone who owned a Xerox machine *regardless* of whether that person was also an ISO, but read the 1989 policy to mean that Xerox would deal with anyone who owned a Xerox machine *unless* that person was also an ISO (except when the ISO could demonstrate very specific use requirements).

Second, the statements of CCS employees – at least when read in the light most favorable to CCS – also support a finding that Xerox did not, for the most part,[2] refuse to deal with end-user ISOs, such as CCS, prior to 1989, but did refuse to deal with them after 1989. William Dixon stated that in 1987 Xerox told him if he showed a serial number for a machine he owned

---

[2] Admittedly, there is some evidence that on occasion Xerox either reduced or rejected some CCS parts orders prior to 1989. (Xerox Ex. B; Dixon Dep. at 348-52) Construed in CCS's favor, that evidence only demonstrates that Xerox was not entirely willing to deal with end-user ISOs prior to 1989. It is, however, still consistent with a finding that, for the most part, Xerox was willing to deal with end-user ISOs prior to 1989, and, for the most part, was not willing to deal with them after 1989. (That is, of course, not the only inference that could be drawn from the evidence, but it is a reasonable one, which I must draw when deciding a motion for summary judgment.)

he could order parts. (Dixon Aff. at 42) Similarly, Theodis Bethea, a CCS employee, testified that initially Xerox would allow orders so long as CCS could provide a serial number, and only later imposed stricter requirements. (Bethea Dep. at 15)

Alternatively, even if a jury concluded that Xerox's 1989 policy only restated the policy previously announced in 1984, there is sufficient evidence from which reasonable jurors could conclude that the policy was not seriously enforced until after the limitations period. As just noted, there is evidence that Xerox required only minimal verification of copier ownership in order to allow orders. (Dixon Aff. at 42; Bethea Dep. at 15) Moreover, there is evidence that CCS was, in general, easily able to obtain needed parts prior to 1989 (Dixon Aff. ¶¶ 35, 41, 44), as well as evidence that Xerox dramatically strengthened its enforcement techniques after 1989. Construed in the light most favorable to CCS, that evidence could reasonably be taken to indicate that, prior to the limitations period, Xerox's policy, at least as applied to CCS, was not strictly enforced and did not result in an actual refusal to deal.

Consequently, because jurors could reasonably conclude that Xerox's 1984 policy was not a complete refusal to deal, Xerox is not entitled to summary judgment on the ground that the 1989 policy was merely a "reaffirmation" of a prior refusal.

      b.  New Injury

Xerox argues that, even if its 1989 policy was an independent violation, there is no evidence that the policy caused any new injury to CCS. I disagree.

There are several pieces of evidence from which reasonable jurors could find that the 1989 policy caused a new injury to CCS's business. Dixon testified that the 1989 policy caused more harm to CCS than the previous policy. (Dixon Aff. ¶ 48) Several of CCS's clients testified

that they did not experience any decline in CCS's ability to offer service until after 1989. (Payne Dep. at 17; Lewis Dep. at 21) CCS's expert, Jonathan Cunitz, opined that Xerox did not have ascertainable damages before 1990. (Cunitz Decl. ¶ 2)

Xerox's argues, however, that because it never conducted an "end-user verification" of CCS's equipment – a procedure provided for by the 1989 policy – there is no way the 1989 policy could have injured CCS. Although end-user verification was a significant part of the 1989 policy, there is evidence from which reasonable jurors could conclude that other changes introduced by the 1989 policy caused CCS harm. For example, Dixon stated that, starting in 1989, Xerox would delay orders in order to determine whether it needed to conduct verification and would require CCS to match ordered parts with specific machines. (Dixon Aff. ¶¶ 44-45)

Accordingly, because there is evidence from which reasonable jurors could conclude that CCS received fresh injury from Xerox's 1989 policy, summary judgment on the ground that the 1989 policy did not cause any harm is inappropriate.

2.   *CCS's Motion for Summary Judgment*

CCS argues that it is entitled to summary judgment against Xerox's affirmative defense of statute of limitations on two grounds: (1) that the record evidence compels a finding that Xerox engaged in independent violations within the limitation period; and (2) that the evidence compels a finding that CCS was not injured by any of Xerox's action until after the limitations period began. Viewing the evidence in the light most favorable to Xerox (because now CCS is the moving party), I conclude that neither finding is compelled.[3]

---

[3] CCS also argues that the prior decision of the District of Kansas, when this case was consolidated as part of a multi-district litigation, settled the question whether the 1989 actions constituted an independent act. That argument has no merit. The Kansas decisions were not

a. Independent Violation

Although I concluded above that reasonable jurors, viewing the evidence in the light most favorable to CCS, could find that the 1989 policy constituted an independent refusal to deal, that is not the same as concluding that the evidence compels such a finding. On the contrary, when the evidence is viewed in the light most favorable to Xerox, a very different finding is possible.

First, reasonable jurors could read the 1989 policy as merely restating the 1984 policy and providing additional mechanisms for enforcing that, unchanged, policy. Both policies forbade sales to ISOs and allowed sales to end users, and it would be quite reasonable to read the additional language contained in the 1989 policy as an elaboration, not an expansion, of the 1984 policy's restrictions.

Second, there is evidence that Xerox informed CCS as early as 1986 that it could only purchase parts for its machines if it actually needed the parts to service those machines. For example, in a letter dated October 10, 1986, Xerox informed CCS that it was reducing CCS's order to "those quantities deemed reasonable to support the machines our records indicate you personally own."[4] (Xerox Ex. B)

Third, although the evidence that CCS was able to obtain parts easily prior to 1989 could support a finding that Xerox did not refuse to deal before 1989, that evidence could merely

---

findings of fact, they were resolutions of motions, and the facts used by the court in deciding those motions were assumed true only for the purposes of those motions. They are, consequently, not binding on Xerox or this court.

[4] The letter does not, however, establish conclusively that this was Xerox's policy as of 1986. There is evidence that Xerox subsequently relented and allowed CCS to order some of the requested parts. (Xerox Ex. D) Moreover, as explained above, *supra* n.2, the fact that on occasion Xerox reduced parts orders does not compel a conclusion that it had by then made a final refusal to deal.

reflect that CCS needed fewer parts before 1989 or that some Xerox employees were not diligent in enforcing Xerox's policies.

Accordingly, because reasonable jurors could find that Xerox's 1989 policy was not an independent refusal to deal but was only the further implementation of its prior refusal, CCS is not entitled to summary judgment on that ground.

### b. Pre-Limitations Injury

CCS also argues that, even if Xerox's 1989 policy was not an independent refusal to deal, there is no evidence that CCS was injured prior to the start of the limitations period and therefore it is undisputed that CCS's cause of action did not accrue before the limitations period.

Although it is true that in general a cause of action does not accrue until the plaintiff is injured, there is plenty of evidence in this case that CCS was injured by Xerox's 1984 policy well before the start of the limitations period. CCS was forced to buy machines, at significant expense, in order to qualify as an end-user. (Dixon Aff. ¶ 37) CCS was forced to ask its customers to order parts on its behalf. (Dixon Aff. ¶ 41) One of CCS's employees was kicked out of a Xerox training class. (Dixon Aff. ¶ 40) CCS was forced to forgo an opportunity to expand its business into New York. (Dixon Tr. at 349)

In light of that evidence, reasonable jurors could find that CCS's injury accrued well before the start of the limitations period, making summary judgment against the statute of limitations defense inappropriate.

### C. Mitigation of Damages

"An antitrust plaintiff has a duty to mitigate damages." *Litton Systems, Inc. v. AT&T*, 700 F.2d 785, 820 n.47 (2d Cir. 1980). Xerox argues that is entitled to summary judgment on this

affirmative defense because it is undisputed that CCS could have, but did not, ask all its customers to order parts directly from Xerox. CCS argues that, on the contrary, it is entitled to summary judgment against this defense because it is undisputed that it took all reasonable steps to mitigate its damages.

There is some evidence that CCS was able to mitigate the effect of Xerox's policies by asking some of its customers to order parts. (Dixon Aff. ¶¶ 35, 42) On the basis of that evidence, reasonable jurors could find that, had this been done with all customers, CCS might have significantly mitigated its damages. On the other hand, there is also evidence that it was not feasible for CCS to ask all of its customers to order parts because (a) some of its contracts required CCS to get the parts and (b) CCS's reputation would be harmed if its customers thought it could not obtain parts. (Dixon Aff. ¶¶ 67-69) On the basis of that evidence, reasonable jurors could find that CCS could not have mitigated its damages more than it actually did.

In short, this a classic example of a disputed issue of material fact. Reasonable jurors could find that CCS could have mitigated its damages by asking more customers to order parts. Nevertheless, reasonable jurors could also find that this was not always a practical solution, and, where it was practical, CCS did get its customers to order parts. Consequently, neither party is entitled to summary judgment on the mitigation issue.

D.   Relevant Market

Xerox argues that in order to establish that the market for servicing Xerox high-speed copiers is the relevant market for antitrust purposes, CCS must establish that Xerox changed one or more of its policies regarding service of copiers *after* some customers had already purchased affected copiers. Xerox contends that CCS has not met that burden because "the undisputed facts

show that Xerox has not changed its policies within the limitations period."

Even assuming that Xerox's statement of the law is correct, its assertions about the state of the record are not. As explained above, reasonable jurors could find that Xerox *did* change its policy within the limitations period and, consequently, reasonable jurors could find that customers who purchased copiers between 1984 and 1989 were unaware of the limitations that would be imposed on their ability to obtain ISO service. In other words, reasonable jurors could find that customers bought Xerox copiers at a time when it was reasonable for them to expect – either because of the exceptions in Xerox's 1984 policy or Xerox's failure to enforce that policy – that they could obtain low-cost, reliable, third-party service, only to later find – because of Xerox's 1989 change in policy or decision to start enforcing its earlier policy – that reliable service could not be obtained from those third-parties. Summary judgment on this ground is, therefore, unwarranted.

## III.    Conclusion

Xerox's motion for summary judgment (doc. # 76) is DENIED. CCS's motion for summary judgment (doc. # 88) is DENIED.

It is so ordered.

Dated at Bridgeport, Connecticut, this 2nd day of September 2005.

    /s/ Stefan R. Underhill
        Stefan R. Underhill
        United States District Judge